Page 1

1            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
2                      ATLANTA DIVISION
3
4    LUKAS GOODYEAR, Individually      )
     and on behalf of all others      )
5    similarly situated,              )
                                      )
6           Plaintiffs,               )
                                      )
7        vs.                          ) No. 1:23-cv-05712-TWT
                                      )
8    DELTA AIR LINES, INC.,           )
                                      )
9           Defendant.                )
10
11
12           Videotaped deposition of DEBRA RENEE BARNWELL,
13   taken remotely before NADINE J. WATTS, CSR, RPR, and
14   Notary Public, pursuant to the Federal Rules of Civil
15   Procedure for the United States District Courts
16   pertaining to the taking of depositions, commencing at
17   10:02 a.m. Eastern Daylight Time on the 26th day of
18   March, A.D., 2025.
19
20
21
22
23
24

Page 2

1         There were present at the taking of this
2   deposition the following counsel:
3         (Appeared via videoconference)
          DiCELLO LEVITT, LLP by
4         MR. DANIEL R. FERRI
          MS. MADELINE HILLS
5         10 North Dearborn Street
          Sixth Floor
6         Chicago, Illinois  60602
          (855) 312-9991
7         dferri@dicellolevitt.com
          mhills@dicellalevitt.com
8
             on behalf of the Plaintiffs;
9
          (Appeared via videoconference)
10        SEYFARTH SHAW, LLP by
          MR. SETH FORTIN
11        MS. DANIELLE SHAPIRO
          1075 Peachtree Street NE
12        Suite 2500
          Atlanta, Georgia  30309
13        (404) 885-1500
          sfortin@seyfarth.com
14        dshapiro@seyfarth.com
15           on behalf of the Defendant.
16
17  ALSO PRESENT VIA VIDEOCONFERENCE:
18        Ms. Blaze R. Knott, Delta Air Lines, Inc.
19        Mr. Kevin Duncan, Veritext videographer
20
21
22
23
24

Page 3

1          VIDEOTAPED DEPOSITION OF DEBRA RENEE BARNWELL
2                     TAKEN MARCH 26, 2025
3
4     EXAMINATION BY                                    PAGE
5     Mr. Daniel R. Ferri                                  6
6                          EXHIBITS
7                                                      PAGE
8     BARNWELL DEPOSITION EXHIBIT 1                       25
          DELTA_LG_00000443 - 00000445
9         Metadata and e-mail chain, top
          one from Minfang Long to Renee
10        Barnwell dated 5-13-21
11    BARNWELL DEPOSITION EXHIBIT 2                       33
          DELTA_LG_00000463
12        Excel spreadsheet
13    BARNWELL DEPOSITION EXHIBIT 3                       35
          DELTA_LG_00000654 - 00000657
14        Metadata and e-mail chain, top
          one from Ravi Vanmali to John
15        Early dated 11-16-17
16    BARNWELL DEPOSITION EXHIBIT 4                       46
          DELTA_LG_00000709 - 00000713
17        Metadata and e-mail chain, top
          one from Cheryl Gray to Minfang
18        Long dated 7-6-21
19    BARNWELL DEPOSITION EXHIBIT 5                       51
          DELTA_LG_00000792 - 00000793
20        Metadata and e-mail from
          Dan Hampton to Cheryl Gray
21        dated 9-22-21
22    BARNWELL DEPOSITION EXHIBIT 6                       55
          DELTA_LG_00004728 - 00004729
23        Metadata and e-mail from Pamela
          Joki to Cheryl Gray dated 3-1-22
24

Page 4

1                    EXHIBITS (Continued)

2                                                    PAGE

3   BARNWELL DEPOSITION EXHIBIT 7                      70

        DELTA_LG_00004859 - 00004862

4       Metadata and e-mail chain, top

        one from Todd Miranda to Philip

5       Higgins dated 1-14-22

6   BARNWELL DEPOSITION EXHIBIT 8                      73

        DELTA_LG_00000312 - 00000343

7       Metadata and Hours of Work, Overtime

        Shift Differential

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1      THE VIDEOGRAPHER:  Good morning.  We are going on

2   the video record at 10:02 a.m. on March 26th, 2025.

3           Here begins the virtual video-recorded

4   deposition of Ms. Renee Barnwell taken on behalf of the

5   plaintiffs in the case matter of Lukas Goodyear, et al.

6   versus Delta Air Lines, Inc., filed in the U.S. District

7   Court, for the Northern District of Georgia, Atlanta

8   Division, bearing Case No. 1:23-cv-05712-TWT.

9           My name is Kevin Duncan, and I am a legal

10  videographer representing Veritext Legal Solutions.  The

11  court reporter today is Ms. Nadine Watts.

12          Counsel, will you please identify yourselves

13  and affiliations, starting with the noticing party.

14      MR. FERRI:  Good morning, Dan Ferri on behalf of the

15  plaintiff and the proposed class.

16      MR. FORTIN:  Yes, good morning, this is Seth Fortin

17  from Seyfarth Shaw on behalf of defendant Delta Air

18  Lines.  Also in the room with me is Blaze Knott, inhouse

19  counsel for Delta Air Lines, and the witness Renee

20  Barnwell.

21      THE VIDEOGRAPHER:  Thank you, Counsel.  Will the

22  court reporter please administer the oath.

23          (Witness sworn).

24      THE VIDEOGRAPHER:  Thank you.  You may proceed.

1              DEBRA RENEE BARNWELL,

2     called as a witness herein, having been first duly

3     sworn, was examined upon oral interrogatories and

4     testified as followed:

5                        EXAMINATION

6                     by Mr. Ferri:

7        MR. FERRI:  Q   Good morning, Ms. Barnwell.

8        A    Good morning.

9        Q    Please state your full name for the record.

10       A    Debra Renee Barnwell.

11       Q    And what's your address?

12       A    ████████████████████████ Wake Forest, North

13    Carolina ██████.

14       Q    And do you work out of North Carolina?

15       A    I do.

16       Q    Do you work in an office or do you work from

17    home?

18       A    I am a remote employee.

19       Q    How long have you lived in North Carolina?

20       A    All my life.

21       Q    And do you work with a group of other employees

22    at Delta in North Carolina?

23       A    No, I work with a group in Atlanta.

24       Q    And you work for Delta, correct?

Page 7

1      A    Correct.

2      Q    When did you start at Delta?

3      A    January 14th, 1985.

4      Q    What was your first position at Delta?

5      A    I was a clerk typist at Raleigh-Durham Airport.

6      Q    And -- Well, how long did you hold that

7   position?

8      A    I was in airport customer service for 25 years.

9      Q    Okay.  So that would take us to -- I guess what

10   year would that take us to?

11     A    2009.

12     Q    And then you stayed at Delta after that; is that

13   right?

14     A    Correct.

15     Q    What was your next role?

16     A    I was a contractor in Human Resources.

17     Q    What was your -- What were your responsibilities

18   as a contractor in Human Resources?

19     A    I worked with the development and testing of

20   various time and attendance systems.

21     Q    Can you explain that a little bit?

22     MR. FORTIN:  Objection, form.

23     THE WITNESS:  My role was to convert from a manual

24   process into using some computer systems.

```
 1      MR. FERRI:  Q   What computer systems?

 2      A   The first one was MPS.

 3      Q   What is MPS?

 4      A   Manpower System.

 5      Q   What does that do?

 6      A   It is a time and attendance system.

 7      Q   What does a time and attendance system do?

 8      A   It takes inputted information and calculates

 9   time.

10      Q   I think I know what you mean.  Can you just

11   explain that a little more?

12      A   It takes entries either from a time clock or a

13   manual entry and it consolidates information and

14   provides to our Payroll Department.

15      Q   Provides hours worked by employees to the

16   Payroll Department; is that right?

17      A   That would be correct.

18      Q   And what other systems -- You mentioned systems,

19   plural.  What other systems besides MPS were you

20   referring to, if any?

21      A   I worked with a system called WorkBrain.

22      Q   And what's WorkBrain?

23      A   WorkBrain, again, was a time and attendance

24   system, an input system, that took the hours and
```

Page 9

1    provided it to Payroll.

2        Q    Is WorkBrain still in use at Delta?

3        A    It is not.

4        Q    How long -- Or I should ask, was that used at --

5    was that in use at Delta at one point?

6        A    Yes, it was.

7        Q    And when was that?

8        A    I don't know the exact dates.

9        Q    Just approximately.

10       A    2012 through 2015.

11       Q    Besides MPS and WorkBrain, are there any other

12   systems that you worked with in this role as a

13   contractor?

14       A    MyTime.

15       Q    Let me take one step back.  How long were you in

16   this role as a contractor with HR?

17       A    11 years.

18       Q    So from 2009 to 2020; is that right?

19       A    Correct.

20       Q    Okay.

21       A    '21, I'm sorry.

22       Q    No problem.

23       A    '21.

24       Q    Okay.  And besides MPS, WorkBrain, and MyTime,

Page 10

1   anything else?

2       A    We can go --

3       MR. FORTIN:   Object to form.

4       THE WITNESS:   We can go way back to EPIS.

5       MR. FERRI:   Q   Well, maybe we don't need to.

6   What -- How long was that used for?  Or what years was

7   that in use?  Was it likely before --

8       A    It was way before.   In the late -- or, excuse

9   me, early '90s.

10      Q    Okay.   Yeah, we don't need to talk about that I

11  don't think.

12           All right.   So besides EBIS -- Maybe spell that

13  for the court reporter.

14      A    E-P-I-S.

15      Q    Okay.   Besides MPS, WorkBrain, and MyTime, EBIS

16  or EPIS, was there anything else?

17      MR. FORTIN:   Object.

18      THE WITNESS:   Other than working with manuals, the

19  manual flat files, no.

20      MR. FERRI:   Q   Were MPS, WorkBrain, and MyTime

21  alternatives?  You know -- I guess, yeah, let me ask --

22  put it this way.   Were they alternatives to each other?

23      A    I'm not sure what you mean by alternatives.

24      Q    Yeah, that's a bad way of putting it.   That's a

Page 11

1    bad question.

2              When was -- Let me ask it this way.  When was

3    or how long has MPS been in use at Delta?

4        A    I don't know the exact year, but for years.

5        Q    Still in use, correct?

6        A    Correct.

7        Q    All right.  And it was in use prior to 2017,

8    correct?

9        A    Yes.

10       Q    And how about MyTime, is that still in use at

11   Delta?

12       A    Yes.

13       Q    And when was -- when did Delta begin using

14   MyTime?

15       A    2016 I believe.

16       Q    And why does Delta -- Well, let me step back.  I

17   asked about MPS.  What is MyTime generally?

18       A    Again, it is a time system with inputs that put

19   hours together and send to Payroll.

20       Q    Why does Delta use both MPS and MyTime?

21       A    Because that's just the systems that certain

22   divisions have elected to use.

23       Q    Okay.  Do they -- do they differ in any

24   significant way?

Page 12

1      MR. FORTIN:  Object to form.

2      THE WITNESS:  Well, yes, they do differ in process

3  of inputs, but the end results is the same.

4      MR. FERRI:  Q   Okay.  When you say process of

5  inputs, what do you mean?

6      A   MPS takes time clocks, as MyTime does as well,

7  but they're just different usage from different

8  divisions.

9      Q   Can you just expound on that a little bit more

10  in sort of how they differ and how they process certain

11  exact, you know, inputs?

12      A   It's hard to articulate.

13      Q   Sure.  Take your time.

14      A   MPS is a system that takes punches in and it

15  creates -- If there are errors, a timekeeper has to go

16  in and make corrections.  They're just different

17  programs in terms of just the different divisions that

18  use.

19      Q   Why would some divisions use MyTime and some

20  divisions use MPS?

21      A   MyTime is much more accessible, in terms of

22  employee or leaders can get to MyTime, where MPS is not

23  Internet associated and, therefore, the employees can

24  only get to MPS from a Delta computer.

Page 13

```
 1      Q   Does the way overtime is paid to employees
 2  differ in any way regarding -- whether the division is
 3  using MPS or using MyTime?
 4      A   Neither -- Let me see.  No.
 5      Q   All right.  So stepping back out, you were in a
 6  contractor role with Human Resources up until 2021,
 7  right?
 8      A   Correct.
 9      Q   And then you stayed with Delta after that,
10  correct?
11      A   I was rehired by Delta, yes.
12      Q   Okay.  And what was your role at that point?
13      THE WITNESS:  Excuse me, we're having computer
14  issues.
15      MR. FERRI:  Oh.
16      MR. FORTIN:  Sorry, Dan, just a second.  There is a
17  pop-up window, but we fixed it.
18      MR. FERRI:  Got to watch out for those.
19      THE WITNESS:  Yeah.
20      MR. FERRI:  Q   So, yeah, in 2021 what was your
21  role?
22      A   Senior HR coordinator.
23      Q   Is that the position you currently hold?
24      A   Yes.
```

Page 14

1      Q    And is that within a group, a division, a

2  department at Delta, within Delta?

3      A    Within Time & Attendance within the HR.

4      Q    So is Time & Attendance, is that a group, a

5  division, a department?  How would you characterize

6  that, or how does Delta characterize it?

7      A    It is a group within HR.

8      Q    And is HR a department, a division, a group?

9  How does Delta characterize that?

10     A    HR is the division.

11     Q    And what -- what does the Time & Attendance

12  group -- Strike that.

13          Just generally, what are the responsibilities

14  of the Time & Attendance group?

15     A    We address employee concerns, we look at

16  schedules, we assist with liability balances for

17  employees in the company.

18     Q    That was important.  What do you mean by

19  liability balances?

20     A    Liability, your vacation, your paid personal

21  time.  We help monitor those quotas within the system.

22     Q    What system?

23     A    MyTime, MPS.

24     Q    Okay.  And then MyTime and MPS, they feed into

Page 15

1  the payroll system; is that right?

2      A   Correct.

3      Q   Do you have responsibility for that payroll

4  system or is that a separate group?

5      A   Separate group.

6      Q   Okay.  The Time & Attendance group, does that --

7  do you have responsibilities for all of Delta employees

8  or a subset of Delta employees?

9      A   We are corporate time and attendance.  So we

10  work with multiple groups in multiple divisions.

11      Q   Is there any divisions within Delta or groups

12  within Delta that you don't have any responsibility for?

13      A   I have no responsibility for pilots.  Don't

14  touch pilots.

15      Q   Okay.  So pilots are kind of doing their own

16  thing at Delta, right?

17      A   Correct.

18      MR. FORTIN:  Object to form.

19      MR. FERRI:  Q   Yeah.  So besides pilots, is

20  there -- Well, let me just cut to the chase perhaps.

21  Are you familiar with the term ground non-contract

22  employees?

23      A   Yes, sir.

24      Q   Does Time & Attendance have responsibility for

Page 16

1    all ground non-contract employees?

2        A    Yes.

3        Q    Is the Time & Attendance group located in

4    Atlanta primarily?

5        A    The office is here in Atlanta, yes.

6        Q    How about Payroll, are they primarily located in

7    Atlanta?

8        A    I don't know.

9        Q    Sure.  Do you report to somebody within the

10   Time & Attendance group?

11       A    Yes.

12       Q    Who is that.

13       A    Allison Bryant.

14       Q    What's her role?

15       A    She's the manager of Time & Attendance, one of

16   several.

17       Q    Okay.  What's -- what's her particular

18   managerial role compared to her fellow managers?

19       A    Our team is divided basically for

20   responsibilities, and she manages one of those towers

21   within the group.

22       Q    What tower is that?

23       A    Employee movement.

24       Q    Say again, I'm sorry.

1      A    Employee movement.

2      Q    What are the -- And is she in Atlanta?

3      A    She's based here in Atlanta.

4      Q    What are the other towers within the Time &

5   Attendance group?

6      A    One tower -- one tower handles reporting and

7   training and one tower handles more day-to-day entry

8   issues.

9      Q    When you say entry issues, what do you mean?

10     A    If a timekeeper is having a problem with any

11  time system, our team will assist.

12     Q    So there's employee movement tower, there's

13  training, entry issues, and I think you said -- The

14  fourth one I missed.

15     A    No, it's reporting and training.

16     Q    Okay.  Is there a fourth tower or more?

17     A    No, sir.

18     Q    What's employee movement do?

19     A    We are more involved with issues with liability

20  and balances.  We handle final payouts of employees that

21  retire or terminate.  We do a lot of testing of the

22  system.  If there's upgrades or changes, we do the

23  testing.

24     Q    What does reporting and training do?

Page 18

1    A    Prepares reports and trains.

2    Q    Sure.  I guess who does it train?

3    A    It trains timekeepers and it trains leaders.

4    Q    What's a timekeeper?

5    A    A designated person that is responsible for that

6    location's inputs and processes of time.

7    Q    What kind of reports does it prepare?

8    A    There are a lot of reports that are compliance

9    reports that they prepare.  If leaders need to know any

10   history on employees or a group, they prepare that

11   information.

12   Q    Are the leaders of all these towers based in

13   Atlanta?

14   A    The managers in Time & Attendance are in

15   Atlanta, yes.

16   Q    What other groups besides Time & Attendance are

17   within the HR division?

18   A    There are multiple groups.  There's Data

19   Management.  There's Systems Ops.  There's Talent

20   Acquisition.  There's Human Resource HR VPs.  I'm sure

21   there's many more that I'm not aware.

22   Q    What are your responsibilities as a senior HR

23   coordinator?

24   A    My day-to-day responsibilities are to answer any

Page 19

1    ServiceNow questions that come in from either leaders or
2    employees, and then I have some additional
3    responsibilities.
4        Q   So I used the term ground non-contract employees
5    before.  You said you knew what I was talking about
6    there, right?
7        A   Yes, sir.
8        Q   And what -- Can you sort of define what those
9    employees are within Delta?
10       A   A ground non-contract employee is anyone that's
11   position is essentially on the ground, they're not a
12   flight crew.  They do not fly in the airplanes or fly
13   airplanes.
14       Q   And how many approximately -- to your
15   understanding, approximately how many employees at Delta
16   are ground non-contract employees?
17       A   I have no idea on the number.
18       Q   Sure.  Would you guess that it's over a
19   thousand?
20       A   Yes.
21       Q   Okay.  And are all ground non-contract employees
22   full time?
23       A   No.
24       Q   How -- What percentage of them approximately is

Page 20

1    full time or part-time?

2        A    I have no idea.

3        Q    Who would know that?

4        A    I have no idea.

5        Q    Is it fair to say somebody would probably be

6    able to give me an answer to that?

7        A    I would assume someone would be able to provide

8    that answer, but not me.

9        Q    Sure.  Is it fair to say there's over more than

10   a thousand full-time ground non-contract employees at

11   Delta?

12       A    Absolutely.

13       Q    And more than 10,000?

14       A    Absolutely.

15       Q    Has that been consistent over the last say seven

16   or eight years?

17       A    I have no idea.

18       Q    I'll ask a question better.  Is it fair to say

19   that over the last seven or eight years on any given

20   year there's probably more than 10,000 full-time ground

21   non-contract employees at Delta?

22       A    That would be my guess.

23       Q    Any reason to think that's not the case?

24       A    No.

Page 21

1      Q    Now, of these ground non-contract employees, are

2   some of them on a regular schedule and some on an

3   irregular schedule?

4      A    Yes.

5      Q    Just so we can have sort of -- make sure we're

6   on the same page, what is a regular schedule basically

7   within Delta?

8      A    A regular schedule is defined as eight hours a

9   day, five days on, two days off, or 10 hours a day, four

10  days on, three days off.

11     Q    And how about an irregular schedule?

12     A    An irregular schedule is a number of different

13  combinations of hours and days off and rotations.  So

14  anything outside of a regular schedule would be

15  considered an irregular schedule.

16     Q    Are most ground non-contract employees on a

17  regular or an irregular schedule?

18     A    I would say most are on a regular schedule

19  within certain divisions and others are on irregular

20  schedules in other divisions.

21     Q    Is there a significant number of employees who

22  are on a regular schedule -- Let me ask -- I'll just

23  give you numbers.  Would you say there's more than a

24  thousand employees on a -- a thousand ground

```
 1   non-contract employees on a regular schedule?
 2        A    I would assume so, yes.
 3        Q    And is there more than a thousand ground
 4   non-contract employees on an irregular schedule?
 5        A    I would assume, yes.
 6        Q    Do pay periods differ between people on regular
 7   and irregular schedules?
 8        MR. FORTIN:  Object to form.
 9        THE WITNESS:  We have two types of pay periods.  We
10   have biweekly and we have semi-monthly.
11        MR. FERRI:  Q   Okay.  So this is something I think
12   I was going to get into with a document in a little bit,
13   but why don't we just ask it now.
14             Can you explain -- Well, what's a -- Can you
15   explain how those pay periods differ?
16        A    Semi-monthly is two paychecks a month.  Biweekly
17   is a paycheck every two weeks.
18        Q    Okay.  And does whether somebody gets a biweekly
19   or a semi-monthly paycheck depend on whether they are a
20   regular or irregular scheduled employee?
21        A    No.
22        Q    Okay.  So, in other words, amongst the
23   irregularly scheduled, with an I, employees, some may be
24   biweekly and some may be semi-monthly; is that correct?
```

Page 23

1    A    Correct.

2    Q    And the same is true for regularly, with an R?

3    A    Correct.

4    Q    And there isn't another pay period for

5    irregularly scheduled -- another type of pay period for

6    irregularly scheduled employees, is that right, with an

7    I?

8    A    That's the only two pay periods for our active

9    employees that we use, biweekly and semi-monthly.

10   Q    Are the majority -- Well, that's a bad way of

11   putting it.

12        Are there more than -- To your understanding,

13   are there more than a thousand ground non-contract

14   employees working in the state of Georgia for Delta?

15   A    I have no idea how many are in Georgia.

16   Q    Okay.  I mean, how big is Delta's operation in

17   Georgia?

18   A    It's huge, but I have no idea what you mean by

19   how big.

20   Q    Well, what do you mean by huge?

21   A    It's a hub operation.  So, yes, there are a lot

22   of employees, but I have no idea how many.

23   Q    And of those, would a lot be on a regular

24   schedule?

Page 24

```
 1      A   I don't know.

 2      Q   Any reason to think that it would not be -- that

 3 many of them would not be on a regular schedule?

 4      A   Again, I can't tell you how many are on regular

 5 schedules or how many on irregular schedules.  I do not

 6 know.

 7      Q   How often do you come to Georgia for work?

 8      A   Not often.

 9      Q   Once a year even?

10      A   No, probably three to four times a year.

11      Q   Okay.  And where is Delta's headquarters within

12 Georgia?

13      A   Atlanta, Georgia.

14      Q   Okay.  Is it like a campus or how is it set up?

15 Or is it a building or is it sort of like -- sort of an

16 office campus?

17      A   Well, there is a general office.  There is a

18 huge airport.  There's technical operations.  There is

19 reservations.  So we're kind of spread around.

20      Q   Okay.  A lot of employees are there, right?

21      A   I would assume so, yes.

22      Q   I'm going to introduce a document, so bear with

23 me while I try and do that.

24          We are just numbering them by deposition,
```

Page 25

1   right, like starting with 1 here?

2       MR. FORTIN:  Yeah, I think we started over every

3   time.

4       MR. FERRI:  Yep.

5       MR. FORTIN:  And, Renee, he's going to show you a

6   document in that window over there.

7       THE WITNESS:  Okay.

8       MR. FERRI:  Q   All right.  I just introduced an

9   exhibit which will be Barnwell Exhibit 1 with the Bates

10  No. ending in 00443.

11              (Document marked as Barnwell Deposition

12              Exhibit 1 for identification.)

13      Q   Please let me know when you're able to see that

14  document.

15      A   I can see it now.

16      Q   And can you tell me what this document is?

17      A   No, not without reading it.

18      Q   Sure.  Well, why don't you take a minute to --

19  You know, read the first page at least.

20      MR. FORTIN:  And, Dan, I'm sorry, I'm just going to

21  talk to the witness a second about viewing.

22              Do you want to make it larger?  Would you like

23  me to do --

24      THE WITNESS:  Yeah.  No, I'm good -- I'm good here.

Page 26

1    I'm just --

2         MR. FORTIN:  Sorry for the interruption.

3         THE WITNESS:  Okay.  I completed reading.

4         MR. FERRI:  Q    Thank you.  If you can go down to

5    the bottom of the first page of e-mails there, do you

6    see an e-mail from Minfang Long to yourself on May 12th,

7    2021?

8         A    Yes.

9         Q    Okay.  And who is Minfang Long?

10        A    She is an HR VP.

11        Q    Is she within the Time & Attendance group?

12        A    No.

13        Q    What group is she in?

14        A    She is a Human Resource manager, a business

15   partner.

16        Q    What's that mean?

17        A    She works with various departments and/or

18   divisions as the HR manager.

19        Q    Doing what?

20        A    Addressing any issues with leaders and/or

21   employees.

22        Q    Okay.  Is she out of Atlanta?

23        A    I assume, but I don't know.

24        Q    Sure.  Okay.  In this e-mail from Ms. Long to

Page 27

1    yourself, do you see the second sentence where it says,

2    I recently joined Crew Resources team and Krista asked

3    me to follow up with you to review the overtime

4    situation of the Crew Tracking team?  Do you see that?

5        A    Yes.

6        Q    Do you have any idea what in the context of this

7    e-mail she means by the overtime situation for Crew

8    Tracking team?

9        A    I do.

10       Q    What is that?

11       A    I did an overtime/double time reconciliation for

12   Crew Tracking due to some issues during COVID and the 25

13   percent reduced work schedule that Delta implemented.

14       Q    What do you mean by a reconciliation?

15       A    It was an audit.

16       Q    Okay.  And what was the purpose of this

17   particular audit?

18       A    Her tracking did not apply some of the corporate

19   policies and procedures regarding work hours and

20   overtime and double time during our COVID period.

21       Q    What policies or procedures did they not apply?

22       A    They did not apply overtime correctly during

23   this period of time and, therefore, the employees were

24   not paid correctly to policy and procedure.

1    Q   How did they not pay overtime or apply overtime

2    correctly?

3    A   During the COVID year we were directed to reduce

4    schedules by 25 percent.  So employees were working 32

5    hours instead of 40 hours approximately.  This

6    department was not able to meet their work requirements

7    in their operation, and so they offered employees

8    additional shifts, and they did not pay overtime

9    accordingly to those additional shifts.  They paid

10   employees straight time.

11   Q   So tell me if I am understanding this correctly.

12   So during this COVID year, instead of working 40 hours a

13   week, employees in the Crew Tracking Department may have

14   been scheduled for 32 hours a week; is that correct?

15       MR. FORTIN:  Objection, misstates testimony.

16       MR. FERRI:  Q   Well, I want to see -- just sort of

17   walk through this.  So tell me if I'm misstating

18   anything.  We'll take it one step at a time basically.

19   So I can rephrase that question.

20   A   Please.

21   Q   Okay.  So during the COVID year was there a

22   reduction in scheduled work hours for people within this

23   group?

24   A   Yes.

1      Q    But then it turned out that the group, just to

2   complete what needed to be done, needed people to end up

3   working more than their scheduled hours; is that right?

4      A    Correct.

5      Q    And so people within that group started taking

6   on additional hours worked beyond their scheduled hours;

7   is that right?

8      A    Beyond their reduced scheduled hours.

9      Q    And they were not paid overtime for those

10  additional hours worked; is that right?

11     A    Correct.

12     Q    Now, my question I guess is, are you saying that

13  then you determined that they should be paid overtime

14  for those additional hours worked?

15     A    Correct.

16     Q    Because -- So even though the additional hours

17  worked might not have taken them in excess of 40 hours a

18  week, because they were in excess of their reduced

19  scheduled hours, they should have gotten paid overtime

20  is how that got determined; is that right?

21     MR. FORTIN:    Objection, misstates testimony.    Object

22  to form.

23     THE WITNESS:    The Crew Tracking works irregular

24  schedules and we needed to look at each employee's

Page 30

1  schedule and calculate or audit what they were paying

2  for additional shifts.

3      MR. FERRI:  Q   Additional shifts in excess of their

4  reduced scheduled time, right?

5      A   Correct.

6      Q   So I guess what I'm trying to figure out was

7  during this time period was the overtime threshold based

8  on their reduced scheduled hours worked, reduced

9  schedule?

10     A   I'm sorry, ask the question again.

11     Q   Sure.  Maybe I'll take a step back too.  Whether

12 someone gets paid overtime rates or double time rates

13 depends on them having worked a certain amount of hours

14 in a work period; is that right?

15     A   Working their scheduled hours in a work period.

16     Q   Sure.  And during this COVID period that ability

17 to be paid overtime pay or double time pay was based on

18 working their reduced scheduled hours, right, not like

19 their unreduced scheduled hours?

20     A   Before overtime or double time was paid they

21 still had to work their scheduled hours, not reduced

22 scheduled, but their scheduled hours.

23     Q   So -- I feel like maybe we're talking past each

24 other.  I don't want to spend too much time on this, but

Page 31

```
1    I do want to get this clear.  So let me just try and

2    take a different tack.

3           Why were people thinking during this period of

4    time that they did not receive appropriate overtime or

5    double time pay?

6       MR. FORTIN:  Objection, calls for speculation.

7       THE WITNESS:  I don't know.

8       MR. FERRI:  Q   Well, why did you determine that

9    they had not received their appropriate overtime and

10   double time pay?

11      A   We had a complaint.

12      Q   A complaint from whom?

13      A   I have no idea.

14      Q   And what was the nature of that complaint?  Like

15   what were they complaining about?

16      A   I never actually saw the complaint.  So I don't

17   know exactly what they were saying.

18      Q   What was your understanding of the complaint?

19      MR. FORTIN:  Calls for speculation.

20      THE WITNESS:  I don't know.  Again, I never saw the

21   actual complaint.

22      MR. FERRI:  Q   Well, you said there was some

23   corrective -- Like what was the audit addressing?  Let

24   me ask you that.
```

Page 32

1       A    The audit?  We took multiple pay periods, we

2    took every employee individually, we reviewed what they

3    were scheduled to work, what they did work, were they

4    taking vacation or liability time.  We just looked at

5    each individual person to determine if they had been

6    paid in accordance with our policy.

7       Q    And when you say what were they scheduled to

8    work, do you mean the reduced schedule during COVID or

9    do you mean a normal pre-COVID schedule?

10      A    A normal pre-COVID schedule, because this

11   department was allowed to go back and I believe they

12   were granted exception to work full time.

13      Q    Okay.  Okay.  And why had the department not

14   paid overtime pay or double time pay in accordance with

15   policy during this period?

16      MR. FORTIN:  Objection, calls for speculation.

17      THE WITNESS:  I don't know what they were thinking.

18      MR. FERRI:  Q   How did they not pay it correctly?

19      MR. FORTIN:  Object to form.

20      THE WITNESS:  I don't know how to answer how.

21      MR. FERRI:  Q   Sure.  In what way did they deviate

22   from the appropriate procedure of paying overtime?

23      A    I don't know how they deviated.

24      Q    Well, you're saying they didn't -- You said

Page 33

1    that -- And correct me if I'm wrong.  I don't want to

2    put words in your mouth.  But you said that they did not

3    pay overtime in accordance with the policies and

4    procedures, right?

5        A    Correct.

6        Q    Okay.  In what way did they not?

7        A    When they allowed an employee to pick up the

8    shift, they paid it as straight time.

9        Q    And why should it have been paid as overtime or

10   double time?

11       MR. FORTIN:  Objection, form.

12       THE WITNESS:  One, because Delta asked them to pick

13   up shifts, and, two, if it was above their regularly

14   scheduled, then they should have been paid

15   appropriately.

16       MR. FERRI:  Q    Thank you for working through that

17   with me.

18            I'll introduce another exhibit now.  I'm going

19   to introduce what's going to be marked as Exhibit 2.

20   This is a document ending in Bates No. 00463.

21            (Document marked as Barnwell Deposition

22            Exhibit 2 for identification.)

23       Q    Let me know when you can see this please,

24   Ms. Barnwell.

1      A    I can.

2      Q    So this would have been produced as an Excel

3    sheet, so it comes up a little different here in the

4    browser.  But do you have any idea what we're looking at

5    here?

6      A    I believe it is the audit that we conducted.

7      Q    So that audit went back to 2018?

8      A    Let me get it to slide down.  There we go.

9    Actually, I don't -- I don't know what this document is.

10     Q    Okay.  Do you know what EMP NO there is in row

11    3?

12     A    Employee number.

13     Q    And EMP NM?

14     A    Employee name.

15     Q    Do you know where the information on this

16    spreadsheet would have been pulled from, what system?

17     A    I do not.

18     Q    If you go in that row to -- Do you see where it

19    says OT?

20     A    Yes, sir.

21     Q    Is that overtime?

22     A    Yes, sir.

23     Q    DT, is that double time?

24     A    Yes, sir.

1     Q    What about 2S, do you know what that is?

2     A    Second shift.

3     Q    3S?

4     A    Third shift.

5     Q    PPT?

6     A    I'm not seeing that column.

7     Q    Next to 3S, PPT.

8     A    I've got to get the document to slide over.

9  Yes, PPT is paid personal time.

10    Q    Okay.  How about HOL?

11    A    Holiday hours.

12    Q    DOC?

13    A    Docking hours.

14    Q    And S means straight?

15    A    I'm assuming would be straight time hours.

16    Q    Okay.  I'm going to move on to a different

17 exhibit.  I'm introducing Exhibit 3, which is a document

18 ending in the Bates No. 00654.

19         (Document marked as Barnwell Deposition

20         Exhibit 3 for identification.)

21    Q    Please let me know when you can see that

22 document.

23         Can you see that document?

24    A    I do.  I'm reading through this document.

Page 36

1       Q   Sure, please do.

2       MR. FORTIN:  Dan, I see we're coming up on an hour.

3   When you're done with this document, would it be a good

4   time to take a break?

5       MR. FERRI:  That's fine.

6       THE WITNESS:  Okay.

7       MR. FERRI:  Q   All right.  So do you see an e-mail

8   on this page, again, I'm looking at the second e-mail

9   here, it's an e-mail from John Early to Ravi Vanmali and

10  other people, including yourself?

11      A   Yes.

12      Q   This is from November 16th, 2017?

13      A   Correct.

14      Q   Who is Ravi Vanmali?

15      A   I have no idea.

16      Q   All right.  Do you see where John Early says,

17  Ravi, these individuals are all tracked outside of SAP

18  for time right now, we load their OT/DT at the end of

19  pay periods in a lump sum based on data we receive from

20  your team?

21      A   Correct.

22      Q   Do you see where it says, until we can get them

23  recording their time into MyTime on a daily basis, we

24  won't have access to daily OT/DT as it's recorded

Page 37

1    manually?    Is that -- Do you see that?

2        A    Yes, sir.

3        Q    So in 2017 this is when you were in the contract

4    role for HR, right?

5        A    Correct.

6        Q    And you were working on sort of the MyTime and

7    MPS systems around this time; is that right?

8        A    Correct.

9        Q    Does this e-mail sort of relate to your role

10   doing so?

11       MR. FORTIN:  Objection, lacks foundation.

12       MR. FERRI:  Q    Not a great question.  I could ask

13   it, or something else.  So let me ask a new question.

14            When Mr. Early says we load their OT/DT at the

15   end of pay periods as a lump sum based on data we

16   receive from your team, do you know -- would you know

17   what he means by that?

18       MR. FORTIN:  Objection, calls for speculation.

19       THE WITNESS:  This group was manually tracked.  They

20   were not in a time and attendance system.

21       MR. FERRI:  Q    And for people who were manually

22   tracked, how did Delta keep track of the amount of hours

23   that they worked?  Or let me ask it a different way.

24   Strike that.

Page 38

1          Looking at this word "load" here in this

2    document, how did -- how was manually tracked time

3    loaded into a system at Delta?

4        A    The department would send us a spreadsheet and

5    we would input that information into the SAP system.

6        Q    Is the SAP system a payroll system at this

7    period of time?

8        A    The SAP is the name of the entire HR system.

9    MyTime is part of SAP.

10       Q    So in this period of time, when they were

11   uploading the time into the SAP system, were they

12   loading it into MPS or MyTime?

13       A    No, they were not.

14       Q    Okay.  They were just -- they were uploading it

15   to the system and then that would feed into the payroll

16   system; is that right?

17       MR. FORTIN:  Object to form.

18       THE WITNESS:  Again, SAP is the total system.

19   Everything feeds into SAP.

20       MR. FERRI:  Q    I guess my question is, for the

21   manually tracked time, it was uploaded into the system,

22   right?

23       A    It was uploaded into the SAP system.

24       Q    And it would have been -- then that uploaded

Page 39

```
 1   time would have been used to determine whether somebody

 2   should receive overtime pay; is that right?

 3        MR. FORTIN:  Object to form.

 4        THE WITNESS:  We loaded the information from the

 5   spreadsheet into the system based on the department's

 6   application of Delta policy.

 7        MR. FERRI:  Q   Okay.  So the department was

 8   manually deciding if somebody should be paid overtime or

 9   double time rates at that point; is that right?

10        A    Correct.

11        MR. FORTIN:  I'm sorry.  I'm going to object, lack

12   of foundation.  I don't think we've established what

13   department is involved here.

14        MR. FERRI:  Q   Well, do you see the subject of that

15   e-mail, Ms. Barnwell?

16        A    Yes.

17        Q    Do you see where it says Crew Tracking?

18        A    Yes.

19        Q    Do you understand that you're referring to the

20   Crew Tracking Department?

21        A    Yes.

22        Q    So at that point in time the Crew Tracking

23   Department was sort of determining the -- Strike that.

24             At that point in time Crew Tracking was
```

Page 40

1    determining whether somebody should be paid OT or double
2    time for a given shift manually; is that right?
3        A    Correct.
4        Q    Are you thinking or did you not hear my
5    question?
6            Okay.  At that -- I can ask it again.  At that
7    point in time there were individuals making their own
8    determinations in the Crew Tracking Department about
9    whether a given shift should be paid at OT or DT; is
10   that right?
11       A    Again, correct.
12       Q    Okay.  And at some point Crew Tracking
13   transitioned to MyTime; is that right?
14       A    Correct.
15       Q    And then at that point the determination of
16   whether a shift should be paid overtime or double time
17   rates was determined automatically, correct?
18       A    Correct.
19       Q    Who in the Crew Tracking Department was making
20   that determination about whether a shift should be paid
21   at overtime or double time rates?
22       A    I don't know.
23            Did you not hear my answer?
24       Q    I heard you say I don't know.  I was just

```
                                                    Page 41
 1    looking at --

 2         A    Okay.

 3         Q    -- a document.

 4              Did you want to take a break now?

 5         MR. FORTIN:   I guess if she needs a break.

 6         THE WITNESS:   Yeah.

 7         MR. FORTIN:   Yeah, we'll take a break now.

 8         MR. FERRI:   Okay, cool.   And I think we're moving

 9    along pretty well here in general.

10         THE VIDEOGRAPHER:   Please standby.   We are going off

11    record at 11:06 a.m.

12              (Recess was taken.)

13         THE VIDEOGRAPHER:   We are back on record at 11:19

14    a.m.   You may proceed.

15         MR. FERRI:   Q    So before our break, Ms. Barnwell,

16    we were talking about the Crew Track -- the Crew

17    Tracking team calculating overtime and double time

18    manually.   Do you remember that?

19         A    Yes, sir.

20         Q    And before that we were talking about a time I

21    think that was more closer to 2021 when they had

22    deviated from Delta policies and procedures in how they

23    calculated overtime and double time.   Do you recall

24    that?
```

1     A    It was not '21.  It was 2020.

2     Q    Okay.  But there was a point at which they were

3    not aligning with Delta's policies and procedures in how

4    they were manually tracking overtime and double time; is

5    that right?

6     A    Correct.

7     Q    Where are the Delta policies and procedures that

8    govern how overtime and double time are supposed to be

9    paid stored?

10     A    The HR policies are located on DeltaNet.

11     Q    And that tells the people who are in charge of

12    calculating overtime/double time manually in the past

13    how they should be doing so; is that right?

14     A    They are --

15    THE REPORTER:  Mr. Fortin, if you were saying

16    something, it didn't come through.

17    MR. FORTIN:  I'm sorry, I just said objection to

18    form.

19    MR. FERRI:  Q   You can answer.

20     A    The policies are there for both employees and

21    leaders to review.

22     Q    Do leaders, with respect to calculating payment

23    for overtime or double time, receive training on those

24    policies?

Page 43

1        A    If they request it.

2        Q    And if they request it, who would give that

3   training?

4        A    In today's environment, it would be part of our

5   training team.

6        Q    How about in the -- in the 2017 time period?

7        A    I'm not sure who would have provided the

8   training.

9        Q    Are you aware of training ever -- Are you aware

10  of any instances in which training was provided in how

11  overtime and double time should be paid by people who

12  were doing manual -- the teams who were doing manual

13  calculation of that?

14       MR. FORTIN:  Object to form.

15       THE WITNESS:  I am not.

16       MR. FERRI:  Q    So, to your knowledge, are they just

17  supposed to just sort of read the document and figure it

18  out or what?

19       MR. FORTIN:  Object to form.

20       THE WITNESS:  We will be happy to help them if they

21  ask for the help.

22       MR. FERRI:  Q    But otherwise they're supposed to

23  look at the documents on DeltaNet and decide how to do

24  it; is that right?

Page 44

1      MR. FORTIN:  Object to form, misstates testimony.

2      THE WITNESS:  Do I still answer?

3      MR. FORTIN:  Yeah, you can answer if you understand

4   the question.

5      THE WITNESS:  Yeah, I would like you to repeat the

6   question please.

7      MR. FERRI:  Q    Sure.  What I'm trying to just get

8   an understanding of is when people, like in Crew

9   Tracking, at one point were making manual determinations

10  as to when overtime and double time rates should be

11  paid, what guidance do they receive in making those

12  determinations for Delta?

13     A    Again, looking at the policy and the examples in

14  the policy.

15     Q    Are you familiar with the Hours of Work

16  document?

17     A    Yes.

18     Q    Okay.  Would that be the policy you're referring

19  to?

20     A    Yes.

21     Q    And are you aware of instances when people who

22  were in charge of making these manual determinations

23  were found by others in Delta not to have made them

24  consistent with the Hours of Work document?

Page 45

1       MR. FORTIN:  Object to form, calls for speculation.

2       THE WITNESS:  I am not.

3       MR. FERRI:  Q   What about in that 2020 period with

4   Crew Tracking, the time of the audit, were they acting

5   consistent with the Hours of Work document then?

6       MR. FORTIN:  Object to form.

7       THE WITNESS:  Because of the complaint, we chose to

8   do a complete audit to validate whether people were paid

9   correctly or not.

10      MR. FERRI:  Q   And did you find some instances

11  where people were not paid correctly?

12      A   Yes.

13      Q   And would that have been because the person in

14  charge of calculating overtime was not acting

15  consistently with the Hours of Work document?

16      A   I don't know what was the reason beyond the

17  department was paying straight time.  I don't know the

18  reason.

19      Q   Okay.  I'm going to introduce another document

20  here.  Oh, let me -- before I do, let me ask you this.

21  How many groups within Delta are still doing this sort

22  of manual time entry?

23      A   I believe there's only four.

24      Q   And which groups are those?

1      A    I can't give you the exact department numbers.

2      Q    Can you give me any way to identify any of them?

3      A    Maintenance Control is one.  I don't know what

4  the other departments' names or numbers are.

5      Q    Why are they still doing it manually?

6      MR. FORTIN:  Objection, calls for speculation.

7      THE WITNESS:  I have no idea.

8      MR. FERRI:  Q   Do you know who would know the

9  answer to that question?

10      A    I would assume leadership.

11      Q    Anybody particular within leadership?

12      A    Potentially John Early.

13      Q    Anybody else?

14      A    Not off the top of my head that I'm aware of.  I

15  don't know names.

16      Q    I'm going to introduce what's marked as Exhibit

17  4.  It's a document ending in Bates No. 00709.

18          (Document marked as Barnwell Deposition

19          Exhibit 4 for identification.)

20      Q    Please take a look at that document,

21  Ms. Barnwell, when it's available to you.

22          Have you had a chance to look at this document?

23      A    I am -- Yes, I am at the top.  Yes.

24      Q    Yeah.  Do you see the first e-mail here from

Page 47

```
1    Cheryl Gray to Minfang Long?

2        A    On which date?

3        Q    July 6th, 2021 at 4:43 p.m.

4        A    Yes.

5        Q    You're copied on that e-mail, correct?

6        A    Yes.

7        Q    And the subject of the e-mail mentions Crew

8    Tracking.  Do you see that?

9        A    Yes.

10       Q    And do you understand this to refer to the Crew

11   Tracking group?

12       A    Yes.

13       Q    And at some point the Crew Tracking group was

14   transitioned into MyTime time and attendance system; is

15   that right?

16       A    Correct.

17       Q    And why did they do that?

18       A    Our objective was to put everyone that we could

19   in a time and attendance system.

20       Q    And why?

21       A    Again, part of Delta's objective was to have

22   everyone in a system that was doing the calculations and

23   feeding to Payroll.

24       Q    Why was that an objective?
```

Page 48

1      MR. FORTIN:  Objection, calls for speculation to the

2   extent you're asking about Delta objectives.

3      THE WITNESS:  I can't answer that question.

4      MR. FERRI:  Q   Do you have any understanding why

5   that was an objective of Delta?

6      MR. FORTIN:  The same objection.

7      THE WITNESS:  I'm sorry, I don't even understand

8   your question.

9      MR. FERRI:  Q   No problem.  You said that there was

10   an objective of Delta to transition people so that their

11   time was automatically entered into a system, right?

12      A   Correct.

13      Q   So you know that -- you do have an understanding

14   at least that was an objective of Delta, right?

15      A   Yes.

16      Q   So what I'm asking is, do you have any

17   understanding of what -- of why that was an objective of

18   Delta?

19      MR. FORTIN:  Same objection, speculation.

20      THE WITNESS:  Again, that was a decision over my

21   head.

22      MR. FERRI:  Q   Sure.  But do you have --

23   Nevertheless, do you have an understanding of what -- of

24   why that was an objective for Delta?

Page 49

1        MR. FORTIN:  Same objection.

2        THE WITNESS:  In my personal opinion, for

3    consistency.

4        MR. FERRI:  Q   So that all groups were getting paid

5    overtime and double time, for example, consistent with

6    each other?

7        MR. FORTIN:  Objection to form.

8        MR. FERRI:  Q   Well, let me strike that question.

9    What do you mean by consistency?

10       A   Any time that we have everyone in a system

11   that's doing the calculations, applying the policies,

12   and going -- the information going to Payroll, it

13   provides consistent pay.

14       Q   How does the system apply the policies?

15       MR. FORTIN:  Object to form.

16       THE WITNESS:  The system has been coded, and that

17   coding takes the information and applies the rules to

18   time.

19       MR. FERRI:  Q   Have you ever seen that coding?

20       A   I'm not a coder, sir.  No.

21       Q   Sure.  Do you know who did that coding?

22       A   No.  In terms of specifically who did the

23   coding, no.

24       Q   Do you know what group or do you know any --

Page 50

```
 1   yeah, what group might have done the coding?
 2       A    I would assume our Information Technologies
 3   group.
 4       Q    And do you know who would have given them the
 5   directions on how to code it, to code the system with
 6   respect to the calculation of overtime?
 7       MR. FORTIN:   Objection, calls for speculation.
 8       THE WITNESS:   IT is given business requirements
 9   documents, and they code based on the business
10   requirement documents.
11       MR. FERRI:   Q    In this e-mail do you see where it
12   says -- this first e-mail we're looking here at
13   Plaintiff's Exhibit 4, do you see where it says, yes,
14   that is part of the transition from SM to BW?
15       A    Yes.
16       Q    Do you know what SM and BW mean from this
17   context?
18       A    Semi-monthly to biweekly.
19       Q    And did the transition to MyTime affect whether
20   people were paid semi-monthly or biweekly?
21       A    It didn't -- MyTime didn't change their pay
22   frequency unless we transitioned them from semi-monthly
23   to biweekly.   But MyTime handles both.
24       Q    And I think we discussed this, but whether
```

Page 51

1   someone's paid semi-monthly or biweekly, does that

2   affect how they are paid overtime?

3        MR. FORTIN:  Object to form.

4        THE WITNESS:  No, it does not.

5             Actually, I'm going to back up just a moment.

6   I want you to ask the question again.

7        MR. FERRI:  What question?

8        THE WITNESS:  The one you just asked me, sir.

9        MR. FERRI:  Ms. Watts, would you mind reading back

10  that question.

11            (Whereupon, the reporter read the following:

12            "Q  And I think we discussed this, but whether

13             someone's paid semi-monthly or biweekly, does

14             that affect how they are paid overtime?")

15       THE WITNESS:  Okay.  Thank you.  I stick with my

16  answer.

17       MR. FERRI:  Q   Thank you.  I appreciate the --

18  We're looking for clarity here.  So that's all good.

19            I'm going to introduce another exhibit here.

20  This will be Exhibit 5, a document ending in Bates

21  No. 00792.

22            (Document marked as Barnwell Deposition

23             Exhibit 5 for identification.)

24       Q   Do you see this document?

A I'm looking through it, sir.
Q Yes, please.
A Okay.
Q Do you see this e-mail from Dan Hampton to a number of people, including yourself, on September 22nd, 2021?
A I do.
Q Do you understand this to generally refer to the transition to -- from departments, including Crew Tracking, to the MyTime system?
A Yes.
Q Just in case, do you know which departments Department 008 and 061 are?
A One is Crew Tracking and one is -- I don't know what the other one is technically called.
Q Generally what is it; do you know?
A They both involve pilots' scheduling and Crew Tracking.
Q Okay. And in this e-mail from Mr. Hampton, he says he has a few questions for the coordinators. Do you see that?
A I do.
Q And in the first question, I'll read it, it says, if a coordinator swaps all scheduled shifts to

Page 53

1    another coordinator during a single pay period, but then

2    picks up a shift from an extra time bid that was on a

3    regular scheduled day off, how will that shift be paid.

4    Do you see that?

5        A    I do.

6        Q    Do you understand what he's asking there?

7        MR. FORTIN:  Objection, calls for speculation.

8        MR. FERRI:  Q    Let me ask it this way.  Does that

9    question make sense to you?

10       A    It does.  And they're asking if an employee

11   swaps away -- I'm assuming that's where I say swaps

12   away -- all of their shift during a scheduled week and

13   then picks up extra shifts, they're asking if he would

14   be paid -- or they're asking how the shift would be

15   paid.

16       Q    And would that shift be paid differently after

17   the transition to MyTime than it would have been before

18   the transition to MyTime?

19       MR. FORTIN:  Objection, lack of foundation, calls

20   for speculation.

21       THE WITNESS:  I do not know how they would have paid

22   it prior to.

23       MR. FERRI:  Q    And how would they have paid it

24   after?

Page 54

1       A    It would not pay at overtime.

2       Q    Okay.

3       A    In that specific example it would not pay.

4       Q    Understood.  Do you have any idea why he's

5    asking this question?

6       MR. FORTIN:  Objection, calls for speculation.

7       THE WITNESS:  I believe this group did a tremendous

8    amount of swapping shifts and were very concerned about

9    being paid for hours worked under biweekly pay.

10      MR. FERRI:  Q    Do you understand that they might

11   have been paid overtime rates for this shift that was

12   picked up on a regularly scheduled day off in question 1

13   here prior to the transition to MyTime?

14      MR. FORTIN:  Objection, lacks foundation and calls

15   for speculation.

16      THE WITNESS:  I don't know how it would have been

17   paid before.

18      MR. FERRI:  Q    Is it possible that it would have

19   been paid as overtime by this group before the

20   transition to MyTime?

21      MR. FORTIN:  Same objection.

22      THE WITNESS:  I have no idea.

23      MR. FERRI:  Q    Do you have any reason to think it

24   was not possible?

Page 55

1        A    I -- I think it is possible, but it would have

2    been paid incorrectly.

3        Q    By incorrectly, you mean as overtime pay?

4        A    Potentially, yes.

5        Q    Why do you say that's incorrectly?

6        A    Well, number one, it's a hypothetical.  So

7    without knowing what the schedules -- what the scheduled

8    shifts were and what was swapped off and what was picked

9    up, I cannot answer that question accurately.

10       Q    Sure.  But why do you say incorrectly?

11       A    Again, I don't know without looking at the

12    specific situation.  I can't tell you how it was going

13    to be paid.

14       Q    Bear with me for one second.  I'm going to look

15    to see if I want to introduce another exhibit here.  I'm

16    going to introduce more in time, but.

17            I'm going to introduce what's marked as Exhibit

18    6.  It's a document ending in Bates No. 004728.

19            (Document marked as Barnwell Deposition

20            Exhibit 6 for identification.)

21       Q    Just let me know when you have a chance to look

22    at that document please.

23       THE WITNESS:  Oh, what did I do?

24       MR. FORTIN:  Hang on, we lost the window.

Page 56

```
 1      MR. FERRI:  No problem.
 2      MR. FORTIN:  All right.  We're back.
 3      THE WITNESS:  Let me scroll down.  There we go.
 4      MR. FERRI:  Q   Please take a moment to read that
 5   e-mail there.
 6      A   I have to make this bigger.  Okay.
 7      Q   All right.  Do you see the e-mail here from
 8   Pamela Joki to Cheryl Gray?
 9      A   Yes.
10      Q   And do you see in that e-mail they include some
11   messages, one from a D.R. Barnwell?
12      A   Yes.
13      Q   Does that D.R. Barnwell refer to you?
14      A   That is me.
15      Q   Maybe it's R.D. Barnwell.  I apologize.
16          What are these messages from?
17      MR. FORTIN:  Objection, form.
18      MR. FERRI:  Q   Let me ask it a different way.  What
19   system are these messages created in?
20      A   Well, the e-mail would have been through Outlook
21   and the -- I don't know where these other messages,
22   whether they were Outlook or Teams.  I don't know.
23      Q   Do you use Teams for communication?
24      A   Yes.
```

Page 57

1        Q    Regularly?

2        A    Yes.

3        Q    I want you to look at the second message there

4    please.

5        A    Yes, sir.

6        Q    The one at 8:30 a.m.

7        MR. FORTIN:    Sorry, Dan, are we looking at the

8    second e-mail or the second message?

9        MR. FERRI:    Q    The second message from D.R.

10    Barnwell at 8:30 a.m.    Do you see that?    It starts with,

11    okay, I'll put together a list and send you.

12        A    Yes.

13        Q    It says, Department -- I can't tell if it's an 8

14    or a 6, but Department 8 has not gotten schedules to me

15    yet, but demonstrating at least some of these will help.

16    Please be prepared for lots of swap questions, not just

17    how to input, but how it's going to pay.    They are very

18    concerned about the OT issues.    Do you see that?

19        A    Yes.

20        Q    It goes on, so in reconciling balances, I found

21    that Department 61 allowed holidays from 2021 to be used

22    in 2022.    They, again, are creating their own rules.    So

23    some policy discussion may arise.    Do you see that?

24        A    I do.

1      Q    What do you mean by creating their own rules in

2   the context of this document?

3      A    That was my way of saying they weren't following

4   policy.

5      Q    And would these be the people who were doing the

6   manual determinations of overtime?

7      A    Correct.

8      Q    And so to your understanding there had been

9   discrepancies in how groups in charge of doing manual

10  determinations of overtime made those determinations

11  versus how those determinations are or would have been

12  made in the automated system; is that right?

13     MR. FORTIN:  Objection, misstates testimony.

14     MR. FERRI:  Q   I can rephrase that question.  Is it

15  your understanding that historically there have been

16  discrepancies in the way that people in the manual

17  groups calculated when overtime and double time pay

18  should be paid versus how those same calculations would

19  have been determined in the automated system?

20     MR. FORTIN:  Same objection.

21     THE WITNESS:  Yes, there have been some

22  determinations that things were not paid correctly by

23  manually tracked.

24     MR. FERRI:  Q   Generally speaking, in Delta there's

Page 59

1  weekly overtime and daily overtime; is that right?

2      A   Correct.

3      Q   Are you aware of any discrepancies in how weekly

4  overtime has been calculated?

5      MR. FORTIN:  Object to form.

6      THE WITNESS:  That's a very vague question.

7      MR. FERRI:  Q   Okay.  Let me ask it another way.

8  Do you know -- Do you have any reason -- Or, sorry,

9  strike that.

10          Do you have any understanding at all of the

11  basis for manual groups' determinations of how overtime

12  or double time should be paid that was different from

13  how they would have been paid through the automated

14  systems?

15     MR. FORTIN:  Object to form.

16     THE WITNESS:  Again, manual is a human being making

17  a determination, and a pay system is automatedly --

18  automatically applying the policies and the rules.

19     MR. FERRI:  Q   As coded in there, correct?

20     A   Correct.

21     Q   So stepping out, is it fair to say that there is

22  a policy within Delta for how overtime and double time

23  will be paid, and that's included within this Hours of

24  Work document we talked about?

Page 60

1      MR. FORTIN:  Object to form, misstates testimony.

2      MR. FERRI:  Q   Let me rephrase it because I'm

3   not -- I don't think I was even restating your

4   testimony.  I was basing it on things we discussed, but

5   I wasn't trying to restate any of your testimony.  So I

6   can it more -- I'll break it up a little bit more.

7           Is there a policy, a Delta policy, about how

8   overtime and double time should be calculated?

9      A   Yes.

10     Q   Is that policy within the Hours of Work

11  document?

12     A   Yes.

13     Q   And then there's the practice within Delta as to

14  how hours -- overtime and double time is actually

15  calculated, right?

16     MR. FORTIN:  Object to form.

17     THE WITNESS:  I would say that, again, we try to

18  follow policy.

19     MR. FERRI:  Q   Yes.  But the practice of

20  calculating overtime and double time within Delta has

21  not always, in your understanding, matched the policy;

22  is that right?

23     MR. FORTIN:  Objection to form.

24     THE WITNESS:  That would be correct.

Page 61

1       MR. FERRI:  Q   We talked before about ground

2    non-contract employees generally.  Do you remember that?

3       A   Yes.

4       Q   Do they all have the ability to swap shifts

5    within Delta?

6       MR. FORTIN:  Object to form and calls for

7    speculation.

8       THE WITNESS:  There are -- The answer to the

9    question is, no, not everybody can swap shifts.

10      MR. FERRI:  Q   Who cannot swap shifts?

11      MR. FORTIN:  Object to form and calls for

12   speculation.

13      THE WITNESS:  There are some divisions or

14   departments within divisions and there are some State

15   requirements that prevent it.

16      MR. FERRI:  Q   What states?

17      A   I cannot answer that question, sir.

18      Q   Do you have any idea how many states?

19      A   No, sir.

20      Q   No idea whatsoever?

21      A   No, sir.

22      Q   Can you name a single state?

23      MR. FORTIN:  Objection, asked and answered.

24      MR. FERRI:  Q   You can answer.

Page 62

1      A    No, I cannot.

2      Q    Sure.  Okay.  But you say -- you say some states

3    don't allow swapping.  I'm just trying to understand

4    like are you -- So are you saying, and I'm asking, that

5    there are some states where there's Delta employees who

6    are not allowed to swap shifts?

7      A    My understanding is there are some states that

8    do not allow, but I -- beyond that, I cannot give you

9    specific states.

10      MR. FORTIN:  Yeah, and I'm just going to interpose

11    an objection here.  I feel like we may be asking for a

12    legal opinion.

13      MR. FERRI:  Q   So I'm not asking for what the law

14    of the state may say.  I'm asking whether if there's

15    states where Delta does not allow its employees to swap

16    shifts -- Delta does not allow its employees in those

17    states to swap shifts.  And you're saying, just to be

18    clear, you do not -- you do not -- you cannot identify

19    any such state; is that right?

20      A    That is correct.

21      Q    Okay.  Generally speaking, are most ground

22    non-contract employees in Delta permitted to swap

23    shifts?

24      A    Most are, but not all.

1       Q    Most are, but not all.  Do you have any -- Can

2   you give me any sort of idea of what percentage of them

3   are not allowed to swap shifts?

4       A    No, sir, I cannot.

5       Q    But it's fair to say most are, right?

6       A    Correct.

7       Q    You mentioned I think with respect to Crew

8   Tracking that they were heavy shift swappers; is that

9   right?

10      A    Correct.

11      Q    Do you have any idea how -- when you say heavy

12  shift swappers, like how frequently that means in your

13  understanding?

14      MR. FORTIN:  Objection, calls for speculation.

15      THE WITNESS:  I can't give you a specific.

16      MR. FERRI:  Q   What does heavy mean to you,

17  approximately?

18      MR. FORTIN:  Object to form.

19      THE WITNESS:  Under the semi-monthly pay frequency

20  an employee could swap his entire shifts, all of his

21  shifts off.

22      MR. FERRI:  Q   Did that change with the biweekly?

23      A    What changed is with biweekly they were paid for

24  the hours they worked.

Page 64

1      Q    Can you explain that difference to me please?

2      A    Semi-monthly, they got one-half of their base

3   salary every month -- or, excuse me, every pay period

4   regardless of the hours that they worked in the pay

5   period.  Biweekly is you're paid for the hours you work.

6      Q    But the pay should be the same; is that right?

7      A    The pay is the same based on the annual salary,

8   yes.

9      MR. FORTIN:  Give me just a second before you answer

10  to object.

11     THE WITNESS:  Sure.  Sorry.

12     MR. FORTIN:  No, no worries.  Sorry, go on, Dan.

13     MR. FERRI:  Q   Did the overtime threshold change

14  between the semi-monthly and the biweekly pay?

15     MR. FORTIN:  Objection, lacks foundation.

16     THE WITNESS:  Their overtime was based on their

17  scheduled work periods.

18     MR. FERRI:  Q   For both semi-monthly and biweekly?

19     A    Correct.

20     Q    And so would swaps have affected the payment of

21  overtime differently in a semi-monthly versus biweekly

22  pay system?

23     A    Should not.

24     Q    Should not, but did it?

Page 65

```
 1      A    Again, I cannot answer under the manual how they
 2   were doing it.
 3      Q    Did it make a difference in the automated
 4   system?
 5      A    It was applied correctly in the automated
 6   system.
 7      Q    Both semi-monthly and biweekly?
 8      A    In the automated system, yes.
 9      Q    And when you say correctly, what do you mean?
10      A    Swaps do not count for overtime.
11      Q    And we can get into that a little bit later, but
12   what you're -- Where does that come from?
13      MR. FORTIN:  Object to form.
14      THE WITNESS:  It's stated in the policy.
15      MR. FERRI:  Q   So when -- Going back to what we
16   were talking about a minute ago, does the average
17   employee swap twice a year, 10 times a year, 20 times a
18   year?
19      A    I have --
20      MR. FORTIN:  Object to form and calls for
21   speculation.
22      THE WITNESS:  I have no idea.
23      MR. FERRI:  Q   Just from your understanding, can
24   you give me any understanding of how frequently people
```

Page 66

```
 1   swap?
 2        MR. FORTIN:  Object to form and calls for
 3   speculation.
 4        THE WITNESS:  I have no idea.
 5        MR. FERRI:  Q   Do you understand it to be
 6   infrequently?
 7        MR. FORTIN:  Object to form and calls for
 8   speculation.
 9        THE WITNESS:  I think you used the word average and
10   I cannot tell you that.
11        MR. FERRI:  Q   Well, now I'm asking do you
12   understand it to be infrequent?
13        MR. FORTIN:  Object to form and calls for
14   speculation, and I think at this point asked and
15   answered.
16        MR. FERRI:  You can answer.
17        MR. FORTIN:  If you have an answer, you can answer
18   it.
19        THE WITNESS:  I don't know how frequent or
20   infrequent people swap.
21        MR. FERRI:  Q   I guess do you understand it to be
22   an infrequent occurrence within Delta?
23        MR. FORTIN:  Objection, it calls for speculation.
24   Object to form and asked and answered.
```

Page 67

1      THE WITNESS:  I'm sorry, are you waiting on me?

2      MR. FERRI:  Q   Yes.

3      A   Again, I can't tell you how frequently or

4   infrequently people swap.

5      Q   Are you permitted to swap shifts?

6      A   No, not really.

7      Q   What do you mean not really?

8      A   Well --

9      Q   Are you a ground non-contract employee?

10     A   I'm a ground non-contract employee, but my

11  entire team works Monday through Friday.

12     Q   Are you permitted to swap shifts under the

13  policy?

14     MR. FORTIN:  Object to form and lacks foundation.

15     THE WITNESS:  I would not be able to swap with

16  anybody because everybody works the same schedule.

17     MR. FERRI:  Q   I understand.  I understand what

18  you're saying.

19         Have you ever heard of somebody swapping shifts

20  within Delta?

21     MR. FORTIN:  I'm going to object to form.

22     THE WITNESS:  Have I ever heard?

23     MR. FERRI:  Q   Yeah, of an instance where somebody

24  did that.

Page 68

1    A    Yes.

2    Q    Have you heard of multiple instances when

3    somebody did that, or multiple instances of somebody

4    swapping shifts?

5    A    Yes.

6    Q    Over 10?

7    A    Yes.

8    Q    Over a hundred?

9    A    Yes.

10    Q    Over a thousand?

11    A    I would assume, yes.

12    Q    If we wanted to know how many times in any given

13    year Delta ground non-contract employees did a full

14    swap, how do we find that out?

15    A    One, I would like to know what you mean by full

16    swap.

17    Q    They swapped off a shift and they swapped on a

18    shift with another employee.

19    MR. FORTIN:  I'm just going to object, calls for

20    speculation.

21    THE WITNESS:  I have no idea how we would determine

22    that.

23    MR. FERRI:  Q   Is this something that could be

24    determined?

Page 69

```
 1      MR. FORTIN:  Object to form and calls for
 2   speculation.
 3      THE WITNESS:  I don't really know how we would
 4   determine all of that.
 5      MR. FERRI:  Q   Do you see any issue with a
 6   determination of it?
 7      MR. FORTIN:  Object to form and calls for
 8   speculation.
 9      THE WITNESS:  I'm not sure what you mean by issue.
10      MR. FERRI:  Q   Well, do you have any reason to
11   think that Delta couldn't figure that out?
12      MR. FORTIN:  Object to form, calls for speculation.
13      THE WITNESS:  I think that we might be able to, but
14   I don't know that I have that skill.
15      MR. FERRI:  Q   Do you have any idea of
16   approximately the average pay for a ground non-contract
17   employee at Delta?
18      MR. FORTIN:  Objection, calls for speculation.
19      THE WITNESS:  I have no idea what the average is,
20   no.
21      MR. FERRI:  Q   Sure.  I guess what I'm really
22   trying to figure out is if somebody worked a shift of
23   additional time, what -- what the pay for that shift
24   would possibly look like for a ground non-contract
```

Page 70

1   employee, would generally look like?

2       MR. FORTIN:  Objection, hypothetical, calls for a

3   speculation.

4       THE WITNESS:  Very hypothetical question.  I can't

5   answer that.

6       MR. FERRI:  Q   Yeah, okay.  Yeah, I'm sure it's a

7   range, right?

8       A   Correct.

9       Q   You know, do you think it's a range sort of

10  generally between -- you know, it could be anywhere from

11  50 to a thousand dollars, within that range?

12      MR. FORTIN:  Objection, calls for speculation.

13      THE WITNESS:  I have no idea.

14      MR. FERRI:  Q   Sure.  I'm going to introduce

15  another exhibit here.

16      A   Oh, sorry.

17      Q   This is Exhibit 7.  Ends in a Bates No. with

18  004859.  Or has a Bates No. ending 004859.  I'm sorry

19          (Document marked as Barnwell Deposition

20          Exhibit 7 for identification.)

21      Q   Please let me know once you've had a chance to

22  look at this document.

23      A   Okay.

24      Q   Would you look at the third e-mail down, the

Page 71

1    e-mail from yourself to Lukas Goodyear on January 13th,

2    2022.

3        A    Yes.

4        Q    Do you see that e-mail?

5        A    I do.

6        Q    And you know Lukas Goodyear is the plaintiff in

7    this case I assume?

8        A    Yes.

9        Q    And in there you say, Lukas, in our town hall

10   meetings in an FAQ we did discuss how the employee's

11   hourly rate is determined, but I'll be happy to share

12   again.  Annual salary divided by 2,080 hours equals

13   hourly rate.  Do you see that?

14       A    Yes.

15       Q    What does that 2,080 refer to?

16       A    In the next line down, 40 hours a week times 52

17   weeks equals 2,080 hours.

18       Q    And is that the amount of hours that a full-time

19   employee -- a full-time ground non-contract employee at

20   Delta works?

21       A    On a regular schedule, yes.

22       MR. FORTIN:  Objection, calls for speculation.

23       MR. FERRI:  Q    I just want to make sure we're

24   using -- or the terminology's not confused.  But

Page 72

```
 1   regularly scheduled versus irregularly scheduled or do
 2   you just mean that's how much a full-time employee's
 3   general schedule is?
 4        MR. FORTIN:  Objection, calls for speculation.
 5        MR. FERRI:  Q   Does that make sense?
 6        A   40 hours times 52 weeks is an industry standard
 7   calculation for yearly hours worked.
 8        Q   I believe Mr. Goodyear was on an irregular
 9   schedule, but he was still given 2080; is that your
10   understanding?
11        A   He was on --
12        MR. FORTIN:  I'm sorry.  Objection, lacks
13   foundation.
14        THE WITNESS:  He was on an irregular schedule.  I
15   don't know if he was guaranteed or scheduled for 2080
16   hours.
17        MR. FERRI:  Q   Are employees on irregular schedules
18   generally scheduled for 2080 -- 2,080 hours a year?
19        MR. FORTIN:  Objection, calls for speculation, lack
20   of foundation.
21        THE WITNESS:  Irregular schedules or rotations may
22   not equal 2080 hours exactly.
23        MR. FERRI:  Can we take just like a one-minute
24   break?  I just want to get this exhibit in here.
```

Page 73

1      MR. FORTIN:  Sure.

2      THE VIDEOGRAPHER:  Please standby.  Going off record

3   at 12:15 p.m.

4          (Recess was taken.)

5      THE VIDEOGRAPHER:  We are back on record at 12:19

6   p.m.  You may proceed.

7      MR. FERRI:  Q   I introduced what's marked as

8   Exhibit 8, and this is a document beginning with the

9   Bates No. ending in 00312.

10          (Document marked as Barnwell Deposition

11           Exhibit 8 for identification.)

12     Q   Do you see that document, Ms. Barnwell?

13     A   It's coming up.

14     MR. FORTIN:  We're getting it on the screen.  You

15  know, just a second.  Okay.  It took us a second to

16  refresh.  Okay.  All right, we got it.

17     MR. FERRI:  Q   Do you recognize this as the Hours

18  of Work document we've discussed a couple times

19  throughout this deposition?

20     A   I do.

21     Q   At the bottom of that first page there, do you

22  see where it says full-time work schedule includes 2,080

23  scheduled working hours in the year?

24     A   I do.

Page 74

1      Q   Okay.  And so, again, does that apply to

2   employees on both a regular schedule and employees on an

3   irregular schedule?

4      MR. FORTIN:  Objection, calls for speculation.

5      THE WITNESS:  Regular scheduled employees, five

6   and -- five days on, two days off, or four 10-hour days

7   on, three days off, would indeed for 52 weeks reach

8   2,080 hours.  Employees on irregular schedules may not

9   reach 2,080 exactly.

10      MR. FERRI:  Q   But they'd still be full-time

11   employees potentially?

12      A   Yes.

13      Q   Okay.  And for employees on a regular, with an

14   R, schedule, if they worked hours in excess of that

15   2,080, so say they worked 2,090 hours, should they be

16   paid overtime for those excess hours?

17      MR. FORTIN:  Objection, calls for speculation,

18   hypothetical.

19      THE WITNESS:  Without knowing were those additional

20   hours worked at Delta's request or were they hours

21   worked due to a swap, I can't answer that question.

22      MR. FERRI:  Q   What do you mean by at Delta's

23   request versus due to a swap?

24      A   If Delta asked an employee to work an additional

Page 75

```
 1   shift and they've met their weekly threshold, then we
 2   are asking them to work and, therefore, we would apply
 3   the overtime rules appropriately.
 4        Q   And how does Delta ask somebody to work?
 5        MR. FORTIN:  Objection, calls for speculation.
 6        THE WITNESS:  There are various, various ways of
 7   doing that.
 8        MR. FERRI:  Q   I just mean if somebody picks up an
 9   extra shift that's not part of a swap, does that mean
10   that they're doing that at Delta's request based on sort
11   of what your -- the terminology you were using?
12        A   If Delta posts or Delta asks, yes.
13        Q   And so -- But you said if it's -- if they work
14   over 2,080 because of a swap, then they would not be
15   entitled to overtime; is that what -- Am I capturing
16   what you said correctly?
17        MR. FORTIN:  Objection, misstates testimony.  Object
18   to form.
19        THE WITNESS:  Swaps do not count for overtime.
20        MR. FERRI:  Q   So if the reason somebody goes
21   over -- a regularly scheduled employee works over 2,080
22   hours is simply because they picked up a swapped shift,
23   you're saying they should not be paid overtime rates for
24   that -- those excessive hours, is that right, or excess
```

Page 76

1    hours?

2        MR. FORTIN:  Object to form and misstates testimony.

3        THE WITNESS:  Again, if those additional hours were

4    due to picking up a swap, the overtime rules do not

5    apply.

6        MR. FERRI:  Q   But if they were due to picking up

7    time at Delta's request, they do apply; is that right?

8        MR. FORTIN:  Object to form and misstates testimony.

9    And calls for speculation.

10       THE WITNESS:  It could be a hypothetical, but, yes,

11   they would be or could be paid overtime.

12       MR. FERRI:  Q   Is there any other instances in

13   which they would not be paid overtime that you can think

14   of?

15       MR. FORTIN:  Objection, calls for speculation.

16       THE WITNESS:  Not that I'm aware of.

17       MR. FERRI:  Q   Do you know who drafted this

18   document?

19       A   I have no idea, sir.

20       Q   To your knowledge, has this document been around

21   since 2017?

22       A   I have no idea.  It's dated August 22nd.

23       Q   Were you familiar with this -- When did you

24   become familiar with this document?

Page 77

```
 1      A   I can't tell you when the first time I saw this
 2   document.
 3      Q   Have you known about it since you took your
 4   role -- your current role as the senior HR coordinator I
 5   believe?
 6      A   Yes.
 7      Q   Did you know about it -- Or were you familiar
 8   with this document before that?
 9      A   I'm sure I referred to it in the past.
10      Q   Do you understand it to be a contract?
11      MR. FORTIN:  I'm going to object to form and calls
12   for a legal conclusion.
13      THE WITNESS:  Absolutely no, it is not a contract in
14   my opinion.
15      MR. FERRI:  Q   Is there somebody within Delta or
16   sort of in charge of maintaining this document?
17      A   Yes.
18      Q   Who is that?
19      A   A specific person I cannot tell you.
20      Q   What group?
21      A   I think it's --
22      MR. FORTIN:  I was going to say, calls for
23   speculation.
24      THE WITNESS:  I don't know exactly, sir.
```

1    MR. FERRI:  Q   What -- Well, what were you going to

2    potentially say?

3    A    My -- in my opinion, it would be a combination

4    between HR Payroll and Legal to make sure everything is

5    compliant.

6    Q    Where is the Delta Legal Department based

7    geographically?

8    A    Atlanta, Georgia.

9    Q    And do you know where the HR Payroll Department

10   is based geographically?

11   A    There are people in Atlanta.  There are people

12   in other areas.

13   Q    If you felt like a change was needed to this

14   document, who would you raise that with?

15   A    My leader.

16   Q    And I think you've told me his or her name

17   before, but can you remind me of that?

18   A    My direct manager is Allison Bryant.

19   Q    And why would you raise that with her?

20   MR. FORTIN:  Objection, hypothetical.

21   THE WITNESS:  That's where the normal chain of

22   information would go.

23   MR. FERRI:  Q   Do you think that she would raise

24   the issue with somebody else who would be in charge of

Page 79

1    maybe making that change in the document?

2        MR. FORTIN:  Objection, calls for speculation.

3        THE WITNESS:  I assume she would.

4        MR. FERRI:  Q   Do you know who that might be?

5        A    I would assume that it would be her manager.

6        Q    Which is who?

7        A    Cheryl Gray.

8        Q    Okay.  And then do you know who Cheryl Gray

9    might raise it with or do you think Cheryl Gray would

10   have the power to sort of do that change herself?

11       MR. FORTIN:  Objection, calls for speculation.

12       THE WITNESS:  I don't know the process above what

13   Cheryl would do.

14       MR. FERRI:  Q   Are employees informed -- Or let me

15   ask it a different way.  Are ground non-contract

16   employees at Delta informed of this Hours of Work

17   document?

18       MR. FORTIN:  Objection, form and calls for

19   speculation.

20       THE WITNESS:  I have no idea, sir.

21       MR. FERRI:  Q   Is it shared with employees in any

22   way?

23       A    The policies are on DeltaNet, and DeltaNet is

24   available to the employee.

Page 80

1        Q    And how would employees know to go to DeltaNet

2    to look at this document?

3        MR. FORTIN:  Objection, calls for speculation.

4        THE WITNESS:  I would assume leadership would have

5    directed them or the employee would search the document,

6    search DeltaNet.

7        MR. FERRI:  Q   Do you think the ground non-contract

8    employees should -- should fairly expect to be paid in

9    accordance with this document?

10       MR. FORTIN:  Objection, calls for speculation.

11   Object to form.

12       THE WITNESS:  I would -- I would believe that

13   employees that read this document would be able to

14   determine if they were paid correctly.

15       MR. FERRI:  Q   Besides this document, is there

16   another way in which employees are informed of when they

17   will receive overtime or double time pay rates?

18       MR. FORTIN:  Objection, calls for speculation.

19       THE WITNESS:  I'm not aware of another written

20   document.

21       MR. FERRI:  Q   The circumstances in which an

22   employee will receive overtime or double time rates is

23   something that's probably important to most ground

24   non-contract employees; is that fair to say?

Page 81

1        MR. FORTIN:  Objection, calls for speculation.

2        THE WITNESS:  I would say most employees are

3    concerned with getting a paycheck.

4        MR. FERRI:  Q   Would you say they would like to

5    know when that paycheck would include overtime and

6    double time pay?

7        MR. FORTIN:  Objection, calls for speculation.

8        MR. FERRI:  Q   I mean, I can rephrase it if you'd

9    like.  I'm not trying to -- I think you see what I'm --

10   What I'm getting at is, people generally want to know

11   like what they have to do to get overtime rates, right?

12       MR. FORTIN:  Objection to form and calls for

13   speculation.

14       THE WITNESS:  I don't assume what the employee

15   knows.

16       MR. FERRI:  Q   Sure.  Let me ask it -- Do you think

17   that Delta ground non-contract employees understand that

18   this is the document that tells them the circumstances

19   in which they can receive overtime or double time pay?

20       MR. FORTIN:  Objection, calls for speculation.

21       THE WITNESS:  I would assume that they would.

22       MR. FERRI:  Q   Can you -- can you look at page 12

23   of this document.  You know, we call that bold number in

24   the bottom right-hand corner of the document the Bates

Page 82

1    No.  And so for that, it would be the one ending in 323.

2            Let me know when you're there please.  Well,

3    actually, you can go up to the page before that, page

4    11, with the Bates No. ending in 322 please.

5        A    I'm there.

6        Q    Okay.  So do you see where it says OVERTIME

7    DEFINED - IRREGULAR SCHEDULE (ONLY IN APPROVED

8    STATIONS)?

9        A    No, I'm sorry, I'm not seeing that.

10        Q    It's on page 11, the Bates ending number in 322.

11        A    322.  322.

12        Q    It's about two-thirds of the way down the page

13    in bold capitals.

14        A    Yes.  Sorry.  Now I'm with you.

15        Q    No problem.  So this is -- this is defining

16    overtime for irregular schedules, right?

17        A    Correct.

18        Q    And it says, irregular schedules must be

19    approved and must equal to 2,080 scheduled working hours

20    a year for full-time employees.  Do you see that?

21        A    I do.

22        Q    Does that make you rethink your answer about

23    how -- hours for people on irregular schedules?

24        A    No, it does not.  And, again, it's based on a

Page 83

1   rotation and it potentially could be a shift below or a

2   shift over.

3       Q    What does it mean by must be approved and must

4   equal the 2,080 scheduled hours?

5       A    Well, to make sure that the shift is not

6   completely out of compliance, the shifts are reviewed.

7   The schedules are reviewed.

8       Q    Well, I guess I'm just -- Here it says,

9   irregular schedules must be approved and must equal to

10  2,080 scheduled working hours.  Is that not true in

11  practice?

12      MR. FORTIN:  Object to form.  And calls for

13  speculation.

14      THE WITNESS:  Again, sir, there is -- based on the

15  number of days in the rotation, there is the potential

16  that it may be one shift below 2,080 or a shift over

17  2,080.

18      MR. FERRI:  Q    So that sentence there is not --

19  does not necessarily reflect how Delta determines

20  full-time status for irregularly scheduled employees in

21  practice; is that right?

22      MR. FORTIN:  Object to form and calls for

23  speculation.

24      THE WITNESS:  We would not penalize an employee if

Page 84

1   their scheduled -- irregular scheduled was a little less

2   than 2,080.

3        MR. FERRI:  Q   So if it was -- Sorry.  If it was a

4   little less than 2,080, that would still be like the

5   scheduled hours for any overtime determinations; is that

6   right?

7        A   Scheduled hours?

8        Q   Well, you're saying it may be one shift less for

9   irregularly scheduled employees.  So what would that be?

10  Maybe 2,072 hours?

11       A   Irregular schedules can vary between eight, 10

12  or 12-hour shifts.

13       Q   Sure.  So it could be 2,072 hours; is that what

14  you're saying?

15       MR. FORTIN:  Object to form and misstates testimony.

16       THE WITNESS:  Yes.

17       MR. FERRI:  Q   And that could be the full-time --

18  that could be the scheduled yearly hours for a full-time

19  employee on an irregular schedule, is that right,

20  hypothetically?

21       A   Hypothetically, yes.

22       Q   Okay.  And if they worked 2,080 hours then, they

23  would then be working eight hours in excess of their

24  yearly regular schedule, right, or their yearly

Page 85

1    schedule; is that right?

2        MR. FORTIN:  Object to form, calls for -- calls for

3    speculation, lack of foundation.

4        THE WITNESS:  I would have no way of answering that

5    without seeing the schedule.

6        MR. FERRI:  Q   Well, I'm just saying.  You're

7    saying there could be an employee who's on an irregular

8    schedule who was scheduled for 2,072 hours a year; is

9    that correct?

10       A    Correct.

11       Q    Okay.  So if that employee ended up working

12   eight additional hours, they would then work 2,080 hours

13   a year, right?

14       A    Correct.

15       Q    And would -- If they picked up those eight

16   additional hours at Delta's request, would they be paid

17   overtime for those hours?

18       MR. FORTIN:  Object to form, calls for speculation,

19   lacks foundation.

20       THE WITNESS:  And we've also answered this before.

21   If it was at Delta's request, it would be paid

22   appropriately and that could be at overtime.

23       MR. FERRI:  Q   Okay.  And if you go down to the

24   next page, this will be page 12, 12 of 32 in the bottom

Page 86

1    right-hand corner.

2         A    Where on the page?

3         Q    I'm looking in -- at the top there, which is

4    WEEKLY OVERTIME in all capital letters.  Do you see

5    that?

6         A    Yes, sir.

7         Q    It says, for full-time employees working on an

8    irregular schedule, weekly overtime is the time required

9    to be worked on scheduled days off provided the

10   scheduled days had been worked during the preceding work

11   period exclusive of daily overtime.  Do you see that?

12        A    Yes, sir.

13        Q    What do you understand work period to mean

14   there?

15        A    Work period is defined as your first day of

16   scheduled work through your last off day.

17        Q    Of a year?

18        A    Weekly overtime is the required work period.

19   This is -- We're not talking over a year.  We're talking

20   weekly overtime.

21        Q    Is that a pay period or is that different?

22        A    Pay periods and work -- Pay periods are defined

23   and work periods are based on the employee's schedule.

24        Q    So I want to go through a few different

Page 87

1    scenarios here looking at that sentence we just read.

2         If an employee just works their scheduled hours

3    and then they picked up an extra -- an additional shift

4    at Delta's request, there are no swaps, they should get

5    overtime pay for that additional shift, right?

6       MR. FORTIN:  Object to form and calls for

7    speculation.

8       THE WITNESS:  In your example, if they have worked

9    their scheduled hours in their work period and pick up a

10   shift at Delta's request, it would be paid at overtime.

11      MR. FERRI:  Q   When it says preceding work period,

12   what does preceding work period mean?  Does that just

13   mean the work period or it just means something else?

14      A   It -- The work period is defined as the first

15   day of work, scheduled work, through the last off day.

16   So it's saying in that preceding, those days before the

17   off days, did they work their schedule.

18      Q   For employees on an irregular schedule, are

19   their work periods tracked by Delta in some way?

20      MR. FORTIN:  Object to form and calls for

21   speculation.

22      THE WITNESS:  I'm not sure what you mean by tracked.

23      MR. FERRI:  Q   Well, how does Delta know what their

24   work periods are like for the purposes of calculating

Page 88

1  overtime?

2      MR. FORTIN:  Object to form and calls for

3  speculation.

4      THE WITNESS:  In the MyTime system, MPS system, any

5  of the other systems that we have, their schedules are

6  loaded.  And so, yes, we know what their scheduled days

7  are.

8      MR. FERRI:  Q  All right.  So going back to that

9  first sentence there, starting with for full-time

10 employees working on an irregular schedule, I want to go

11 through a scenario where somebody picks up a shift as

12 part of a swap.

13          So they worked all their scheduled days and

14 then during that same work period they pick up a shift

15 as a swap, they swap on to another employee's shift.

16 Should they get overtime pay for that swap-on shift?

17     A   No.

18     MR. FORTIN:  I'm sorry.  Object to form and calls

19 for speculation.

20     THE WITNESS:  And no.

21     MR. FERRI:  Q  And why not?

22     A   Swaps do not count for overtime.

23     Q   And why don't -- why doesn't Delta pay

24 overtime --

Page 89

1       MR. FORTIN:  Object to form.

2       MR. FERRI:  -- for swaps?

3       MR. FORTIN:  Sorry, were you done?

4       MR. FERRI:  Q   Why doesn't Delta pay overtime for

5   swaps?

6       MR. FORTIN:  Object to form and calls for

7   speculation.

8       THE WITNESS:  A swap is between two employees and

9   Delta is not involved if employee A asked employee B to

10  work their shifts.  And Delta does not -- is not

11  involved.

12      MR. FERRI:  Q   Do you know why -- the reasoning

13  behind Delta not paying overtime instances of swaps is?

14  Do you know the logic behind that?  Do you know the

15  basis for that?

16      MR. FORTIN:  Object to form and calls for

17  speculation.

18      MR. FERRI:  Q   Let me rephrase it so I'm just

19  asking you one question.  Do you know any reasoning

20  behind for Delta not paying overtime in instances of

21  swaps?

22      MR. FORTIN:  Objection, calls for speculation.

23      THE WITNESS:  Again, a swap is between two

24  individual employees and Delta is not involved.

Page 90

1        MR. FERRI:  Q   So I want to go through a third

2   scenario here with that same sentence beginning with for

3   full-time employees working on an irregular schedule.

4           So in this scenario, a person -- the employee

5   works all but one of their scheduled days and then they

6   swap off for that last scheduled day, it's worked by

7   their fellow employee, and then original employee picks

8   up an extra shift at Delta's request.  Should he be paid

9   overtime for that extra shift at Delta's request?

10       MR. FORTIN:  Object to form and calls for

11   speculation.

12       THE WITNESS:  No.

13       MR. FERRI:  Q   And why not?

14       A   Because they did not work their scheduled shift.

15       Q   And looking at that first sentence here,

16   beginning with for full-time employees working an

17   irregular schedule, do you see where it says weekly

18   overtime is the time required to be worked on scheduled

19   days off provided the scheduled days have been worked

20   during the preceding work period?

21       A   Yes.

22       Q   So in the scenario I just gave, those scheduled

23   days had been worked, right, just one shift was worked

24   by another employee; is that how you understood it?

Page 91

1        A    No.

2        MR. FORTIN:   Object to form and hypothetical.

3        MR. FERRI:   Q    And why not?

4        A    Because all of the scheduled days were not

5    worked.

6        Q    Well, that -- I guess to be clear, in the

7    scenario I gave, another employee worked the swapped-off

8    shift.  So it was worked.

9        A    It was not worked by the employee that swapped

10   off.

11       Q    And where does it say that it must be worked by

12   the employee that swapped off, if anywhere?

13       A    I believe the sentence, provided the scheduled

14   days have been worked during the preceding period,

15   applies to the employee that swapped off, and he did not

16   work all of his scheduled days.

17       Q    What's your basis for that belief?

18       A    Reading the policy.

19       Q    This policy?

20       A    Correct.

21       Q    What in that policy informs that belief, if

22   anything?

23       A    It explains that weekly overtime is -- what

24   weekly overtime is, and it clearly states that all the

Page 92

```
 1   schedule -- excuse me, provided the scheduled days had
 2   been worked during that preceding work period.  Swapping
 3   off a day means that the employee did not work their
 4   scheduled days, all of their scheduled days, in the
 5   preceding work period.
 6        Q    In that last scenario I gave where they swapped
 7   off and then they worked an additional shift at Delta's
 8   request, assuming that they also swapped on and that the
 9   swaps neutralized each other, why doesn't working an
10   additional shift entitle them to overtime?
11        MR. FORTIN:  Objection, calls for speculation.
12        THE WITNESS:  Our policy says swaps do not count for
13   overtime.
14        MR. FERRI:  Q    Let's go to page 4 of that document
15   please.
16        MR. FORTIN:  4 of 32 in the bottom right hand?
17        MR. FERRI:  Yes.
18        THE WITNESS:  I have 34.
19        MR. FORTIN:  Oh, yeah.  No, it's just the cover
20   sheet.
21        THE WITNESS:  Okay.
22        MR. FORTIN:  There we go.  That's good.  Okay.
23        MR. FERRI:  Q    Do you see the section titled Swaps
24   in bold there?
```

Page 93

1      A    Yes, sir.

2      Q    A few sentences in do you see where it says,

3  swaps do not count towards OT thresholds, so swapping

4  should never put an employee into an overtime eligible

5  situation?

6      A    Yes, sir.

7      Q    Is that the part of the policy you were just

8  referring to?

9      A    Yes, sir.

10     Q    Okay.  And what does so swapping should never

11  put an employee into an overtime eligible situation mean

12  to you?

13     A    I'm sorry, are you asking what it means to me?

14     Q    Yes.

15     A    It means to me that if an employee swaps and

16  works more than their scheduled weekly hours, that those

17  swaps do not count for overtime.

18     Q    Go to page 6 please.  Actually, sorry, page 7.

19  And this is -- ends in Bates No. 318.

20     MR. FORTIN:  That may be easier for her to read on

21  the screen, Dan, if you give the Bates Nos.

22     MR. FERRI:  Yeah, sorry.

23     MR. FORTIN:  Yeah, no worries.

24     MR. FERRI:  Tough -- You know, tough decision.

Page 94

1          This is OVERTIME DEFINED, slash, or dash,

2     REGULAR SCHEDULE.  Do you see that?

3          A    Yes.

4          Q    Do you see that?  Okay.  This section defines

5     how overtime is calculated for employees on their

6     regular schedule; is that right?

7          A    Correct.

8          Q    And if you go down, do you see where it says in

9     bold Weekly Overtime?  Same page.

10         A    I see the header, yes.

11         Q    Yeah.  And, unfortunately, this gets cut off a

12    little bit here.  But you can see at the start of the

13    next page there's a sentence that says, weekly overtime

14    for a regularly --  regular scheduled employee is time

15    actually worked in excess of 40 hours exclusive of daily

16    overtime during any workweek.  Do you see that?

17         A    Yes.

18         Q    Okay.  And the next sentence says, effective

19    May 1st, 2014 scheduled time not actually worked within

20    a workweek will count as time worked for purposes of

21    calculating overtime.  Do you see that?

22         A    I do.

23         Q    What does that sentence mean to you?

24         A    It means that if you take a liability, a

Page 95

1    vacation day, a PPT day, a holiday, in your work period,

2    that is considered work -- work time for calculating

3    overtime.

4        Q   And what if you swapped off?

5        A   Swaps do not count for overtime.

6        Q   But that would be scheduled time not actually

7    worked within a workweek, right?

8        MR. FORTIN:  Objection, misstates testimony.

9        MR. FERRI:  Q   I could rephrase if you'd like.

10   Would you like me to rephrase it?

11       A   Sure.

12       Q   A swap-off would be scheduled time not actually

13   worked within a workweek, correct?

14       A   It is a day that was scheduled that the employee

15   elected to work with another employee and take the day

16   off.  And, no, swaps do not count for overtime.

17       Q   I'm asking one question here.  Is a swap-off

18   scheduled time not actually worked within a workweek?

19       A   It is -- It was a scheduled day that the

20   employee did not work.

21       Q   And nowhere in this sentence does it say -- the

22   sentence here on page 8 that starts with effective

23   May 1st, 2014, nowhere does it say there that that's not

24   referring to swap-offs, right?

1     A    Correct.  The word swap-off is not in that

2  sentence.

3     MR. FERRI:  All right.  No further questions.

4     MR. FORTIN:  Okay.  Do you mind if we take a quick

5  break so I can decide if I have any follow-up?

6     MR. FERRI:  Yes, or I do not mind.

7     THE VIDEOGRAPHER:  Please standby.  We are going off

8  record at 12:58 p.m.

9          (Recess was taken.)

10     THE VIDEOGRAPHER:  Good afternoon.  We are back on

11  record at 1:00 o'clock p.m.  You may proceed.

12     MR. FORTIN:  Thank you.  And we have no questions

13  either.  So we're ready to conclude.

14     THE VIDEOGRAPHER:  All right.  We are going off

15  record at 1:00 o'clock p.m. and concludes today's

16  testimony.  Master media will be retained by Veritext

17  Legal Solutions.  Thank you all.

18

19

20

21

22

23

24

Page 97

```
 1   STATE OF ILLINOIS  )

                      )  SS:

 2   COUNTY OF C O O K  )

 3           The within and foregoing deposition of the

 4   aforementioned witness was taken before NADINE J.

 5   WATTS, CSR, RPR, and Notary Public, at the place, date

 6   and time aforementioned.

 7           There were present during the taking of the

 8   deposition the previously named counsel.

 9           The said witness was first duly sworn and was

10   then examined upon oral interrogatories; the questions

11   and answers were taken down in shorthand by the

12   undersigned, acting as stenographer and Notary Public;

13   and the within and foregoing is a true, accurate and

14   complete record of all of the questions asked of and

15   answers made by the forementioned witness, at the time

16   and place hereinabove referred to.

17           Before completion of the deposition, review of

18   the transcript { } was {X} was not requested.  If

19   requested, any changes made by the deponent (and

20   provided to the reporter) during the period allowed are

21   appended hereto.

22           The undersigned is not interested in the

23   within case, nor of kin or counsel to any of the

24   parties.
```

Page 98

1           Witness my official signature and seal as

2    Notary Public in and for Cook County, Illinois on the

3    31st day of March, A.D. 2025.

4

5                           *Nadine J. Watts*

                            NADINE J. WATTS CSR, RPR

6                           Notary Public

                            License No. 084-002736

7                           One North Franklin Street

                            Suite 2100

8                           Chicago, Illinois  60606

                            Phone:  (312) 442-9087

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**[& - 4]**                                                          Page 1

| & |
| --- |

**&**  14:3,4,11,14
  15:6,24 16:3
  16:10,15 17:4
  18:14,16 26:11

| 0 |
| --- |

**00000312**  4:6
**00000343**  4:6
**00000443**  3:8
**00000445**  3:8
**00000463**  3:11
**00000654**  3:13
**00000657**  3:13
**00000709**  3:16
**00000713**  3:16
**00000792**  3:19
**00000793**  3:19
**00004728**  3:22
**00004729**  3:22
**00004859**  4:3
**00004862**  4:3
**00312**  73:9
**00443**  25:10
**00463**  33:20
**004728**  55:18
**004859**  70:18
  70:18
**00654**  35:18
**00709**  46:17
**00792**  51:21
**008**  52:13
**05712**  1:7 5:8

**061**  52:13
**084-002736**
  98:6

| 1 |
| --- |

**1**  3:8 25:1,9,12
  54:12
**1-14-22**  4:5
**10**  2:5 21:9
  65:17 68:6
  74:6 84:11
**10,000**  20:13,20
**1075**  2:11
**10:02**  1:17 5:2
**11**  9:17 82:4,10
**11-16-17**  3:15
**11:06**  41:11
**12**  81:22 84:12
  85:24,24
**12:15**  73:3
**12:58**  96:8
**12th**  26:6
**13th**  71:1
**14th**  7:3
**16th**  36:12
**1985**  7:3
**1:00**  96:11,15
**1:23**  1:7 5:8
**1st**  94:19 95:23

| 2 |
| --- |

**2**  3:11 33:19,22
**2,072**  84:10,13
  85:8

**2,080**  71:12,15
  71:17 72:18
  73:22 74:8,9
  74:15 75:14,21
  82:19 83:4,10
  83:16,17 84:2
  84:4,22 85:12
**2,090**  74:15
**20**  65:17
**2009**  7:11 9:18
**2012**  9:10
**2014**  94:19
  95:23
**2015**  9:10
**2016**  11:15
**2017**  11:7
  36:12 37:3
  43:6 76:21
**2018**  34:7
**2020**  9:18 42:1
  45:3
**2021**  13:6,20
  26:7 41:21
  47:3 52:6
  57:21
**2022**  57:22
  71:2
**2025**  1:18 3:2
  5:2 98:3
**2080**  72:9,15,18
  72:22
**20805**  98:5
**21**  9:21,23 42:1

**2100**  98:7
**22nd**  52:5
  76:22
**25**  3:8 7:8
  27:12 28:4
**2500**  2:12
**26**  3:2
**26th**  1:17 5:2
**27587**  6:13
**2820**  6:12
**2s**  35:1

| 3 |
| --- |

**3**  3:13 34:11
  35:17,20
**3-1-22**  3:23
**30309**  2:12
**312**  98:8
**312-9991**  2:6
**318**  93:19
**31st**  98:3
**32**  28:4,14
  85:24 92:16
**322**  82:4,10,11
  82:11
**323**  82:1
**33**  3:11
**34**  92:18
**35**  3:13
**3s**  35:3,7

| 4 |
| --- |

**4**  3:16 46:17,19
  50:13 92:14,16

**40**  28:5,12
  29:17 71:16
  72:6 94:15
**404**  2:13
**442-9087**  98:8
**46**  3:16
**4:43**  47:3

**5**

**5**  3:19 51:20,23
**5-13-21**  3:10
**50**  70:11
**51**  3:19
**52**  71:16 72:6
  74:7
**55**  3:22

**6**

**6**  3:5,22 55:18
  55:20 57:14
  93:18
**60602**  2:6
**60606**  98:8
**61**  57:21
**6th**  47:3

**7**

**7**  4:3 70:17,20
  93:18
**7-6-21**  3:18
**70**  4:3
**73**  4:6

**8**

**8**  4:6 57:13,14
  73:8,11 95:22
**855**  2:6
**885-1500**  2:13
**8:30**  57:6,10

**9**

**9-22-21**  3:21
**90s**  10:9

**a**

**a.d.**  1:18 98:3
**a.m.**  1:17 5:2
  41:11,14 57:6
  57:10
**ability**  30:16
  61:4
**able**  20:6,7
  25:13 28:6
  67:15 69:13
  80:13
**above**  33:13
  79:12
**absolutely**
  20:12,14 77:13
**access**  36:24
**accessible**
  12:21
**accordance**
  32:6,14 33:3
  80:9
**accurate**  97:13

**accurately**  55:9
**acquisition**
  18:20
**acting**  45:4,14
  97:12
**active**  23:8
**actual**  31:21
**actually**  31:16
  34:9 51:5
  60:14 82:3
  93:18 94:15,19
  95:6,12,18
**additional**  19:2
  28:8,9 29:6,10
  29:14,16 30:2
  30:3 69:23
  74:19,24 76:3
  85:12,16 87:3
  87:5 92:7,10
**address**  6:11
  14:15
**addressing**
  26:20 31:23
**administer**
  5:22
**affect**  50:19
  51:2,14
**affected**  64:20
**affiliations**
  5:13
**aforemention...**
  97:4,6
**afternoon**
  96:10

**ago**  65:16
**air**  1:8 2:18 5:6
  5:17,19
**airplanes**  19:12
  19:13
**airport**  7:5,8
  24:18
**al**  5:5
**aligning**  42:3
**allison**  16:13
  78:18
**allow**  62:3,8,15
  62:16
**allowed**  32:11
  33:7 57:21
  62:6 63:3
  97:20
**alternatives**
  10:21,22,23
**amount**  30:13
  37:22 54:8
  71:18
**annual**  64:7
  71:12
**answer**  18:24
  20:6,8 32:20
  40:23 42:19
  44:2,3 46:9
  48:3 51:16
  55:9 61:8,17
  61:24 64:9
  65:1 66:16,17
  66:17 70:5
  74:21 82:22

**answered**
61:23 66:15,24
85:20
**answering** 85:4
**answers** 97:11
97:15
**anybody** 46:11
46:13 67:16
**apologize** 56:15
**appeared** 2:3,9
**appended**
97:21
**application**
39:6
**applied** 65:5
**applies** 49:17
91:15
**apply** 27:18,21
27:22 28:1
49:14 74:1
75:2 76:5,7
**applying** 49:11
59:18
**appreciate**
51:17
**appropriate**
31:4,9 32:22
**appropriately**
33:15 75:3
85:22
**approved** 82:7
82:19 83:3,9
**approximately**
9:9 19:14,15

19:24 28:5
63:17 69:16
**areas** 78:12
**articulate**
12:12
**asked** 11:17
27:2 33:12
51:8 61:23
66:14,24 74:24
89:9 97:14
**asking** 48:2,16
53:6,10,13,14
54:5 62:4,11
62:13,14 66:11
75:2 89:19
93:13 95:17
**asks** 75:12
**assist** 14:16
17:11
**associated**
12:23
**assume** 20:7
22:2,5 24:21
26:23 46:10
50:2 68:11
71:7 79:3,5
80:4 81:14,21
**assuming** 35:15
53:11 92:8
**atlanta** 1:2
2:12 5:7 6:23
16:4,5,7 17:2,3
18:13,15 24:13
26:22 78:8,11

**attendance**
7:20 8:6,7,23
14:3,4,11,14
15:6,9,24 16:3
16:10,15 17:5
18:14,16 26:11
37:20 47:14,19
**audit** 27:15,17
30:1 31:23
32:1 34:6,7
45:4,8
**august** 76:22
**automated**
58:12,19 59:13
65:3,5,8
**automatedly**
59:17
**automatically**
40:17 48:11
59:18
**available** 46:21
79:24
**average** 65:16
66:9 69:16,19
**aware** 18:21
43:9,9 44:21
46:14 59:3
76:16 80:19

| **b** |
| :---: |

**b** 89:9
**back** 9:15 10:4
11:16 13:5
30:11 32:11

34:7 41:13
51:5,9 56:2
65:15 73:5
88:8 96:10
**bad** 10:24 11:1
23:10
**balances** 14:16
14:19 17:20
57:20
**barnwell** 1:12
3:1,8,10,11,13
3:16,19,22 4:3
4:6 5:4,20 6:1
6:7,10 25:9,11
33:21,24 35:19
39:15 41:15
46:18,21 51:22
55:19 56:11,13
56:15 57:10
70:19 73:10,12
**base** 64:2
**based** 17:3
18:12 30:7,17
36:19 37:15
39:5 50:9 64:7
64:16 75:10
78:6,10 82:24
83:14 86:23
**basically** 16:19
21:6 28:18
**basing** 60:4
**basis** 36:23
59:11 89:15
91:17

**[bates - chicago]** Page 4

**bates** 25:9
33:20 35:18
46:17 51:20
55:18 70:17,18
73:9 81:24
82:4,10 93:19
93:21
**bear** 24:22
55:14
**bearing** 5:8
**beginning** 73:8
90:2,16
**begins** 5:3
**behalf** 1:4 2:8
2:15 5:4,14,17
**belief** 91:17,21
**believe** 11:15
32:11 34:6
45:23 54:7
72:8 77:5
80:12 91:13
**better** 20:18
**beyond** 29:6,8
45:16 62:8
**bid** 53:2
**big** 23:16,19
**bigger** 56:6
**bit** 7:21 12:9
22:12 60:6
65:11 94:12
**biweekly** 22:10
22:16,18,24
23:9 50:18,20
50:23 51:1,13

54:9 63:22,23
64:5,14,18,21
65:7
**blaze** 2:18 5:18
**bold** 81:23
82:13 92:24
94:9
**bottom** 26:5
73:21 81:24
85:24 92:16
**break** 36:4 41:4
41:5,7,15 60:6
72:24 96:5
**browser** 34:4
**bryant** 16:13
78:18
**building** 24:15
**business** 26:14
50:8,9
**bw** 50:14,16

**c**

**c** 97:2
**calculate** 30:1
**calculated**
41:23 58:17
59:4 60:8,15
94:5
**calculates** 8:8
**calculating**
41:17 42:12,22
45:14 60:20
87:24 94:21
95:2

**calculation**
43:13 50:6
72:7
**calculations**
47:22 49:11
58:18
**call** 81:23
**called** 6:2 8:21
52:15
**calls** 31:6,19
32:16 37:18
45:1 46:6 48:1
50:7 53:7,19
54:6,14 61:6
61:11 63:14
65:20 66:2,7
66:13,23 68:19
69:1,7,12,18
70:2,12 71:22
72:4,19 74:4
74:17 75:5
76:9,15 77:11
77:22 79:2,11
79:18 80:3,10
80:18 81:1,7
81:12,20 83:12
83:22 85:2,2
85:18 87:6,20
88:2,18 89:6
89:16,22 90:10
92:11
**campus** 24:14
24:16

**capital** 86:4
**capitals** 82:13
**capturing**
75:15
**carolina** 6:13
6:14,19,22
**case** 5:5,8
20:23 52:12
71:7 97:23
**certain** 11:21
12:10 21:19
30:13
**chain** 3:9,14,17
4:4 78:21
**chance** 46:22
55:21 70:21
**change** 50:21
63:22 64:13
78:13 79:1,10
**changed** 63:23
**changes** 17:22
97:19
**characterize**
14:5,6,9
**charge** 42:11
44:22 45:14
58:9 77:16
78:24
**chase** 15:20
**cheryl** 3:17,20
3:23 47:1 56:8
79:7,8,9,13
**chicago** 2:6
98:8

**[chose - correctly]**                                                      Page 5

chose   45:7
circumstances
    80:21 81:18
civil   1:14
clarity   51:18
class   5:15
clear   31:1
    62:18 91:6
clearly   91:24
clerk   7:5
clock   8:12
clocks   12:6
closer   41:21
code   50:5,5,9
coded   49:16
    59:19
coder   49:20
coding   49:17
    49:19,21,23
    50:1
column   35:6
combination
    78:3
combinations
    21:13
come   19:1 24:7
    42:16 65:12
comes   34:3
coming   36:2
    73:13
commencing
    1:16
communication
    56:23

company   14:17
compared
    16:18
complaining
    31:15
complaint
    31:11,12,14,16
    31:18,21 45:7
complete   29:2
    45:8 97:14
completed   26:3
completely
    83:6
completion
    97:17
compliance
    18:8 83:6
compliant   78:5
computer   7:24
    8:1 12:24
    13:13
concerned   54:8
    57:18 81:3
concerns   14:15
conclude   96:13
concludes
    96:15
conclusion
    77:12
conducted   34:6
confused   71:24
considered
    21:15 95:2

consistency
    49:3,9
consistent
    20:15 44:24
    45:5 49:5,13
consistently
    45:15
consolidates
    8:13
context   27:6
    50:17 58:2
continued   4:1
contract   15:21
    16:1 19:4,10
    19:16,21 20:10
    20:21 21:1,16
    22:1,4 23:13
    37:3 61:2
    62:22 67:9,10
    68:13 69:16,24
    71:19 77:10,13
    79:15 80:7,24
    81:17
contractor   7:16
    7:18 9:13,16
    13:6
control   46:3
convert   7:23
cook   98:2
cool   41:8
coordinator
    13:22 18:23
    52:24 53:1
    77:4

coordinators
    52:20
copied   47:5
corner   81:24
    86:1
corporate   15:9
    27:18
correct   6:24
    7:1,14 8:17
    9:19 11:5,6,8
    13:8,10 15:2
    15:17 22:24
    23:1,3 28:14
    29:4,11,15
    30:5 33:1,5
    36:13,21 37:5
    37:8 39:10
    40:3,11,14,17
    40:18 42:6
    47:5,16 48:12
    58:7 59:2,19
    59:20 60:24
    62:20 63:6,10
    64:19 70:8
    82:17 85:9,10
    85:14 91:20
    94:7 95:13
    96:1
corrections
    12:16
corrective
    31:23
correctly   27:22
    27:24 28:2,11

[correctly - deltanet]                                                    Page 6

32:18 45:9,11
58:22 65:5,9
75:16 80:14
**counsel**   2:2
  5:12,19,21
  97:8,23
**count**   65:10
  75:19 88:22
  92:12 93:3,17
  94:20 95:5,16
**county**   97:2
  98:2
**couple**   73:18
**court**   1:1 5:7
  5:11,22 10:13
**courts**   1:15
**cover**   92:19
**covid**   27:12,20
  28:3,12,21
  30:16 32:8,9
  32:10
**created**   56:19
**creates**   12:15
**creating**   57:22
  58:1
**crew**   19:12
  27:2,4,7,12
  28:13 29:23
  39:17,20,22,24
  40:8,12,19
  41:16,16 44:8
  45:4 47:7,10
  47:13 52:9,14
  52:17 63:7

**csr**   1:13 97:5
  98:5
**current**   77:4
**currently**   13:23
**customer**   7:8
**cut**   15:20 94:11
**cv**   1:7 5:8

**d**

**d.r.**   56:11,13
  57:9
**daily**   36:23,24
  59:1 86:11
  94:15
**dairy**   6:12
**dan**   3:20 5:14
  13:16 25:20
  36:2 52:4 57:7
  64:12 93:21
**daniel**   2:4 3:5
**danielle**   2:11
**dash**   94:1
**data**   18:18
  36:19 37:15
**date**   47:2 97:5
**dated**   3:10,15
  3:18,21,23 4:5
  76:22
**dates**   9:8
**day**   1:17 17:7,7
  18:24,24 21:9
  21:9 53:3
  54:12 86:15,16
  87:15,15 90:6

92:3 95:1,1,14
95:15,19 98:3
**daylight**   1:17
**days**   21:9,9,10
  21:10,13 74:6
  74:6,6,7 83:15
  86:9,10 87:16
  87:17 88:6,13
  90:5,19,19,23
  91:4,14,16
  92:1,4,4
**dearborn**   2:5
**debra**   1:12 3:1
  6:1,10
**decide**   43:23
  96:5
**deciding**   39:8
**decision**   48:20
  93:24
**defendant**   1:9
  2:15 5:17
**define**   19:8
**defined**   21:8
  82:7 86:15,22
  87:14 94:1
**defines**   94:4
**defining**   82:15
**delta**   1:8 2:18
  3:8,11,13,16,19
  3:22 4:3,6 5:6
  5:17,19 6:22
  6:24 7:2,4,12
  9:2,5 11:3,11
  11:13,16,20

12:24 13:9,11
14:2,2,6,9 15:7
15:8,11,12,16
19:9,15 20:11
20:21 21:7
23:14 27:13
33:12 37:22
38:3 39:6
41:22 42:7
44:12,23 45:21
48:2,5,10,14,18
48:24 58:24
59:22 60:7,13
60:20 61:5
62:5,15,16,22
66:22 67:20
68:13 69:11,17
71:20 74:24
75:4,12,12
77:15 78:6
79:16 81:17
83:19 87:19,23
88:23 89:4,9
89:10,13,20,24
**delta's**   23:16
  24:11 42:3
  47:21 74:20,22
  75:10 76:7
  85:16,21 87:4
  87:10 90:8,9
  92:7
**deltanet**   42:10
  43:23 79:23,23
  80:1,6

**[demonstrating - dollars]**                                    Page 7

| | | | |
|---|---|---|---|
| **demonstrating** | 69:6 | **different** 12:7,7 | **doc** 35:12 |
| 57:15 | **determinations** | 12:16,17 21:12 | **docking** 35:13 |
| **department** | 40:8 44:9,12 | 31:2 34:3 | **document** |
| 8:14,16 14:2,5 | 44:22 58:6,10 | 35:16 37:23 | 22:12 24:22 |
| 14:8 28:6,13 | 58:10,11,22 | 56:18 59:12 | 25:6,11,14,16 |
| 32:11,13 38:4 | 59:11 84:5 | 79:15 86:21,24 | 33:20,21 34:9 |
| 39:7,13,20,23 | **determine** 31:8 | **differential** 4:7 | 35:8,17,19,22 |
| 40:8,19 45:17 | 32:5 39:1 | **differently** | 35:23,24 36:3 |
| 46:1 52:13 | 68:21 69:4 | 53:16 64:21 | 38:2 41:3 |
| 57:13,14,21 | 80:14 | **direct** 78:18 | 43:17 44:16,24 |
| 78:6,9 | **determined** | **directed** 28:3 | 45:5,15,19 |
| **department's** | 29:13,20 40:17 | 80:5 | 46:17,18,20,22 |
| 39:5 | 58:19 68:24 | **directions** 50:5 | 51:20,22,24 |
| **departments** | 71:11 | **discrepancies** | 55:18,19,22 |
| 26:17 46:4 | **determines** | 58:9,16 59:3 | 58:2 59:24 |
| 52:9,12 61:14 | 83:19 | **discuss** 71:10 | 60:11 70:19,22 |
| **depend** 22:19 | **determining** | **discussed** 50:24 | 73:8,10,12,18 |
| **depends** 30:13 | 39:23 40:1 | 51:12 60:4 | 76:18,20,24 |
| **deponent** 97:19 | **development** | 73:18 | 77:2,8,16 |
| **deposition** 1:12 | 7:19 | **discussion** | 78:14 79:1,17 |
| 2:2 3:1,8,11,13 | **deviate** 32:21 | 57:23 | 80:2,5,9,13,15 |
| 3:16,19,22 4:3 | **deviated** 32:23 | **district** 1:1,1 | 80:20 81:18,23 |
| 4:6 5:4 24:24 | 41:22 | 1:15 5:6,7 | 81:24 92:14 |
| 25:11 33:21 | **dferri** 2:7 | **divided** 16:19 | **documents** |
| 35:19 46:18 | **dicellalevitt.c...** | 71:12 | 43:23 50:9,10 |
| 51:22 55:19 | 2:7 | **division** 1:2 5:8 | **doing** 15:15 |
| 70:19 73:10,19 | **dicello** 2:3 | 13:2 14:1,5,8 | 26:19 37:10 |
| 97:3,8,17 | **dicellolevitt.c...** | 14:10 18:17 | 42:13 43:12,12 |
| **depositions** | 2:7 | **divisions** 11:22 | 45:21 46:5 |
| 1:16 | **differ** 11:23 | 12:8,17,19,20 | 47:22 49:11 |
| **designated** | 12:2,10 13:2 | 15:10,11 21:19 | 58:5,9 65:2 |
| 18:5 | 22:6,15 | 21:20 26:18 | 75:7,10 |
| **determination** | **difference** 64:1 | 61:13,14 | **dollars** 70:11 |
| 40:15,20 59:17 | 65:3 | | |

**double**  27:11
27:20 30:12,17
30:20 31:5,10
32:14 33:10
34:23 39:9
40:1,16,21
41:17,23 42:4
42:8,12,23
43:11 44:10
49:5 58:17
59:12,22 60:8
60:14,20 80:17
80:22 81:6,19
**drafted**  76:17
**dshapiro**  2:14
**dt**  34:23 36:18
36:24 37:14
40:9
**due**  27:12
74:21,23 76:4
76:6
**duly**  6:2 97:9
**duncan**  2:19
5:9
**durham**  7:5

**e**

**e**  3:9,14,17,20
3:23 4:4 10:14
26:5,6,24 27:7
36:7,8,9 37:9
39:15 46:24
47:5,7 50:11
50:12 52:4,19

56:5,7,10,20
57:8 70:24
71:1,4
**early**  3:15 10:9
36:9,16 37:14
46:12
**easier**  93:20
**eastern**  1:17
**ebis**  10:12,15
**effective**  94:18
95:22
**eight**  20:16,19
21:8 84:11,23
85:12,15
**either**  8:12 19:1
96:13
**elected**  11:22
95:15
**eligible**  93:4,11
**emp**  34:10,13
**employee**  6:18
12:22 14:15
16:23 17:1,12
17:18 19:10
22:20 32:2
33:7 34:12,14
53:10 63:20
65:17 67:9,10
68:18 69:17
70:1 71:19,19
74:24 75:21
79:24 80:5,22
81:14 83:24
84:19 85:7,11

87:2 89:9,9
90:4,7,7,24
91:7,9,12,15
92:3 93:4,11
93:15 94:14
95:14,15,20
**employee's**
29:24 71:10
72:2 86:23
88:15
**employees**  6:21
8:15 12:23
13:1 14:17
15:7,8,22 16:1
17:20 18:10
19:2,4,9,15,16
19:21 20:10,21
21:1,16,21,24
22:1,4,23 23:6
23:9,14,22
24:20 26:21
27:23 28:4,7
28:10,13 42:20
61:2 62:5,15
62:16,22 68:13
72:17 74:2,2,5
74:8,11,13
79:14,16,21
80:1,8,13,16,24
81:2,17 82:20
83:20 84:9
86:7 87:18
88:10 89:8,24
90:3,16 94:5

**ended**  85:11
**ends**  70:17
93:19
**entered**  48:11
**entire**  38:8
63:20 67:11
**entitle**  92:10
**entitled**  75:15
**entries**  8:12
**entry**  8:13 17:7
17:9,13 45:22
**environment**
43:4
**epis**  10:4,16
**equal**  72:22
82:19 83:4,9
**equals**  71:12,17
**errors**  12:15
**essentially**
19:11
**established**
39:12
**et**  5:5
**everybody**  61:9
67:16
**exact**  9:8 11:4
12:11 46:1
**exactly**  31:17
72:22 74:9
77:24
**examination**
3:4 6:5
**examined**  6:3
97:10

**[example - forest]**                                   Page 9

example  49:5
  54:3 87:8
examples  44:13
excel  3:12 34:2
exception
  32:12
excess  29:17,18
  30:3 74:14,16
  75:24 84:23
  94:15
excessive  75:24
exclusive  86:11
  94:15
excuse  10:8
  13:13 64:3
  92:1
exhibit  3:8,11
  3:13,16,19,22
  4:3,6 25:9,9,12
  33:18,19,22
  35:17,17,20
  46:16,19 50:13
  51:19,20,23
  55:15,17,20
  70:15,17,20
  72:24 73:8,11
exhibits  3:6 4:1
expect  80:8
explain  7:21
  8:11 22:14,15
  64:1
explains  91:23
expound  12:9

extent  48:2
extra  53:2,13
  75:9 87:3 90:8
  90:9

**f**

fair  20:5,9,18
  59:21 63:5
  80:24
fairly  80:8
familiar  15:21
  44:15 76:23,24
  77:7
faq  71:10
federal  1:14
feed  14:24
  38:15
feeding  47:23
feeds  38:19
feel  30:23 62:11
fellow  16:18
  90:7
felt  78:13
ferri  2:4 3:5
  5:14,14 6:6,7
  8:1 10:5,20
  12:4 13:15,18
  13:20 15:19
  22:11 25:4,8
  26:4 28:16
  30:3 31:8,22
  32:18,21 33:16
  36:5,7 37:12
  37:21 38:20

39:7,14 41:8
41:15 42:19
43:16,22 44:7
45:3,10 46:8
48:4,9,22 49:4
49:8,19 50:11
51:7,9,17 53:8
53:23 54:10,18
54:23 56:1,4
56:18 57:9
58:14,24 59:7
59:19 60:2,19
61:1,10,16,24
62:13 63:16,22
64:13,18 65:15
65:23 66:5,11
66:16,21 67:2
67:17,23 68:23
69:5,10,15,21
70:6,14 71:23
72:5,17,23
73:7,17 74:10
74:22 75:8,20
76:6,12,17
77:15 78:1,23
79:4,14,21
80:7,15,21
81:4,8,16,22
83:18 84:3,17
85:6,23 87:11
87:23 88:8,21
89:2,4,12,18
90:1,13 91:3
92:14,17,23

93:22,24 95:9
  96:3,6
figure  30:6
  43:17 69:11,22
filed  5:6
files  10:19
final  17:20
find  45:10
  68:14
fine  36:5
first  6:2 7:4 8:2
  25:19 26:5
  46:24 50:12
  52:23 73:21
  77:1 86:15
  87:14 88:9
  90:15 97:9
five  21:9 74:5,6
fixed  13:17
flat  10:19
flight  19:12
floor  2:5
fly  19:12,12
follow  27:3
  60:18 96:5
followed  6:4
following  2:2
  51:11 58:3
foregoing  97:3
  97:13
forementioned
  97:15
forest  6:12

**[form - going]** Page 10

**form** 7:22 10:3
  12:1 15:18
  22:8 29:22
  32:19 33:11
  38:17 39:3
  42:18 43:14,19
  44:1 45:1,6
  49:7,15 51:3
  56:17 59:5,15
  60:1,16,23
  61:6,11 63:18
  65:13,20 66:2
  66:7,13,24
  67:14,21 69:1
  69:7,12 75:18
  76:2,8 77:11
  79:18 80:11
  81:12 83:12,22
  84:15 85:2,18
  87:6,20 88:2
  88:18 89:1,6
  89:16 90:10
  91:2
**fortin** 2:10 5:16
  5:16 7:22 10:3
  10:17 12:1
  13:16 15:18
  22:8 25:2,5,20
  26:2 28:15
  29:21 31:6,19
  32:16,19 33:11
  36:2 37:11,18
  38:17 39:3,11
  41:5,7 42:15

42:17 43:14,19
44:1,3 45:1,6
46:6 48:1,6,19
49:1,7,15 50:7
51:3 53:7,19
54:6,14,21
55:24 56:2,17
57:7 58:13,20
59:5,15 60:1
60:16,23 61:6
61:11,23 62:10
63:14,18 64:9
64:12,15 65:13
65:20 66:2,7
66:13,17,23
67:14,21 68:19
69:1,7,12,18
70:2,12 71:22
72:4,12,19
73:1,14 74:4
74:17 75:5,17
76:2,8,15
77:11,22 78:20
79:2,11,18
80:3,10,18
81:1,7,12,20
83:12,22 84:15
85:2,18 87:6
87:20 88:2,18
89:1,3,6,16,22
90:10 91:2
92:11,16,19,22
93:20,23 95:8
96:4,12

**found** 44:23
  57:20
**foundation**
  37:11 39:12
  53:19 54:14
  64:15 67:14
  72:13,20 85:3
  85:19
**four** 21:9 24:10
  45:23 74:6
**fourth** 17:14,16
**franklin** 98:7
**frequency**
  50:22 63:19
**frequent** 66:19
**frequently**
  63:12 65:24
  67:3
**friday** 67:11
**full** 6:9 19:22
  20:1,10,20
  32:12 68:13,15
  71:18,19 72:2
  73:22 74:10
  82:20 83:20
  84:17,18 86:7
  88:9 90:3,16
**further** 96:3

**g**

**general** 24:17
  41:9 72:3
**generally** 11:17
  14:13 52:8,16

58:24 61:2
62:21 70:1,10
72:18 81:10
**geographically**
  78:7,10
**georgia** 1:1
  2:12 5:7 23:14
  23:15,17 24:7
  24:12,13 78:8
**getting** 49:4
  73:14 81:3,10
**give** 20:6 21:23
  43:2 46:1,2
  62:8 63:2,15
  64:9 65:24
  93:21
**given** 20:19
  40:2,9 50:4,8
  68:12 72:9
**go** 10:2,4 12:15
  26:4 32:11
  34:8,18 56:3
  64:12 78:22
  80:1 82:3
  85:23 86:24
  88:10 90:1
  92:14,22 93:18
  94:8
**goes** 57:20
  75:20
**going** 5:1 22:12
  24:22 25:5,20
  33:18,19 35:16
  39:11 41:10

**[going - hr]**                                                    Page 11

45:19 46:16
49:12,12 51:5
51:19 55:12,14
55:16,17 57:17
62:10 65:15
67:21 68:19
70:14 73:2
77:11,22 78:1
88:8 96:7,14
**good** 5:1,14,16
6:7,8 25:24,24
36:3 51:18
92:22 96:10
**goodyear** 1:4
5:5 71:1,6 72:8
**gotten** 29:19
57:14
**govern** 42:8
**granted** 32:12
**gray** 3:17,20,23
47:1 56:8 79:7
79:8,9
**great** 37:12
**ground** 15:21
16:1 19:4,10
19:11,16,21
20:10,20 21:1
21:16,24 22:3
23:13 61:1
62:21 67:9,10
68:13 69:16,24
71:19 79:15
80:7,23 81:17

**group** 6:21,23
14:1,4,7,8,12
14:14 15:4,5,6
16:3,10,21
17:5 18:10
26:11,13 28:23
29:1,5 37:19
47:11,13 49:24
50:1,3 54:7,19
77:20
**groups** 15:10
15:11 18:16,18
45:21,24 49:4
58:9,17 59:11
**guaranteed**
72:15
**guess** 7:9 10:21
18:2 19:18
20:22 29:12
30:6 38:20
41:5 66:21
69:21 83:8
91:6
**guidance** 44:11

**h**

**half** 64:2
**hall** 71:9
**hampton** 3:20
52:4,19
**hand** 81:24
86:1 92:16
**handle** 17:20

**handles** 17:6,7
50:23
**hang** 55:24
**happy** 43:20
71:11
**hard** 12:12
**head** 46:14
48:21
**header** 94:10
**headquarters**
24:11
**hear** 40:4,23
**heard** 40:24
67:19,22 68:2
**heavy** 63:8,11
63:16
**help** 14:21
43:20,21 57:15
**hereinabove**
97:16
**hereto** 97:21
**higgins** 4:5
**hills** 2:4
**historically**
58:15
**history** 18:10
**hol** 35:10
**hold** 7:6 13:23
**holiday** 35:11
95:1
**holidays** 57:21
**home** 6:17
**hour** 36:2 74:6
84:12

**hourly** 71:11
71:13
**hours** 4:7 8:15
8:24 11:19
21:8,9,13
27:19 28:5,5
28:12,14,22
29:3,6,6,8,10
29:14,16,17,19
30:8,13,15,18
30:19,21,22
35:11,13,15
37:22 44:15,24
45:5,15 54:9
59:23 60:10,14
63:24 64:4,5
71:12,16,17,18
72:6,7,16,18,22
73:17,23 74:8
74:14,15,16,20
74:20 75:22,24
76:1,3 79:16
82:19,23 83:4
83:10 84:5,7
84:10,13,18,22
84:23 85:8,12
85:12,16,17
87:2,9 93:16
94:15
**hr** 9:16 13:22
14:3,7,8,10
18:17,20,22
26:10,18 37:4
38:8 42:10

77:4 78:4,9
**hub** 23:21
**huge** 23:18,20
24:18
**human** 7:16,18
13:6 18:20
26:14 59:16
**hundred** 68:8
**hypothetical**
55:6 70:2,4
74:18 76:10
78:20 91:2
**hypothetically**
84:20,21

**i**

**idea** 19:17 20:2
20:4,17 23:15
23:18,22 27:6
31:13 34:4
36:15 46:7
54:4,22 61:18
61:20 63:2,11
65:22 66:4
68:21 69:15,19
70:13 76:19,22
79:20
**identification**
25:12 33:22
35:20 46:19
51:23 55:20
70:20 73:11
**identify** 5:12
46:2 62:18

**illinois** 2:6 97:1
98:2,8
**implemented**
27:13
**important**
14:18 80:23
**include** 56:10
81:5
**included** 59:23
**includes** 73:22
**including** 36:10
52:5,9
**incorrectly**
55:2,3,5,10
**individual** 32:5
89:24
**individually**
1:4 32:2
**individuals**
36:17 40:7
**industry** 72:6
**information**
8:8,13 18:11
34:15 38:5
39:4 49:12,17
50:2 78:22
**informed** 79:14
79:16 80:16
**informs** 91:21
**infrequent**
66:12,20,22
**infrequently**
66:6 67:4

**inhouse** 5:18
**input** 8:24 38:5
57:17
**inputs** 11:18
12:3,5,11 18:6
**inputted** 8:8
**instance** 67:23
**instances** 43:10
44:21 45:10
68:2,3 76:12
89:13,20
**interested**
97:22
**internet** 12:23
**interpose** 62:10
**interrogatories**
6:3 97:10
**interruption**
26:2
**introduce**
24:22 33:18,19
45:19 46:16
51:19 55:15,16
55:17 70:14
**introduced**
25:8 73:7
**introducing**
35:17
**involve** 52:17
**involved** 17:19
39:13 89:9,11
89:24
**irregular** 21:3
21:11,12,15,17

21:19 22:4,7
22:20 24:5
29:23 72:8,14
72:17,21 74:3
74:8 82:7,16
82:18,23 83:9
84:1,11,19
85:7 86:8
87:18 88:10
90:3,17
**irregularly**
22:23 23:5,6
72:1 83:20
84:9
**issue** 69:5,9
78:24
**issues** 13:14
17:8,9,13,19
26:20 27:12
57:18

**j**

**j** 1:13 97:4 98:5
**january** 7:3
71:1
**john** 3:14 36:9
36:16 46:12
**joined** 27:2
**joki** 3:23 56:8
**july** 47:3

**k**

**k** 97:2
**keep** 37:22

**kevin** 2:19 5:9
**kin** 97:23
**kind** 15:15 18:7
  24:19
**knew** 19:5
**knott** 2:18 5:18
**know** 8:10 9:8
  10:21 11:4
  12:11 16:8
  18:9 20:3 24:1
  24:6 25:13,19
  26:23 31:7,17
  31:20 32:17,20
  32:23 33:23
  34:9,10,15
  35:1,21 37:16
  37:16 40:22,24
  45:16,17 46:3
  46:8,8,15
  48:13 49:21,24
  49:24 50:4,16
  52:12,14,16
  53:21 54:16
  55:11,21 56:21
  56:22 59:8
  66:19 68:12,15
  69:3,14 70:9
  70:10,21 71:6
  72:15 73:15
  76:17 77:7,24
  78:9 79:4,8,12
  80:1 81:5,10
  81:23 82:2
  87:23 88:6

89:12,14,14,19
  93:24
**knowing** 55:7
  74:19
**knowledge**
  43:16 76:20
**known** 77:3
**knows** 81:15
**krista** 27:2

**l**

**lack** 39:11
  53:19 72:19
  85:3
**lacks** 37:11
  54:14 64:15
  67:14 72:12
  85:19
**larger** 25:22
**late** 10:8
**law** 62:13
**leader** 78:15
**leaders** 12:22
  18:3,9,12 19:1
  26:20 42:21,22
**leadership**
  46:10,11 80:4
**legal** 5:9,10
  62:12 77:12
  78:4,6 96:17
**letters** 86:4
**levitt** 2:3
**lg** 3:8,11,13,16
  3:19,22 4:3,6

**liability** 14:16
  14:19,20 17:19
  32:4 94:24
**license** 98:6
**life** 6:20
**likely** 10:7
**line** 71:16
**lines** 1:8 2:18
  5:6,18,19
**list** 57:11
**little** 7:21 8:11
  12:9 22:12
  34:3 60:6
  65:11 84:1,4
  94:12
**lived** 6:19
**llp** 2:3,10
**load** 36:18
  37:14 38:1
**loaded** 38:3
  39:4 88:6
**loading** 38:12
**located** 16:3,6
  42:10
**location's** 18:6
**logic** 89:14
**long** 3:9,18
  6:19 7:6 9:4,15
  10:6 11:3 26:6
  26:9,24 47:1
**look** 14:15
  29:24 43:23
  46:20,22 55:14
  55:21 57:3

69:24 70:1,22
  70:24 80:2
  81:22
**looked** 32:4
**looking** 34:4
  36:8 38:1 41:1
  44:13 50:12
  51:18 52:1
  55:11 57:7
  86:3 87:1
  90:15
**loop** 6:12
**lost** 55:24
**lot** 17:21 18:8
  23:21,23 24:20
**lots** 57:16
**lukas** 1:4 5:5
  71:1,6,9
**lump** 36:19
  37:15

**m**

**made** 44:23
  58:10,12 97:15
  97:19
**madeline** 2:4
**mail** 3:9,14,17
  3:20,23 4:4
  26:6,24 27:7
  36:7,8,9 37:9
  39:15 46:24
  47:5,7 50:11
  50:12 52:4,19
  56:5,7,10,20

57:8 70:24
71:1,4
**mails** 26:5
**maintaining**
77:16
**maintenance**
46:3
**majority** 23:10
**make** 12:16
21:5 25:22
53:9 56:6 65:3
71:23 72:5
78:4 82:22
83:5
**making** 40:7,19
44:9,11,22
59:16 79:1
**management**
18:19
**manager** 16:15
26:14,18 78:18
79:5
**managerial**
16:18
**managers**
16:18 18:14
**manages** 16:20
**manpower** 8:4
**manual** 7:23
8:13 10:19
43:12,12 44:9
44:22 45:22
58:6,9,16
59:11,16 65:1

**manually** 37:1
37:19,21 38:2
38:21 39:8
40:2 41:18
42:4,12 46:5
58:23
**manuals** 10:18
**march** 1:18 3:2
5:2 98:3
**marked** 25:11
33:19,21 35:19
46:16,18 51:22
55:17,19 70:19
73:7,10
**master** 96:16
**matched** 60:21
**matter** 5:5
**mean** 8:10
10:23 12:5
14:18 17:9
23:16,18,20
26:16 27:14
32:8,9 49:9
50:16 55:3
58:1 63:16
65:9 67:7
68:15 69:9
72:2 74:22
75:8,9 81:8
83:3 86:13
87:12,13,22
93:11 94:23
**means** 27:7
35:14 37:17

63:12 87:13
92:3 93:13,15
94:24
**media** 96:16
**meet** 28:6
**meetings** 71:10
**mentioned** 8:18
63:7
**mentions** 47:7
**message** 57:3,8
57:9
**messages** 56:11
56:16,19,21
**met** 75:1
**metadata** 3:9
3:14,17,20,23
4:4,7
**mhills** 2:7
**mind** 51:9 96:4
96:6
**minfang** 3:9,17
26:6,9 47:1
**minute** 25:18
65:16 72:23
**miranda** 4:4
**missed** 17:14
**misstates** 28:15
29:21 44:1
58:13 60:1
75:17 76:2,8
84:15 95:8
**misstating**
28:17

**moment** 51:5
56:4
**monday** 67:11
**monitor** 14:21
**month** 22:16
64:3
**monthly** 22:10
22:16,19,24
23:9 50:18,20
50:22 51:1,13
63:19 64:2,14
64:18,21 65:7
**morning** 5:1,14
5:16 6:7,8
**mouth** 33:2
**move** 35:16
**movement**
16:23 17:1,12
17:18
**moving** 41:8
**mps** 8:2,3,19
9:11,24 10:15
10:20 11:3,17
11:20 12:6,14
12:20,22,24
13:3 14:23,24
37:7 38:12
88:4
**multiple** 15:10
15:10 18:18
32:1 68:2,3
**mytime** 9:14,24
10:15,20 11:10
11:14,17,20

**[mytime - okay]** Page 15

12:6,19,21,22
13:3 14:23,24
36:23 37:6
38:9,12 40:13
47:14 50:19,21
50:23 52:10
53:17,18 54:13
54:20 88:4

**n**

**nadine** 1:13
5:11 97:4 98:5
**name** 5:9 6:9
34:14 38:8
61:22 78:16
**named** 97:8
**names** 46:4,15
**nature** 31:14
**ne** 2:11
**necessarily**
83:19
**need** 10:5,10
18:9
**needed** 29:2,2
29:24 78:13
**needs** 41:5
**neither** 13:4
**neutralized**
92:9
**never** 31:16,20
93:4,10
**nevertheless**
48:23

**new** 37:13
**nm** 34:13
**non** 15:21 16:1
19:4,10,16,21
20:10,21 21:1
21:16 22:1,4
23:13 61:2
62:22 67:9,10
68:13 69:16,24
71:19 79:15
80:7,24 81:17
**normal** 32:9,10
78:21
**north** 2:5 6:12
6:14,19,22
98:7
**northern** 1:1
5:7
**nos** 93:21
**notary** 1:14
97:5,12 98:2,6
**noticing** 5:13
**november**
36:12
**number** 19:17
21:12,21 34:12
52:5 55:6
81:23 82:10
83:15
**numbering**
24:24
**numbers** 21:23
46:1,4

**o**

**o** 97:2,2
**o'clock** 96:11
96:15
**oath** 5:22
**object** 10:3,17
12:1 15:18
22:8 29:21
32:19 38:17
39:3,11 43:14
43:19 44:1
45:1,6 49:15
51:3 59:5,15
60:1,16 61:6
61:11 63:18
64:10 65:13,20
66:2,7,13,24
67:14,21 68:19
69:1,7,12
75:17 76:2,8
77:11 80:11
83:12,22 84:15
85:2,18 87:6
87:20 88:2,18
89:1,6,16
90:10 91:2
**objection** 7:22
28:15 29:21
31:6 32:16
33:11 37:11,18
42:17 46:6
48:1,6,19 49:1
49:7 50:7 53:7

53:19 54:6,14
54:21 56:17
58:13,20 60:23
61:23 62:11
63:14 64:15
66:23 69:18
70:2,12 71:22
72:4,12,19
74:4,17 75:5
75:17 76:15
78:20 79:2,11
79:18 80:3,10
80:18 81:1,7
81:12,20 89:22
92:11 95:8
**objective** 47:18
47:21,24 48:5
48:10,14,17,24
**objectives** 48:2
**occurrence**
66:22
**offered** 28:7
**office** 6:16 16:5
24:16,17
**official** 98:1
**offs** 95:24
**oh** 13:15 45:20
55:23 70:16
92:19
**okay** 7:9 9:20
9:24 10:10,15
11:23 12:4
13:12 14:24
15:6,15 16:17

**[okay - pay]**                                                                                     Page 16

17:16 19:21
22:11,18,22
23:16 24:11,14
24:20 25:7
26:3,9,22,24
27:16 28:21
32:13,13 33:6
34:10 35:10,16
36:6 38:14
39:7 40:6,12
41:2,8 42:2
44:18 45:19
51:15 52:3,19
54:2 56:6
57:11 59:7
62:2,21 70:6
70:23 73:15,16
74:1,13 79:8
82:6 84:22
85:11,23 92:21
92:22 93:10
94:4,18 96:4
**once**   24:9 70:21
**operation**
  23:16,21 28:7
**operations**
  24:18
**opinion**   49:2
  62:12 77:14
  78:3
**ops**   18:19
**oral**   6:3 97:10
**original**   90:7

**ot**   34:19 36:18
  36:24 37:14
  40:1,9 57:18
  93:3
**outlook**   56:20
  56:22
**outside**   21:14
  36:17
**overtime**   4:7
  13:1 27:3,7,11
  27:20,22 28:1
  28:1,8 29:9,13
  29:19 30:7,12
  30:17,20 31:4
  31:9 32:14,22
  33:3,9 34:21
  39:2,8 40:16
  40:21 41:17,23
  42:4,8,12,23
  43:11 44:10
  45:14 49:5
  50:6 51:2,14
  54:1,11,19
  55:3 58:6,10
  58:17 59:1,1,4
  59:11,22 60:8
  60:14,20 64:13
  64:16,21 65:10
  74:16 75:3,15
  75:19,23 76:4
  76:11,13 80:17
  80:22 81:5,11
  81:19 82:6,16
  84:5 85:17,22

86:4,8,11,18,20
87:5,10 88:1
88:16,22,24
89:4,13,20
90:9,18 91:23
91:24 92:10,13
93:4,11,17
94:1,5,9,13,16
94:21 95:3,5
95:16
**own**   15:15 40:7
  57:22 58:1

**p**

**p**   10:14
**p.m.**   47:3 73:3
  73:6 96:8,11
  96:15
**page**   3:4,7 4:2
  21:6 25:19
  26:5 36:8
  73:21 81:22
  82:3,3,10,12
  85:24,24 86:2
  92:14 93:18,18
  94:9,13 95:22
**paid**   13:1 14:20
  27:24 28:9
  29:9,13,19
  30:12,17,20
  32:6,14 33:8,9
  33:14 35:9
  39:8 40:1,9,16
  40:20 42:9

43:11 44:11
45:8,11 49:4
50:20 51:1,2
51:13,14 53:3
53:14,15,16,21
53:23 54:9,11
54:17,19 55:2
55:13 58:18,22
59:12,13,23
63:23 64:5
74:16 75:23
76:11,13 80:8
80:14 85:16,21
87:10 90:8
**pamela**   3:23
  56:8
**part**   20:1 38:9
  43:4 47:21
  50:14 75:9
  88:12 93:7
**particular**
  16:17 27:17
  46:11
**parties**   97:24
**partner**   26:15
**party**   5:13
**past**   30:23
  42:12 77:9
**pay**   22:6,9,15
  23:4,5,8 28:1,8
  30:17,17 31:5
  31:10 32:1,14
  32:14,18 33:3
  36:19 37:15

39:2 49:13
50:21 53:1
54:1,3,9 55:3
57:17 58:17
59:17 63:19
64:3,4,6,7,14
64:22 69:16,23
80:17 81:6,19
86:21,22,22
87:5 88:16,23
89:4
**paycheck** 22:17
22:19 81:3,5
**paychecks**
22:16
**paying** 30:1
32:22 45:17
89:13,20
**payment** 42:22
64:20
**payouts** 17:20
**payroll** 8:14,16
9:1 11:19 15:1
15:3 16:6 38:6
38:15 47:23
49:12 78:4,9
**peachtree** 2:11
**penalize** 83:24
**people** 22:6
28:22 29:2,5
31:3 36:10
37:21 42:11
43:11 44:8,21
45:8,11 48:10

50:20 52:5
58:5,16 65:24
66:20 67:4
78:11,11 81:10
82:23
**percent** 27:13
28:4
**percentage**
19:24 63:2
**period** 23:4,5
27:20,23 30:7
30:14,15,16
31:3 32:15
38:7,10 43:6
45:3 53:1 64:3
64:5 86:11,13
86:15,18,21
87:9,11,12,13
87:14 88:14
90:20 91:14
92:2,5 95:1
97:20
**periods** 22:6,9
22:15 23:8
32:1 36:19
37:15 64:17
86:22,22,23
87:19,24
**permitted**
62:22 67:5,12
**person** 18:5
32:5 45:13
77:19 90:4

**personal** 14:20
35:9 49:2
**pertaining** 1:16
**philip** 4:4
**phone** 98:8
**pick** 33:7,12
87:9 88:14
**picked** 54:12
55:8 75:22
85:15 87:3
**picking** 76:4,6
**picks** 53:2,13
75:8 88:11
90:7
**pilots** 15:13,14
15:15,19 52:17
**place** 97:5,16
**plaintiff** 5:15
71:6
**plaintiff's**
50:13
**plaintiffs** 1:6
2:8 5:5
**please** 5:12,22
6:9 25:13
28:20 33:23
35:21 36:1
41:10 44:6
46:20 52:2
55:22 56:4
57:4,16 64:1
70:21 73:2
82:2,4 92:15
93:18 96:7

**plural** 8:19
**point** 9:5 13:12
39:9,22,24
40:7,12,15
42:2 44:9
47:13 66:14
**policies** 27:19
27:21 33:3
41:22 42:3,7
42:10,20,24
49:11,14 59:18
79:23
**policy** 27:24
32:6,15 39:6
44:13,14,18
57:23 58:4
59:22 60:7,7
60:10,18,21
65:14 67:13
91:18,19,21
92:12 93:7
**pop** 13:17
**position** 7:4,7
13:23 19:11
**possible** 54:18
54:24 55:1
**possibly** 69:24
**posts** 75:12
**potential** 83:15
**potentially**
46:12 55:4
74:11 78:2
83:1

| | | | |
|---|---|---|---|
| **power** 79:10 | **proceed** 5:24 | **q** | 81:11 |
| **ppt** 35:5,7,9 | 41:14 73:6 | | **ravi** 3:14 36:9 |
| 95:1 | 96:11 | **question** 11:1 | 36:14,17 |
| **practice** 60:13 | **process** 7:24 | 20:18 28:19 | **reach** 74:7,9 |
| 60:19 83:11,21 | 12:2,4,10 | 29:12 30:10 | **read** 25:19 |
| **pre** 32:9,10 | 79:12 | 37:12,13 38:20 | 43:17 51:11 |
| **preceding** | **processes** 18:6 | 40:5 44:4,6 | 52:23 56:4 |
| 86:10 87:11,12 | **produced** 34:2 | 46:9 48:3,8 | 80:13 87:1 |
| 87:16 90:20 | **programs** | 49:8 51:6,7,10 | 93:20 |
| 91:14 92:2,5 | 12:17 | 52:23 53:9 | **reading** 25:17 |
| **prepare** 18:7,9 | **proposed** 5:15 | 54:5,12 55:9 | 26:3 35:24 |
| 18:10 | **provide** 20:7 | 58:14 59:6 | 51:9 91:18 |
| **prepared** 57:16 | **provided** 9:1 | 61:9,17 70:4 | **ready** 96:13 |
| **prepares** 18:1 | 43:7,10 86:9 | 74:21 89:19 | **really** 67:6,7 |
| **present** 2:1,17 | 90:19 91:13 | 95:17 | 69:3,21 |
| 97:7 | 92:1 97:20 | **questions** 19:1 | **reason** 20:23 |
| **pretty** 41:9 | **provides** 8:14 | 52:20 57:16 | 24:2 45:16,18 |
| **prevent** 61:15 | 8:15 49:13 | 96:3,12 97:10 | 54:23 59:8 |
| **previously** 97:8 | **public** 1:14 | 97:14 | 69:10 75:20 |
| **primarily** 16:4 | 97:5,12 98:2,6 | **quick** 96:4 | **reasoning** |
| 16:6 | **pulled** 34:16 | **quotas** 14:21 | 89:12,19 |
| **prior** 11:7 | **punches** 12:14 | **r** | **recall** 41:23 |
| 53:22 54:13 | **purpose** 27:16 | **r** 2:4,18 3:5 | **receive** 31:4 |
| **probably** 20:5 | **purposes** 87:24 | 23:2 74:14 | 36:19 37:16 |
| 20:20 24:10 | 94:20 | **r.d.** 56:15 | 39:2 42:23 |
| 80:23 | **pursuant** 1:14 | **raise** 78:14,19 | 44:11 80:17,22 |
| **problem** 9:22 | **put** 10:22 11:18 | 78:23 79:9 | 81:19 |
| 17:10 48:9 | 33:2 47:18 | **raleigh** 7:5 | **received** 31:9 |
| 56:1 82:15 | 57:11 93:4,11 | **range** 70:7,9,11 | **recently** 27:2 |
| **procedure** 1:15 | **putting** 10:24 | **rate** 71:11,13 | **recess** 41:12 |
| 27:24 32:22 | 23:11 | **rates** 30:12,12 | 73:4 96:9 |
| **procedures** | | 39:9 40:17,21 | **recognize** |
| 27:19,21 33:4 | | 44:10 54:11 | 73:17 |
| 41:22 42:3,7 | | 75:23 80:17,22 | |

**[reconciliation - right]**                                      Page 19

**reconciliation**
    27:11,14
**reconciling**
    57:20
**record**  5:2 6:9
    41:11,13 73:2
    73:5 96:8,11
    96:15 97:14
**recorded**  5:3
    36:24
**recording**
    36:23
**reduce**  28:3
**reduced**  27:13
    29:8,18 30:4,8
    30:8,18,21
    32:8
**reduction**
    28:22
**refer**  47:10
    52:8 56:13
    71:15
**referred**  77:9
    97:16
**referring**  8:20
    39:19 44:18
    93:8 95:24
**reflect**  83:19
**refresh**  73:16
**regarding**  13:2
    27:19
**regardless**  64:4
**regular**  21:2,6
    21:8,14,17,18

21:22 22:1,6
22:20 23:23
24:3,4 53:3
71:21 74:2,5
74:13 84:24
94:2,6,14
**regularly**  23:2
    33:13 54:12
    57:1 72:1
    75:21 94:14
**rehired**  13:11
**relate**  37:9
**remember**
    41:18 61:2
**remind**  78:17
**remote**  6:18
**remotely**  1:13
**renee**  1:12 3:1
    3:9 5:4,19 6:1
    6:10 25:5
**repeat**  44:5
**rephrase**  28:19
    58:14 60:2
    81:8 89:18
    95:9,10
**report**  16:9
**reporter**  5:11
    5:22 10:13
    42:15 51:11
    97:20
**reporting**  17:6
    17:15,24
**reports**  18:1,7
    18:8,9

**representing**
    5:10
**request**  43:1,2
    74:20,23 75:10
    76:7 85:16,21
    87:4,10 90:8,9
    92:8
**requested**
    97:18,19
**required**  86:8
    86:18 90:18
**requirement**
    50:10
**requirements**
    28:6 50:8
    61:15
**reservations**
    24:19
**resource**  18:20
    26:14
**resources**  7:16
    7:18 13:6 27:2
**respect**  42:22
    50:6 63:7
**responsibilities**
    7:17 14:13
    15:7 16:20
    18:22,24 19:3
**responsibility**
    15:3,12,13,24
**responsible**
    18:5
**restate**  60:5

**restating**  60:3
**results**  12:3
**retained**  96:16
**rethink**  82:22
**retire**  17:21
**review**  27:3
    42:21 97:17
**reviewed**  32:2
    83:6,7
**right**  7:13 8:16
    9:18 10:12
    11:7 13:5,7
    15:1,16 19:6
    23:6 24:20
    25:1,8 29:3,7
    29:10,20 30:4
    30:14,18 33:4
    36:7,16,18
    37:4,7 38:16
    38:22 39:2,9
    40:2,10,13
    42:5,13 43:24
    47:15 48:11,14
    56:2,7 58:12
    59:1 60:15,22
    62:19 63:5,9
    64:6 70:7
    73:16 75:24
    76:7 81:11,24
    82:16 83:21
    84:6,19,24
    85:1,13 86:1
    87:5 88:8
    90:23 92:16

**[right - semi]**                                                    Page 20

94:6 95:7,24
96:3,14
**role** 7:15,23
9:12,16 13:6
13:12,21 16:14
16:18 37:4,9
77:4,4
**room** 5:18
**rotation** 83:1
83:15
**rotations** 21:13
72:21
**row** 34:10,18
**rpr** 1:13 97:5
98:5
**rules** 1:14
49:17 57:22
58:1 59:18
75:3 76:4

| s |
| --- |

**s** 10:14 35:14
**salary** 64:3,7
71:12
**sap** 36:17 38:5
38:6,8,9,11,18
38:19,23
**saw** 31:16,20
77:1
**saying** 29:12
31:17 32:24
42:15 58:3
62:4,17 67:18
75:23 84:8,14

85:6,7 87:16
**says** 27:1 34:19
36:16,22 37:14
39:17 50:12,13
52:20,24 57:13
73:22 82:6,18
83:8 86:7
87:11 90:17
92:12 93:2
94:8,13,18
**scenario** 88:11
90:2,4,22 91:7
92:6
**scenarios** 87:1
**schedule** 21:2,3
21:6,8,11,12,14
21:15,17,18,22
22:1,4 23:24
24:3 27:13
30:1,9 32:8,9
32:10 67:16
71:21 72:3,9
72:14 73:22
74:2,3,14 82:7
84:19,24 85:1
85:5,8 86:8,23
87:17,18 88:10
90:3,17 92:1
94:2,6
**scheduled**
22:20,23 23:5
23:6 28:14,22
29:3,6,8,19
30:4,8,15,18,19

30:21,22,22
32:3,7 33:14
52:24 53:3,12
54:12 55:7
64:17 72:1,1
72:15,18 73:23
74:5 75:21
82:19 83:4,10
83:20 84:1,1,5
84:7,9,18 85:8
86:9,10,16
87:2,9,15 88:6
88:13 90:5,6
90:14,18,19,22
91:4,13,16
92:1,4,4 93:16
94:14,19 95:6
95:12,14,18,19
**schedules**
14:16 21:20
22:7 24:5,5
28:4 29:24
55:7 57:14
72:17,21 74:8
82:16,18,23
83:7,9 84:11
88:5
**scheduling**
52:17
**screen** 73:14
93:21
**scroll** 56:3
**seal** 98:1

**search** 80:5,6
**second** 13:16
25:21 27:1
35:2 36:8
55:14 57:3,8,8
57:9 64:9
73:15,15
**section** 92:23
94:4
**see** 13:4 25:13
25:15 26:6
27:1,4 28:16
33:23 34:18
35:21,23 36:2
36:7,16,22
37:1 39:14,17
46:24 47:8
50:11,13 51:24
52:4,21 53:4
55:15 56:7,10
57:10,18,23
69:5 71:4,13
73:12,22 81:9
82:6,20 86:4
86:11 90:17
92:23 93:2
94:2,4,8,10,12
94:16,21
**seeing** 35:6
82:9 85:5
**seen** 49:19
**semi** 22:10,16
22:19,24 23:9
50:18,20,22

**[semi - speculation]**                                                    Page 21

51:1,13 63:19
64:2,14,18,21
65:7
**send** 11:19 38:4
57:11
**senior** 13:22
18:22 77:4
**sense** 53:9 72:5
**sentence** 27:1
83:18 87:1
88:9 90:2,15
91:13 94:13,18
94:23 95:21,22
96:2
**sentences** 93:2
**separate** 15:4,5
**september** 52:5
**service** 7:8
**servicenow**
19:1
**set** 24:14
**seth** 2:10 5:16
**seven** 20:15,19
**several** 16:16
**seyfarth** 2:10
5:17
**seyfarth.com**
2:13,14
**sfortin** 2:13
**shapiro** 2:11
**share** 71:11
**shared** 79:21
**shaw** 2:10 5:17

**sheet** 34:3
92:20
**shift** 4:7 33:8
35:2,4 40:2,9
40:16,20 53:2
53:3,12,14,16
54:11 63:8,12
68:17,18 69:22
69:23 75:1,9
75:22 83:1,2,5
83:16,16 84:8
87:3,5,10
88:11,14,15,16
90:8,9,14,23
91:8 92:7,10
**shifts** 28:8,9
30:2,3 33:13
52:24 53:13
54:8 55:8 61:4
61:9,10 62:6
62:16,17,23
63:3,20,21
67:5,12,19
68:4 83:6
84:12 89:10
**shorthand**
97:11
**show** 25:5
**signature** 98:1
98:5
**significant**
11:24 21:21
**similarly** 1:5

**simply** 75:22
**single** 53:1
61:22
**sir** 15:23 17:17
19:7 34:20,22
34:24 37:2
41:19 49:20
51:8 52:1 57:5
61:17,19,21
63:4 76:19
77:24 79:20
83:14 86:6,12
93:1,6,9
**situated** 1:5
**situation** 27:4,7
55:12 93:5,11
**sixth** 2:5
**skill** 69:14
**slash** 94:1
**slide** 34:8 35:8
**sm** 50:14,16
**solutions** 5:10
96:17
**somebody** 16:9
20:5 22:18
39:1,8 40:1
67:19,23 68:3
68:3 69:22
75:4,8,20
77:15 78:24
88:11
**someone's** 51:1
51:13

**sorry** 9:21
13:16 16:24
25:20 26:2
30:10 39:11
42:17 48:7
57:7 59:8
64:11,12 67:1
70:16,18 72:12
82:9,14 84:3
88:18 89:3
93:13,18,22
**sort** 12:10 19:8
21:5 24:15,15
28:16 37:6,9
39:23 43:17
45:21 63:2
70:9 75:10
77:16 79:10
**speaking** 58:24
62:21
**specific** 54:3
55:12 62:9
63:15 77:19
**specifically**
49:22
**speculation**
31:6,19 32:16
37:18 45:1
46:6 48:1,19
50:7 53:7,20
54:6,15 61:7
61:12 63:14
65:21 66:3,8
66:14,23 68:20

**[speculation - systems]**                    Page 22

69:2,8,12,18
70:3,12 71:22
72:4,19 74:4
74:17 75:5
76:9,15 77:23
79:2,11,19
80:3,10,18
81:1,7,13,20
83:13,23 85:3
85:18 87:7,21
88:3,19 89:7
89:17,22 90:11
92:11
**spell**   10:12
**spend**   30:24
**spread**   24:19
**spreadsheet**
  3:12 34:16
  38:4 39:5
**ss**   97:1
**standard**   72:6
**standby**   41:10
  73:2 96:7
**start**   7:2 94:12
**started**   25:2
  29:5
**starting**   5:13
  25:1 88:9
**starts**   57:10
  95:22
**state**   6:9 23:14
  61:14,22 62:14
  62:19 97:1

**stated**   65:14
**states**   1:1,15
  61:16,18 62:2
  62:5,7,9,15,17
  91:24
**stations**   82:8
**status**   83:20
**stayed**   7:12
  13:9
**stenographer**
  97:12
**step**   9:15 11:16
  28:18 30:11
**stepping**   13:5
  59:21
**stick**   51:15
**stored**   42:9
**straight**   28:10
  33:8 35:14,15
  45:17
**street**   2:5,11
  98:7
**strike**   14:12
  37:24 39:23
  49:8 59:9
**subject**   39:14
  47:7
**subset**   15:8
**suite**   2:12 98:7
**sum**   36:19
  37:15
**supposed**   42:8
  43:17,22

**sure**   10:23
  12:13 16:9
  18:2,20 19:18
  20:9 21:5
  25:18 26:24
  30:11,16 32:21
  36:1 43:7 44:7
  48:22 49:21
  55:10 62:2
  64:11 69:9,21
  70:6,14 71:23
  73:1 77:9 78:4
  81:16 83:5
  84:13 87:22
  95:11
**swap**   57:16
  61:4,9,10 62:6
  62:15,17,22
  63:3,20 65:17
  66:1,20 67:4,5
  67:12,15 68:14
  68:16 74:21,23
  75:9,14 76:4
  88:12,15,15,16
  89:8,23 90:6
  95:12,17,24
  96:1
**swapped**   55:8
  68:17,17 75:22
  91:7,9,12,15
  92:6,8 95:4
**swappers**   63:8
  63:12

**swapping**   54:8
  62:3 67:19
  68:4 92:2 93:3
  93:10
**swaps**   52:24
  53:11,11 64:20
  65:10 75:19
  87:4 88:22
  89:2,5,13,21
  92:9,12,23
  93:3,15,17
  95:5,16
**sworn**   5:23 6:3
  97:9
**system**   8:4,6,7
  8:21,24,24
  11:18 12:14
  14:21,22 15:1
  15:4 17:11,22
  34:16 37:20
  38:3,5,6,6,8,11
  38:15,16,18,21
  38:23 39:5
  47:14,19,22
  48:11 49:10,14
  49:16 50:5
  52:10 56:19
  58:12,19 59:17
  64:22 65:4,6,8
  88:4,4
**systems**   7:20,24
  8:1,18,18,19
  9:12 11:21
  18:19 37:7

| | | | |
|---|---|---|---|
| 59:14 88:5 | **technical** 24:18 | **thing** 15:16 | 14:3,4,11,14,21 |
| **t** | **technically** | **things** 58:22 | 15:6,9,24 16:3 |
| **tack** 31:2 | 52:15 | 60:4 | 16:10,15 17:4 |
| **take** 7:9,10 | **technologies** | **think** 8:10 | 17:11 18:6,14 |
| 9:15 12:13 | 50:2 | 10:11 17:13 | 18:16 19:22 |
| 25:18 28:18 | **tell** 24:4 25:16 | 20:23 22:11 | 20:1,1,10,20 |
| 30:11 31:2 | 28:11,17 55:12 | 24:2 25:2 | 25:3 26:11 |
| 36:4 41:4,7 | 57:13 66:10 | 39:12 41:8,21 | 27:11,20,23 |
| 46:20 56:4 | 67:3 77:1,19 | 50:24 51:12 | 28:10,18 30:4 |
| 72:23 94:24 | **tells** 42:11 | 54:23 55:1 | 30:7,12,17,20 |
| 95:15 96:4 | 81:18 | 60:3 63:7 66:9 | 30:24 31:4,5 |
| **taken** 1:13 3:2 | **term** 15:21 | 66:14 69:11,13 | 31:10 32:4,12 |
| 5:4 29:17 | 19:4 | 70:9 76:13 | 32:14 33:8,10 |
| 41:12 73:4 | **terminate** | 77:21 78:16,23 | 34:23 35:9,15 |
| 96:9 97:4,11 | 17:21 | 79:9 80:7 81:9 | 36:4,18,23 |
| **takes** 8:8,12 | **terminology** | 81:16 | 37:7,20 38:2,7 |
| 12:6,14 49:17 | 75:11 | **thinking** 31:3 | 38:10,11,21 |
| **talent** 18:19 | **terminology's** | 32:17 40:4 | 39:1,9,22,24 |
| **talk** 10:10 | 71:24 | **third** 35:4 | 40:2,7,16,21 |
| 25:21 | **terms** 12:17,21 | 70:24 90:1 | 41:17,20,23 |
| **talked** 59:24 | 49:22 | **thirds** 82:12 | 42:4,8,12,23 |
| 61:1 | **testified** 6:4 | **thousand** 19:19 | 43:6,11 44:10 |
| **talking** 19:5 | **testimony** | 20:10 21:24,24 | 45:4,17,22 |
| 30:23 41:16,20 | 28:15 29:21 | 22:3 23:13 | 47:14,19 48:11 |
| 65:16 86:19,19 | 44:1 58:13 | 68:10 70:11 | 49:5,10,18 |
| **team** 16:19 | 60:1,4,5 75:17 | **three** 21:10 | 53:2 55:16 |
| 17:11 27:2,4,8 | 76:2,8 84:15 | 24:10 74:7 | 58:17 59:12,22 |
| 36:20 37:16 | 95:8 96:16 | **threshold** 30:7 | 60:8,14,20 |
| 41:17 43:5 | **testing** 7:19 | 64:13 75:1 | 69:23 71:18,19 |
| 67:11 | 17:21,23 | **thresholds** 93:3 | 72:2 73:22 |
| **teams** 43:12 | **thank** 5:21,24 | **thurman** 6:12 | 74:10 76:7 |
| 56:22,23 | 26:4 33:16 | **time** 1:17 7:20 | 77:1 80:17,22 |
| | 51:15,17 96:12 | 8:6,7,9,12,23 | 81:6,19 82:20 |
| | 96:17 | 11:18 12:6,13 | 83:20 84:17,18 |

**[time - using]**                                                    Page 24

86:7,8 88:9
90:3,16,18
94:14,19,20
95:2,6,12,18
97:6,15
**timekeeper**
12:15 17:10
18:4
**timekeepers**
18:3
**times** 24:10
65:17,17 68:12
71:16 72:6
73:18
**titled** 92:23
**today** 5:11
**today's** 43:4
96:15
**todd** 4:4
**together** 11:19
57:11
**told** 78:16
**took** 8:24 32:1
32:2 73:15
77:3
**top** 3:9,14,17
4:4 46:14,23
86:3
**total** 38:18
**touch** 15:14
**tough** 93:24,24
**towards** 93:3
**tower** 16:22
17:6,6,7,12,16

**towers** 16:20
17:4 18:12
**town** 71:9
**track** 37:22
41:16
**tracked** 36:17
37:19,22 38:2
38:21 58:23
87:19,22
**tracking** 27:4,8
27:12,18 28:13
29:23 39:17,20
39:22,24 40:8
40:12,19 41:17
42:4 44:9 45:4
47:8,11,13
52:10,14,18
63:8
**train** 18:2
**training** 17:7
17:13,15,24
42:23 43:3,5,8
43:9,10
**trains** 18:1,3,3
**transcript**
97:18
**transition**
48:10 50:14,19
52:9 53:17,18
54:13,20
**transitioned**
40:13 47:14
50:22

**tremendous**
54:7
**true** 23:2 83:10
97:13
**try** 24:23 31:1
60:17
**trying** 30:6
44:7 60:5 62:3
69:22 81:9
**turned** 29:1
**twice** 65:17
**two** 21:9 22:9
22:16,17 23:8
33:13 74:6
82:12 89:8,23
**twt** 1:7 5:8
**type** 23:5
**types** 22:9
**typist** 7:5

**u**

**u.s.** 5:6
**under** 54:9
63:19 65:1
67:12
**undersigned**
97:12,22
**understand**
39:19 44:3
47:10 48:7
52:8 53:6
54:10 62:3
66:5,12,21
67:17,17 77:10

81:17 86:13
**understanding**
19:15 23:12
28:11 31:18
44:8 48:4,13
48:17,23 58:8
58:15 59:10
60:21 62:7
63:13 65:23,24
72:10
**understood**
54:4 90:24
**unfortunately**
94:11
**united** 1:1,15
**unreduced**
30:19
**upgrades** 17:22
**uploaded** 38:21
38:23,24
**uploading**
38:11,14
**usage** 12:7
**use** 9:2,5 10:7
11:3,5,7,10,20
11:22 12:18,19
12:20 23:9
56:23
**used** 9:4 10:6
19:4 39:1
57:21 66:9
**using** 7:24
11:13 13:3,3
71:24 75:11

| v | w |
|---|---|
| **vacation**  14:20 | **waiting**  67:1 |
| 32:4 95:1 | **wake**  6:12 |
| **vague**  59:6 | **walk**  28:17 |
| **validate**  45:8 | **want**  25:22 |
| **vanmali**  3:14 | 28:16 30:24 |
| 36:9,14 | 31:1 33:1 41:4 |
| **various**  7:20 | 51:6 55:15 |
| 26:17 75:6,6 | 57:3 71:23 |
| **vary**  84:11 | 72:24 81:10 |
| **veritext**  2:19 | 86:24 88:10 |
| 5:10 96:16 | 90:1 |
| **versus**  5:6 | **wanted**  68:12 |
| 58:11,18 64:21 | **watch**  13:18 |
| 72:1 74:23 | **watts**  1:13 5:11 |
| **video**  5:2,3 | 51:9 97:5 98:5 |
| **videoconfere...** | **way**  10:4,8,22 |
| 2:3,9,17 | 10:24 11:2,24 |
| **videographer** | 13:1,2 23:10 |
| 2:19 5:1,10,21 | 32:21 33:6 |
| 5:24 41:10,13 | 37:23 46:2 |
| 73:2,5 96:7,10 | 53:8 56:18 |
| 96:14 | 58:3,16 59:7 |
| **videotaped** | 79:15,22 80:16 |
| 1:12 3:1 | 82:12 85:4 |
| **viewing**  25:21 | 87:19 |
| **virtual**  5:3 | **ways**  75:6 |
| **vp**  26:10 | **we've**  39:12 |
| **vps**  18:20 | 73:18 85:20 |
| **vs**  1:7 | **week**  28:13,14 |
|  | 29:18 53:12 |
|  | 71:16 |

| | |
|---|---|
| **weekly**  59:1,3 | 64:16 65:14,22 |
| 75:1 86:4,8,18 | 66:4,9,19 67:1 |
| 86:20 90:17 | 67:15,22 68:21 |
| 91:23,24 93:16 | 69:3,9,13,19 |
| 94:9,13 | 70:4,13 72:14 |
| **weeks**  22:17 | 72:21 74:5,19 |
| 71:17 72:6 | 75:6,19 76:3 |
| 74:7 | 76:10,16 77:13 |
| **went**  34:7 | 77:24 78:21 |
| **whatsoever** | 79:3,12,20 |
| 61:20 | 80:4,12,19 |
| **window**  13:17 | 81:2,14,21 |
| 25:6 55:24 | 83:14,24 84:16 |
| **witness**  5:19,23 | 85:4,20 87:8 |
| 6:2 7:23 10:4 | 87:22 88:4,20 |
| 10:18 12:2 | 89:8,23 90:12 |
| 13:13,19 22:9 | 92:12,18,21 |
| 25:7,21,24 | 97:4,9,15 98:1 |
| 26:3 29:23 | **word**  38:1 66:9 |
| 31:7,20 32:17 | 96:1 |
| 32:20 33:12 | **words**  22:22 |
| 36:6 37:19 | 33:2 |
| 38:18 39:4 | **work**  4:7 6:14 |
| 41:6 43:15,20 | 6:16,16,21,23 |
| 44:2,5 45:2,7 | 6:24 15:10 |
| 46:7 48:3,7,20 | 24:7 27:13,19 |
| 49:2,16 50:8 | 28:6,22 30:14 |
| 51:4,8,15 | 30:15,21 32:3 |
| 53:21 54:7,16 | 32:3,8,12 |
| 54:22 55:23 | 44:15,24 45:5 |
| 56:3 58:21 | 45:15 59:24 |
| 59:6,16 60:17 | 60:10 64:5,17 |
| 60:24 61:8,13 | 73:18,22 74:24 |
| 63:15,19 64:11 | 75:2,4,13 |

**[work - yep]** Page 26

79:16 85:12
86:10,13,15,16
86:18,22,23
87:9,11,12,13
87:14,15,15,17
87:19,24 88:14
89:10 90:14,20
91:16 92:2,3,5
95:1,2,2,15,20
**workbrain**
8:21,22,23 9:2
9:11,24 10:15
10:20
**worked**   7:19
8:15,21 9:12
29:6,10,14,17
30:8,13 37:23
54:9 63:24
64:4 69:22
72:7 74:14,15
74:20,21 84:22
86:9,10 87:8
88:13 90:6,18
90:19,23,23
91:5,7,8,9,11
91:14 92:2,7
94:15,19,20
95:7,13,18
**working**   10:18
23:14 28:4,12
29:3 30:15,18
33:16 37:6
73:23 82:19
83:10 84:23

85:11 86:7
88:10 90:3,16
92:9
**works**   26:17
29:23 67:11,16
71:20 75:21
87:2 90:5
93:16
**workweek**
94:16,20 95:7
95:13,18
**worries**   64:12
93:23
**written**   80:19
**wrong**   33:1

|     x     |
| --------- |
| **x**   97:18 |

|     y     |
| --------- |
| **yeah**   10:10,21 |

10:24 13:19,20
15:19 25:2,24
41:6,7 44:3,5
46:24 50:1
62:10 67:23
70:6,6 92:19
93:22,23 94:11
**year**   7:10 11:4
20:20 24:9,10
28:3,12,21
65:17,17,18
68:13 72:18
73:23 82:20
85:8,13 86:17

86:19
**yearly**   72:7
84:18,24,24
**years**   7:8 9:17
10:6 11:4
20:16,19
**yep**   25:4

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.