Page 1

1              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION
3
     LUKAS GOODYEAR, individually     )
4    and on behalf of all others      )
     similarly situated               )
5                                      )
                 Plaintiffs,          ) No.
6                                      ) 1:23-CV-05712-TWT
     vs.                              )
7                                      )
     DELTA AIR LINES, INC.,           )
8                                      )
                 Defendants.          )
9
10              REMOTE VIDEOTAPED DEPOSITION
11                    Via ZOOM of
12                    CHERYL GRAY
13                  March 19, 2025
14                  10:00 a.m. ET
15
16
17
18
19
20
21
22
23   STENOGRAPHICALLY REPORTED BY:
     JO ANN LOSOYA, CSR, RPR, CRR
24   LICENSE #:  084-002437
25

Page 2

1                        APPEARANCES
            (All participants appearing remotely)
2
3        DICELLO LEVITT LLP
         MADELINE HILLS
4        DANIEL FERRI
         10 North Dearborn Street
5        Sixth Floor
         Chicago, Illinois 60602
6        (312) 214-7900
         mhills@dicellolevitt.com
7        dferri@dicellolevitt.com
8              Appeared on behalf of Plaintiffs.
9
10
         SEYFARTH SHAW, LLP
11       MITCH ROBINSON
         DANIELLE SHAPIRO
12       1075 Peachtree Street
         Suite 2500
13       Atlanta, Georgia 30309
         (404) 704-9637
14       mrobinson@seyfarth.com
         dshapiro@seyfarth.com
15
               Appeared on behalf of Defendants.
16
17
         Also present:
18
         Blaze Knott
19
20
21    VIDEOGRAPHER: KEVIN DUNCAN
22
                   * * * * * * * * * * * * *
23
24
25

Page 3

1                          EXAMINATION

2     Witness                                    Page     Line

3     CHERYL GRAY

4       By Ms. Hills                                6        6

5

6                     * * * * * * * * * * * * * * *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                    INDEX OF EXHIBITS

2   EXHIBIT              DESCRIPTION              PAGE

3   Exhibit 1    DELTA_LG_00000312-DELTA_LG_        47

4                00000343, Hours of Work,

5                Overtime and Shift Differential

6                policy

7   Exhibit 2    DELTA_LG_00009319 Email string    68

8   Exhibit 3    DELTA_LG_00012531 Email string    89

9   Exhibit 5    DELTA_LG_00012554 Email String   101

10  Exhibit 6    DELTA_LG_0005776 Email string    111

11  Exhibit 7    DELTA_LG_00000442 slipsheet      127

12  Exhibit 8    DELTA_LG_00000442 Excel          129

13  Exhibit 9    DELTA_LG_00006607 Slipsheet      150

14  Exhibit 10   DELTA_LG_00006607 Excel          152

15  Exhibit 11   DELTA_LG_00006516 Slipsheet      166

16  Exhibit 12   DELTA_LG_00006516 Excel          167

17  Exhibit 13   DELTA_LG_00006610 Slipsheet      172

18  Exhibit 14   DELTA_LG_00006610 Excel          173

19  Exhibit 15   DELTA_LG_00017092 Email string   178

20

21

22   *Exhibit 4 marked and loaded into Exhibit Share but

23   not used.*

24

25

Page 5

```
 1              THE VIDEOGRAPHER:  Good morning.  We are
 2      going on the video record on 10:12 a.m. on March 19,
 3      2025.
 4                    Here begins the virtual video
 5      recorded deposition of Ms. Cheryl Gray taken on
 6      behalf of the plaintiffs in the case matter of Lukas
 7      Goodyear, et al., versus Delta Air Lines Inc., filed
 8      in the U.S. District Court for the Northern District
 9      of Georgia, Atlanta Division, bearing case
10      No. 1:23-CV-05712-TWT.
11                    My name is Kevin Duncan, and I'm a
12      legal videographer representing Veritext Legal
13      Solutions.  The court reporter today is Ms. JoAnn
14      Losoya.
15                    Counsel, will you please identify
16      yourselves and affiliations starting with the
17      noticing party.
18              MS. HILLS:  Madeline Hills on behalf of
19      the plaintiff from Dicello Levitt.
20              MR. ROBINSON:  Mitch Robinson, counsel
21      for defendant.
22              THE VIDEOGRAPHER:  Thank you, counsel.
23                    Will the court reporter please
24      administer the oath.
25                        (Witness sworn.)
```

Page 6

```
 1    WHEREUPON:
 2                    CHERYL GRAY,
 3    called as a witness herein, having been first duly
 4    sworn, was examined and testified as follows:
 5                 E X A M I N A T I O N
 6    BY MS. HILLS:
 7         Q.    Good morning, Ms. Gray.
 8         A.    Good morning.
 9         Q.    Again, my name is Madeline Hills on
10    behalf of the plaintiff.  We appreciate you being
11    here today.
12                    Have you ever had your deposition
13    taken before?
14         A.    No, I haven't.
15         Q.    Okay.  We're going to go through some
16    ground rules that you might have discussed with your
17    counsel just to make sure that we're all on the same
18    page.
19                    So the first thing is do you
20    understand that the court reporter can only type
21    what one person is saying at a time?
22         A.    Yes.
23         Q.    So it is difficult for her to keep a
24    clean record if we're talking over each other so we
25    will -- I'll try to be careful not to talk over you.
```

```
                                            Page  7
 1    Can you do the same for me?

 2         A.    Yes.

 3         Q.    And then we're going to take breaks about

 4    every hour on the hour, but that's flexible.  We'll

 5    also take a longer break for lunch.  If you need

 6    breaks outside of that, just let me know, but I do

 7    ask that you answer any pending questions before we

 8    go on break.

 9                 Does that make sense?

10         A.    Yes.

11         Q.    Okay.  And did you do anything to prepare

12    for this deposition today?

13         A.    Just spoke with my attorney.

14         Q.    Who is that?

15         A.    Mitch Robinson.

16         Q.    How long did you meet?

17         A.    Actually, we met several times.  I don't

18    have an exact amount of number of hours.

19         Q.    More than one day?

20              MR. ROBINSON:  Object.

21    BY THE WITNESS:

22         A.    It was never a full day.  We just had

23    some small meetings.

24         Q.    Okay.  Do you understand what this case

25    is about?
```

Page 8

1       A.    Yes.

2       Q.    What is it about?

3       A.    It is Mr. Goodyear is stating that he

4    doesn't believe he was paid overtime correctly

5    according to Delta's policy.

6       Q.    Do you know Mr. Goodyear?

7       A.    I have been in meetings with

8    Mr. Goodyear, but as far as know him personally, no.

9       Q.    Is there anything preventing you from

10   testifying truthfully today?

11      A.    No.

12      Q.    Are there any distractions in the room

13   that you're sitting in right now?

14      A.    No.

15      Q.    Okay.  Is there anyone sitting directly

16   across from you?

17      A.    No.

18      Q.    And what is your address, your current

19   address?

20      A.    As in my home address or where I'm

21   presently sitting?

22      Q.    Your home address.

23      A.    My home address is ███████████████ in

24   Fairburn, Georgia.

25      Q.    Is that near Atlanta?

Page 9

1         A.      Yes, it is.

2         Q.      About how far?

3         A.      About ten miles outside of Atlanta.

4         Q.      Okay.  And how old are you?

5         A.      I am 51 years old.

6         Q.      Are you currently employed at Delta Air

7   Lines?

8         A.      Yes.

9         Q.      How long have you worked there?

10        A.      For 25 years.

11        Q.      Okay.  So we'll go back a bit in time.

12  Did you go to college?

13        A.      Yes.

14        Q.      Where did you go to college?

15        A.      The University of Georgia.

16        Q.      And what did you study there?

17        A.      French.

18        Q.      And anything else?

19        A.      No.

20        Q.      What year did you graduate?

21        A.      1995.

22        Q.      And did you have any further education

23  after college?

24        A.      Yes.  I have a master's degree.

25        Q.      What is your master's degree in?

Page 10

1          A.      Information systems.

2          Q.      What does that mean?

3          A.      Well, it is the -- it's the study of how

4     systems work together.  So I looked at HR systems,

5     how you would develop one, and how the information

6     connects.

7          Q.      You looked at HR systems in particular

8     during your master's degree?

9                  MR. ROBINSON:  Object to form.

10    BY MS. HILLS:

11         Q.      Did you study human resource systems

12    during your masters program?

13                 MR. ROBINSON:  Object to the form.

14                      You can answer.

15    BY THE WITNESS:

16         A.      No.  I studied information systems in

17    general.  Some of the things I focused on as a HR

18    person was HR systems.

19         Q.      Did you have that focus during your

20    masters program?

21                 MR. ROBINSON:  Object to form.

22    BY MS. HILLS:

23         Q.      What was your first job after your

24    masters -- after you finished your master's degree?

25                 MR. ROBINSON:  Object to form.

Page 11

1    BY THE WITNESS:

2         A.    I was already working for Delta when I

3    got my masters.

4         Q.    Okay.  So did you begin working for Delta

5    after your undergrad career?

6         A.    It was several years after, yes.

7         Q.    Okay.  What was your first job after

8    college?

9         A.    High school French teacher.

10        Q.    Okay.  How long do you do that?

11        A.    About a year and a half.

12        Q.    Was that in the Atlanta area?

13              MR. ROBINSON:  Object to form.

14   BY THE WITNESS:

15        A.    No.

16        Q.    Where was it?

17        A.    Augusta, Georgia.

18        Q.    What would you do after you were a French

19   teacher?

20              MR. ROBINSON:  Object to form.

21   BY MS. HILLS:

22        Q.    What was your next job after you were a

23   French teacher?

24        A.    I was a special needs para pro.

25        Q.    A what?

Page 12

```
 1        A.    A special needs para pro.
 2        Q.    Is that in the same school district as
 3    where you were a teacher?
 4        A.    No.
 5        Q.    Where was that at?
 6        A.    In Norcross, Georgia.
 7        Q.    Okay.  Is that near Augusta?
 8        A.    No.
 9        Q.    How long were you in that position?
10              MR. ROBINSON:  Object to form.
11    BY THE WITNESS:
12        A.    About a year and a half as well.
13        Q.    When did you first start working for
14    Delta?
15        A.    In 1991 -- sorry.  1999.
16        Q.    What was your first role at Delta?
17        A.    I was a reservation specialist.
18        Q.    What does that mean?
19        A.    I took calls for reservations for Delta
20    Air Lines.
21        Q.    Where were you based out of when you did
22    that?
23              MR. ROBINSON:  Object to form.
24              MS. HILLS:  Sorry.  Go ahead.
25
```

Page 13

1    BY THE WITNESS:

2         A.    Out of Augusta, Georgia.

3         Q.    So you start in 1999.  How long were you

4    a reservation specialist?

5         A.    It was roughly four years.

6         Q.    About 2003?

7         A.    Correct.

8         Q.    What was your next role?

9         A.    I was an analyst in the research planning

10   department for reservations.

11        Q.    What does that job entail?

12              MR. ROBINSON:  Object to form.

13   BY THE WITNESS:

14        A.    It entails building shift bids and

15   vacation bids for reservation specialists across the

16   enterprise.

17        Q.    When you were a reservation specialist --

18   or I'm sorry.  When you were a you say a schedule

19   analyst?

20        A.    Yes, an analyst in --

21              MR. ROBINSON:  Object to form.

22                   You can answer.

23   BY THE WITNESS:

24        A.    An analyst in resource planning.

25        Q.    In resource planning.  Okay.

```
                                            Page 14
 1                   And so were there other people with
 2     your same title at that time?
 3                   MR. ROBINSON:  Object to form.
 4     BY THE WITNESS:
 5          A.    Yes.
 6          Q.    At Delta?
 7          A.    Yes.
 8          Q.    About how many were there at your
 9     location?
10                   MR. ROBINSON:  Object to form.
11     BY THE WITNESS:
12          A.    I'm not sure of your question.  Can you
13     be more specific?
14          Q.    Were there analysts for the -- for the
15     reservations department, were there other analysts
16     other than you for the reservations department?
17                   MR. ROBINSON:  Object to form.
18     BY THE WITNESS:
19          A.    Yes.
20          Q.    And how long were you in that position?
21          A.    I was there for about two or three years
22     before I got promoted.
23          Q.    What was your promotion title?
24          A.    Manager.
25          Q.    Manager of what was it?
```

Page 15

1        A.    Resource planning.

2        Q.    And that was still specifically for the

3   reservations department?

4             MR. ROBINSON:  Object to form.

5   BY THE WITNESS:

6        A.    Yes.

7        Q.    And so the reservations department or

8   were you the manager for all locations or only your

9   geographic location?

10            MR. ROBINSON:  Object to form.

11  BY THE WITNESS:

12       A.    For all domestic locations.

13       Q.    Okay.  So there were no other managers of

14  resource development for the reservations department

15  at other locations, it would only be you, correct?

16            MR. ROBINSON:  Object to form.

17  BY THE WITNESS:

18       A.    Correct.  It was manager of resource

19  planning.

20       Q.    Resource planning.  Sorry.  What was your

21  next position after that?

22       A.    Project leader for res technology.

23       Q.    About what year did you become the

24  project leader for res technology?

25       A.    I don't remember specifically what year

Page 16

1    it was.

2         Q.    That's okay.

3               Was that position within human

4    resources at Delta?

5               MR. ROBINSON:  Object to form.

6    BY THE WITNESS:

7         A.    No.

8         Q.    What was the -- what department was it in

9    if not human resources?

10        A.    It was in reservations.  It was

11   reservations technology.

12        Q.    What did you do in that role?

13              MR. ROBINSON:  Object to form.

14   BY THE WITNESS:

15        A.    I was essentially a systems administrator

16   for one of their systems.

17        Q.    Which system?

18        A.    For MPS and EWFM.

19        Q.    What is MPS?

20        A.    MPS, the manpower planning system.  It is

21   the time and attendance system for reservations.

22        Q.    So reservations as a department, does

23   that cover multiple geographic locations, the

24   employees?

25              MR. ROBINSON:  Object to form.

Page 17

```
 1   BY MS. HILLS:
 2        Q.    Or the employees who work in
 3   reservations, are they in multiple offices?
 4              MR. ROBINSON:  Same objection, form.
 5   BY THE WITNESS:
 6        A.    Yes, they are.
 7        Q.    Outside of Georgia?
 8        A.    Yes, there are some outside of Georgia.
 9        Q.    Are the majority of the people working in
10   reservations based in Georgia?
11              MR. ROBINSON:  Object to form.
12   BY THE WITNESS:
13        A.    I don't know the exact percentages at
14   that point, but at that time, there were more in
15   Georgia.
16        Q.    Has that changed?
17              MR. ROBINSON:  Object to form.
18   BY THE WITNESS:
19        A.    I can't answer that.  I don't -- I don't
20   know.
21        Q.    At that time were the leadership roles in
22   that department mostly in Georgia?
23              MR. ROBINSON:  Object to form.
24   BY THE WITNESS:
25        A.    They were actually pretty well
```

Page 18

1    distributed.

2         Q.    So you mentioned MPS and another system.

3    What was the other system?

4         A.    EWFM.

5         Q.    Do you know what that stands for?

6         A.    Yes.

7         Q.    What does it stand for?

8         A.    Electronic workforce management system.

9         Q.    And what is that?

10         A.    It is a call center technology for

11    planning forecasting and scheduling type items.

12         Q.    Forecasting of what?

13              MR. ROBINSON:  Object to form.

14    BY THE WITNESS:

15         A.    Of call volume.

16         Q.    Call volume?

17         A.    Yes.

18         Q.    Okay.  And so this was a system used by

19    the reservations department?

20              MR. ROBINSON:  Object to form.

21    BY THE WITNESS:

22         A.    It is one of the systems used by the

23    reservations department.

24         Q.    And does the reservations department

25    still use MPS?

1        A.    I'm sorry.  Can you restate your

2    question?

3        Q.    Does the reservations department still

4    use MPS?

5        A.    Yes.

6        Q.    Okay.  So what was your next role there?

7    I guess how long were you in that position?

8              MR. ROBINSON:  Object to form.

9    BY THE WITNESS:

10       A.    For approximately two years in that

11   position.

12       Q.    And what did you do next?

13       A.    Came back as the manager of resource

14   planning.

15       Q.    So why did you go back to resource

16   planning?

17       A.    It was just a better opportunity at the

18   time.

19       Q.    Where were you located when you were in

20   that position?

21       A.    In Atlanta.

22       Q.    What's -- what's the difference between a

23   manager and a project leader?

24             MR. ROBINSON:  Object to form.

25

Page 20

1    BY THE WITNESS:

2        A.    It is actually completely different job

3    responsibilities, as well as title and grade.

4        Q.    So were you the manager for resource

5    planning for all locations in the United States?

6        A.    Yes, I was the resource planning manager

7    that covered the United States, yes.

8        Q.    And who did you report to when you were

9    in that position?

10        A.    Can you be more specific?

11        Q.    Who was your direct boss in that

12    position?

13        A.    Robin Stone.

14        Q.    And what's their title?

15        A.    General manager for resource planning.

16        Q.    Who reported to you when you were in that

17    position, manager of resource planning?

18            MR. ROBINSON:   Object to form.

19    BY THE WITNESS:

20        A.    Because I was the manager of resource

21    planning twice, which time?

22        Q.    I think this is around 2015 to 2016.

23        A.    And I mean we had several different sets

24    of people.  I couldn't give you a comprehensive list

25    of names.

Page 21

1          Q.     About how many people reported directly
2     to you when you were the manager of resource
3     planning?
4                 MR. ROBINSON:  Object to form.
5     BY THE WITNESS:
6          A.     There were three that reported -- that
7     would have reported directly to me at any point in
8     time.
9          Q.     Were they also in Atlanta?
10         A.     Yes.
11         Q.     And what did you do next after that
12     position?
13         A.     Became the manager of time and
14     attendance.
15         Q.     Do you remember about what year that was
16     that you made that switch?
17         A.     Not the year, just several years ago.
18         Q.     And how long were you the manager of time
19     and attendance?
20         A.     For about three years.
21         Q.     What is time and attendance?  Is that a
22     division or a department or what do you call that?
23                MR. ROBINSON:  Object to form.
24     BY THE WITNESS:
25         A.     It is a department.

```
                                                Page 22
 1        Q.    Does it have smaller divisions within it?
 2              MR. ROBINSON:  Object to form.
 3    BY THE WITNESS:
 4        A.    No.
 5        Q.    Okay.  Is time and attendance within
 6    human resources at Delta?
 7        A.    Yes, it is.
 8        Q.    And is it related to payroll?
 9              MR. ROBINSON:  Object to form.
10    BY THE WITNESS:
11        A.    It provides hours that is turned over to
12    the payroll team.
13        Q.    Is payroll considered a separate
14    department?
15              MR. ROBINSON:  Object to form.
16    BY THE WITNESS:
17        A.    Yes.
18        Q.    Does it have any smaller divisions within
19    it, the payroll department?
20              MR. ROBINSON:  Object to form.
21    BY THE WITNESS:
22        A.    I can't fully answer that, not being a
23    part of that team.
24        Q.    But the time and attendance department
25    provides information to the payroll department,
```

Page 23

```
 1    correct?
 2         A.    Correct.
 3         Q.    Do you work with the individuals who were
 4    in the payroll department regularly?
 5              MR. ROBINSON:  Object to form.
 6    BY THE WITNESS:
 7         A.    Yeah, we communicated on occasion.
 8         Q.    Who is the manager of the payroll
 9    department?
10              MR. ROBINSON:  Object to form.
11    BY THE WITNESS:
12         A.    The manager of payroll, I'm not sure who
13    their actual manager is.
14         Q.    Do you know who is the general manager
15    is?
16              MR. ROBINSON:  Object to form.
17    BY THE WITNESS:
18         A.    Yes.
19         Q.    Who is that?
20         A.    Naomi Reed.
21         Q.    And she's the general manager of the
22    payroll department just to be clear, correct?
23         A.    Yes.
24         Q.    Do you know how long she's been in that
25    position?
```

Page 24

1          MR. ROBINSON:  Object to form.

2    BY THE WITNESS:

3          A.    No, I have no idea how long.

4          Q.    Has she been there more than a year?

5          A.    I believe she's been there more than a

6    year.

7          Q.    And so manager of time and attendance,

8    who did you report to?

9          MR. ROBINSON:  Object to form.

10   BY THE WITNESS:

11         A.    To John Early.

12         Q.    What is his title?

13         A.    Can I -- I'm sorry.  Could you be more

14   specific?

15         Q.    Yeah.  During the time that you were the

16   manager of time and attendance, you reported to John

17   Early.  What was his title at that time?

18         A.    General manager of I want to say it was

19   time and productivity.

20         Q.    Is that different than time and

21   attendance?

22         MR. ROBINSON:  Object to form.

23   BY THE WITNESS:

24         A.    Yes.

25         Q.    Is it a separate department?

Page 25

1       A.    No.

2       Q.    So is time and attendance a department

3   within time and productivity?

4             MR. ROBINSON:  Object to form.

5   BY THE WITNESS:

6       A.    No.  I think his job entailed some things

7   that are -- that was more than time and attendance.

8       Q.    But when he was -- when John Early was a

9   general manager of time and productivity, was his

10  position within the time and attendance department?

11            MR. ROBINSON:  Object to form.

12  BY THE WITNESS:

13      A.    Yes, he was over the time and attendance

14  team, yes.

15      Q.    Was he the general manager over any other

16  team?

17            MR. ROBINSON:  Object to form.

18  BY THE WITNESS:

19      A.    Yes.

20      Q.    What was that?

21      A.    The disability management team.

22      Q.    The disability management team is a

23  separate department?

24            MR. ROBINSON:  Object to form.

25

Page 26

1    BY THE WITNESS:

2        A.    Yes.

3        Q.    And who reported to you when you were the

4    manager of time and attendance?

5            MR. ROBINSON:  Object to form.

6    BY THE WITNESS:

7        A.    I have actually had several different

8    people report to me over time.

9        Q.    About how many people report to you --

10   reported to you at a given time when you were the

11   manager of time and attendance?

12           MR. ROBINSON:  Object to form.

13   BY THE WITNESS:

14       A.    Is there any specific time period?

15       Q.    Just was your team larger than ten

16   people?

17           MR. ROBINSON:  Object to form.

18   BY THE WITNESS:

19       A.    Yes.

20       Q.    Was it more than 20 people?

21           MR. ROBINSON:  Same objection.

22   BY THE WITNESS:

23       A.    Yes.  In most years it was more than 20

24   people.

25       Q.    There would be more than 20 people

Page 27

```
 1    reporting to you in that position?

 2         A.    Yes.

 3         Q.    Yes?

 4         A.    Yes.

 5         Q.    Were they based in Georgia?

 6               MR. ROBINSON:  Object to form.

 7    BY THE WITNESS:

 8         A.    Yes.

 9         Q.    And I might have already asked you but

10    you were -- you were in Atlanta as well for this

11    position, right?

12               MR. ROBINSON:  Object to form.

13    BY THE WITNESS:

14         A.    Yes.

15         Q.    And all of the time and attendance team

16    was in Atlanta?

17               MR. ROBINSON:  Object to form.

18    BY THE WITNESS:

19         A.    Yes.

20         Q.    So when you were the manager of time and

21    attendance, did your work cover other locations or

22    did -- let me rephrase.

23               Did -- the time and attendance team

24    in Atlanta, did their work apply to other locations?

25               MR. ROBINSON:  Object to form.
```

Page 28

```
 1   BY THE WITNESS:
 2        A.    I'm sorry.  I don't think I understand
 3   your question.
 4        Q.    Was there a separate time and attendance
 5   department for locations outside of Atlanta?
 6        A.    No.
 7        Q.    It was just the one?
 8              MR. ROBINSON:  Objection.
 9   BY THE WITNESS:
10        A.    Yes.
11        Q.    And are you still in that position the
12   manager of time and attendance?
13        A.    No.
14        Q.    What is your current role?
15        A.    I'm the general manager of time and
16   attendance.
17        Q.    Were there any other positions you held
18   between those two, manager and general manager?
19        A.    No.
20        Q.    When did you become the general manager?
21        A.    It's been approximately five years.
22        Q.    Who do you report to now?
23        A.    John Early.
24        Q.    What is his current title?
25        A.    Actually, I know he is a director.  I'm
```

Page 29

1    not sure what they have added to the end of it

2    honestly.

3         Q.    That's okay.  So are there others with

4    your title at separate Delta locations, general

5    manager of time and attendance?

6              MR. ROBINSON:  Object to form.

7    BY THE WITNESS:

8         A.    No.

9         Q.    I'm going to go back to when you were the

10    manager.  Was there not a general manager like the

11    position you were in now?

12             MR. ROBINSON:  Object to form.

13    BY THE WITNESS:

14        A.    Can you rephrase -- can you elaborate a

15    little bit?  I don't --

16        Q.    Yeah.  I'm sorry.  It's early.

17             When you were the manager of time and

18    attendance, you reported to John Early, right?

19        A.    Yes.

20        Q.    But there was no one with your -- when

21    were you the manager, there was no one with your

22    current title?

23             MR. ROBINSON:  Object to form.

24    BY THE WITNESS:

25        A.    So my current -- no.  John -- I reported

Page 30

1    to him.  His title was different.

2         Q.    Okay.  So let's see, the last -- you said

3    the majority of your career at Delta has been in the

4    human resources department or side?

5              MR. ROBINSON:  Object to form.

6    BY THE WITNESS:

7         A.    No.

8         Q.    Time and attendance is within human

9    resources, right?

10        A.    Yes.

11        Q.    Resource planning is not within human

12   resources?

13        A.    Correct.

14        Q.    Correct.  Okay.

15              Outside of time and attendance, what

16   other departments are within human resources that

17   you know of?

18              MR. ROBINSON:  Object to form.

19   BY THE WITNESS:

20        A.    There are a lot of departments within

21   human resources.

22        Q.    Are there any that you work closely with?

23        A.    No.  I'm primarily working with, if

24   anyone, payroll.

25        Q.    And the payroll department, are they

Page 31

```
 1    largely based in Atlanta as well?

 2         A.    That one I can't tell you, not being part

 3    of that team.

 4         Q.    Are there any written policies at Delta

 5    about time and attendance that you're aware of?

 6              MR. ROBINSON:  Object to form.

 7    BY THE WITNESS:

 8         A.    Can you elaborate more?  What kind of

 9    policies?

10         Q.    Yeah.  Let me -- have you written any

11    official policies for Delta about time and

12    attendance?

13              MR. ROBINSON:  Object to form.

14    BY THE WITNESS:

15         A.    I have done revisions of policies, but

16    not wholly written policies.  And that's with other

17    groups of people, not solo.

18         Q.    What policies would those be?

19         A.    For example, the vacation policy.  We

20    have -- we had to make amendments as vacation rules

21    change.

22         Q.    When was that roughly that you made

23    amendments to the vacation policy?

24         A.    About two years ago.

25         Q.    Okay.  Any other policies that you have
```

Page 32

```
 1   helped amend?
 2         A.    I don't remember if there are others.
 3   The vacation one just stood out.
 4         Q.    Where do employees go to access the
 5   policies that apply to them at Delta?
 6               MR. ROBINSON:  Object to form.
 7   BY THE WITNESS:
 8         A.    Delta's intranet has a policy section.
 9         Q.    Are there other sections on the intranet
10   or is it just store policies?
11               MR. ROBINSON:  Object to form.
12   BY THE WITNESS:
13         A.    I'm sorry.  I don't think I understand
14   your question.
15         Q.    We'll skip that one.
16               What is the DeltaNet, the Delta
17   intranet?
18               MR. ROBINSON:  Object to form.
19   BY THE WITNESS:
20         A.    It is just the internal Delta website.
21         Q.    Who maintains the website at Delta?
22         A.    I have no idea.
23         Q.    Have you ever uploaded documents on to
24   the DeltaNet?
25               MR. ROBINSON:  Object to form.
```

Page 33

```
 1   BY THE WITNESS:
 2        A.    I have never personally uploaded a
 3   document to DeltaNet.
 4        Q.    Do you know if it is -- the intranet, is
 5   that hosted on a local server?
 6              MR. ROBINSON:  Object to form.
 7   BY THE WITNESS:
 8        A.    I'm sorry.  I have no idea.
 9        Q.    What does it mean to be a regularly
10   scheduled employee at Delta?
11              MR. ROBINSON:  Object to form.
12   BY THE WITNESS:
13        A.    I'm not sure I understand your question
14   there.
15        Q.    What is the difference between a regular
16   schedule and an irregular schedule?
17        A.    And a regular schedule is -- usually has
18   fixed off days.  It is typically either eight hours
19   or ten hours and for daily duration.  An irregular
20   schedule could have an irregular pattern for off
21   dates.  It could still be eight or ten hours.  It
22   may have a differing duration.
23        Q.    So for a regular schedule, is -- does
24   that mean that the schedule is the same
25   week-to-week?
```

Page 34

1        A.    I'm sorry.  Could you repeat that?

2        Q.    Sure.  A regular schedule is -- when you

3   said that's consistent, I think you said is that

4   week-to-week?

5        A.    Yes.

6        Q.    Okay.  What does that mean?

7             MR. ROBINSON:  Object to form.

8   BY THE WITNESS:

9        A.    Well, that would mean if my off days are

10  Saturday and Sunday, they are Saturday, Sunday every

11  week.

12       Q.    That's for regular schedule?

13            MR. ROBINSON:  Object to form, asked and

14  answered.

15  BY MS. HILLS:

16       Q.    Sorry.  It sounds kind of similar over

17  Zoom irregular and regular.  We're talking about

18  regular without the "IR," right --

19       A.    Correct.

20       Q.    Okay.  How many hours a week are in a

21  regular schedule?

22            MR. ROBINSON:  Object to form.

23  BY THE WITNESS:

24       A.    I'm sorry.  Can you state that again?

25       Q.    Yes.  How many hours are on the schedule

Page 35

1    per week for a regularly scheduled employee?

2            MR. ROBINSON:  Object to form.

3    BY THE WITNESS:

4        A.    And that actually depends.

5        Q.    On what?

6        A.    Well, when they're building a regular

7    schedule, it could be -- as long as the days are

8    fixed it could be less than 40 hours.  It would

9    typically max out at 40.

10       Q.    Would a full-time regularly scheduled

11   employee work 40 hours per week?

12       A.    Typically, an employee who works a

13   regular schedule works 40 hours.

14       Q.    When would that not be the case?

15       A.    If that employee has done something to

16   change their schedule.

17       Q.    Okay.  Who creates the schedules at

18   Delta?

19            MR. ROBINSON:  Object to form.

20   BY THE WITNESS:

21       A.    It depends upon the division.

22       Q.    At a single division, is everyone in a

23   division either regular or irregularly scheduled or

24   can there be some combination?

25            MR. ROBINSON:  Object to form.  Vague and

Page 36

1    compound.

2    BY MS. HILLS:

3        Q.    Can there be irregular and regularly

4    scheduled employees in the same division?

5        A.    Yes.

6        Q.    What is an irregular schedule?

7            MR. ROBINSON:  Object to form.

8    BY THE WITNESS:

9        A.    An irregular schedule, typically does not

10   have fixed off days or it doesn't -- or it isn't

11   consistent week-to-week.

12       Q.    An irregularly scheduled employee can be

13   a full-time employee, right?

14       A.    Yes.

15       Q.    Even if they don't work 40 hours each

16   week?

17       A.    I'm sorry.  Repeat that for me.

18       Q.    An irregularly scheduled employee might

19   work less than 40 hours in a week but could still be

20   full time, right?

21           MR. ROBINSON:  Object to form.

22   BY THE WITNESS:

23       A.    That is correct.  It depends on the

24   rotation that they're on.

25       Q.    What do you mean by rotation?

Page 37

1        A.    As we talked about, an irregular schedule

2    that they might not work the same -- they might not

3    have the same off days each week.  So a rotation

4    would mean that you would actually rotate from

5    week-to-week what your schedule is.

6        Q.    What do you mean rotate week-to-week?

7        A.    Well, when -- for an example, an employee

8    might work four days their first week and the next

9    week they might work three days and the next week

10   they might work four days again.  So it would -- the

11   schedule would rotate through the weeks for as long

12   as they were on that schedule.

13       Q.    So how -- what is the -- what would the

14   work period for an employee that had that schedule?

15             MR. ROBINSON:  Object to form.

16   BY THE WITNESS:

17       A.    I'm not sure what you mean by work

18   period.

19       Q.    So if every other week an employee works

20   the same hours, how long is their work period?

21             MR. ROBINSON:  Object to form, vague.

22   BY THE WITNESS:

23       A.    I'm not sure I understand your question.

24       Q.    So are employees on an irregular schedule

25   that are full-time, do they work about the same

Page 38

1    amount of hours in the year as a full-time employee

2    on a regular schedule?

3            MR. ROBINSON:  Object to form.

4    BY THE WITNESS:

5        A.    It depends on the rotation.

6        Q.    Is a full-time employee ever scheduled

7    less than 2,080 hours in a year?

8            MR. ROBINSON:  Object to form.

9    BY THE WITNESS:

10       A.    Again, that also depends on where they

11   begin and their off days.

12       Q.    How does an irregularly scheduled

13   employee know if they're considered full-time?

14           MR. ROBINSON:  Object to form.

15   BY THE WITNESS:

16       A.    Well, it depends on how they're hired.

17   Most of the time you know when you're hired whether

18   you're hired as full-time or not.

19       Q.    When would that not be the case?

20       A.    I can't answer that.  I'm not part of the

21   hiring process.

22       Q.    Can you see whether a specific employee

23   is full-time or part time?

24           MR. ROBINSON:  Object to form.

25

Page 39

1    BY THE WITNESS:
2         A.    Within the HR system, yes.
3         Q.    What is the HR system?
4         A.    It is the system that we use to track HR
5    data.
6         Q.    What is that called?
7         A.    SAP.
8         Q.    You can see within SAP whether an
9    employee is full-time, or part time?
10        A.    Yes.
11        Q.    That's for any employees at Delta?
12        A.    Only for the employees I have the ability
13   to see.
14        Q.    So for irregularly scheduled employees,
15   is their schedule set at the beginning of the year?
16              MR. ROBINSON:  Object to form.
17   BY THE WITNESS:
18        A.    It depends on the department or division.
19        Q.    How do the divisions do that differently?
20              MR. ROBINSON:  Object to form.
21   BY THE WITNESS:
22        A.    Each one is different.  They determine
23   when they start their schedules.
24        Q.    Can it be -- so they can create a yearly
25   schedule at different times depending on the

Page 40

1    division?

2              MR. ROBINSON:  Object to form.

3    BY THE WITNESS:

4         A.    That's correct.

5         Q.    Can you think of an example?

6              MR. ROBINSON:  Object to form, vague.

7    BY THE WITNESS:

8         A.    Can you -- I think -- can you restate

9    that question for me?  I don't think I understand.

10        Q.    Can you give an example of a specific

11   department when they set their schedules for

12   irregularly scheduled employees?

13        A.    I cannot because each group bids at their

14   own time.  I don't have a specific example.

15        Q.    You are not sure when any one group

16   creates their yearly schedule?

17        A.    I'm not -- I can tell you for my team.

18        Q.    Okay.

19        A.    The best I can tell you, right, my team

20   isn't -- are regularly scheduled, they have fixed

21   off days, and they started well over two years ago

22   and have been on the exact same schedule since.

23   They're all Saturday, Sunday.

24        Q.    Have you ever worked in a department

25   that's on an irregular schedule?

Page 41

1              MR. ROBINSON:  Object to form.
2      BY THE WITNESS:
3          A.    No, I have not personally worked in a
4      department that had an irregular schedule.
5          Q.    Are you eligible for overtime?
6          A.    No.
7          Q.    Have you ever worked in a department
8      where you're eligible for overtime?
9              MR. ROBINSON:  Object to form.
10     BY THE WITNESS:
11         A.    Yes.
12         Q.    Which department?
13         A.    When I was in reservations as a
14     reservations specialist, I was eligible for
15     overtime.
16         Q.    And at that time, you were on a regular
17     schedule, right?
18         A.    Correct.
19         Q.    How was your -- how was overtime
20     determined when you were in the reservations
21     department?
22             MR. ROBINSON:  Object to form.
23     BY THE WITNESS:
24         A.    It was based off of my work week and
25     whether I would have had to have worked my schedule

Page 42

1    during my work week.  If I worked over my daily

2    hours, I could potentially earn overtime or over my

3    weekly, I could.  It depended upon whether I did

4    anything to adjust my schedule in any way.

5         Q.    So it was based on the work week --

6    overtime was based on the work week?

7         A.    Overtime was based on my specific work

8    week.

9         Q.    And what period of time is overtime based

10    on for an irregular schedule?

11              MR. ROBINSON:  Object to form.

12    BY THE WITNESS:

13         A.    It's still based on their work week.

14         Q.    What is a work week for an irregularly

15    scheduled employee?

16              MR. ROBINSON:  Object to form.

17    BY THE WITNESS:

18         A.    It varies.  It depends on what the actual

19    schedule is.

20         Q.    How about for the example that you gave,

21    alternating weeks of I think you said four days and

22    three days?

23              MR. ROBINSON:  Object to form, vague,

24    mischaracterizes testimony.

25

Page 43

1    BY THE WITNESS:

2          A.    It all depends upon what days of the week

3    it is.  So there's no way without having specifics

4    to give you that information.

5          Q.    Do irregularly scheduled employees know

6    what their schedule is for an entire year?

7                MR. ROBINSON:  Object to form, asked and

8    answered.

9    BY THE WITNESS:

10         A.    It may not be for an entire year.  It

11   depends on the group.

12         Q.    Are there groups that create schedules

13   for less than a year?

14         A.    Yes.

15         Q.    What are those groups?

16         A.    Actually it depends on the department.

17   Different groups bid for different periods of time.

18         Q.    What are ground employees at Delta?

19                MR. ROBINSON:  Object to form.

20   BY THE WITNESS:

21         A.    Ground employees typically is a -- the

22   group of employees that does not include flight

23   attendants and pilots.  They are employees who

24   typically work on the ground, if that makes sense.

25         Q.    You said flight attendants and pilots

Page 44

```
 1    would not be ground employees.  Are there any other
 2    groups of Delta employees that are not considered
 3    ground employees?
 4              MR. ROBINSON:  Object to form.
 5    BY THE WITNESS:
 6         A.    Those are the only ones that I'm aware
 7    of.
 8         Q.    How many ground employees are there in
 9    the US?
10              MR. ROBINSON:  Object to form.
11    BY THE WITNESS:
12         A.    I don't know exactly how many there are.
13         Q.    Would you say it's more than 30,000?
14         A.    I would be guessing if I said that, I
15    mean, but I would think there might be more than
16    that.  I just don't know.
17         Q.    Do you know of the ground employees at
18    Delta how many are on an irregular schedule?
19              MR. ROBINSON:  Object to form.
20    BY THE WITNESS:
21         A.    No, I don't.
22         Q.    Do you know if it's more common for Delta
23    employees to be on an irregular schedule than a
24    regular schedule?
25         A.    It is -- it is uncommon for them to be on
```

Page 45

1    an irregular schedule.

2         Q.    Is that true for ground employees?

3              MR. ROBINSON:  Object to form, asked and

4    answered.

5    BY THE WITNESS:

6         A.    Yes.  Ground employees are typically on a

7    regular schedule in most groups.

8              MS. HILLS:  We're at 10:04.  Right about

9    an hour.  If everyone is okay with taking a break

10   right now or we can keep going.

11             MR. ROBINSON:  It is up to you,

12   counselor.  How long would you like?

13             MS. HILLS:  Ten minutes.

14             MR. ROBINSON:  Does that work for you,

15   Ms. Gray?

16             THE WITNESS:  That works for me.

17             MR. ROBINSON:  Sounds good.

18             THE VIDEOGRAPHER:  Going off record at

19   11:04 a.m.

20                       (Break in the proceedings taken

21                        at 11:04 a.m.)

22             THE VIDEOGRAPHER:  We're back on record

23   at 11:19 a.m.

24                  You may proceed.

25

Page 46

1    BY MS. HILLS:

2        Q.    Ms. Gray, we were talking about a few

3    different terms that you see in your work.  I'm just

4    trying to understand what some of these mean, big

5    picture.  You have been at Delta for about 25 years,

6    right?

7        A.    That's correct.

8        Q.    And so is overtime -- weekly overtime,

9    generally is that calculated based on a work period?

10            MR. ROBINSON:  Object to form.

11   BY THE WITNESS:

12       A.    It's based off of the employee's specific

13   work week.

14       Q.    Have you seen the term "work period"

15   before in terms of overtime?

16            MR. ROBINSON:  Object to form.

17   BY THE WITNESS:

18       A.    We don't usually reference it that way so

19   I don't think I have seen that at all.

20       Q.    You never heard "work period" used to

21   describe how overtime works at Delta?

22       A.    We used -- we use the term "work week."

23       Q.    Okay.  I'm going to pull up an exhibit.

24   Let me see if I can -- so this was previously marked

25   as Exhibit 12 in the prior deposition, but it will

Page 47

1    be marked as Exhibit 1.  Let me know if you're able

2    to see that.

3                        (Deposition Exhibit 1 was marked

4                        for identification.)

5    BY THE WITNESS:

6         A.    Not yet.  Please give me one moment.

7               Yes, we have it.

8         Q.    Ms. Gray, do you recognize this document?

9         A.    Can I have a moment to look through it?

10        Q.    Of course.

11              I'll -- actually just to be clear, on

12   that first page, you see it says Delta_LG_312, that

13   has some metadata about the document.  So the first

14   page of the document we're looking at has

15   Delta_LG_000312 on the bottom, right?

16        A.    Correct.  I see it.  This is the hours of

17   work overtime and shift differential policy.

18        Q.    Do you recognize this document?

19        A.    Yes.

20        Q.    Is this a policy at Delta?

21        A.    Yes.  This is one of the policies at

22   Delta.

23        Q.    Is this one of the policies that Delta

24   follows about hours and time?

25              MR. ROBINSON:  Object to form.

Page 48

1    BY THE WITNESS:

2         A.    Can you restate that question?

3         Q.    Sure.  Does Delta follow this policy?

4         A.    Yes.

5         Q.    And so if you could just scroll down, it

6    will be PDF page 12.  I can also give you the number

7    that will be on the bottom -- actually, let's see.

8              MR. ROBINSON:  For the record purposes,

9    can you identify the Bates label at the bottom?

10             MS. HILLS:  Yes.  On the beginning of the

11   this document or where we at now?

12             MR. ROBINSON:  Where you are directing

13   her.

14             MS. HILLS:  Yes.  Just one moment.  I'll

15   give that to you.  It is PDF page 13 but the bottom

16   right will show the Bates number 322.

17             THE WITNESS:  Okay.

18   BY MS. HILLS:

19        Q.    Do you see the header in capital letters

20   that says "OVERTIME DEFINED-IRREGULAR SCHEDULE"?

21        A.    Yes.

22        Q.    Okay.  And do you see where it says right

23   under that "irregular schedules must be approved and

24   must equal to 2,080 scheduled working hours in a

25   year for full-time employees"?

Page 49

1          A.    Yes.

2          Q.    Is that still the policy at Delta?

3          A.    Yes.

4          Q.    We can go down to the following page and

5     it says "WEEKLY OVERTIME" at the top.  That is

6     Bates 323.

7          A.    Correct.

8          Q.    You also see it says "Full-Time

9     Employees"?

10         A.    Yes.

11         Q.    I'll go ahead and read.  "For full-time

12    employees working an irregular schedule, weekly

13    overtime is the time required to be worked on

14    scheduled days off, provide the scheduled days have

15    been worked during the preceding work period

16    (exclusive of daily overtime)."

17              Did I read that correct?

18         A.    Yes.

19         Q.    So in this context, what is a work

20    period?

21              MR. ROBINSON:  Object to form.

22    BY THE WITNESS:

23         A.    Yeah, in this, it is -- it is their work

24    week.

25         Q.    How do you know that?

Page 50

1          A.    Well, I mean, as they're talking about

2     the time required to be worked on scheduled off

3     days, like, it would have to be worked within their

4     work week, like all of our policies -- at the

5     beginning of this policy it talks about what a work

6     week is.

7          Q.    Could you go up to page, it would be PDF

8     13, again, and Bates 322.

9          A.    Okay.

10          Q.    And do you see the header that is in

11    capital letters that says "OVERTIME DEFINED-REGULAR

12    SCHEDULE"?

13          A.    Correct, I see it.

14          Q.    And then a bit lower you see it the

15    header "Weekly Overtime"?

16               MR. ROBINSON:  Object to form.

17    BY THE WITNESS:

18          A.    Yes, I see the header.

19          Q.    Do you understand this to be weekly

20    overtime for regular scheduled employees?

21          A.    Yes.

22          Q.    This section generally?

23          A.    Yes, and it is specific to people who

24    have four days on and three days off.

25          Q.    In that bullet point, could you just read

Page 51

1    the first sentence in that bullet point under

2    "Weekly Overtime"?

3                    MR. ROBINSON:  Object to form.

4                    What bullet point are you referring

5    to?

6                    MS. HILLS:  Under the header "Weekly

7    Overtime" on Bates 322.

8    BY THE WITNESS:

9         A.    "For these employees, weekly overtime is

10   paid at one and a half times the regular hourly rate

11   for the first eight hours of weekly overtime for all

12   hours worked over 40 in the work week exclusive of

13   daily overtime."

14        Q.    So in this section, it uses the term

15   "work week."  I'm just trying to understand how that

16   is different from a work period that is used in the

17   section for irregular employees.

18                    Can you -- can you explain that for

19   me?

20        A.    So I did not write this policy.  So I'm

21   going to give you what my thoughts are on it.

22   Right?  And the difference between a regular and an

23   irregular schedule is the fact that a regular

24   schedule has a defined -- the days off are the same

25   every week, where an irregular isn't.  So it may

Page 52

1    have been used that work period, again, not one that
2    we typically use.  When we're talking about this, we
3    actually refer the employee back to their standard
4    work week, and if you are an irregular, it may not
5    be a standard work week, it is based upon what your
6    schedule says your work week is.
7         Q.    Where does it say -- where does a
8    schedule say what a work week is?  Where could I
9    find that?
10              MR. ROBINSON:  Object to form.
11   BY THE WITNESS:
12        A.    I don't think I understand your question.
13        Q.    Where does an irregularly scheduled
14   employee see what work week means for them?
15              MR. ROBINSON:  Object to form, vague.
16   BY THE WITNESS:
17        A.    I still don't think I understand.  I'm
18   sorry.
19        Q.    How does an irregularly scheduled
20   employee know what their work week is?
21        A.    They are aware based off the schedule
22   that they're on.
23        Q.    Where does that start?  Where is the
24   schedule?
25              MR. ROBINSON:  Object to form, vague.

Page 53

```
 1    BY THE WITNESS:
 2         A.    I'm sorry.  I still don't understand your
 3    question.
 4         Q.    Where does a -- where does a work week
 5    begin for an irregularly scheduled employee?
 6              MR. ROBINSON:  Same objection.
 7    BY THE WITNESS:
 8         A.    So the work week beginning on the first
 9    working day.
10         Q.    What does that mean?
11         A.    First day that they are scheduled to work
12    is their first working day.
13         Q.    Does Delta keep track of an employee's --
14    irregularly scheduled employees, does Delta keep
15    track of what their work week is?
16              MR. ROBINSON:  Object to form.
17    BY THE WITNESS:
18         A.    Can you be more specific?
19         Q.    No.
20              MR. ROBINSON:  Same objection.  Can you
21    restate the question, counselor?
22    BY MS. HILLS:
23         Q.    Does Delta keep track of what a work week
24    is for its irregularly scheduled employees?
25              MR. ROBINSON:  Object to form, vague,
```

Page 54

1    specifically as to what a "work week" is.

2            MS. HILLS:  I'm using it in the way that

3    Ms. Gray used it before.

4            MR. ROBINSON:  I think that

5    mischaracterizes her testimony.

6                Could you restate it?  I'm not trying

7    to be difficult counselor, just so she understands

8    your question clearly.

9    BY MS. HILLS:

10       Q.    Does Delta keep track of the definition

11   of a work week for its irregularly scheduled

12   employees?

13       A.    So the definition of a work week as

14   defined in the policy?  Are you asking do we have

15   that somewhere in the policy?

16       Q.    Well, before --

17       A.    I'm really -- I'm not sure what the

18   question is.  I'm sorry.

19       Q.    It's hard to state clearly.

20                So you have said a work week is

21   different depending on the employee's schedule,

22   right?

23       A.    Correct.

24       Q.    Different irregularly scheduled employees

25   might have different work weeks from one another,

Page 55

1    right?

2          A.    That is correct.

3          Q.    Does Delta keep track of what is

4    considered a work week for all of its irregularly

5    scheduled employees?

6                MR. ROBINSON:    Same objection.

7                You can answer, Ms. Gray, to the best

8    of your ability.

9    BY THE WITNESS:

10         A.    So the schedule itself, the first working

11   day is the beginning of that work week, and so if

12   we're aware of the schedule, if we have been given

13   the schedule, we would know that that's what starts

14   the week.  Is that -- I hope I'm answering that.

15         Q.    And what are you -- how do you define the

16   first working day?

17         A.    So usually a schedule consists of working

18   days and days off.  So if you come off of a working

19   day, your first day becomes you're first working

20   day.

21         Q.    And can your first working day in a week

22   change?  In other words, can your work week -- let

23   me rephrase.

24                Can the first working day change --

25   can an employee change what is considered their

Page 56

1    first working day of the week?

2              MR. ROBINSON:  Object to form, vague.

3    BY THE WITNESS:

4         A.    So I'm sorry.  I'm going to repeat back

5    what I thought you asked me is if an employee can

6    change what their first working day is?

7         Q.    I'll give you an example.

8              If an employee swaps off their shift

9    on their first working day and they don't work that

10   shift, is that day still their first working day?

11             MR. ROBINSON:  Object to form.

12             You can answer.

13   BY THE WITNESS:

14        A.    There is a -- it's their first

15   scheduled -- yeah, I mean it would have been a

16   scheduled working day, yeah.  So the first day they

17   were scheduled to work.

18        Q.    So the definition of the work week would

19   not change because of a swap off?

20             MR. ROBINSON:  Object to form.

21   BY THE WITNESS:

22        A.    Right.  So that is still their -- that

23   would have been the first day of their week, they

24   opted to swap it off.

25        Q.    Does it change their work week in terms

Page 57

1     of how overtime is calculated?

2               MR. ROBINSON:  Object to form.

3     BY THE WITNESS:

4          A.    It impacts their work week.  Right?  So

5     if they were scheduled to work eight hours that day

6     and they swapped off, that eight hours is not

7     counted towards the daily threshold because they

8     didn't work it nor is it counted towards the weekly

9     threshold.

10         Q.    If an employee's work week can change,

11    how do they know what is considered their work week

12    for any given week if it's subject to change?

13              MR. ROBINSON:  Object to form, compound.

14    BY THE WITNESS:

15         A.    I'm not sure.  Like the week still -- in

16    the scenario you gave, that was still the first day

17    of their work week.  Nothing there changed.

18         Q.    Is that shown in an employee's schedule

19    that that day would be the first day of their work

20    week?

21         A.    I don't think I understand your question.

22         Q.    In other words, if an employee does not

23    actually come to work themselves from their first

24    day of the work week.

25         A.    If they don't come to work?

Page 58

1          MR. ROBINSON:  Object to form.  Is there

2    a question, counselor?

3          MS. HILLS:  Yes.

4    BY MS. HILLS:

5      Q.    Can the first day of the work week -- can

6    an employee's first day of the work week be a day

7    that they are not working?

8      A.    As you had in the example you gave me, if

9    employee operates to swap that time off, then yes.

10     Q.    So the employee's work week is subject to

11   change?

12          MR. ROBINSON:  Object to form,

13   mischaracterizes testimony.

14   BY THE WITNESS:

15     A.    Each time we have talked about that is

16   the first work day.  If the employee chooses to swap

17   it off, it's still their first -- their scheduled

18   work day at that point.  They just -- they opted to

19   swap it off.  They could have as well potentially

20   took the day off using time off.  Like, it doesn't

21   change that that is still the start of their work

22   week.

23     Q.    So is the phrase "work period" just not

24   applicable for overtime?

25          MR. ROBINSON:  Object to form.

Page 59

```
 1    BY THE WITNESS:
 2         A.    It is, but it is synonymous at this point
 3    with work week.
 4         Q.    When did that change?
 5         A.    It hasn't.
 6         Q.    Work period has always meant work week?
 7               MR. ROBINSON:  Object to form.
 8    BY THE WITNESS:
 9         A.    Again, I can't always speak to always,
10    but as far as I'm aware of, those two go
11    hand-in-hand.
12         Q.    Do you know how many employees at Delta
13    are eligible to earn overtime?
14               MR. ROBINSON:  Object to form.
15    BY THE WITNESS:
16         A.    No, I don't know how many, like an actual
17    number.
18         Q.    Do you know how many of the ground
19    employees at Delta are eligible to earn overtime?
20         A.    No.
21         Q.    Is it more than half?
22         A.    I can't answer that.  I don't get to see
23    all of the entire population.
24         Q.    What are published pay scales?
25               MR. ROBINSON:  Object to form, vague.
```

Page 60

```
 1   BY THE WITNESS:
 2        A.    Can you restate that?
 3        Q.    Can you -- let's see.  Are you able to
 4   see the published pay scales for employees at Delta?
 5        A.    Yes.  Or some of them.  I don't know that
 6   I see all of them.
 7        Q.    Do you know how many ground employees are
 8   on published pay scales?
 9        A.    I do not.
10        Q.    Would you say it's over half of ground
11   employees?
12              MR. ROBINSON:  Object to form.
13   BY THE WITNESS:
14        A.    I cannot say that.  Again, I don't see
15   the entire population.
16        Q.    What population do you see?
17        A.    Again, I don't know who I don't see so it
18   is hard to answer that question.
19        Q.    What groups in the ground employees do
20   you -- are you familiar with?
21              MR. ROBINSON:  Object to form.
22   BY THE WITNESS:
23        A.    Can you be more specific?
24        Q.    So could you repeat your current position
25   at Delta?
```

Page 61

1          A.    General manager of time and attendance.

2          Q.    Okay.  As general manager of time and

3    attendance, do you work with groups that are

4    considered ground employees?

5          A.    Yes.

6          Q.    Do you work specifically with any

7    department's ground employees?

8                MR. ROBINSON:  Object to form.

9    BY THE WITNESS:

10         A.    I work with several departments.

11         Q.    Which departments are those?

12         A.    They're probably too many to actually

13   name.  We work with several groups of departments.

14         Q.    So are the departments organized into

15   groups, larger groups?

16               MR. ROBINSON:  Object to form.

17   BY MS. HILLS:

18         Q.    I'm trying to understand how -- I know a

19   lot of businesses categorize people in groups

20   differently.  So it's hard to keep track of, but

21   ground employees, how many departments I guess are

22   in -- are in that universe of ground employees?

23               MR. ROBINSON:  Same objections.

24   BY THE WITNESS:

25         A.    I can't tell you for sure there.  That

Page 62

```
 1    isn't part of my responsibility to know how many.  I

 2    just don't know.

 3         Q.    You mentioned you worked with several

 4    groups of departments.  Can you explain what you

 5    mean by that?

 6         A.    So usually we -- groups of departments

 7    can usually be divisions.  Right?  So, for instance,

 8    reservations is a division.  There are several

 9    departments within that division.  There are

10    different divisions in different departments.

11         Q.    Okay.  What are some other divisions?

12              MR. ROBINSON:  Object to form, vague.

13    BY THE WITNESS:

14         A.    Are you just looking for the name of

15    another division?

16         Q.    Yeah.  I'm just trying to better

17    understand how these groups are organized when we

18    say, like, department or group or, you know, work

19    group, or anything like that.  I'm just trying to

20    better understand who fits into what.  So I guess,

21    how many divisions are there of ground employees, if

22    you can answer that?

23         A.    I can't answer that.  I'm sorry.

24         Q.    So crew tracking as an example, is that a

25    department or a division?
```

Page 63

1          A.     It is a department.

2          Q.     Is it within a division?

3          A.     It is within a division.

4          Q.     What would that be?

5               MR. ROBINSON:  Object to form.

6    BY THE WITNESS:

7          A.     Without looking it up, I believe that is

8    the Flight Ops division.

9          Q.     We spoke a little bit about it before,

10   but are you familiar with swaps?

11         A.     I have some familiarity with swaps.

12         Q.     So really basic level, if I agree to work

13   your shift, you agree to work my shift, is that a

14   swap?

15               MR. ROBINSON:  Object to form.

16   BY THE WITNESS:

17         A.     Yes.

18         Q.     Do you deal a lot with swaps in your

19   current position?

20         A.     No, I do not.

21         Q.     How about in your previous position?

22         A.     No.

23         Q.     Where there are policy questions about

24   swaps, are you the one to answer those questions?

25               MR. ROBINSON:  Object to form.

Page 64

```
 1    BY THE WITNESS:
 2         A.    Not often.
 3         Q.    Who is the best person to ask for policy
 4    questions about swaps generally?
 5         A.    There isn't a single person because
 6    swaps -- and the swap policies around that are often
 7    divisionally or departmentally based.
 8         Q.    What do you mean by that?
 9         A.    It means there might be a department or a
10    division that doesn't allow swaps or they might have
11    specific types of swaps that they allow that others
12    do not.
13         Q.    What are the different types of swaps?
14         A.    There are a couple of different kinds.
15    An example is the one that where you gave as a
16    example where I agreed to work for you and you work
17    for me to a different day, which would have been a
18    swap a payback.
19         Q.    With a payback you said?
20         A.    Hm-hmm.
21         Q.    What does that mean?
22         A.    That you agree to -- I swap for you on
23    this day and you pay me back on this other day for
24    swapping.  So we work each other's shift on the days
25    that we have committed in the swap.
```

Page 65

1        Q.    Are all Delta employees allowed to engage

2   in swaps?

3              MR. ROBINSON:  Object to form, asked and

4   answered.

5                  Answer to the best of your ability,

6   Ms. Gray.

7   BY THE WITNESS:

8        A.    Yeah, I can't speak to all employees but

9   as mentioned, some divisions allow them to swap and

10  some do not.  So I can't.

11       Q.    In your experience is it usually

12  consistent within a department whether or not the

13  employees are allowed to swap?

14       A.    I'm actually -- again, without knowing

15  which departments it is, I can't necessarily say

16  that.  I don't know.

17       Q.    So is it completely random?

18             MR. ROBINSON:  Object to form.

19  BY THE WITNESS:

20       A.    Again, I can't answer if it's random or

21  not.  Again, not being a part of those particular

22  departments or divisions, I don't know what all of

23  their rules are.

24       Q.    Does Delta have a record of what the

25  different rules are regarding swaps in different

Page 66

1    departments?

2            MR. ROBINSON:  Object to form.

3    BY THE WITNESS:

4        A.    No.  That's within each division.  The

5    types of swaps allowed or if it's allowed are all

6    handled locally.

7        Q.    So you would have no way of finding out

8    what a given department's rules are around swaps?

9            MR. ROBINSON:  Object to form.

10   BY THE WITNESS:

11       A.    Not without reaching out to someone in

12   that department.

13       Q.    Who would you reach out to answer that

14   question?

15           MR. ROBINSON:  Object to form, vague,

16   lacks specificity.

17           MS. HILLS:  I'll rephrase.

18   BY MS. HILLS:

19       Q.    Who would you reach out to find out of

20   the swap rules that apply in a department?

21           MR. ROBINSON:  Object to form, same

22   objection.

23   BY THE WITNESS:

24       A.    So if I needed to find out anything, I

25   might reach out to the HR business partner for that

Page 67

1    particular department or division.

2        Q.    What's an HR business partner?

3        A.    It is the HR representative for them.

4        Q.    For?

5        A.    For the department.

6        Q.    So every department has its own HR

7    business representative?

8        A.    Each one is assigned, and it might not be

9    an individual one per department, it might be per

10   the division.  I don't know how they determine who

11   is who, but there is an HR business partner that is

12   at minimally attached to a division that we could

13   reach out and ask some questions to.

14       Q.    So do the separate departments have

15   complete control over whether or not employees are

16   allowed to swap?

17           MR. ROBINSON:  Object to form.

18   BY THE WITNESS:

19       A.    So within each -- yeah, within the

20   department or the division, because it could go at

21   either level, they determine their rules for

22   swapping.

23       Q.    Is there any consistency across the

24   departments?

25       A.    I cannot answer that.

Page 68

1             MS. HILLS:  I'm going to pull up a

2     document.  I just introduced Exhibit 2.  It is

3     Bates 9319.  You may need to refresh to see that.

4                         (Deposition Exhibit 2 was marked

5                          for identification.)

6     BY MS. HILLS:

7         Q.    So, again, you will see this page that

8     has the metadata for the document.  You can go ahead

9     and scroll down to the page 9319, the third page on

10    the PDF.

11               Do you recognize this document?

12        A.    Correct.  Can I take some time to read

13    it?

14        Q.    Yes.  Let me know when you're ready.

15        A.    I'm sorry.  I'm ready.

16        Q.    No, you're fine.

17               Do you recognize this document?

18        A.    I recognize the email, yes.

19        Q.    Is this an email from a Cathy Ringot to

20    you?

21        A.    Yes.

22        Q.    And it was sent on March 31 of 2017?

23        A.    Correct.

24        Q.    Who is Cathy Ringot?  I don't know if I'm

25    saying that correctly.

Page 69

1        A.    You are saying it correctly.

2               She was a leader in the Salt Lake

3    City customer engagement center for reservations.

4        Q.    What's the customer engagement center?

5        A.    It's the same as a call center, if that

6    makes sense.

7        Q.    And this sentence -- actually I'll read

8    the first couple of sentences.

9               It says, "As you know after recently

10   learning that SAP is using different logic than MPS

11   had in terms of daily and weekly OT thresholds, we

12   locally became concerned that this is a change in

13   pay experience for our employees."

14               Did I read that correctly?

15       A.    Yes.

16       Q.    And so was Ms. Ringot's department -- had

17   they recently transitioned to using SAP?

18               MR. ROBINSON:  Object to form.

19   BY THE WITNESS:

20       A.    This appears to be around that same time

21   when we changed over, yeah.

22       Q.    And what departments were changed over to

23   SAP?

24               MR. ROBINSON:  Object to form.

25               You can answer, Ms. Gray.

Page 70

1    BY THE WITNESS:

2         A.    There were several.

3         Q.    Can you tell me any that you remember?

4         A.    Reservations was one of those.

5         Q.    Any others?

6         A.    Yeah.  As I mentioned, there were many

7    that got moved over at that time.  I wouldn't be

8    able to give you a comprehensive list.

9         Q.    And so the next sentence, it says, "You

10   explained to me that the SAP logic is the intended

11   logic but agreed that our employees may have

12   experienced something different prior to SAP."

13              Do you know what she's talking about

14   here?

15        A.    As far as remembering the exact

16   conversation, no.  Again, noted this was 2017.  But

17   as I read through the document, some of this dealt

18   with when a -- the result of a shift bid.

19        Q.    The result of a you said shift bid?

20        A.    Correct.

21        Q.    What is a shift bid?

22        A.    So reservation employees bid on their

23   shift, they bid three times a year to change their

24   shift.

25        Q.    So does that mean that three times a

Page 71

1    year, the employees in reservations are bidding on a

2    schedule or could you explain further what that

3    means?

4                MR. ROBINSON:   Object to form.

5    BY THE WITNESS:

6        A.    Yes.  So the part of the shift bid is the

7    shift in schedules, again, two words that can be

8    used synonymously.  So the employees, they post the

9    list of available schedules that meet what they need

10   for the demand for the calls, and the employees in

11   seniority order are able to bid on them and

12   determine what their shift will be for that next

13   period.  So usually about four months.

14       Q.    So reservations makes their schedules in

15   periods of about four months?

16       A.    Correct.

17       Q.    Did you and Ms. Ringot have a discussion

18   that there were needed updates to documents in the

19   DeltaNet?

20               MR. ROBINSON:   Object to form.

21   BY THE WITNESS:

22       A.    Again, I don't remember that

23   conversation.  So I can't really answer that.

24       Q.    Around 2017, were there any updates made

25   to the documents in DeltaNet related to overtime?

Page 72

```
 1              MR. ROBINSON:  Object to form.
 2      BY THE WITNESS:
 3          A.    I cannot say for sure.  I don't know.
 4          Q.    Still in the first paragraph, Ms. Ringot
 5      writes, "We talked about the benefit of some
 6      divisional communication to call this out as well as
 7      needed updates to the DLNet documents around how
 8      daily OT thresholds are reached."
 9                  Did I read that correctly?
10          A.    Yes.
11          Q.    Did you believe that divisional
12      communication was needed to explain how overtime
13      thresholds were reached?
14              MR. ROBINSON:  Object to form, vague.
15      BY THE WITNESS:
16          A.    Can you restate the question for me
17      please?
18          Q.    Sure.
19                  Did you think there was any confusion
20      among the departments about how overtime policies
21      operated?
22              MR. ROBINSON:  Same objection, vague,
23      lacks specificity, counselor.
24      BY MS. HILLS:
25          Q.    I'm just asking about your thoughts at
```

Page 73

1    this time.

2              MR. ROBINSON:  Same objection, vague,

3    lacks specificity with regard to departments.

4    BY THE WITNESS:

5         A.    So my thoughts -- and again, I'm looking

6    at an email in 2017 so again, I don't have a lot of

7    memory of what went on at that time to figure out

8    why -- why we noted what we noted, and if divisional

9    communication was needed.

10              There was a piece in the logic that

11   we wanted to make sure that they understood because,

12   as we mentioned, we read the sentence but it -- we

13   skipped the piece where it says "MPS is not as smart

14   as SAP" so we were able to have more granular detail

15   in SAP than we were in MPS.

16        Q.    And so there's a change in pay logic that

17   coincided with transitioning from MPS to SAP?

18              MR. ROBINSON:  Object to form,

19   mischaracterizes testimony.

20              You may answer, Ms. Gray.

21   BY THE WITNESS:

22        A.    It's not a change in the pay logic

23   itself.  It was the fact that it -- SAP could go

24   down to a much granular detail than MPS was allowed

25   to.

Page 74

1      Q.    Do you think the transition from MPS to
2   SAP resulted in a change in pay experience for
3   employees?
4            MR. ROBINSON:   Object to form, vague.
5   BY THE WITNESS:
6      A.    That's hard to answer.  It isn't -- I
7   don't know that it was necessarily -- sorry.  I
8   don't remember what your words you used there, but I
9   don't think that was the issue.  I do believe that
10  it was -- it was a little bit different for them,
11  but nothing that was wildly different.
12     Q.    Did the transition in MPS to SAP cause a
13  reduction in overtime pay to employees?
14     A.    It did change depending on the
15  circumstance, there was -- in this same issue, there
16  were people who actually received overtime and then
17  other people who did not.  So it probably was net
18  neutral.
19     Q.    What do you mean net neutral?
20     A.    That there wasn't more overtime being
21  paid to employees in general.
22     Q.    But a specific employee could be paid
23  less overtime due to the transition from MPS to SAP?
24     A.    It wasn't due to the transition.  It was
25  due to how the rules were handled between the two

Page 75

1    systems.

2         Q.    When a department transitioned from MPS

3    to SAP, did they adopt the rules under the SAP

4    system?

5              MR. ROBINSON:  Object to form.  Object to

6    also to the characterization.

7    BY THE WITNESS:

8         A.    I'm not sure I understand your question.

9         Q.    When did the payrolls change for

10   departments that switched from MPS to SAP?

11        A.    The payrolls were the payrolls.  So they

12   didn't change.

13        Q.    Are you familiar with Project Horizon?

14        A.    Yes, I have some familiarity.

15        Q.    What is Project Horizon?

16             MR. ROBINSON:  Object to form.

17   BY THE WITNESS:

18        A.    Project Horizon was the project that they

19   used to bring on SAP as an HR system.

20        Q.    When did Project Horizon start?

21        A.    I don't have the details of that.  I was

22   not part of that.

23        Q.    You weren't part of Project Horizon at

24   all?

25        A.    I wasn't part of Project Horizon at the

Page 76

1    start.  So I don't know exactly when it started.

2        Q.    When did you become involved in Project

3    Horizon?

4        A.    When I moved into HR.

5        Q.    When was that?

6        A.    At the same time I became the manager of

7    time and attendance.  I don't remember what date.

8        Q.    Do you understand what Ms. Ringot means

9    by the term "pay logic"?

10            MR. ROBINSON:  Object to form.

11   Counselor, it calls for speculation on behalf of

12   Ms. Gray.

13   BY THE WITNESS:

14       A.    I don't know for sure what she intended

15   for pay logic.

16       Q.    What do you believe "pay logic" means in

17   terms of SAP and MPS systems?  What is pay logic?

18            MR. ROBINSON:  Object to form, vague.

19            Would you restate the question,

20   Counsel.

21   BY MS. HILLS:

22       Q.    What do you understand "pay logic" to

23   mean?

24       A.    So, again, not being Ms. Ringot, right,

25   I'm assuming her "logic" is synonymous with the word

Page 77

1    "rule," like she was thinking this is the same thing

2    as the pay rules.  But again that's a guess.

3        Q.    You've never heard the phrase "pay logic"

4    in relation to SAP or MPS outside of this message

5    from Ms. Ringot?

6            MR. ROBINSON:  Object to form with regard

7    to -- well, both the form and then also just the

8    vagueness of the question.

9    BY THE WITNESS:

10       A.    So, again, pay logic is an -- I mean, I

11   have heard -- there are folks in the field that will

12   use that as opposed to using pay rules.  I don't --

13   again, I'm not sure always their intention.  Right?

14       Q.    Do you see on this page towards the

15   bottom of 9319.

16       A.    Sure.

17       Q.    Where it says, "Overtime Defined" in

18   bold?

19       A.    Yes, I see it.

20       Q.    Above that is a link.  Does that appear

21   to be a link to the DeltaNet?

22       A.    Yes.

23       Q.    And does it look like that's the hours of

24   work for overtime and shift differential document

25   that we saw before in Exhibit 1?

Page 78

1              MR. ROBINSON:  Object to form.
2     BY MS. HILLS:
3         Q.    Does this look like a link to a policy
4     document called Hours of Work-Overtime and Shift
5     Differential"?
6         A.    Yes, it does.
7         Q.    Were any changes made to the hours of
8     work policy document as a result of the transition
9     from MPS to SAP?
10             MR. ROBINSON:  Object to form.
11    BY THE WITNESS:
12        A.    Not that I'm aware of.
13        Q.    Did that document apply to -- let's see
14    what Ms. Ringot's group is -- reservations?  Did the
15    hours -- did the hours of work, overtime, and shift
16    differential document apply to the reservations
17    department at this time?
18             MR. ROBINSON:  Object to form.
19    BY THE WITNESS:
20        A.    Yes, it did at that time and currently.
21             MS. HILLS:  I think we can take another
22    short break, if that's okay with everyone.
23             MR. ROBINSON:  Counselor, that's fine.  I
24    figured that probably you and most of us here at
25    some point will need to get a little bit of

Page 79

1    nourishment.

2              MS. HILLS:  It's 12:15 for you all, isn't

3    it?

4              MR. ROBINSON:  And so it's entirely up to

5    you, I was going to suggest maybe in 15 minutes or

6    so, but if you would like to break now, that's up to

7    you.

8              MS. HILLS:  Yeah, we can go ahead and

9    take the lunch break right now.  Like is a half hour

10   okay for everyone or do you need more time?

11             MR. ROBINSON:  We're going to need a

12   little more time than that.  That's why I was

13   suggesting --

14             THE VIDEOGRAPHER:  Let's go off the

15   record so we can discuss this.  Going off the record

16   at 12:15 p.m. Thank you.

17                       (Break in the proceedings taken

18                        at 12:15 p.m.)

19             THE VIDEOGRAPHER:  Good afternoon.  We

20   are back on record at 1:38 p.m.

21                  You may proceed.

22   BY MS. HILLS:

23        Q.    Hello, Ms. Gray.  How was your lunch?

24        A.    It was good.  Thank you.

25        Q.    Do you understand that you are still

Page 80

1    under oath to testify truthfully?

2         A.    Yes.

3         Q.    Do you understand that's equivalent as if

4    you were testifying in court?

5         A.    Yes.

6         Q.    And do you understand that I'm entitled

7    to your best recollection?

8              MR. ROBINSON:  Object to form.

9    BY THE WITNESS:

10        A.    I don't know that I understand what that

11   means.

12        Q.    So I might ask you questions that you are

13   truthfully unable to answer, and that's fine.  We

14   have come across some of those, but if you are able

15   to answer my questions, then I'm entitled to your

16   best recollection.  Does that make sense?

17        A.    Yes.

18        Q.    Did you speak with your attorney over the

19   break?

20        A.    Yes.

21        Q.    Do you wish to change any part of your

22   testimony from before the break?

23        A.    No.

24        Q.    Did you discuss the substance of your

25   testimony with your attorney over the break?

Page 81

1           MR. ROBINSON:  Object to form.

2                I'm just going to advise my client

3      that to the extent this line of questioning, you're

4      free to answer, Ms. Gray, goes into anything that's

5      privileged, I'd like to just lodge that objection

6      just ahead of time to be preemptive.

7                You can answer.

8      BY THE WITNESS:

9           A.    I was going to ask you to restate the

10     question.

11          Q.    Did you discuss the substance of your

12     testimony with your attorney over the break?

13          A.    Not really the substance, just whether,

14     you know, whether I was doing okay, whether I'm

15     feeling okay.  Nothing more.

16          Q.    For calculating over time for ground

17     employees at Delta, does swaps count towards the

18     overtime threshold?

19          A.    Repeat that for me one more time, please.

20          Q.    When calculating overtime for ground

21     employees at Delta, does swaps count toward the

22     overtime threshold?

23           MR. ROBINSON:  Object to form.

24     BY THE WITNESS:

25          A.    No, swaps do not count towards the

Page 82

1    overtime threshold.

2         Q.    During your time at Delta, have there

3    been any misunderstandings about that rule?

4              MR. ROBINSON:  Object to form, vague.

5    BY THE WITNESS:

6         A.    Can you -- can you help me understand

7    what you're asking me there?

8         Q.    Yeah.  We'll back up.  Is it -- so you

9    said "yes" for calculating overtime swaps do not

10   count towards the overtime threshold.  Is that --

11   that's true for all overtime eligible ground

12   employees, correct?

13             MR. ROBINSON:  Object to form.

14                  You can answer.

15   BY THE WITNESS:

16        A.    Yes, to overtime eligible employees, that

17   is -- that is true.  They have to meet their

18   threshold.

19        Q.    During your time working at Delta, have

20   you seen anyone misunderstand that rule?

21             MR. ROBINSON:  Object to form.

22   BY THE WITNESS:

23        A.    I have had questions on that rule, yes.

24        Q.    What kind of questions?

25        A.    Most of the time it is understanding what

Page 83

```
 1    their threshold is.
 2         Q.    What is the threshold?
 3              MR. ROBINSON:  Object to form.
 4              THE WITNESS:  Go ahead and reask your
 5    question.  I cut you off accidentally.
 6                        (Court reporter technical
 7                        difficulties.)
 8              THE VIDEOGRAPHER:  We are going off
 9    record at 1:42 p.m.
10                        (Off the record.)
11              THE VIDEOGRAPHER:  We're back on record
12    at 1:44 p.m.
13                   You may proceed.
14    BY MS. HILLS:
15         Q.    We just got disconnected there for a
16    moment, but I will repeat my question.
17                   What is the overtime threshold?
18              MR. ROBINSON:  Object to form.
19    BY THE WITNESS:
20         A.    The overtime threshold is the point at
21    which the employee is able to earn overtime based
22    upon their specific work week and scheduled number
23    of hours.
24         Q.    And were there any misunderstandings
25    about what that meant?
```

Page 84

1              MR. ROBINSON:  Object to form.

2      BY MS. HILLS:

3          Q.    Did you receive any indication that

4      people at Delta were interpreting the overtime rule

5      incorrectly?

6              MR. ROBINSON:  Object to form.

7      BY THE WITNESS:

8          A.    So is it that someone was

9      misunderstanding the overtime rule, is that what

10     your question is?

11         Q.    Did you have any indication that people

12     were interpreting the overtime rule differently?

13             MR. ROBINSON:  Object to form.

14     BY THE WITNESS:

15         A.    No, because I really can't speak to their

16     interpretation.

17         Q.    Right.  I don't want you to speak to

18     anyone else's interpretation.

19              Did you receive any indication that

20     there may have been a difference in interpretations

21     about the overtime threshold?

22             MR. ROBINSON:  Object to form, asked and

23     answered.

24             MS. HILLS:  I don't think she has

25     answered that question.

Page 85

1              MR. ROBINSON:  She did.  She said she
2      couldn't speak to someone else's interpretation.
3      You asked her again --
4              MS. HILLS:  That's not the question.
5              MR. ROBINSON:  Okay.  Restate the
6      question then, counselor.
7              MS. HILLS:  Could you repeat back the
8      question?
9                      (Record read as requested.)
10             MR. ROBINSON:  Same objection to the
11     extent that you were asking for Ms. Gray to
12     speculate on the interpretation made by other
13     people.
14                 You may answer to the best of your
15     ability, Ms. Gray.
16     BY THE WITNESS:
17         A.    I mean, we've been asked usually in
18     relation to a paycheck about whether they have met
19     their threshold or not.
20         Q.    And I'll go back a little bit and
21     that's -- again, my question is not other people's
22     interpretations.  I don't want to hear about that.
23     I know you can't speak to other people's thoughts.
24                 My question is:  Did you receive
25     indication that there may have been inconsistency in

Page 86

1    Delta in how people were interpreting the overtime
2    threshold rule?
3              MR. ROBINSON:  Object to form.
4    BY THE WITNESS:
5        A.    I'm sorry.  I don't understand that
6    question.
7        Q.    Did anyone ask you questions about how
8    the overtime rule was interpreted?
9              MR. ROBINSON:  Object to form.
10   BY THE WITNESS:
11       A.    I think I'm struggling with the word
12   interpreted, not how it's interpreted.
13       Q.    Let's go back.
14              So the swaps do not count towards
15   overtime threshold, correct?
16       A.    Correct.
17       Q.    Has anyone at Delta ever interpreted that
18   rule incorrectly?
19              MR. ROBINSON:  Object to form, vague.
20   BY THE WITNESS:
21       A.    Again, I'm being asked to interpret on
22   behalf of all Delta employees, I can't answer that.
23       Q.    In your experience, have you seen the
24   rule misrepresented?
25       A.    In my experience, have I seen it

Page 87

1    misinterpreted where it is related to the overtime

2    threshold?  I have seen where people thought that

3    maybe they should have been but did not take in all

4    the factors.

5         Q.    Can you tell me more about that?

6              MR. ROBINSON:  Object to form.  Vague as

7    to "that."

8              MS. HILLS:  The preceding sentence.

9              THE WITNESS:  Well, they don't --

10              MR. ROBINSON:  Just a second.  Objection,

11    again.  Counsel, not trying to be difficult, what's

12    the preceding sentence?

13                 What did you mean by that?  I just

14    want to be --

15              MS. HILLS:  Ms. Gray's answer -- my

16    follow-up question was about her previous answer

17    that she's seen -- I mean, we can have the court

18    reporter read back again the previous -- could we

19    please have Ms. Gray's last answer repeated?

20                    (Record read as requested.)

21              MR. ROBINSON:  Same objection, again,

22    vague.

23              MS. HILLS:  You can answer, if you're

24    able, Ms. Gray.

25

1   BY THE WITNESS:

2        A.    I'm sorry.  Say that last bit one more

3   time.  I'm sorry.

4        Q.    You can go ahead and answer if you're

5   able.

6        A.    So where the employee tends to

7   misunderstand it is that they have forgotten they

8   had possibly a swap that impacted it.

9        Q.    And did you receive complaints or did you

10  learn about misinterpretations directly from

11  employees about the overtime threshold and how --

12  I'll back up.

13             When did you first start seeing

14  misunderstandings about how swaps impacted overtime

15  threshold?

16             MR. ROBINSON:  Object to form.

17             You may answer, Ms. Gray.

18  BY THE WITNESS:

19        A.    And so it usually comes about after they

20  look at their paycheck.  So there's no overarching

21  misunderstanding about how swaps impact over time.

22        Q.    There's no overarching misunderstanding

23  about how swaps impact overtime threshold?

24             MR. ROBINSON:  Object to form.

25

Page 89

1    BY THE WITNESS:
2         A.    No, there's nothing overarching about
3    that.
4              MS. HILLS:  Okay.  I have introduced
5    Exhibit 3.  Let me know when you're able to see it.
6    It is Bates number 12531.
7                    (Deposition Exhibit 3 was marked
8                     for identification.)
9              THE WITNESS:  I'm able to see it.
10   BY MS. HILLS:
11        Q.    We'll first start out at the page, it
12   doesn't have a Bates number, it is the metadata, the
13   second page in the PDF.
14        A.    Yes.
15        Q.    And do you see that your name is listed
16   as the custodian of this document?
17        A.    Yes.
18        Q.    It is a few pages long, but we are going
19   to scroll down to 12 -- 12533 Bates number, it is
20   also page 5 in the PDF.
21        A.    Okay.
22        Q.    And is this a message from a Peter
23   Schramm to Tamberly Bassett, Daniel Phillips, and
24   Rick Christy?
25        A.    Yes, based off of what I see here, yes.

Page 90

1          Q.    And do you see it is dated April 13,
2     2017?
3          A.    Yes.
4          Q.    Do you know who Peter Schramm is?
5          A.    No, I do not.
6          Q.    Who is Tamberly Bassett?
7          A.    I don't know right offhand.
8          Q.    How about Daniel Phillips?
9          A.    I don't know.
10         Q.    Do you know Rick Christy?
11         A.    I know the name.  I don't remember what
12    context.  I see names all day long.
13         Q.    Sure.  Last one for you, do you know
14    Barbara Franz in the copy line?
15         A.    I do.
16         Q.    Who is Barbara Franz?
17         A.    Barbara Franz is over the HR -- the HR
18    business partners for ACS.
19         Q.    What is ACS?
20         A.    Airport customer service.
21         Q.    Is she based in Atlanta?
22               MR. ROBINSON:  Object to form.
23    BY THE WITNESS:
24         A.    Yes.
25         Q.    And so looking at this message, it

Page 91

1    appears to be from Peter Schramm, addressed to the

2    individuals we just named.  It says "As you know, I

3    was docked (four different days back in February)

4    for leaving early on a swap with permission.  Then

5    again, when I received my paycheck (2.3 hours which

6    was equivalent to when I left early on the swaps)."

7                    Now, could you read the following

8    paragraph?

9         A.    Sure.

10                   "According to our phone conversation

11   yesterday, you stated that once I work two swaps in

12   a week, my overtime threshold will become 50 hours.

13   Am I correct with this statement?  This is a Delta

14   policy (you quoted a specific work rule), correct?"

15        Q.    And I know this -- this message is not

16   fully in context for you, but based on this

17   sentence, do you agree that swaps can raise or lower

18   an employee's overtime threshold?

19                   MR. ROBINSON:  Object to form, calls for

20   speculation.

21                   You may answer, Ms. Gray.

22                   MS. HILLS:  I'll restate.

23   BY MS. HILLS:

24        Q.    Can swaps raise or lower the overtime

25   threshold for an employee?

Page 92

1              MR. ROBINSON:  Object to form, vague.

2                   You may answer, Ms. Gray.

3     BY THE WITNESS:

4         A.    So the way that I'm reading this is it is

5     directionally correct.  So, in this situation, the

6     employee worked two swaps on top of their schedule,

7     and mathematically, knowing that 40 hours typically

8     gets you to overtime, two swaps would have -- if

9     they were five hours apiece, the employee would have

10    had to work 50 hours before they would have been

11    eligible to overtime because the two swaps did not

12    count towards their -- their original threshold,

13    which would have been the 40 hours.

14                   So it was something that they used to

15    make it make sense mathematically for an employee

16    how many hours they would need to work in order to

17    reach overtime.

18        Q.    I don't understand your answer.  What

19    does that mean?

20              MR. ROBINSON:  Object to form.

21              MS. HILLS:  I'll restate.

22    BY MS. HILLS:

23        Q.    So swaps can increase the amount of hours

24    that an employee must work in order to receive

25    overtime?

Page 93

1           MR. ROBINSON:  Object to form.
2                Is that the question, Counsel?
3           MS. HILLS:  Yes.
4     BY THE WITNESS:
5           A.    So using that example, yes, the employee
6     would have to work 50 hours because they'd have to
7     work the equivalent of those swap hours as well as
8     their base schedule before they would be eligible
9     for overtime.
10          Q.    What is a base schedule?
11          A.    Again, I don't know what this employee's
12    specific schedule is.  It does not take --
13          Q.    Generally.
14          A.    There's no general for a base schedule.
15    It depends upon what that schedule the employee is
16    assigned on.
17                So there's not enough to give you
18    detailed information.  Typically an employee would
19    have to work 50 hours or not 50 -- 40 hours of their
20    regular schedule before they got into overtime and
21    so they have picked up swaps, the swaps do not
22    count.
23          Q.    So if an employee needs to work 40 hours
24    to be able to receive overtime, is the swap not part
25    of -- does the swap change their schedule?

Page 94

1           MR. ROBINSON:  Object to form.

2     BY THE WITNESS:

3           A.    I'm not sure I understand your question.

4           Q.    When an employee swaps, the hours they

5     swap are added to their original overtime threshold;

6     is that correct?

7                 MR. ROBINSON:  Object to form.

8     BY THE WITNESS:

9           A.    The hours that they swap for, they have

10    to work above whatever their normal threshold is to

11    the same amount of that swap before they can get

12    overtime.

13          Q.    If you could scroll up to page 12531,

14    about halfway down, do you see this is a message

15    from Charles Dowd?

16          A.    Yes.

17          Q.    Who is that?

18          A.    Charles Dowd is one of the coordinators

19    on the time and attendance team.

20          Q.    Is he based in Atlanta?

21          A.    Yes.

22          Q.    And do you see that you're copied on this

23    message as well from Charles Dowd?

24          A.    Yes.

25          Q.    Okay.  He says, in his message, "although

Page 95

1    you won't find in writing where policy states the

2    swapped hours are added to daily and weekly

3    thresholds, that is the programming logic that had

4    to be put in place so that our time and attendance

5    systems can calc OT."

6                    Do you see that?

7        A.    Yes.

8        Q.    So is that true, that the programming

9    logic put into Delta's time and attendance systems

10   increases weekly threshold due to swaps --

11               MR. ROBINSON:  Object to form.

12               MS. HILLS:  -- overtime?

13               MR. ROBINSON:  Object to form.

14   BY THE WITNESS:

15       A.    So within the systems, it is not

16   increasing the threshold, the swap itself does not

17   count.

18       Q.    So what I just read, is that incorrect?

19       A.    It is directionally correct, as I stated

20   earlier.  A lot of times this verbiage is used to

21   help people understand mathematically the total

22   number of hours they have to work before overtime is

23   there.

24       Q.    Is the rule different than how overtime

25   operates mathematically?

Page 96

1          MR. ROBINSON:  Object to form.

2    BY THE WITNESS:

3          A.    So we utilize the verbiage that a swap

4    does not count towards your weekly threshold.

5    Right?  A lot of times our employees are not

6    thinking in that manner.  Their goal is how many

7    hours do I have to work to get to overtime.  So

8    they've actually simplified to help them understand

9    I've got to work my regular schedule and replace any

10   hours that I might have swapped away, plus any hours

11   that I swapped to work, anything that was swapped,

12   away or to work, don't count toward that threshold.

13            So regardless that employee still had

14   to work more hours before that overtime would kick

15   in because they participated in a swap voluntarily.

16        Q.    Has that -- had that policy ever changed

17   since this time, 2017?  Has that been consistent

18   since that time?

19          MR. ROBINSON:  Object to form, lacks

20   specificity.

21   BY MS. HILLS:

22        Q.    Let me back up.  Let's go back to the

23   bottom page, that 12533.  Just to have that up as a

24   reference.

25            It would be correct to say that for

1    this individual, swaps could have increased his

2    overtime threshold mathematically speaking?

3         A.    Yes.  He would have had to work his

4    regular scheduled hours plus any hours that he

5    swapped to work.

6         Q.    And so the document we were just looking

7    at, is that -- that was a time that someone

8    misunderstood the overtime threshold rule?

9              MR. ROBINSON:  Object to form.

10   BY THE WITNESS:

11        A.    I think as I have stated before,

12   employees tend to ask these questions after they see

13   a paycheck.

14        Q.    Were there other instances of similar

15   questions?

16             MR. ROBINSON:  Object to form.

17   BY MS. HILLS:

18        Q.    Did you see other similar questions about

19   how swaps interacted with the overtime threshold?

20        A.    I have seen questions about swaps and

21   overtime amongst all of the tickets that we do for

22   time and attendance.

23        Q.    Is it a common issue?

24             MR. ROBINSON:  Object to form.

25

1    BY THE WITNESS:

2         A.    I mean, again, how do we quantify

3    "common."

4         Q.    Do you receive the time and attendance

5    tickets in your role?

6         A.    I do not personally receive time and

7    attendance tickets, no.

8         Q.    Are time and attendance tickets ever

9    escalated to you?

10        A.    Yes.

11        Q.    So in that capacity, is the -- are

12   questions about how swaps interact with overtime a

13   common question in the time and attendance tickets

14   you have seen?

15             MR. ROBINSON:  Object to form, compound

16   question.

17   BY THE WITNESS:

18        A.    For the ones that get escalated to me,

19   they are rarely about swaps and overtime.

20        Q.    How many would you say you have seen?

21             MR. ROBINSON:  Object to form.

22   BY THE WITNESS:

23        A.    There's no way to quantify.

24        Q.    More than a hundred?

25        A.    I'd say it's not more than a hundred.

Page 99

1    They're not rare, but I don't have a number or, I'm

2    sorry, they're not frequent, they're rare, but I

3    don't have a number for that.

4         Q.    More than 50 would you say?

5              MR. ROBINSON:  Object to form.

6    BY THE WITNESS:

7         A.    So over what period of time?

8         Q.    Since 2017.

9         A.    Since 2017, there could -- I don't think

10   that I have even had 50 come across that are related

11   to swaps and overtime.

12        Q.    But you are not sure?

13             MR. ROBINSON:  Object to form, asked and

14   answered.

15   BY THE WITNESS:

16        A.    Again, since 2017, there's no way for me

17   to be able to give you anything specific.

18        Q.    So in your role, when you see a recurring

19   question about a policy, did you ever escalate

20   recurring issues to your superior, to John Early?

21             MR. ROBINSON:  Object to form, compound,

22   vague.

23   BY THE WITNESS:

24        A.    I'm sorry.  Can you -- can you repeat

25   that for me?

Page 100

1        Q.    Sure.  I'll restate.

2              Did you -- did you see recurring

3    complaints in the MyTime tickets that overtime was

4    being underpaid due to swaps?

5              MR. ROBINSON:  Object to form.

6    BY THE WITNESS:

7        A.    No.

8        Q.    Did you see any complaints that overtime

9    was being underpaid due to swaps?

10              MR. ROBINSON:  Object to form.

11   BY THE WITNESS:

12       A.    Not complaints.  Again, when we get a

13   ticket, they are asking questions to understand why.

14   It typically is correct in how it was processed and

15   paid.

16       Q.    Were any exceptions ever made to the rule

17   that swaps don't count towards the overtime

18   threshold?

19       A.    Not that I'm aware of.  I mean, it's rare

20   that an exception would ever even be considered for

21   that.

22       Q.    When would an exception be considered?

23       A.    I have not seen a situation.  So as far

24   as from my standpoint, I have never offered an

25   exception for that in my position as general manager

```
                                                  Page 101

 1    of time and attendance for Delta Air Lines.

 2               MS. HILLS:  All right.  There should be

 3    an Exhibit 5 I just introduced.  Let me know when

 4    you see it.

 5                          (Deposition Exhibit 5 was marked

 6                           for identification.)

 7               THE WITNESS:  I have got it.

 8    BY MS. HILLS:

 9         Q.    That is Bates number 12554?

10         A.    Correct.

11         Q.    On that first page with the metadata, do

12    you see that you're listed as the custodian for this

13    document?

14         A.    Hm-hmm, yes.

15         Q.    I'll have you scroll down to the last

16    page.

17         A.    Okay.

18         Q.    Do you recognize this document?

19         A.    I recognize it is an email.  Again, it's

20    from 2017.

21         Q.    Do you need a moment to read it?

22         A.    I do.

23         Q.    Let me know when you're ready.

24         A.    Give me just one more moment.

25                    Okay, I am ready.
```

Page 102

1        Q.    What is this document?

2              MR. ROBINSON:  Object to form.

3    BY THE WITNESS:

4        A.    It appears to be an email.

5        Q.    And who is Rhonda Evans?

6        A.    Rhonda was a member of the time and

7    attendance team several years ago.

8        Q.    Was she based in Atlanta?

9              MR. ROBINSON:  Object to form, vague with

10   regard to "based."

11   BY MS. HILLS:

12       Q.    Is that question unclear to you,

13   Ms. Gray?

14       A.    No.  She lived in Atlanta, yes.

15       Q.    And then what does DFW Ops refer to?

16       A.    DFW is Dallas-Fort Worth.  Ops is the

17   operations desk.

18       Q.    And do you know who Delores is at DFW and

19   Ops?

20       A.    Yes, I do.

21       Q.    Who is Delores?

22       A.    Delores was one of the -- one of the

23   specialists on the Ops Desk in Dallas.

24       Q.    Specialists in?

25       A.    It is the title.

Page 103

1       Q.    Was she in human resources?

2       A.    No.

3       Q.    Do you know which time and attendance

4    system that Ops used at this time in June of 2017?

5            MR. ROBINSON:   Object to form.

6    BY THE WITNESS:

7       A.    I'm sorry.  Ask your question again.  I'm

8    sorry.

9       Q.    Sure.  Do you know which time and

10   attendance system Ops used around this time, which

11   was June 2017?

12      A.    Yes, they used MPS.

13      Q.    Do they still use MPS?

14      A.    No, they do not.

15      Q.    And so is this -- I'll first ask you.  Do

16   you know who Lisa Johnson is?

17      A.    No, I do not.

18      Q.    Do you know see that long number next to

19   the name Lisa Johnson?

20      A.    I don't know where you are referencing.

21      Q.    On the first line of the email?

22      A.    Yes.

23      Q.    Is that an employee identification

24   number?

25      A.    Yes, it is.

Page 104

1        Q.    And do you understand the text in italics
2    to be a message from Lisa Johnson?
3        A.    Based off of what I'm seeing, that would
4    be my thought.
5        Q.    Do you see it is signed "Thanks, Lisa L.
6    Johnson" in the middle?
7        A.    Yes.
8        Q.    And then below it you see the text is not
9    in italics?
10       A.    Yes.
11       Q.    And at the bottom of the message do you
12   see that it is signed, "Thank you, Rhonda"?
13       A.    Yes.
14       Q.    So did you have a chance to read the
15   whole message -- the whole document?
16       A.    Yes, I did.
17       Q.    Could you explain what is going on here?
18            MR. ROBINSON:   Object to form, calls for
19   speculation.
20                 You may answer, Ms. Gray.
21   BY THE WITNESS:
22       A.    So based off of the content of what's
23   presented in front of me, Lisa had some concerns on
24   what she saw in her paycheck, and it looks to be
25   several things that were going on during that period

1    of time, and so Rhonda was trying to clarify what

2    she saw and to explain to me what her -- I'm

3    assuming her thoughts and feelings at the time were.

4         Q.    And do you see about halfway down the

5    beginning of Rhonda's message, the second sentence,

6    excuse me, the first sentence, where it says "We

7    went over each on the phone and we discussed she was

8    paid correctly.  The new bid began on May 15th and

9    she had a swap off of 10.0 hours on May 14.  She was

10   not paid exactly 10.0 hours of OT due to the hours

11   missed on the swap off."

12                   Did I read that correctly?

13        A.    Yes, you did.

14        Q.    And do you remember an exception being

15   made for the employee Lisa Johnson to the swap

16   policy, the swap and overtime policy?

17        A.    No, I don't remember.

18        Q.    Based on this message from Rhonda Evans,

19   did the employee's overtime threshold change as a

20   result of their swap?

21              MR. ROBINSON:  Object to form.

22   BY THE WITNESS:

23        A.    Based on what Rhonda said she wasn't paid

24   10 hours of OT because she swapped 10 hours at the

25   start of her new bid.

1      Q.    And you see the following paragraphs

2   where it says "Delores asked me to pay the OT hours

3   that paid as ST due to the shift bid."  What do you

4   understand that to mean?

5      A.    That she was being asked by someone to

6   pay overtime instead of straight time.

7      Q.    And then the following sentence, do you

8   see that it says "I told her we could add the hours

9   to the next check."

10     A.    Yes, I see that.

11     Q.    So was this employee paid overtime hours

12  after a swap off?

13            MR. ROBINSON:  Object to form.

14  BY THE WITNESS:

15     A.    So with this -- I can't tell you that for

16  sure.  This could have still just been part of a

17  conversation still that may or may not netted out

18  the way it looks at this point.

19     Q.    Do you have any reason to doubt that the

20  employee was paid for the hours on the next check?

21            MR. ROBINSON:  Object to form.

22  BY THE WITNESS:

23     A.    I mean, again, I wouldn't know without

24  going into a system and looking it up.

25     Q.    Go down a little bit where it says, "But

Page 107

1    we are sending the wrong message with all of the

2    exceptions we are granting."

3              Did I read that correctly?

4        A.    Yes, you did.

5        Q.    Was Delta granting exceptions to the

6    overtime policy in regard to swaps?

7              MR. ROBINSON:   Objection to form, asked

8    and answered.

9    BY THE WITNESS:

10        A.    I don't know that we were, and actually

11    quite frankly, the cusp of this is shift bid change,

12    not swap.

13        Q.    What was that?

14        A.    The root of this issue was due to shift

15    bid change, not necessarily all swap, so that

16    becomes very hard to answer that question as that

17    isn't wholesale the situation here.

18        Q.    But so the top sentence says "she was not

19    paid exactly 10.0 hours of OT due to the hours

20    missed on the swap off."

21              This situation was not about a swap

22    off?

23        A.    Well, but you have to look at the part

24    right before that that talks about the new shift bid

25    beginning on May 15.  So there was multiple things

1    here that impacted this situation.  It wasn't just

2    one.

3         Q.    Does the -- why would the shift bid date

4    make a difference in overtime pay here?

5         A.    Because it could change what their work

6    week is.

7         Q.    How is that?

8         A.    Well --

9              MR. ROBINSON:  Object to form.

10                  You may answer, Ms. Gray.

11   BY THE WITNESS:

12        A.    It may change what their off days were as

13   well as their working days.

14        Q.    Could you explain that further?

15        A.    An employee's working days as a result of

16   the shift bid could be different.  I might not get

17   the exact same shift with the same off days.

18        Q.    Exact same as what?

19        A.    As what they held previously.  So a shift

20   bid is a change, one shift bid I held one particular

21   schedule; on the next one I could hold something

22   different.

23        Q.    The shift bid date, that changes an

24   employee's work week?

25              MR. ROBINSON:  Object to form.

Page 109

1    BY THE WITNESS:

2         A.    It could.  It depends on whether their

3    off days change or not.

4         Q.    Change from what?  I'm not following.  If

5    their off days change from?

6         A.    So as mentioned, a shift bid, you had one

7    schedule, so whatever your off days are, as a result

8    of the new shift bid change over, you might have a

9    different set of off days.  It changes your work

10   week.

11        Q.    So by shift -- is shift for shift bid,

12   are you -- does that mean like it's scheduled on

13   multiple days or a single day?

14             MR. ROBINSON:  Object to form.

15                  You may answer, Ms. Gray.

16   BY THE WITNESS:

17        A.    Their shift contains their scheduled

18   start time and their off days and the duration.

19        Q.    For what duration?

20        A.    Their daily duration, how many hours

21   they're expected to work as part of their start and

22   end time.

23        Q.    So do employees bid on a shift every day?

24             MR. ROBINSON:  Object to form.

25

Page 110

1    BY THE WITNESS:

2         A.    No.

3         Q.    So in this email, for example, that

4    mentions a May 14 shift bid.  What are the employees

5    bidding for?

6         A.    They were bidding on their -- essentially

7    their shift, which includes their start time, their

8    duration, their off days.  That would have started

9    on, it looks like it says the shift bid began on

10   May 15th.  It would have ended roughly four months

11   later.  And so the employee works -- they work fixed

12   schedules there.  So whatever schedule this employee

13   was on -- I guess that's the fire alarm so...

14              MR. ROBINSON:  Could we go off the

15   record?  It appears to be a fire alarm.

16              MS. HILLS:  Yep.

17              THE VIDEOGRAPHER:  Please stand by.  We

18   are going off record at 2:29 p.m.

19                        (Break in the proceedings taken

20                         at 2:29 p.m.)

21              THE VIDEOGRAPHER:  We are back on record

22   at 2:58 p.m.

23                    You may proceed.

24   BY MS. HILLS:

25         Q.    Thank you.  Ms. Gray, we just took a

```
                                              Page 111
 1    brief break.  There was a little bit of a fire
 2    alarm, but I think everyone is safe.  So we'll carry
 3    on.
 4                   I'm going to introduce a new
 5    document.  Just one moment.
 6                        (Deposition Exhibit 6 was marked
 7                        for identification.)
 8    BY MS. HILLS:
 9        Q.    I'm introducing Exhibit 6.  It is Bates
10    number 5776.  Let me know when you have got it.
11        A.    I have it.
12        Q.    Do you see on the metadata page that you
13    were one of the custodians listed for this document?
14        A.    Yes.
15        Q.    And then on the first page that's 5776,
16    do you recognize this document?
17        A.    Yes.
18        Q.    What is it?
19        A.    This was the meeting notices from a
20    conversation that we had with the crew tracking
21    team.
22        Q.    Meeting notices, is that what you said?
23        A.    Yeah, it was meeting notes.
24        Q.    Okay.  And so did you keep notes to
25    memorialize the meetings you had with the crew
```

Page 112

1    tracking department?

2         A.    Yes.  It was meant to make sure all of us

3    were on the same page as we were working through the

4    conversion from semi-monthly to bi-weekly.

5         Q.    You yourself were in the meetings when

6    the notes were taken?

7         A.    Yes.

8         Q.    Did you store the notes in your email?

9         A.    Yes.  It should have just been in my

10   email.  I was taking them as we went along.

11        Q.    Was this a regular practice for you to

12   take meeting notes to memorialize discussions with

13   departments?

14             MR. ROBINSON:  Object to form.

15   BY THE WITNESS:

16        A.    Depending upon what the purpose of the

17   meeting was, yes, it is, I take notes.

18        Q.    If you go down to let's see 5777, does it

19   look like these are the notes from an August 9,

20   2021, meeting?

21        A.    Yes.

22        Q.    And on the next page down, 5778, do you

23   see that's a message on July 30, 2021?

24        A.    Yes.

25        Q.    And then, I'm sorry, we're going to down

```
                                        Page 113
```

1    one more, page 5779, do you see the message from you

2    dated July 28, 2021?

3         A.    Yes.

4         Q.    And is this message also your notes from

5    a meeting with crew tracking?

6         A.    Yes.

7         Q.    Okay.  So the notes were taken in the

8    regular course of business?

9              MR. ROBINSON:  Object to form.

10   BY THE WITNESS:

11        A.    This was just notes of things that we

12   discussed in that meeting.

13        Q.    And the meeting -- was the meeting

14   recurring?

15        A.    We did have a recurring meeting as we

16   worked on -- it was a project meeting essentially.

17        Q.    You typically took notes to memorialize

18   those meetings?

19              MR. ROBINSON:  Object to form.

20   BY THE WITNESS:

21        A.    Yes.

22        Q.    I'm going to move you to page 5784.

23        A.    Okay.

24        Q.    Nearest to the top of page, do you see a

25   message from you on July 6, 2021, at 4:14 p.m.?

Page 114

1       A.    Yes.

2       Q.    And who is that addressed to?

3       A.    To Phil Higgins.

4       Q.    And then could you read the names that

5   are in the copy line?

6       A.    Dan Hampton, Min Fang Long, D Barnell,

7   Amanda Buffington.

8       Q.    And in your message, you talk about or it

9   mentions a move from semi-monthly to bi-weekly.

10  What is that?

11      A.    That is the pay frequency that the crew

12  tracking team was on.  They were being paid

13  semi-monthly, and we were moving them to bi-weekly.

14      Q.    Was that part of Project Horizon?

15      A.    No.

16      Q.    That was separate from Project Horizon?

17      A.    Yes.

18      Q.    And so does bi-weekly explain -- is that

19  a pay period -- is that a change in pay period or

20  not?

21            MR. ROBINSON:  Object to form, vague.

22  BY MS. HILLS:

23      Q.    Was there -- I'm sorry.  Go ahead.

24      A.    Go ahead.  Ask your question.

25      Q.    Was the shift for crew tracking from

Page 115

1    semi-monthly to bi-weekly, did that change their pay
2    period?
3         A.    Yes, it did.
4         Q.    How so?
5         A.    Semi-monthly, you get paid twice a month.
6    Bi-weekly, you get paid every two weeks.
7         Q.    Did that transition change their work
8    period?
9         A.    No.
10        Q.    If you would go down, actually up, 5783,
11   you can just read the messages that are on that page
12   and let me know when you're done.
13        A.    Okay.
14        Q.    So is the transition from a semi-monthly
15   to a bi-weekly pay schedule, is that synonymous with
16   transitioning to MyTime?
17        A.    No, it's not.
18        Q.    How is it different?
19        A.    MyTime is an application transitioning
20   between bi-weekly and semi-monthly are pay
21   frequencies.
22        Q.    This was in 2021, did you help facilitate
23   transitioning the crew tracking and pilot tracking
24   departments to MyTime?
25        A.    I participated in the transitioning of

Page 116

1    crew tracking and pilot scheduling to MyTime.

2            Q.    Pilot scheduling?

3            A.    Yeah.  We didn't have any oversight over

4    pilot tracking.

5            Q.    We can go to page 5781.  Let me know when

6    you're there.

7            A.    I'm there.

8            Q.    This is a message that says, "Phil and

9    Joe, a bid cycle really doesn't have much impact on

10   cutover as a pay period will.  So waiting until the

11   next year for a new bid cycle might not be the best

12   way to go about it."

13                 Did I read that correctly?

14           A.    Yes.

15           Q.    What does the cutover mean in this

16   message?

17           A.    This is the transition from bi-weekly --

18   or from semi-monthly to bi-weekly.  So you cutover

19   from one pay period to the other one.

20           Q.    Okay.  Do you see below that there's a

21   table that says task list for transition projects?

22           A.    Yes.

23           Q.    Did you prepare this table?

24           A.    My team prepared this table.

25           Q.    Who is your team?

Page 117

```
 1        A.    I have several people on my team in
 2   general.
 3        Q.    Do you know who prepared this table?
 4        A.    Yes.
 5        Q.    Who was it?
 6        A.    Renee Barnwell.
 7        Q.    Do you know anyone else?
 8        A.    I don't remember correctly.  So again
 9   this was 2017 so...
10        Q.    This is 2021.
11        A.    Oh, sorry.  Either way.
12        Q.    What is the -- I'll bring you back to the
13   page 5781.
14        A.    Okay.
15        Q.    What does the "pay period" mean in this
16   sentence that I just read?  It says "a bid cycle
17   really doesn't have as much impact on cutover as a
18   pay period will.  So waiting until the next year"
19   and then it continues on.
20              What does a pay period mean there?
21        A.    A pay period is when -- like a start and
22   end date for which we're paying an employee for.
23        Q.    And so for crew tracking, would they --
24   would transitioning crew tracking to MyTime, did
25   that require -- did that require cutting into a pay
```

Page 118

1   cycle?

2              MR. ROBINSON:  Object to form.

3   BY THE WITNESS:

4        A.    I'm not sure I understand your question.

5        Q.    I'm just trying to better understand this

6   idea of a cutover in this context.  I can actually

7   skip that one.

8                   I'm going to take you down to 5778.

9        A.    5778.  Okay.

10       Q.    I'm sorry.  5780 actually.

11                  Do you see the message on -- from you

12   on July 23, 2021 at 5:07 p.m.?

13       A.    Yes.

14       Q.    And do you see that's a message addressed

15   to Min Fang Wong?

16       A.    Yes.

17       Q.    You say "this is a tough group to

18   schedule for."

19                  What do you mean by that?

20       A.    It meant you have several leaders on here

21   with conflicting calendars.  It is very hard to get

22   a time that works for everybody that's on the list.

23       Q.    That was in reference to the individuals

24   on the meeting?

25       A.    Correct.  As you will note, everybody in

Page 119

1    the meeting was actually copied in on that meeting,
2    on that notice.
3         Q.    Okay.  So this was not in reference to
4    crew tracking?
5         A.    No.
6         Q.    Okay.  Could you go to 5779?
7         A.    Okay.
8         Q.    And then do you see this is another
9    message from you?
10        A.    Yes.
11        Q.    On July 28, 2021?
12        A.    Correct.
13        Q.    And do you see the bullet, the round
14   bullet point, on a couple of paragraphs down that
15   says "Future/Outstanding Swaps"?
16        A.    Yes.
17        Q.    Then it says, "understand how this works
18   going forward (paid for what you work); it's the
19   change management and reconciliation aspect for
20   swaps owed."
21              Did I read that correctly?
22        A.    You did.
23        Q.    What are "swaps owed" in this context?
24              MR. ROBINSON:  Object to form.
25              You may answer, Ms. Gray.

Page 120

1   BY THE WITNESS:

2        A.    I don't remember all of the details, but

3   I do remember at some point there were swaps that

4   had not been fulfilled yet.  One person had worked

5   the time that the other person had not.  So it was

6   swap time owed.  It is something that's featured in

7   the future.

8        Q.    And two bullet points down, it says swaps

9   that had not been paid back will need to be

10  reconciled by the transition date.

11              Did I read that correctly?

12       A.    Yes.

13       Q.    So do you understand that to be talking

14  about the same thing -- or I'll ask a new question.

15              What does that mean?

16            MR. ROBINSON:  Object to form.

17              You may answer to the best of your

18  ability, Ms. Gray.

19  BY THE WITNESS:

20       A.    I mean, it's about the same thing that --

21  the email does not indent where it would make

22  logical sense at this point.  I think it is just how

23  the transmission came across, but they were bullet

24  points.  So this was another bullet point around

25  swaps.

1    Q.    And did swaps have to be paid back before

2    the crew tracking department transitioned to MyTime?

3    A.    Yes, they did.

4    Q.    Why is that?

5    A.    Because they were transitioning their

6    schedule as well as their pay frequency, and once

7    their schedule changed, that swap may or may not

8    have been necessary.  It might not have even been

9    valid at that point, so they needed to go ahead,

10   close out the previous period before you started

11   something new and started clean.

12   Q.    What do you mean, a swap may not have

13   been valid from before?

14   A.    So if an employee schedule changed, they

15   might now be off on a date that that they were

16   scheduled work, or vice versa, that it wouldn't

17   have -- it wouldn't have made sense with the new

18   schedule.  The old swap does not fit because it's

19   based off of a schedule that was its predecessor.

20   Q.    What are the systems that Delta uses for

21   scheduling employees?

22           MR. ROBINSON:  Object to form, vague.

23   BY THE WITNESS:

24   A.    It depends on what division, as to what

25   systems that they use.

Page 122

1        Q.    Do you know what systems are used by

2    employees -- by ground employees -- ground

3    employees, excuse me, at Delta?

4        A.    It depends on which division you're in as

5    to which system you would use.

6        Q.    Can you name the ones that you know?

7        A.    Sure.  There is APS.  There's MyTime.

8    And are we talking about the time period in 2021 or

9    are we talking presently?

10        Q.    Including any systems that you're aware

11    of that have been used by ground employees.

12              MR. ROBINSON:  Object to form.

13    BY THE WITNESS:

14        A.    So in what time period?  Systems change.

15        Q.    During your time at Delta.

16        A.    So you are asking me for every time

17    system used at Delta during the period that I have

18    been at Delta?  I can't answer that.  I know what it

19    was when I was in reservations.  Once I got out,

20    then there were others I learned about.  I don't

21    know what everyone uses.

22        Q.    How about since 2017, what scheduling

23    systems have been used?

24              MR. ROBINSON:  Object to form.

25

Page 123

1    BY THE WITNESS:

2         A.    Again, again MPS, MyTime, Calabrio,

3    MyDeltaDay, amongst others.  There are several

4    others out there.  We don't always have direct

5    insight into the systems.

6         Q.    Who is "we"?

7         A.    Well, it starts with me or my team, we.

8         Q.    The time and attendance team doesn't have

9    insight into the scheduling systems used by

10   departments?

11        A.    Not into all of them because if they

12   put -- if they put their information into the system

13   that feeds us data, it's fine.  They might be using

14   something that I am not aware of.

15        Q.    What is the system that feeds your team

16   data?

17             MR. ROBINSON:  Object to form.

18   BY THE WITNESS:

19        A.    So the ones that I listed before, those

20   all feed us data.

21        Q.    Through what interface?

22        A.    I can't answer that.  That's a technical

23   question.

24        Q.    What are the systems that are used to

25   record employees' time?

1          MR. ROBINSON:  Object to form.

2     BY THE WITNESS:

3          A.    This would be some of the same ones that

4     we mentioned already.

5          Q.    So the systems that record employee time

6     are they the same as the systems that are used for

7     employee scheduling?

8          MR. ROBINSON:  Object to form.

9     BY THE WITNESS:

10         A.    It also depends on that division, whether

11    they care to have separate systems or not.  So,

12    again, I can't speculate on all of the systems that

13    are being used at Delta.

14         Q.    Do you know if the systems used for

15    scheduling and recording time interact with each

16    other?

17         MR. ROBINSON:  Object to form.

18    BY THE WITNESS:

19         A.    I'm not sure I understand your question.

20         Q.    Let's start with MyTime.  Is MyTime

21    provided through SAP?

22         A.    MyTime is a -- yes, kind of an SAP built

23    product, yes.

24         Q.    But is MPS provided through SAP?

25         A.    I'm sorry.  Can I ask what do you mean by

Page 125

1    "provided through"?

2         Q.    Is MPS housed within SAP?

3         A.    No.

4         Q.    Does MPS data feed into the SAP time

5    system?

6              MR. ROBINSON:  Object to form.

7    BY THE WITNESS:

8         A.    Yes.

9         Q.    How does that work?

10             MR. ROBINSON:  Object to form.

11   BY THE WITNESS:

12        A.    I can't answer that.  That's a technical

13   question.

14        Q.    You have no idea?

15        A.    I can't give you any details.  They're

16   our data feeds.  That's all I know.

17        Q.    Does MPS gather the data for whether an

18   employee swaps a shift?

19             MR. ROBINSON:  Object to form.

20   BY THE WITNESS:

21        A.    MPS has data from where an employee swaps

22   because they swap using the system.

23        Q.    And so does MPS gather data when there is

24   a swap on specifically?

25             MR. ROBINSON:  Object to form.

Page 126

1    BY THE WITNESS:

2          A.    Yes.

3          Q.    Does MPS gather data for a swap off?

4                MR. ROBINSON:  Same objection.

5    BY THE WITNESS:

6          A.    Yes.

7          Q.    So after it goes into MPS, swap data,

8    does that -- does that feed into an SAP time system?

9                MR. ROBINSON:  Object to form?

10   BY THE WITNESS:

11         A.    Yes.

12         Q.    How does that work?

13         A.    I cannot answer that question.  It is a

14   technical question.

15         Q.    What is Calabrio?

16               MR. ROBINSON:  Object to form.  Can you

17   restate the question, counselor?  I didn't hear you

18   correctly I don't think.

19   BY MS. HILLS:

20         Q.    What is Calabrio?

21         A.    Calabrio is the system that reservations

22   just recently began using for time and attendance.

23         Q.    It is only used by reservations?

24         A.    Yes.

25         Q.    When did reservations start using

Page 127

1    Calabrio?

2         A.    Just about two years ago.

3         Q.    Does Calabrio store information about

4    whether employees swapped a shift?

5         A.    I don't know for sure.  I don't have a

6    lot of insight into that tool.

7         Q.    I'm going to introduce an exhibit.  It is

8    an Excel file.  So I will first introduce the

9    metadata sheet like we've been looking at before,

10   and then I will have -- counsel, if we could make

11   sure that the Excel spreadsheet is up afterwards.

12             THE WITNESS:  Okay.

13             MS. HILLS:  What's uploading now is just

14   the PDF with the metadata and then the Excel will

15   follow.  I just introduced the Exhibit 7 which is

16   the cover sheet for Bates 442.

17                  (Deposition Exhibit 7 was marked

18                   for identification.)

19   BY MS. HILLS:

20        Q.    Do you have that in front of you, Ms.

21   Gray?

22        A.    Yes.

23        Q.    Do you see that the author listed for

24   this document is SAP WebAS?

25        A.    Yes.

Page 128

1        Q.    That the custodian is Delta Air Lines?

2        A.    Yes.

3        Q.    Do you know what SAP WebAS means?

4        A.    No, I don't.

5        Q.    If you look at the file name, do you see

6    that there's a number 386862 Lukas Goodyear, CATSDB

7    records?

8        A.    Yes.

9        Q.    Do you know what CATSDB means?

10            MR. ROBINSON:  Object to form.

11   BY THE WITNESS:

12        A.    Yes, it's the CATS database records.

13        Q.    What are what -- are the CATS database

14   records?

15        A.    It is the cross attendance time sheet in

16   SAP.

17        Q.    So that database is maintained in SAP?

18        A.    As best I understand and that's a

19   technical question.

20        Q.    When time data from MPS is sent to SAP,

21   is it -- is that data stored in SAP?

22        A.    Yes.

23        Q.    And then that is collected in the CATS

24   database; is that correct?

25            MR. ROBINSON:  Object to form.

Page 129

1    BY THE WITNESS:

2         A.    Yes, it comes over and fills in their

3    time sheet.

4         Q.    And do you know in -- when time data from

5    Calabrio is imported into SAP, do you know if that

6    data is collected in the CATS database?

7              MR. ROBINSON:  Object to form.

8    BY THE WITNESS:

9         A.    Yes, that data goes into the time sheet

10   as well.

11        Q.    And how about MyDeltaDay, when time data

12   from MyDeltaDay is imported into an SAP, does that

13   get stored in the CATS database?

14        A.    Yes.

15             MS. HILLS:  All right.  And then I will

16   introduce now the Excel file, and we will make sure

17   that everyone has it up.

18             MR. ROBINSON:  Are you going to upload

19   that on Exhibit Share, counselor?

20             MS. HILLS:  Yes.  I have introduced

21   Exhibit 8442.

22                       (Deposition Exhibit 8 was marked

23                        for identification.)

24             MS. HILLS:  You should have downloading

25   permission.

1            THE WITNESS:  It says I do not have

2    permission to download it.  I can bring it to screen

3    but it will not let me download.

4            MR. ROBINSON:  Counsel, if she can bring

5    up the spreadsheet, is there a need for her to

6    download it?

7            MS. HILLS:  It does appear a little bit

8    differently in this platform.  Let me see if I can

9    work around it.

10           MR. ROBINSON:  Counsel, are you going to

11   be directing Ms. Gray to particular columns and

12   rows?

13           MS. HILLS:  Actually, yes, we will do

14   that later, but in this one, no, probably not.

15   We'll just open this one without downloading.  That

16   will be okay.  It's Exhibit 8, Bates 442, that's a

17   Excel file.

18   BY MS. HILLS:

19       Q.    You can just open that in the window.

20       A.    Yes, I have it opened.

21       Q.    Do you know who maintains the CATS

22   database at Delta?

23       A.    No, it's a technical question.

24       Q.    Are all employees' time information

25   gathered in the CATS database?

1          MR. ROBINSON:  Object to form.  With

2    regard to all employees?

3          THE WITNESS:  Can you be more specific?

4    BY MS. HILLS:

5      Q.    Sure.  So there's variation in the

6    scheduling systems used by different departments of

7    ground employees, right?

8          MR. ROBINSON:  Object to form.

9    BY THE WITNESS:

10     A.    Different groups use different tools,

11   correct.

12     Q.    So, for employees who's time data is

13   gathered through MPS, are there -- is information

14   about their swaps maintained within the CATS

15   database?

16     A.    Say that again for me.

17     Q.    One second.  We'll back up.  MPS collects

18   data about whether employees swap shifts, correct?

19     A.    Correct.

20     Q.    And then MPS is imported into SAP; is

21   that correct?

22     A.    Correct.

23     Q.    MPS data?

24     A.    Correct.

25     Q.    So when that happens, do you know whether

1    I'll be able to find instances of swaps in an

2    employee schedule in the CATS database if that

3    employee used MPS?

4              MR. ROBINSON:   Object to the form.

5    BY THE WITNESS:

6        A.    Yes, there should be data in the system

7    if they swapped.

8        Q.    And that would include swap offs,

9    correct?

10             MR. ROBINSON:   Object to the form.

11   BY THE WITNESS:

12       A.    Correct.

13       Q.    And then if we're looking at this

14   document, Exhibit 8, there are two tabs.  You can go

15   to the tab 386862 Goodyear.

16       A.    Yes.

17       Q.    And then just looking at this, generally,

18   have you seen this type of report for an employee

19   before?

20       A.    I have seen things similar, not this

21   specific report.

22       Q.    If I wanted a report that included an

23   employee's time entries, swap information, and hours

24   worked, does a report like this exist for -- does a

25   report like this already exist for all employees who

Page 133

1    are tracked using MyTime?

2              MR. ROBINSON:  Object to form, vague,

3    compound.

4    BY THE WITNESS:

5         A.    I don't -- I don't know I understand that

6    question, so I don't know how to answer that.

7         Q.    Let's go up to the top where you see all

8    of the column headers.

9         A.    Okay.

10        Q.    And then do you see on column L?

11        A.    Yes.

12        Q.    One moment.  I was shifted.  It is column

13   G.  It says "wage type"?

14        A.    Yes.

15        Q.    And then below you see that there are

16   different codes that correspond for different dates?

17        A.    Correct.

18        Q.    And then if you go to the legend tab at

19   the bottom, if you scroll down that says wage type

20   and description?

21        A.    Hm-hmm.

22        Q.    If I wanted to know this information

23   about another employee, another ground employee,

24   whose time data was collected and using MPS, for

25   example, how difficult would it be to make a report

Page 134

1    like this for them?

2                MR. ROBINSON:  Object to form.

3                    You can answer to the best of your

4    ability, Ms. Gray.

5    BY THE WITNESS:

6         A.    I don't know how difficult because that

7    would require more than I would be able to do.

8         Q.    Does Delta keep reports like this one in

9    the regular course of business?

10               MR. ROBINSON:  Object to form,

11   specifically as it pertains to the use of regular

12   course of business.

13   BY THE WITNESS:

14        A.    I don't know that there's a report out

15   there like this for every employee at Delta.

16        Q.    But you understand that this -- that data

17   on an employee's overtime swaps, premium pay, and

18   the other categories shown here, that information is

19   collected in the CATS database?

20               MR. ROBINSON:  Object to form.

21   BY THE WITNESS:

22        A.    Yes.  This data or some of this data is

23   collected in the CATS database.

24        Q.    Is there any of this data that's not

25   collected in the CATS database?

1      A.    I don't know that I understand your

2   question.

3      Q.    Well, you said some of this data is

4   collected in the CATS database.  Is there any data

5   that is not collected in the CATS database?

6      A.    I'm sure there's something, but the

7   reason I used the word "some" is even looking at the

8   data here that you provided to us, the vast majority

9   of this data was when Mr. Goodyear was a manually

10   tracked employee.  So data appears differently for

11   them than it does for somebody else that may be

12   coming from a different system.  Your legend is

13   correct, but this is not a normal sample of data.

14   This is one specific employee with a specific

15   situation for the time periods that were pulled.

16      Q.    Do you know when crew tracking was

17   transitioned from manually tracked to MyTime?

18      A.    Not exact date.  Based off of what we

19   looked at already, I believe they were looking at a

20   4/1 cutover for the year they did it.  Without

21   looking at it, I couldn't just give you a date off

22   the top of my head.

23      Q.    Stay on this legend, you see on the very

24   top, the second row, it says ADHW?

25      A.    Correct.

Page 136

1        Q.    Have you seen that acronym before?

2        A.    Yes.

3        Q.    And do you understand that to mean

4    "additional hours worked"?

5        A.    Yes.

6        Q.    Is that the same thing as overtime?

7              MR. ROBINSON:  Object to form.

8    BY THE WITNESS:

9        A.    Not in every situation.

10       Q.    In what situations would it be different?

11       A.    If the employee has not -- if the

12   employee doesn't qualify for overtime, it doesn't

13   pay at overtime, but it is tracking all of the

14   additional hours that that employee worked outside

15   of their schedule.

16       Q.    In that same table -- do you see on the

17   20th row, there is SWOF?

18       A.    Correct.

19       Q.    Do you understand that to mean "swap

20   off"?

21       A.    Yes.

22       Q.    Is this SWOF, is that the designation for

23   swap offs inside of the CATS database?

24             MR. ROBINSON:  Object to form.

25                  You may answer.

Page 137

1    BY THE WITNESS:

2         A.    Yes.

3         Q.    And then how about "SWAP"?

4               MR. ROBINSON:  Object to form.

5    BY MS. HILLS:

6         Q.    What does that designate in the CATS

7    database?

8         A.    Swap to work.

9         Q.    Looking at this legend, is there any way

10   to see in the CATS database if a swap was one way?

11              MR. ROBINSON:  Object to form, vague.

12   BY THE WITNESS:

13        A.    Can you restate the question for me,

14   please?

15        Q.    Yeah.  So, earlier we talked about a swap

16   where I work your shift and you work my shift.  You

17   mentioned the requirement to payback a swap.

18              Is there a way in the CATS database

19   to see if a swap is incomplete?

20              MR. ROBINSON:  Same objection.

21   BY THE WITNESS:

22        A.    I'm sorry.  I'm not 100 percent sure what

23   you're asking me for.

24        Q.    So these designations that we're looking

25   at right here that are used within the database for

```
                                              Page 138
 1    a given employee, is there a way for me to determine
 2    if a swap was not completed between two employees?
 3         A.    I am not sure what the "has not been
 4    completed" means.
 5         Q.    What is a one way swap?
 6         A.    That's a swap where you would just give
 7    time to another employee.  There's no essentially
 8    payback date.  So my hours are being given to you.
 9         Q.    How is that designated in the database?
10         A.    It is not.
11         Q.    When SWOF appears in the CATS database,
12    that shows that there's a completed swap, correct?
13              MR. ROBINSON:  Object to form.
14    BY THE WITNESS:
15         A.    I'm sorry.  That question isn't clear on
16    "completed swap."
17         Q.    In our agreement to work each other's
18    shifts, we each work each other's shifts in exchange
19    for each other's off time; is that right?
20              MR. ROBINSON:  Object to form, vague.
21    And counselor, your usage of the word "we," could
22    you be more specific?
23    BY MS. HILLS:
24         Q.    In our hypothetical where I work your
25    shift and you work my shift, when would a swap off
```

1    be shown in the CATS database for us on the shifts

2    that we each gave away?

3                MR. ROBINSON:  Object to form.

4                You can answer to the best of your

5    ability, Ms. Gray.

6    BY THE WITNESS:

7        A.    So if we have entered the time in as a

8    swap, and I am not going to work because you're

9    going to work my shift on my schedule, it shows as a

10   swap off, and that same day on your schedule shows

11   as a swap.

12       Q.    And the inverse is true as well, correct?

13                MR. ROBINSON:  Object to form.

14   BY MS. HILLS:

15       Q.    Would each of our schedules have a swap

16   off on the calendar?

17                MR. ROBINSON:  Object to form.

18   BY THE WITNESS:

19       A.    So on the time off on the time sheet, it

20   would show that, assuming it was a two-way swap or a

21   swap with a payback.  If it was one way, there would

22   be nothing on the other side.

23                MS. HILLS:  Okay.  Do you want to do a

24   ten-minute break?

25                MR. ROBINSON:  Whatever you prefer.

```
                                                Page 140

 1                  Ms. Gray, would you like a ten-minute

 2     break or would you like to keep going?

 3                  THE WITNESS:  I could keep going.  We're

 4     okay.

 5                  MS. HILLS:  Let's do a ten-minute break,

 6     if that's okay with you y'all.

 7                  MR. ROBINSON:  Not a problem.

 8                  THE VIDEOGRAPHER:  Please stand by.  We

 9     are going off record at 3:53 p.m.

10                         (Break in the proceedings taken

11                          at 3:53 p.m.)

12                  THE VIDEOGRAPHER:  We're back on record

13     at 4:05 p.m.

14                  You may proceed.

15     BY MS. HILLS:

16         Q.   We're going to stay in this same

17     document, Exhibit 8.  That's Bates number 442.  I

18     just wanted to run through some of these columns

19     with you.

20                  So starting with column B, you see

21     that it says personnel number?

22         A.   You're on the one --

23         Q.   First row, Row 1, Column B.  Do you see

24     that says "personnel number"?

25         A.   Correct.
```

Page 141

1          Q.     In the rows below, does it appear like
2     those are all the same personnel number?
3          A.     Not being able to filter, but yes, they
4     do appear to be the same person.
5          Q.     And the next column, column C, that's the
6     date?
7          A.     Correct.
8          Q.     And do you see even with those first two
9     rows, Row 2 and Row 3, do you see that those are
10    both for the same date, January 15, 2021?
11         A.     Correct.
12         Q.     And then in the fourth row, it's
13    February 15, 2021?
14         A.     Yes.
15         Q.     And then going over to Column F, it's
16    titled ATT/ABS.  Do you know what that means?
17         A.     Yes.  It is the attendance absence type.
18         Q.     And then do you see the first row below
19    Row 2, that there's nothing in that column?
20         A.     Correct.
21         Q.     I'll have you scroll down the Row 62, if
22    we're still looking at Column F, do you see that
23    column begins being filled on Row 62?
24         A.     Yes.
25         Q.     And it looks like that aligns with the

Page 142

1    date March 6 of 2022?

2         A.    Yes.

3         Q.    Okay.  And then going back up on the top,

4    do you see Column G is titled "Wage Type"?

5         A.    Yes.

6         Q.    Do you see below that there are numbers

7    in the rows below of 1202, 1210?

8         A.    Correct.

9         Q.    If you scroll down to again Row 62, do

10   you see that the data in Column G discontinues on

11   Row 62?

12        A.    That is correct.

13        Q.    Again, that's corresponding with the date

14   of March 6, 2022?

15        A.    That is correct.

16        Q.    All right.  Back up to the top, do you

17   see that Column K is entitled "Created on"?

18        A.    Yes.

19        Q.    It looks like there are dates in that

20   column?

21        A.    Correct.

22        Q.    Do you understand that to be the date

23   that the entry was created?

24        A.    Yes.

25        Q.    Just taking our first row as an example,

Page 143

1    Row 2, do you see that the date in Column K for

2    "created on" is January 21, 2021?

3         A.    Yes.    That's correct.

4         Q.    And then if we compare that to the date

5    in Column C for Row 2, do you see that's January 15,

6    2021?

7         A.    Yes.

8         Q.    So it appears that the entry was created

9    near the time -- the date in Column C?

10        A.    I'm sorry.  I don't -- say that again.

11        Q.    So the date in column C, the dates, do

12   those appear to be about an employee's schedule?

13             MR. ROBINSON:  Object to form.

14   BY THE WITNESS:

15        A.    I don't think I still understand your

16   question.

17        Q.    Sure.  Does the date in Column C on this

18   document, does that represent schedule data for an

19   employee on the date in Column C titled "Date"?

20             MR. ROBINSON:  Object to form, vague.

21   BY THE WITNESS:

22        A.    So, no, this is -- there's no schedule

23   data really here at all.

24        Q.    Why is that?

25        A.    Well, on 1/15 of 2021, this employee was

Page 144

1    manually tracked.  And so their data, if they had

2    additional hours or differentials or anything that

3    was outside of regular time for us, they'd send it

4    to us, it got posted the last day of the pay period,

5    so there's nothing here that tells you that this for

6    sure was solely -- that it was because of their

7    schedule on 1/15 of 2021.

8         Q.    Does it tell me what the employee worked

9    on the date of 1/15/21?

10        A.    No.

11        Q.    You said this employee was manually

12   tracked.  How did you know that?

13            MR. ROBINSON:  Object to form.

14   BY THE WITNESS:

15        A.    So are you asking as of result of this

16   file or because of what I know?

17        Q.    In your last answer, you said this is

18   showing someone who is manually tracked.  Are you

19   saying that in this spreadsheet?

20        A.    Yes.

21        Q.    Where are you seeing that?

22        A.    Column AA where under short text, it says

23   "manual."

24        Q.    And then if you stay in that column, if

25   we go, again, down to row 62, do you see that

Page 145

1    identification "manual" discontinues?

2         A.    Yes.

3         Q.    And Column S at the very top, do you see

4    that's titled the "Logical System"?

5         A.    Yes.

6         Q.    Do you know what that means?

7         A.    I don't know the exact definition.

8         Q.    Do you have -- do you know the inexact

9    definition?

10             MR. ROBINSON:   Object to form.

11                  You may answer to the best of your

12   ability, Ms. Gray.

13   BY THE WITNESS:

14        A.    Based off of what I see in the column,

15   HPE is the production version of SAP so...

16        Q.    And then in Column M, do you see it is

17   called "Created By"?

18        A.    Correct.

19        Q.    And then below that, it says ZSYS_CT LM.

20   Do you know what that means?

21        A.    Yes.

22        Q.    What does that mean?

23        A.    It means that it was created by or via

24   Control M which is the process they used to upload

25   data.

Page 146

1          Q.    For this one, too, do you see that in Row

2    62, for that column -- Row 62, Column M, do you see

3    that it switches over to numbers?

4          A.    Yes.

5          Q.    Do you know what those numbers present?

6          A.    The employee who actually created the

7    record initially.

8          Q.    If we change the tab again over to where

9    it says "Legend" up at the top, you see it says

10   ADHW, and so if we go back over to the first tab, we

11   can go to Row 62 again, and in Column F -- Column F.

12   Do you see that Row 62, Column F says ADHW?

13         A.    Yes.

14         Q.    Does that show that the employee had

15   additional hours worked on that date March 6, 2022?

16               MR. ROBINSON:   Object to form.

17   BY THE WITNESS:

18         A.    Yes, it does.

19         Q.    And then one row down 63, on the same

20   column, where it says REGU, does that show that this

21   employee worked regular hours on March 10, 2022?

22         A.    Yes.

23         Q.    And then if you could go down to Row 304.

24         A.    Okay.

25         Q.    And that in Column F still, do you see

Page 147

1    that it says SWOF?

2        A.    Yes.

3        Q.    Does that show that an employee swapped

4    off on October 18, 2022?

5            MR. ROBINSON:    Object to form.

6    BY THE WITNESS:

7        A.    Yes.

8        Q.    And this date, October 18, 2022, do you

9    believe that's later than when crew tracking

10   switched over to the MyTime system?

11           MR. ROBINSON:    Object to form.

12   BY THE WITNESS:

13       A.    Yes, I do believe that was after they

14   moved over to MyTime.

15       Q.    Is it possible if we go back up to Row

16   62, you see that on for Row 62, March 6, 2022, there

17   are several changes in how the data appears from the

18   row above it?

19       A.    Yes.

20       Q.    Is it possible that this is around the

21   time that crew tracking transitioned to MyTime?

22       A.    Yes.  It could be very possible that that

23   was the exact date or somewhere in that range.

24       Q.    If you go back up on the top the farthest

25   column to the right, you see it is titled "number"

1    and parenthesis "Unit"?

2         A.    Yes.

3         Q.    What does that represent?

4         A.    This is the number of hours that are

5    going to be paid at whatever wage type and/or

6    attendance/absence type listed in the file on that

7    row.

8         Q.    In the legend tab, if we go back up on

9    the top, are we able to -- do any of these symbols

10   represent overtime?

11              MR. ROBINSON:  Object to form.

12   BY THE WITNESS:

13        A.    I'm sorry.  Can you repeat that?

14        Q.    Yeah.  In the Legend tab, it looks like

15   there's a block of -- two blocks of Legend, first

16   one is Rows 1 to 22, and then there's another on

17   Rows 27 to 42.

18              Do you see that?

19        A.    Yes.

20        Q.    So in the top section, do any of these

21   represent overtime?

22              MR. ROBINSON:  Same objection.

23   BY THE WITNESS:

24        A.    No, they don't.

25        Q.    How about in that second legend?

Page 149

1           A.    Yes.

2           Q.    If we go back to rows -- I'm sorry.  Oh,

3      yeah.  In that second group, what are the numbers

4      that represent overtime?  Go ahead.

5           A.    The wage type for overtime at 1.5 is 1202

6      and overtime at 2 times is 1203.

7           Q.    If we go back to Row 62 and you will see

8      in that row there's nothing in Column G, correct?

9           A.    Correct.

10          Q.    But there is the identifier in Column F

11     for additional hours worked, correct?

12          A.    Correct.

13          Q.    How do I know if this employee was paid

14     overtime on this date in Row 62?

15          A.    Based off of this report, you don't know.

16          Q.    How would I find that out?

17          A.    To go to the paycheck or in SAP, you

18     could look it up in the window that tells you how a

19     day is paid.

20          Q.    What window is that?

21          A.    I don't know the exact T code.  I'd

22     actually have to be working in SAP to have that.

23          Q.    We're going to do the same thing with

24     another document.  I'll first show you the cover

25     sheet for it and then we'll look at the actual Excel

Page 150

1    spreadsheet.

2         A.    Okay.

3              MS. HILLS:  Okay.  Introducing Exhibit 9

4    and that is just the cover sheet for Bates number

5    6607.

6                        (Deposition Exhibit 9 was marked

7                        for identification.)

8    BY MS. HILLS:

9         Q.    Do you have that open?

10        A.    I do have it open.

11        Q.    Do you see on that metadata table that

12   you are listed as the custodian for this document?

13        A.    Yes.

14        Q.    And then do you see that the file name is

15   "BA Training Matrix only"?

16        A.    Yes.

17        Q.    Is that file name familiar to you?

18        A.    I could guess what it is.  I don't know

19   exactly what without looking at it.

20        Q.    Do you see the author is Remeka Turk?

21        A.    Yes.

22        Q.    Do you know who that is?

23        A.    Yes.

24        Q.    Who is that?

25        A.    She worked on buildings and training

1    materials for us for the bid and award project.

2         Q.    What is the bid and award project?

3         A.    Well, Delta -- several years ago Delta

4    was working to build a new time and attendance

5    system for bid and award use for people who shift

6    bid, vacation bid, to do swaps, and to do time off,

7    all in a singular application.

8         Q.    When was that?

9         A.    They started it a while back.  I don't

10   know exactly when it started.  It was a portion of

11   Project Horizon.

12        Q.    Is it "Ms. Turk;" is that correct?

13        A.    Yes.

14        Q.    So she's a Delta employee?

15        A.    She was at the time.  I'm not sure if she

16   still is a Delta employee or not.

17        Q.    What time would that be?

18             MR. ROBINSON:  Object to form.

19   BY THE WITNESS:

20        A.    At the time we were working on documents

21   like this, it would have been roughly 2018 or so.

22             MS. HILLS:  I'm now going to introduce

23   the actual Excel spreadsheet, and I will just

24   represent, Counsel, this was already marked as

25   Exhibit 7 in the previous deposition with Mr. Early,

Page 152

1   and it is marked today as Exhibit 10.

2                      (Deposition Exhibit 10 was

3                      marked for identification.)

4   BY MS. HILLS:

5       Q.    Are you guys seeing that you have the

6   ability to download that or is that still

7   unavailable?

8       A.    It still says it's not available.

9             MS. HILLS:  Could we go off the record

10  for just a moment?

11            THE VIDEOGRAPHER:  Please stand by.

12            We are going off record at 4:31 p.m.

13                  (Break in the proceedings taken

14                  at 3:31 p.m.)

15            THE VIDEOGRAPHER:  We are back on record

16  at 4:34 p.m.

17            You may proceed.

18  BY MS. HILLS:

19      Q.    I want to confirm that you have open what

20  is labeled Bates 6607.

21            MR. ROBINSON:  Yes.  This is,

22  Mr. Robinson, counsel for defendant, and you

23  mentioned that you were introducing what is

24  Exhibit 10, which in a previous deposition was

25  marked as Exhibit 7, and that those two exhibits are

Page 153

1    the same; is that correct?

2             MS. HILLS:  That is correct.  Could you

3    confirm that it is opened on Excel?

4             MR. ROBINSON:  Yes.

5    BY MS. HILLS:

6        Q.    Ms. Gray, just to make sure we're looking

7    at the same thing, do you see a color bar at the

8    top?  Actually, I'll first -- do you see several

9    tabs at the bottom, we have Home, Leadership, Admin,

10   Genius?

11       A.    Yes.

12       Q.    And the leadership tab, does that appear

13   to be yellow or gold colored?

14       A.    Yes.

15       Q.    Okay.  Great.  Does this document look

16   familiar to you?

17       A.    Not necessarily this exact document, but

18   I have seen similar.

19       Q.    If you could go to the Tab "TO," in

20   capital letters, "Admin"?

21       A.    Sure.

22       Q.    Actually before we go there, I'll have

23   you go to the tab that is titled "Leadership."

24       A.    Okay.

25       Q.    So does this look like a schedule of some

Page 154

1    kind?

2              MR. ROBINSON:  Object to form, vague,

3    with regard to the characterization of the document.

4              MS. HILLS:  I'll restate.

5    BY MS. HILLS:

6         Q.    On the tab that is titled Leadership in

7    Exhibit 10, do you see at the top of the page it

8    says "Leadership Training Agenda"?

9         A.    Yes.

10        Q.    And below that, do you see it says

11   "two-day class"?

12        A.    Correct.

13        Q.    And lower down we have day 1 and day 2?

14        A.    Correct.

15        Q.    So does this appear to be an agenda for a

16   two-day training session?

17        A.    Yes.

18        Q.    Do you remember this training?

19        A.    No.

20        Q.    But now we can go to the top that says

21   TO, just "TO," do you see the top says "Training

22   Matrix"?

23        A.    Yes.

24        Q.    And then just below that, it says "Change

25   Management"?

Page 155

1          A.    Yes.

2          Q.    And then we're still at the top, do you

3     see that it says "Policy/Process" --

4          A.    Yes.

5          Q.    -- in Column E?

6          A.    Yes.

7          Q.    And then there's "What's Changing" in

8     Column F?

9          A.    Yes.

10         Q.    In Column G, it says "Significant Pain

11    Points"?

12         A.    Yes.

13         Q.    Do you understand what this tab is

14    representing?

15               MR. ROBINSON:   Object to form.

16    BY THE WITNESS:

17         A.    Not 100 percent.  Again, I didn't design

18    it so, again, I would be using my thoughts of what

19    this would be for.

20         Q.    What do you think this would be for?

21         A.    My understanding or what I believe this

22    is for is part of the change management process as

23    they were transitioning from one product to another.

24         Q.    Would that be the transition from MPS to

25    SAP?

                                        Page 156

1        A.    Can you elaborate on that?

2        Q.    Is it possible that this is a training

3    about the transition from MPS to SAP?

4              MR. ROBINSON:  Object to form.

5    BY THE WITNESS:

6        A.    It's still a little bit unclear because I

7    don't --

8        Q.    Specifically, could this be a training

9    about the transition from MPS to MyTime, which is

10   housed within SAP?

11             MR. ROBINSON:  Object to form.

12   BY THE WITNESS:

13       A.    So not necessarily.  So there were two

14   MyTime applications.  So MyTime that was being built

15   for bid and award, this would have referenced for

16   those who were transitioning from any other system

17   into that bid and award system, once it was able to

18   go live.  The MyTime that is currently available is

19   not the same application.

20       Q.    If we stay on the tab and if you can go

21   down the Row 22.

22       A.    Sure.

23       Q.    And it will say 22 on the far left, but

24   then within the document, it says Row 28 or Row 18,

25   just so we're clear.

1           Do you see in Column E where it says

2    "Conversion from MPS to SAP"?

3           A.    I do.

4           Q.    Going back to what you were saying, do

5    you believe this document concerns the -- would you

6    call it -- is there a pilot version of MyTime?

7                 MR. ROBINSON:  Object to form.

8    BY THE WITNESS:

9           A.    There was a pilot version of the bid and

10   award program.

11          Q.    Is that what you believe this document is

12   discussing?

13          A.    Yes, from that my best understanding,

14   that would be that particular application.

15          Q.    Why is that?

16          A.    Because the other version of MyTime does

17   not have anything -- it doesn't have any -- it

18   doesn't have the shift in vacation bidding

19   applications in it.  So it wouldn't have been the

20   same thing.

21          Q.    Does Delta commonly put together

22   spreadsheets like this to facilitate training to new

23   software systems?

24                 MR. ROBINSON:  Object to form, compound.

25                 You may answer, Ms. Gray.

1    BY THE WITNESS:

2        A.    I'm not sure it is done on every

3    application.  Again, I'm only privy to the

4    applications I'm privy to.

5        Q.    Have you seen something like this

6    document for other software transitions?

7        A.    Actually, just for the particular one for

8    bid and award.

9        Q.    The author we saw on the metadata page

10   for this document, Ms. Turk, did she prepare other

11   training documents similar to this one?

12            MR. ROBINSON:  Object to form.  For the

13   sake of the record, are you referring to Exhibit 9,

14   Counsel?

15            MS. HILLS:  Yes, the Exhibit 9, the cover

16   sheet for Exhibit 10, Bates 6607.

17   BY THE WITNESS:

18       A.    I know that she did some step action

19   guides for us, but I'm not sure what other kinds of

20   documents she might have put together.

21       Q.    Could you remind me of her title again?

22       A.    I don't know what her title would have

23   been.  She just worked on our project helping with

24   us getting things ready for training.

25       Q.    Does this document represent the training

Page 159

1    that was conducted -- the leadership training that
2    was conducted for the two-day period?
3              MR. ROBINSON:  Object to form.
4    BY THE WITNESS:
5         A.    I'm not sure I understand your question.
6         Q.    Did you -- did you join the -- join a
7    two-day training session that we looked at the
8    agenda on the leadership tab?  Did you say that you
9    remembered joining that training?
10        A.    I didn't participate in that training.
11        Q.    Do you know who would have?
12        A.    I'd have to guess they would have trained
13   the leadership for the groups that were going to
14   actually be within this pilot.
15        Q.    I'll have you go back to the tab that was
16   entitled "Swaps."
17        A.    Sure.  Okay.
18        Q.    You see that I think Column E says
19   "Policy Or Process"?
20        A.    Okay.
21        Q.    Column F says "What's Changing"?
22        A.    Correct.
23        Q.    And then do you know what this means by
24   "Significant Pain Points"?
25        A.    Again, having not written it, I think

1    these were the things they wanted to -- they thought

2    that might have provided questions from employees or

3    admins or leaders that they would want to make sure

4    that they addressed.

5         Q.    Who is they?

6         A.    Whoever executed the training itself.

7         Q.    Do you know who would have led a training

8    like this one?

9              MR. ROBINSON:  Object to form, calls for

10   speculation, asked and answered.

11   BY THE WITNESS:

12        A.    It's several years ago.  I've no idea who

13   actually did their trainings.

14        Q.    Do you know which title -- which position

15   would have led a training similar to this one?

16             MR. ROBINSON:  Same objection.

17   BY THE WITNESS:

18        A.    No, I don't think there was a title per

19   se.  It would have been whoever on the project was

20   asked to do that.  I don't know who that is.

21        Q.    Going to row 21, it is also numbered Row

22   18 in Column B, it says that swaps in Column C?

23        A.    Yes.

24        Q.    For Column F in the same row, you see

25   that it says "MyTime allows the business to post

Page 161

1    additional opportunity hours for employees to pick

2    up on a first come/first serve basis"?

3         A.    Yes.

4         Q.    What are "additional opportunity hours"?

5         A.    Additional opportunity hours was the

6    equivalent of the company saying, hey, I need you to

7    come in to help where we might have a shortage.

8              It was listed as opportunity hours

9    because depending on what their schedule is, we

10   didn't know how it was going to pay.  So it is just

11   essentially the ability for me to pick up extra time

12   if I have availability as an employee in the system.

13        Q.    Is that considered a swap?

14        A.    It is not.

15        Q.    Do you know why this row would be titled

16   "swaps"?

17        A.    Not -- not really.  I think it just fell

18   into this particular category I guess.  I don't

19   know.  Again, having not written it, I can't tell

20   you the intention of who might have written it.

21        Q.    The next row down, Row 2219, do you see

22   that's also titled "Swaps."

23        A.    Yes.

24        Q.    Did the transition from MPS to MyTime

25   make it so that when employees pick up an additional

1    shift, it would no longer count toward overtime?

2              MR. ROBINSON:  Object to form

3    characterization of the exhibit.

4                    You may answer.

5    BY THE WITNESS:

6         A.    I would like a little bit of

7    clarification, if possible.

8         Q.    Did switching from MPS to MyTime change

9    how overtime was calculated in instances of swap

10   offs?

11        A.    No.

12        Q.    We can just run through just quickly the

13   rest of the tabs so you can see them.  I'll have you

14   click on Genius.  That one is empty.

15        A.    Okay.

16        Q.    And then TO Admin, do you see this is a

17   similar training matrix?

18        A.    Correct.

19        Q.    Then we have the tab titled Roster?

20        A.    Yes.

21        Q.    You see that is an organized similarly,

22   "what's changing, significant pain points," yes?

23        A.    Yes.

24        Q.    And then looks like there's a tab "VAC,"

25   do you understand that to be vacation?

Page 163

1          A.    For the vacation bid itself, yes.

2          Q.    Does it look like this document -- all of

3     these tabs were created to facilitate training as to

4     the MyTime bid?

5                MR. ROBINSON:  Object to form, vague,

6     mischaracterizes Ms. Gray's testimony.

7                MS. HILLS:  I wasn't characterizing the

8     testimony.  It was a question.

9                MR. ROBINSON:  It's vague "to all tabs."

10    Be more specific.

11    BY MS. HILLS:

12         Q.    Ms. Gray, did we just run through all of

13    the tabs in this document?

14         A.    Not through all of them but --

15         Q.    Which ones -- are there any we haven't

16    seen?

17         A.    Yes, there's a tab for Corporate, Other,

18    Absence, Pay Types, and there's other things that

19    continue to move over to the right.  There are

20    several tabs that we didn't look at.

21         Q.    Okay.  Let's pull those up.  Do you see

22    the one that's called "Corp"?

23         A.    Hm-hmm.

24         Q.    Does this appear to be organized

25    similarly?

1      A.    Correct.

2      Q.    With a training matrix and change

3  management?

4      A.    Yes.

5      Q.    And then if you want to go to the one

6  titled "ABS_Pay Types," are the codes on this page

7  familiar to you?

8      A.    Yes, they are.

9      Q.    And then let's go to the tab called "Swap

10  Rules."

11     A.    Okay.

12     Q.    Do you see that it says "swaps between

13  work areas not permitted"?

14     A.    Yes.

15     Q.    Is that true?

16          MR. ROBINSON:  Object to form.

17  BY THE WITNESS:

18     A.    That is -- it is depending upon the work

19  areas.  There are work areas that are not allowed to

20  swap between them.

21     Q.    Have you seen a list like this one before

22  or does this list look familiar to you?

23          MR. ROBINSON:  Object to form.

24  BY THE WITNESS:

25     A.    Yes.

Page 165

1        Q.    We may have hit it, maybe not, but the
2    tab called "Home"?
3        A.    Okay.
4        Q.    And do you see that this is an inch -- it
5    says agenda in the middle?
6        A.    Yes.
7        Q.    Altogether, does this seem to be a
8    document that facilitated training at Delta?
9              MR. ROBINSON:    Object to form.
10   BY THE WITNESS:
11       A.    So, I'm going to say no.  It didn't
12   facilitate training.  This is the type of document
13   that would be used to help write training material.
14       Q.    What about the Leadership tab that said
15   "Leadership Training Agenda"?
16       A.    My personal thoughts on this as I'm
17   preparing to set up training, the first thing I do
18   as I've built out what I'm going to do is I prepare
19   an agenda.  All it is is all of the pieces that we
20   would want to hit on as we got ready to deliver it.
21   There would have been separate documentation at the
22   time of training.
23       Q.    But you were not involved in a two-day
24   class?
25       A.    I did not attend the two-day class.

Page 166

1        Q.    We're going to go to another document.

2        A.    Okay.

3        Q.    This one is another spreadsheet and we'll

4    do the same thing, going over the cover sheet first.

5             MS. HILLS:  Okay.  I'm introducing

6    Exhibit 11.  This is just the cover sheet for

7    Bates 6516.  Let me know when you have that open.

8                  (Deposition Exhibit 11 was

9                   marked for identification.)

10   BY THE WITNESS:

11       A.    I have it and it is open.

12       Q.    Do you see the custodian for this

13   document is John Early?

14       A.    Yes.

15       Q.    And you report directly to John Early,

16   correct?

17       A.    Yes.

18       Q.    Again, the author is Ms. Turk?

19       A.    Yes.

20       Q.    And for this one, you see the file name

21   is "Book7" as an Excel file?

22       A.    Yes.

23       Q.    Is that familiar to you?

24       A.    No.

25             MS. HILLS:  This was in the email that I

Page 167

1    sent over to counsel.

2              MR. ROBINSON:  The document was been

3    received, and I have gone ahead and opened it in

4    Excel.

5              MS. HILLS:  I will also add it in Exhibit

6    Share so that all the bases are covered, and I'm not

7    sure if I already said, this was previously Exhibit

8    No. 5 in Mr. Early's deposition.  It is now being

9    marked as Exhibit 12, Bates number 6156.

10                    (Deposition Exhibit 12 was

11                     marked for identification.)

12   BY MS. HILLS:

13        Q.    Do you have that open in Microsoft Excel?

14        A.    Yes, I do.

15        Q.    Does this document look familiar to you?

16        A.    It looks fairly similar to the one we

17   looked at, but do I know this one specifically, no.

18        Q.    Do you see that the title is

19   "Leadership/Admin Training Matrix"?

20        A.    Yes.

21        Q.    Again, we have columns that say

22   "policy/process" same as the last one, right?

23        A.    Correct.

24        Q.    Do you see we have "What's Changing"?

25        A.    Yes.

Page 168

1        Q.    And "Significant Pain Points"?

2        A.    Yes.

3        Q.    If you go to Row 66.

4        A.    Okay.

5        Q.    Under or in Column D "Policy/Process,"

6    what is listed in Row 66?

7        A.    It says ADHW.

8        Q.    What does that mean?

9        A.    Additional hours worked.

10        Q.    And then do you see under What's

11    Changing, in this row, it says "OT/DT is now entered

12    as ADHW (additional hours worked)"?

13        A.    Yes.

14        Q.    So did you understand the transition from

15    MPS to SAP to change how overtime was represented in

16    the data?

17              MR. ROBINSON:  Object to form, vague as

18    to data.

19    BY THE WITNESS:

20        A.    Can you restate that for me again?  I'm

21    sorry.

22        Q.    Yeah.  Did you understand the transition

23    from SAP or, I'm sorry, from MPS to SAP to alter how

24    overtime was represented in employee's schedules?

25        A.    Yes.  But over time is not depicted in an

Page 169

1    employee's schedule in MPS.

2         Q.    What do you mean by that?

3         A.    Meaning they -- in their schedule itself,

4    their schedule doesn't say overtime or double time

5    in it.   Their schedule is their schedule.

6         Q.    And then how about on their -- let's see.

7    One second.

8              How about in their hours worked?

9              MR. ROBINSON:  Object to form.

10   BY THE WITNESS:

11        A.    What do you mean "as in their hours

12   worked"?

13        Q.    What -- so does SAP not contain the data

14   for time worked -- actually worked by employees?

15             MR. ROBINSON:  Object to form, vague.

16             You may answer, Ms. Gray.

17   BY THE WITNESS:

18        A.    SAP does contain the hours that an

19   employee works.

20        Q.    That was my mistake.  In my head, I mix

21   up SAP and MPS.

22             Does MPS contain the data of the

23   hours worked by employees?

24             MR. ROBINSON:  Same objection with

25   regards to that.

Page 170

1    BY THE WITNESS:

2         A.    Yes, an employee's time that they work

3    does get posted to MPS.

4         Q.    And does the MPS data show whether an

5    employee worked overtime or double time?

6         A.    In MPS, the timekeeper, when the employee

7    works extra hours, they have the ability as the

8    timekeeper to say overtime or double time, but it

9    doesn't necessarily pay that way for the employee.

10   It still has to go to SAP to run the time evaluation

11   to determine how that date pays to take account for

12   everything that applies within their schedule.

13        Q.    So an employee tracked through MPS may

14   have OT or DT on their time collection data that

15   will not actually pay out as overtime, am I

16   understanding you correctly?

17        A.    It's not 100 percent correct.  So in

18   their time collection data, it has their hours.  The

19   timekeeper has to explain time that's outside of the

20   schedule.

21             So if I worked additional hours, the

22   timekeeper typically would put on ST, straight time,

23   in certain divisions.  Other divisions they used OT.

24   I don't remember seeing anybody actually put DT, but

25   that designation is just to say that they worked

1    additional hours.  The window says overtime, but it

2    is additional hours.  But that data still has to go

3    to the rules engine.  Whether that rules engine, you

4    know, when it went into SAP, it then takes a look at

5    it, applies the rules based off of that employee's

6    individual work week, and the activities that

7    happened within that week to determine how that day

8    pays.  So there's not really a change in that piece.

9        Q.    So just to make sure I follow, the switch

10   from MPS to SAP, it did change how overtime was

11   reflected in attendance records?

12           MR. ROBINSON:  Object to form.

13   BY THE WITNESS:

14       A.    On the version of the employee's time

15   sheet or within the roster it shows there.

16       Q.    So an employee's roster is separate from

17   their schedule?

18       A.    Yes.  Their schedule is before they work

19   it.  The roster is after they've worked it.

20       Q.    Thank you.  Do you know whether this

21   document was used to facilitate training of

22   leadership or administrators?

23       A.    I can't say that.  I don't believe it

24   was, but, again, I did not craft it.  But if it's

25   just labeled Book7, chances are it's not a

1    legitimate item that would have been saved from

2    project documentation.  It was a draft most likely.

3              MS. HILLS:  We'll move on to the similar

4    document presentation.  This will be the slip sheet

5    for Bates 6610 and then we can move over to the

6    Excel spreadsheet.

7              MR. ROBINSON:  Was this also sent in your

8    email, counselor?

9              MS. HILLS:  What was that?

10             MR. ROBINSON:  Was this spreadsheet also

11   sent in your email?

12             MS. HILLS:  Yes.  So this was previously

13   marked in Mr. Early's deposition as Exhibit 9.

14                  So I'm introducing Exhibit 13, which

15   is just the slip sheet for Bates 6610.

16                       (Deposition Exhibit 13 was

17                        marked for identification.)

18             THE WITNESS:  Okay, I have got it.

19   BY MS. HILLS:

20        Q.    Do you know who Tiffany Croone is?

21        A.    No.

22        Q.    Have you seen her name at Delta?

23        A.    I'm sorry?

24        Q.    Have you seen the name in Delta?

25        A.    No, never seen that name.

Page 173

1     Q.    Do you see the custodian is John Early?

2     A.    Yes.

3     Q.    I'll have you look at the file name

4    "Change Impact Matrix05" in Excel format.

5     A.    Yes.

6     Q.    Does that sound familiar to you?

7     A.    It does not.

8           MS. HILLS:  I'll go ahead and mark the

9    Excel, which again was previously marked in the

10   Early deposition as Exhibit 9.  It will now be

11   Exhibit 14.

12                   (Deposition Exhibit 14 was

13                   marked for identification.)

14           MR. ROBINSON:  Before you get into the

15   document, do you have any sense of how much longer

16   you are going to go.  I'm trying to figure for

17   purposes of the record.

18           MS. HILLS:  I don't think we'll be much

19   longer.  We can take a break shortly after this

20   document and then --

21           MR. ROBINSON:  We can keep on going.

22           MS. HILLS:  Okay.  Yeah, but I'm nearing

23   the end.

24   BY MS. HILLS:

25     Q.    Do you have that open?

1    A.    Yes, I do.

2    Q.    Just to make sure we're seeing the same

3  version because the colors change a bit.  Do you see

4  that the top row is a red background that says

5  "Impacts" in white font?

6    A.    Yes.

7    Q.    And then do you see, there are blue and

8  green and yellow and red cells to make sure we're

9  looking at the same thing?

10    A.    Yes.

11    Q.    Okay.  Great.  Do you recognize this

12  document?

13    A.    No, I do not.

14    Q.    Do you see there are column headers for

15  "Airport Customer Service"?

16    A.    Yes.

17    Q.    And then for "Res"?

18    A.    Yes.

19    Q.    As well as "Tech Ops"?

20    A.    Correct.

21    Q.    Sorry.  One moment.  I'm having an issue

22  with one of the tabs being hidden.

23              Do you see multiple tabs at the

24  bottom of your document?

25    A.    I do not.

Page 175

1        Q.    Have you seen Delta-created documents
2    that assess the impact of changes in software?
3              MR. ROBINSON:  Object to form, vague,
4    lacks specificity.
5    BY MS. HILLS:
6        Q.    Has your work group created documents
7    that assess the impact of software changes in time
8    and attendance?
9              MR. ROBINSON:  Object to form, vague.
10             You may answer to the best of your
11   ability, Ms. Gray.
12   BY THE WITNESS:
13       A.    I mean, I guess similar to what we
14   looked -- the last exhibit but not like this, no, or
15   not this document.
16       Q.    Have you created similar documents to
17   assess the impact of software changes in time and
18   attendance?
19       A.    I have not.
20       Q.    Do you know whether this document was
21   created for training purposes?
22       A.    I don't know.
23       Q.    We can close that.
24             So following the -- let me step back.
25   How many departments at Delta are still manually

1    tracked for their time and attendance?

2        A.    My understanding is there was only four

3    left.

4        Q.    And are there any plans to transition

5    those groups away from manual tracking?

6        A.    Yes.

7        Q.    What are those four groups?

8        A.    I don't know them off the top of my head.

9        Q.    Do you know any of them?

10       A.    No, ma'am.

11       Q.    Have there been any changes in the

12   overtime policy as it relates to swaps since the

13   transition of crew tracking from MPS to SAP?

14              MR. ROBINSON:  Object to form.

15              THE WITNESS:  Can you ask that again for

16   me?

17   BY MS. HILLS:

18       Q.    Sure.

19              How many -- I'm going to ask a

20   different question.

21              How many departments are still using

22   MPS?

23       A.    There's several departments still using

24   MPS.

25       Q.    And Project Horizon that involved

1    transitioning departments from MPS to SAP, correct?

2         A.    Project Horizon was for transitioning

3    people into the SAP bid and award application that

4    actually never launched.  It got piloted.

5         Q.    Okay.  Do you have any concerns that

6    there is a confusion across departments about how

7    the overtime policy is applied in instances of

8    swaps?

9              MR. ROBINSON:  Object to form, asked and

10    answered.

11              MS. HILLS:  I'm going to clarify.

12    Earlier I asked that question about 2017 and now I'm

13    asking about the current time period.

14              MR. ROBINSON:  You may answer to the best

15    of your ability, Ms. Gray.

16    BY THE WITNESS:

17         A.    To my understanding, I don't think

18    there's this widespread misunderstanding about how

19    swaps impact overtime.

20         Q.    Have you received any more complaints in

21    the last year or two about how the policy is applied

22    in instances of swaps?

23         A.    No.  We don't receive a lot of complaints

24    about that in general.

25              MS. HILLS:  Okay.  There will be another

Page 178

1    document, but this one is not an Excel.  So you will

2    be able to view it normally.

3                        (Deposition Exhibit 15 was

4                        marked for identification.)

5    BY MS. HILLS:

6        Q.    I'm introducing Exhibit 15, and the Bates

7    number is 17087.

8        A.    Exhibit 15.

9        Q.    Yes.

10        A.    I have it.  Opening it now.

11        Q.    I'll start on the metadata page, again.

12    Do you see you are the custodian for this document?

13        A.    Correct.

14        Q.    Do you see that the date is October 21,

15    2024?

16        A.    Correct.

17        Q.    And then I'd like to ask you about the

18    file name.  It says "RE:  MyTime ticket."

19                Do you see that?

20        A.    Yes.

21        Q.    And so when you receive tickets

22    concerning MyTime, did they -- are they given

23    identification numbers?

24        A.    Yes, the system generates a ticket number

25    essentially.

Page 179

1        Q.    Okay.  Go down to the first Bates
2    numbered page 17087, do you see that the top message
3    is a message from you to a Rebekah Ulsaker?
4        A.    Yes.
5        Q.    Does this look familiar to you?
6        A.    That it's an email I'm sure -- and it has
7    my name on it, I'm sure it is mine, but I would have
8    to read it to know more about the details.
9        Q.    Who is Rebekah Ulsaker?
10       A.    She's one of the HR business partners.
11       Q.    Is she assigned to a specific department?
12       A.    I think she's assigned to more than one
13   department most likely in Flight Ops.  I don't know
14   all of that for sure.  I don't know the full
15   assignments.
16       Q.    We'll go ahead and scroll -- actually
17   we'll stay here.  So you are -- on this first page,
18   are you responding to Ms. Ulsaker from a forwarded
19   message?
20       A.    Yes.  She forwarded me a message.  I
21   responded back, correct.
22       Q.    Okay.  If you want to go down to the page
23   Bates numbered 17090, it is also PDF page 6 in this
24   document.
25       A.    Okay.

Page 180

1      Q.    And do you see there's a message from a
2    L'orelle Meeks?
3      A.    Yes.
4      Q.    Do you know who that is?
5      A.    No, I do not.
6      Q.    Who is Chaz Dale?
7      A.    Chaz Dale is one of the leaders on my
8    team.
9      Q.    In time and attendance?
10     A.    Yes.
11     Q.    Does he report to you?
12     A.    Yes.
13     Q.    We'll move down to the next page earlier
14   in time, and then do you see the beginning on 17090
15   at the bottom, that was a message from Todd Miranda?
16     A.    Yes.
17     Q.    And that's on July 16, 2024?
18     A.    Yes.
19     Q.    And then is that addressed to your
20   report, Chaz Dale?
21     A.    There are two of them on that page for
22   the same date.  One is addressed to him and one is
23   not and they're both from Todd Miranda.
24     Q.    I'm looking at the very bottom one at
25   10:58 a.m.

Page 181

1          A.     Hm-hmm.

2          Q.     Do you see that message carries over to

3     the next page, 17091?

4          A.     Yes.

5          Q.     Okay.  And then I'll just go ahead and

6     read this.  It says, "Hi Chaz, will you please take

7     a look at the thread below.  L'orelle swapped off

8     June 30 and then swapped to work June 7, she then

9     worked extra hours on June 9, and we believe June 9

10    should pay 8.0 OT and 3.0 DT because the employee --

11    'they' employee worked her scheduled hours (48.0

12    prior to working the OT)."

13               Did I read that correctly?

14         A.     You did read that correctly.

15         Q.     Do you see the list below has the dates

16    mentioned in the message, June 3, 4, 5, 6, 7, 8, and

17    9?

18         A.     Yes.

19         Q.     Do you understand that this represents a

20    week of an employee's schedule?

21         A.     Yes.  This would be the time between

22    those two dates when she was scheduled or what she

23    actually did most likely.

24         Q.     And then do you think this employee was

25    due overtime in this scenario?

1        A.      They're due overtime for what?

2        Q.      The week that we're looking at that

3    includes June 3, 4, 5, 6, 7, 8 and 9?

4             MR. ROBINSON:   Object to form.

5    BY THE WITNESS:

6        A.      So with the data that I'm looking at so

7    what's based on this screen, the employee is not due

8    any overtime or double time on the 9th.

9        Q.      Why is that?

10       A.      Because the employee swapped off on 6/3

11   as stated, the employee swapped to work again on

12   6/7.  The employee still has 12 hours of regular

13   work they are due because of the swap off.

14       Q.      We'll go back up to 17090.  You see up

15   top is a message from L'orelle Meeks on October 8,

16   2024?

17       A.      Hm-hmm.

18       Q.      Could you just read that message?

19       A.      "Below is an example of the same scenario

20   in which I was paid out correctly.  For this week, I

21   swapped off April 13 and swapped on April 17, yet I

22   was paid 48 hours of regular time, 4 hours of

23   overtime, and 22 hours of double time.  This

24   discrepancy shows the inconsistency unless HR policy

25   has changed between now and then."

Page 183

1      Q.    Below that message, do you see it looks
2   like a snippet of a spreadsheet?
3      A.    Correct.
4      Q.    And do you see the date on that is
5   April 2024?
6      A.    Yes.
7      Q.    Has the policy for how overtime is paid
8   in instances of swaps changed between April 2024 and
9   October of 2024?
10      A.    No.
11      Q.    If you could scroll down to the page
12   numbered 17087.
13      A.    Yes.
14      Q.    About halfway through, do you see a
15   message from Chaz Dale to L'orelle Meeks and others
16   on October 21, 2024, at 4:56 p.m.?
17      A.    Hm-hmm.
18      Q.    And do you see where it says "it is
19   important that you feel heard and that I have taken
20   the time to discuss your concerns with your leaders
21   so they can better grasp the implications of swaps
22   and how they should be compensated"?
23      A.    Yes, I see that.
24      Q.    Below that, it says, "They will be
25   communicating with the team soon to clarify how this

Page 184

1    process works.  In good faith, I have arranged for a

2    reimbursement for the amount that was docked from

3    your 10/28 paycheck.  Additionally I have asked

4    payroll to set up a repayment plan for you allowing

5    you to payback the owed amount in manageable

6    increments rather than as a lump sum."

7                    Do you see that?

8         A.    I do.

9         Q.    Did you have any concerns in October

10    of 2024 that the policy regarding overtime in

11    instances of swaps was misunderstood?

12        A.    No, I didn't have any concern.  Please

13    understand that sometimes employees don't like the

14    policy, it's not that they don't understand it.

15        Q.    So was this employee L'orelle Meeks

16    reimbursed for overtime rate pay that they should

17    not have been compensated?

18                MR. ROBINSON:  Object to form.

19    BY MS. HILLS:

20        Q.    Do you remember --

21        A.    For one, I wasn't a part of the

22    conversation when this portion was coming in.  You

23    remember, I was cc'd and FYed.  So I don't really

24    necessarily -- I didn't get into a lot of those

25    details.

1          The other portion of this, I can't

2   tell you what she was reimbursed for unless I have

3   all of the pieces because even if they reimbursed

4   her, it's saying reimbursed for time that she was

5   docked.  It doesn't say whether that time was for a

6   swap.  It doesn't give me enough information.

7          This is, again, one of those

8   situations where there could have been more than one

9   thing going on in this email.

10      Q.    But Chaz Dale reports directly to you,

11  correct?

12      A.    Yes.

13      Q.    On October 21, 2024, you responded to

14  Rebekah Ulsaker, "please let me know what you hear

15  back from her," correct?

16      A.    Yes, that's correct.

17      Q.    Do you remember what happened with this

18  situation after October 21?

19          MR. ROBINSON:  Object to form.  Counsel,

20  she's asked and answered this question.

21  BY THE WITNESS:

22      A.    No.  I don't know what happened after

23  that.  I don't.

24          MS. HILLS:  Okay.  I think we can take a

25  quick break.

Page 186

1                THE VIDEOGRAPHER:  Please stand by.
2      Going off the record at 5:42 p.m.
3                          (Break in the proceedings taken
4                           at 5:42 p.m.)
5                THE VIDEOGRAPHER:  We are back on record
6      at 5:50 p.m.
7                     You may proceed.
8                MS. HILLS:  Thank you, Ms. Gray, for your
9      time today.  I have no further questions.
10               THE WITNESS:  Thank you.
11               THE VIDEOGRAPHER:  Thank you.  Stay
12     online.
13                    We are going off record at 5:51 p.m.,
14     and concludes today testimony.  Master media will be
15     retained by Veritext Legal Solutions.  Thank you
16     all.
17                     (Off the record at 5:51 p.m.)
18
19
20
21
22
23
24
25

Page 187

1

2                    REPORTER CERTIFICATE

3

4         I, JO ANN LOSOYA, a Certified Shorthand

5    Reporter within and for the State of Illinois, do

6    hereby certify:

7                        That previous to the commencement

8    of the examination of the witness, the witness was

9    duly sworn to testify the whole truth concerning the

10   matters herein; That the foregoing deposition

11   transcript was reported stenographically by me, and

12   the foregoing constitutes a true record of the

13   testimony given and the proceedings had; That the

14   said deposition was taken before me at the time and

15   place specified; That I am not a relative or

16   employee or attorney or counsel, nor a relative or

17   employee of such attorney or counsel for any of the

18   parties hereto, nor interested directly or

19   indirectly in the outcome of this action.

20             IN WITNESS WHEREOF, I do hereunto set my

21   hand this day, March 21, 2025.

22                    _____

23

              JO ANN LOSOYA, CSR, RPR, CRR

24             C.S.R. 84-002437

25

Page 188

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

March 23, 2025

To: Mitch Robinson, Esq.

Case Name: Goodyear, Lukas v. Delta Airlines, Inc.

Veritext Reference Number: 7217640

Witness:  Cheryl Gray      Deposition Date:  3/19/2025

Dear Sir/Madam:

Enclosed please find a deposition transcript.  Please have the witness

review the transcript and note any changes or corrections on the

included errata sheet, indicating the page, line number, change, and

the reason for the change.  Have the witness' signature notarized and

forward the completed page(s) back to us at the Production address
shown

above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of

this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department



NO NOTARY REQUIRED IN CA

Page 189

```
 1                    DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
 2
          ASSIGNMENT REFERENCE NO: 7217640
 3        CASE NAME: Goodyear, Lukas v. Delta Airlines, Inc.
          DATE OF DEPOSITION: 3/19/2025
 4        WITNESS' NAME: Cheryl Gray
 5        In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me.
 7        I have made no changes to the testimony
     as transcribed by the court reporter.
 8
     _____          _____
 9   Date                      Cheryl Gray
10        Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:
12
          They have read the transcript;
13        They signed the foregoing Sworn
               Statement; and
14        Their execution of this Statement is of
               their free act and deed.
15
          I have affixed my name and official seal
16
     this _____ day of_____, 20_____.
17
                    _____
18                  Notary Public
19                  _____
                    Commission Expiration Date
20
21
22
23
24
25
```

1                DEPOSITION REVIEW
                CERTIFICATION OF WITNESS
2

        ASSIGNMENT REFERENCE NO: 7217640
3       CASE NAME: Goodyear, Lukas v. Delta Airlines, Inc.
        DATE OF DEPOSITION: 3/19/2025
4       WITNESS' NAME: Cheryl Gray
5           In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7           I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9           I request that these changes be entered
    as part of the record of my testimony.
10
            I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____        _____
    Date                   Cheryl Gray
14
            Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17          They have read the transcript;
            They have listed all of their corrections
18              in the appended Errata Sheet;
            They signed the foregoing Sworn
19              Statement; and
            Their execution of this Statement is of
20              their free act and deed.
21          I have affixed my name and official seal
22  this _____ day of_____, 20_____.
23          _____
            Notary Public
24
            _____
25          Commission Expiration Date

Page 191

1                        ERRATA SHEET

                VERITEXT LEGAL SOLUTIONS MIDWEST

2                    ASSIGNMENT NO: 7217640

3      PAGE/LINE(S) /        CHANGE        /REASON

4      _____

5      _____

6      _____

7      _____

8      _____

9      _____

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16     _____

17     _____

18     _____

19

       _____        _____

20     Date                    Cheryl Gray

21     SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

22     DAY OF _____, 20_____ .

23                     _____

                       Notary Public

24

                       _____

25                     Commission Expiration Date

**[00000312 - 2021]** Page 1

| 0 | | | |
|---|---|---|---|

**00000312** 4:3
**00000343** 4:4
**00000442** 4:11
  4:12
**00006516** 4:15
  4:16
**00006607** 4:13
  4:14
**00006610** 4:17
  4:18
**00009319** 4:7
**00012531** 4:8
**00012554** 4:9
**00017092** 4:19
**000312** 47:15
**0005776** 4:10
**05712** 1:6 5:10
**084-002437**
  1:24

| 1 |
|---|

**1** 4:3 47:1,3
  77:25 140:23
  148:16 154:13
**1.5** 149:5
**1/15** 143:25
  144:7
**1/15/21** 144:9
**10** 2:4 4:14
  105:24,24
  146:21 152:1,2
  152:24 154:7
  158:16

**10.0** 105:9,10
  107:19
**10/28** 184:3
**100** 137:22
  155:17 170:17
**101** 4:9
**1075** 2:12
**10:00** 1:14
**10:04** 45:8
**10:12** 5:2
**10:58** 180:25
**11** 4:15 166:6,8
**1100** 188:1
**111** 4:10
**11:04** 45:19,21
**11:19** 45:23
**12** 4:16 46:25
  48:6 89:19
  167:9,10
  182:12
**1202** 142:7
  149:5
**1203** 149:6
**1210** 142:7
**12531** 89:6
  94:13
**12533** 89:19
  96:23
**12554** 101:9
**127** 4:11
**129** 4:12
**12:15** 79:2,16
  79:18

**13** 4:17 48:15
  50:8 90:1
  172:14,16
  182:21
**14** 4:18 105:9
  110:4 173:11
  173:12
**15** 4:19 79:5
  107:25 141:10
  141:13 143:5
  178:3,6,8
**150** 4:13
**152** 4:14
**15th** 105:8
  110:10
**16** 180:17
**166** 4:15
**167** 4:16
**17** 182:21
**17087** 178:7
  179:2 183:12
**17090** 179:23
  180:14 182:14
**17091** 181:3
**172** 4:17
**173** 4:18
**178** 4:19
**18** 147:4,8
  156:24 160:22
**1820** 188:2
**19** 1:13 5:2
**1991** 12:15
**1995** 9:21

**1999** 12:15
  13:3
**1:23** 1:6 5:10
**1:38** 79:20
**1:42** 83:9
**1:44** 83:12

| 2 |
|---|

**2** 4:7 68:2,4
  141:9,19 143:1
  143:5 149:6
  154:13
**2,080** 38:7
  48:24
**2.3** 91:5
**20** 26:20,23,25
  189:16 190:22
  191:22
**2003** 13:6
**2015** 20:22
**2016** 20:22
**2017** 68:22
  70:16 71:24
  73:6 90:2
  96:17 99:8,9
  99:16 101:20
  103:4,11 117:9
  122:22 177:12
**2018** 151:21
**2021** 112:20,23
  113:2,25
  115:22 117:10
  118:12 119:11
  122:8 141:10

141:13 143:2,6
143:25 144:7
**2022**   142:1,14
146:15,21
147:4,8,16
**2024**   178:15
180:17 182:16
183:5,8,9,16
184:10 185:13
**2025**   1:13 5:3
187:21 188:4
**20th**   136:17
**21**   143:2
160:21 178:14
183:16 185:13
185:18 187:21
**214-7900**   2:6
**216-523-1313**
188:3
**2166**   187:23
**22**   148:16
156:21,23
182:23
**2219**   161:21
**23**   118:12
188:4
**25**   9:10 46:5
**2500**   2:12
**27**   148:17
**28**   113:2
119:11 156:24
**2:29**   110:18,20
**2:58**   110:22

**3**

**3**   4:8 89:5,7
141:9 181:16
182:3
**3.0**   181:10
**3/19/2025**
188:8 189:3
190:3
**30**   112:23
181:8
**30,000**   44:13
**30309**   2:13
**304**   146:23
**31**   68:22
**312**   2:6 47:12
**322**   48:16 50:8
51:7
**323**   49:6
**386862**   128:6
132:15
**3:31**   152:14
**3:53**   140:9,11

**4**

**4**   4:22 181:16
182:3,22
**4/1**   135:20
**40**   35:8,9,11,13
36:15,19 51:12
92:7,13 93:19
93:23
**404**   2:13
**42**   148:17

**44114**   188:2
**442**   127:16
130:16 140:17
**47**   4:3
**48**   182:22
**48.0**   181:11
**4:05**   140:13
**4:14**   113:25
**4:31**   152:12
**4:34**   152:16
**4:56**   183:16

**5**

**5**   4:9 89:20
101:3,5 167:8
181:16 182:3
**50**   91:12 92:10
93:6,19,19
99:4,10
**51**   9:5
**5776**   111:10,15
**5777**   112:18
**5778**   112:22
118:8,9
**5779**   113:1
119:6
**5780**   118:10
**5781**   116:5
117:13
**5783**   115:10
**5784**   113:22
**5:07**   118:12
**5:42**   186:2,4

**5:50**   186:6
**5:51**   186:13,17

**6**

**6**   3:4,4 4:10
111:6,9 113:25
142:1,14
146:15 147:16
179:23 181:16
182:3
**6/3**   182:10
**6/7**   182:12
**60602**   2:5
**6156**   167:9
**62**   141:21,23
142:9,11
144:25 146:2,2
146:11,12
147:16,16
149:7,14
**63**   146:19
**6516**   166:7
**66**   168:3,6
**6607**   150:5
152:20 158:16
**6610**   172:5,15
**68**   4:7

**7**

**7**   4:11 127:15
127:17 151:25
152:25 181:8
181:16 182:3
**704-9637**   2:13

**[7217640 - ago]**                                           Page 3

**7217640**  188:7
189:2 190:2
191:2

**8**

**8**  4:12 129:22
130:16 132:14
140:17 181:16
182:3,15
**8.0**  181:10
**820**  8:23
**84-002437**
187:24
**8442**  129:21
**89**  4:8

**9**

**9**  4:13 112:19
150:3,6 158:13
158:15 172:13
173:10 181:9,9
181:17 182:3
**9319**  68:3,9
77:15
**9th**  182:8

**a**

**a.m.**  1:14 5:2
45:19,21,23
180:25
**aa**  144:22
**ability**  39:12
55:8 65:5
85:15 120:18
134:4 139:5

145:12 152:6
161:11 170:7
175:11 177:15
**able**  47:1 60:3
70:8 71:11
73:14 80:14
83:21 87:24
88:5 89:5,9
93:24 99:17
132:1 134:7
141:3 148:9
156:17 178:2
**above**  77:20
94:10 147:18
188:17
**abs**  141:16
164:6
**absence**  141:17
148:6 163:18
**access**  32:4
**accidentally**
83:5
**accordance**
189:5 190:5
**account**  170:11
**acknowledge**
189:11 190:16
**acronym**  136:1
**acs**  90:18,19
**act**  189:14
190:20
**action**  158:18
187:19

**activities**  171:6
**actual**  23:13
42:18 59:16
149:25 151:23
**actually**  7:17
17:25 20:2
26:7 28:25
35:4 37:4
43:16 47:11
48:7 52:3
57:23 61:12
65:14 69:7
74:16 96:8
107:10 115:10
118:6,10 119:1
130:13 146:6
149:22 153:8
153:22 158:7
159:14 160:13
169:14 170:15
170:24 177:4
179:16 181:23
**add**  106:8
167:5
**added**  29:1
94:5 95:2
**additional**
136:4,14 144:2
146:15 149:11
161:1,4,5,25
168:9,12
170:21 171:1,2
**additionally**
184:3

**address**  8:18,19
8:20,22,23
188:15
**addressed**  91:1
114:2 118:14
160:4 180:19
180:22
**adhw**  135:24
146:10,12
168:7,12
**adjust**  42:4
**admin**  153:9,20
162:16 167:19
**administer**
5:24
**administrator**
16:15
**administrators**
171:22
**admins**  160:3
**adopt**  75:3
**advise**  81:2
**affiliations**
5:16
**affixed**  189:15
190:21
**afternoon**
79:19
**agenda**  154:8
154:15 159:8
165:5,15,19
**ago**  21:17
31:24 40:21
102:7 127:2

[ago - arranged]                                                    Page 4

151:3 160:12
**agree** 63:12,13
  64:22 91:17
**agreed** 64:16
  70:11
**agreement**
  138:17
**ahead** 12:24
  49:11 68:8
  79:8 81:6 83:4
  88:4 114:23,24
  121:9 149:4
  167:3 173:8
  179:16 181:5
**air** 1:7 5:7 9:6
  12:20 101:1
  128:1
**airlines** 188:6
  189:3 190:3
**airport** 90:20
  174:15
**al** 5:7
**alarm** 110:13
  110:15 111:2
**aligns** 141:25
**allow** 64:10,11
  65:9
**allowed** 65:1
  65:13 66:5,5
  67:16 73:24
  164:19
**allowing** 184:4
**allows** 160:25

**alter** 168:23
**alternating**
  42:21
**altogether**
  165:7
**amanda** 114:7
**amend** 32:1
**amendments**
  31:20,23
**amount** 7:18
  38:1 92:23
  94:11 184:2,5
**analyst** 13:9,19
  13:20,24
**analysts** 14:14
  14:15
**ann** 1:23 187:4
  187:23
**answer** 7:7
  10:14 13:22
  17:19 22:22
  38:20 55:7
  56:12 59:22
  60:18 62:22,23
  63:24 65:5,20
  66:13 67:25
  69:25 71:23
  73:20 74:6
  80:13,15 81:4
  81:7 82:14
  85:14 86:22
  87:15,16,19,23
  88:4,17 91:21
  92:2,18 104:20

107:16 108:10
109:15 119:25
120:17 122:18
123:22 125:12
126:13 133:6
134:3 136:25
139:4 144:17
145:11 157:25
162:4 169:16
175:10 177:14
**answered**
  34:14 43:8
  45:4 65:4
  84:23,25 99:14
  107:8 160:10
  177:10 185:20
**answering**
  55:14
**anybody**
  170:24
**apiece** 92:9
**appear** 77:20
  130:7 141:1,4
  143:12 153:12
  154:15 163:24
  189:11 190:15
**appearances**
  2:1
**appeared** 2:8
  2:15
**appearing** 2:1
**appears** 69:20
  91:1 102:4
  110:15 135:10

138:11 143:8
147:17
**appended**
  190:11,18
**applicable**
  58:24
**application**
  115:19 151:7
  156:19 157:14
  158:3 177:3
**applications**
  156:14 157:19
  158:4
**applied** 177:7
  177:21
**applies** 170:12
  171:5
**apply** 27:24
  32:5 66:20
  78:13,16
**appreciate** 6:10
**approved**
  48:23
**approximately**
  19:10 28:21
**april** 90:1
  182:21,21
  183:5,8
**aps** 122:7
**area** 11:12
**areas** 164:13,19
  164:19
**arranged** 184:1

**[asked - based]**

**asked**  27:9
34:13 43:7
45:3 56:5 65:3
84:22 85:3,17
86:21 99:13
106:2,5 107:7
160:10,20
177:9,12 184:3
185:20
**asking**  54:14
72:25 82:7
85:11 100:13
122:16 137:23
144:15 177:13
**aspect**  119:19
**assess**  175:2,7
175:17
**assigned**  67:8
93:16 179:11
179:12
**assignment**
189:2 190:2
191:2
**assignments**
179:15
**assuming**  76:25
105:3 139:20
**atlanta**  1:2
2:13 5:9 8:25
9:3 11:12
19:21 21:9
27:10,16,24
28:5 31:1
90:21 94:20

102:8,14
**att**  141:16
**attached**  67:12
190:7
**attend**  165:25
**attendance**
16:21 21:14,19
21:21 22:5,24
24:7,16,21
25:2,7,10,13
26:4,11 27:15
27:21,23 28:4
28:12,16 29:5
29:18 30:8,15
31:5,12 61:1,3
76:7 94:19
95:4,9 97:22
98:4,7,8,13
101:1 102:7
103:3,10 123:8
126:22 128:15
141:17 148:6
151:4 171:11
175:8,18 176:1
180:9
**attendants**
43:23,25
**attorney**  7:13
80:18,25 81:12
187:16,17
**august**  112:19
**augusta**  11:17
12:7 13:2

**author**  127:23
150:20 158:9
166:18
**authorize**
190:11
**availability**
161:12
**available**  71:9
152:8 156:18
**ave**  188:1
**award**  151:1,2
151:5 156:15
156:17 157:10
158:8 177:3
**aware**  31:5
44:6 52:21
55:12 59:10
78:12 100:19
122:10 123:14

**b**

**b**  140:20,23
160:22
**ba**  150:15
**back**  9:11
19:13,15 29:9
45:22 52:3
56:4 64:23
79:20 82:8
83:11 85:7,20
86:13 87:18
88:12 91:3
96:22,22
110:21 117:12

120:9 121:1
131:17 140:12
142:3,16
146:10 147:15
147:24 148:8
149:2,7 151:9
152:15 157:4
159:15 175:24
179:21 182:14
185:15 186:5
188:15
**background**
174:4
**bar**  153:7
**barbara**  90:14
90:16,17
**barnell**  114:6
**barnwell**  117:6
**base**  93:8,10,14
**based**  12:21
17:10 27:5
31:1 41:24
42:5,6,7,9,13
46:9,12 52:5
52:21 64:7
83:21 89:25
90:21 91:16
94:20 102:8,10
104:3,22
105:18,23
121:19 135:18
145:14 149:15
171:5 182:7

**bases**  167:6
**basic**  63:12
**basis**  161:2
**bassett**  89:23
  90:6
**bates**  48:9,16
  49:6 50:8 51:7
  68:3 89:6,12
  89:19 101:9
  111:9 127:16
  130:16 140:17
  150:4 152:20
  158:16 166:7
  167:9 172:5,15
  178:6 179:1,23
**bearing**  5:9
**began**  105:8
  110:9 126:22
**beginning**
  39:15 48:10
  50:5 53:8
  55:11 105:5
  107:25 180:14
**begins**  5:4
  141:23
**behalf**  1:4 2:8
  2:15 5:6,18
  6:10 76:11
  86:22
**believe**  8:4 24:5
  63:7 72:11
  74:9 76:16
  135:19 147:9
  147:13 155:21

157:5,11
  171:23 181:9
**benefit**  72:5
**best**  40:19 55:7
  64:3 65:5 80:7
  80:16 85:14
  116:11 120:17
  128:18 134:3
  139:4 145:11
  157:13 175:10
  177:14
**better**  19:17
  62:16,20 118:5
  183:21
**bi**  112:4 114:9
  114:13,18
  115:1,6,15,20
  116:17,18
**bid**  43:17 70:18
  70:19,21,22,23
  71:6,11 105:8
  105:25 106:3
  107:11,15,24
  108:3,16,20,20
  108:23 109:6,8
  109:11,23
  110:4,9 116:9
  116:11 117:16
  151:1,2,5,6,6
  156:15,17
  157:9 158:8
  163:1,4 177:3
**bidding**  71:1
  110:5,6 157:18

**bids**  13:14,15
  40:13
**big**  46:4
**bit**  9:11 29:15
  50:14 63:9
  74:10 78:25
  85:20 88:2
  106:25 111:1
  130:7 156:6
  162:6 174:3
**blaze**  2:18
**block**  148:15
**blocks**  148:15
**blue**  174:7
**bold**  77:18
**book7**  166:21
  171:25
**boss**  20:11
**bottom**  47:15
  48:7,9,15
  77:15 96:23
  104:11 133:19
  153:9 174:24
  180:15,24
**break**  7:5,8
  45:9,20 78:22
  79:6,9,17
  80:19,22,25
  81:12 110:19
  111:1 139:24
  140:2,5,10
  152:13 173:19
  185:25 186:3

**breaks**  7:3,6
**brief**  111:1
**bring**  75:19
  117:12 130:2,4
**buffington**
  114:7
**build**  151:4
**building**  13:14
  35:6
**buildings**
  150:25
**built**  124:22
  156:14 165:18
**bullet**  50:25
  51:1,4 119:13
  119:14 120:8
  120:23,24
**business**  66:25
  67:2,7,11
  90:18 113:8
  134:9,12
  160:25 179:10
**businesses**
  61:19

| c |
| --- |

**c**  141:5 143:5,9
  143:11,17,19
  160:22
**c.s.r.**  187:24
**ca**  188:25
**calabrio**  123:2
  126:15,20,21
  127:1,3 129:5

calc   95:5
calculated   46:9
    57:1 162:9
calculating
    81:16,20 82:9
calendar
    139:16
calendars
    118:21
call   18:10,15,16
    21:22 69:5
    72:6 157:6
called   6:3 39:6
    78:4 145:17
    163:22 164:9
    165:2
calls   12:19
    71:10 76:11
    91:19 104:18
    160:9
capacity   98:11
capital   48:19
    50:11 153:20
care   124:11
career   11:5
    30:3
careful   6:25
carries   181:2
carry   111:2
case   5:6,9 7:24
    35:14 38:19
    188:6 189:3
    190:3

categories
    134:18
categorize
    61:19
category
    161:18
cathy   68:19,24
cats   128:12,13
    128:23 129:6
    129:13 130:21
    130:25 131:14
    132:2 134:19
    134:23,25
    135:4,5 136:23
    137:6,10,18
    138:11 139:1
catsdb   128:6,9
cause   74:12
cc'd   184:23
cells   174:8
center   18:10
    69:3,4,5
certain   170:23
certificate
    187:2 190:11
certification
    189:1 190:1
certified   187:4
certify   187:6
chance   104:14
chances   171:25
change   31:21
    35:16 55:22,24
    55:25 56:6,19

    56:25 57:10,12
    58:11,21 59:4
    69:12 70:23
    73:16,22 74:2
    74:14 75:9,12
    80:21 93:25
    105:19 107:11
    107:15 108:5
    108:12,20
    109:3,4,5,8
    114:19 115:1,7
    119:19 122:14
    146:8 154:24
    155:22 162:8
    164:2 168:15
    171:8,10 173:4
    174:3 188:13
    188:14 190:8
    191:3
changed   17:16
    57:17 69:21,22
    96:16 121:7,14
    182:25 183:8
changes   78:7
    108:23 109:9
    147:17 175:2,7
    175:17 176:11
    188:12 189:7
    190:7,9
changing   155:7
    159:21 162:22
    167:24 168:11
characterizati...
    75:6 154:3

    162:3
characterizing
    163:7
charles   94:15
    94:18,23
chaz   180:6,7,20
    181:6 183:15
    185:10
check   106:9,20
cheryl   1:12 3:3
    5:5 6:2 188:8
    189:4,9 190:4
    190:13 191:20
chicago   2:5
chooses   58:16
christy   89:24
    90:10
circumstance
    74:15
city   69:3
civil   189:5
    190:5
clarification
    162:7
clarify   105:1
    177:11 183:25
class   154:11
    165:24,25
clean   6:24
    121:11
clear   23:22
    47:11 138:15
    156:25

| | | | |
|---|---|---|---|
| **clearly** 54:8,19 | 144:24 145:3 | **communicated** | 184:9 |
| **cleveland** 188:2 | 145:14,16 | 23:7 | **concludes** |
| **click** 162:14 | 146:2,2,11,11 | **communicating** | 186:14 |
| **client** 81:2 | 146:12,20,25 | 183:25 | **conducted** |
| **close** 121:10 | 147:25 149:8 | **communication** | 159:1,2 |
| 175:23 | 149:10 155:5,8 | 72:6,12 73:9 | **confirm** 152:19 |
| **closely** 30:22 | 155:10 157:1 | **company** 161:6 | 153:3 |
| **code** 149:21 | 159:18,21 | **compare** 143:4 | **conflicting** |
| **codes** 133:16 | 160:22,22,24 | **compensated** | 118:21 |
| 164:6 | 168:5 174:14 | 183:22 184:17 | **confusion** |
| **codex** 8:23 | **columns** | **complaints** | 72:19 177:6 |
| **coincided** | 130:11 140:18 | 88:9 100:3,8 | **connects** 10:6 |
| 73:17 | 167:21 | 100:12 177:20 | **considered** |
| **collected** | **combination** | 177:23 | 22:13 38:13 |
| 128:23 129:6 | 35:24 | **complete** 67:15 | 44:2 55:4,25 |
| 133:24 134:19 | **come** 55:18 | **completed** | 57:11 61:4 |
| 134:23,25 | 57:23,25 80:14 | 138:2,4,12,16 | 100:20,22 |
| 135:4,5 | 99:10 161:2,7 | 188:15 | 161:13 |
| **collection** | **comes** 88:19 | **completely** | **consistency** |
| 170:14,18 | 129:2 | 20:2 65:17 | 67:23 |
| **collects** 131:17 | **coming** 135:12 | **compound** 36:1 | **consistent** 34:3 |
| **college** 9:12,14 | 184:22 | 57:13 98:15 | 36:11 65:12 |
| 9:23 11:8 | **commencem...** | 99:21 133:3 | 96:17 |
| **color** 153:7 | 187:7 | 157:24 | **consists** 55:17 |
| **colored** 153:13 | **commission** | **comprehensive** | **constitutes** |
| **colors** 174:3 | 189:19 190:25 | 20:24 70:8 | 187:12 |
| **column** 133:8 | 191:25 | **concern** 184:12 | **contain** 169:13 |
| 133:10,12 | **committed** | **concerned** | 169:18,22 |
| 140:20,23 | 64:25 | 69:12 | **contains** |
| 141:5,5,15,19 | **common** 44:22 | **concerning** | 109:17 |
| 141:22,23 | 97:23 98:3,13 | 178:22 187:9 | **content** 104:22 |
| 142:4,10,17,20 | **commonly** | **concerns** | **context** 49:19 |
| 143:1,5,9,11,17 | 157:21 | 104:23 157:5 | 90:12 91:16 |
| 143:19 144:22 | | 177:5 183:20 | 118:6 119:23 |

[continue - csr]                                                    Page 9

| | | | |
|---|---|---|---|
| **continue** | 96:25 100:14 | **correspond** | **court**  1:1 5:8 |
| 163:19 | 101:10 118:25 | 133:16 | 5:13,23 6:20 |
| **continues** | 119:12 128:24 | **corresponding** | 80:4 83:6 |
| 117:19 | 131:11,18,19 | 142:13 | 87:17 189:7 |
| **control**  67:15 | 131:21,22,24 | **counsel**  5:15,20 | **cover**  16:23 |
| 145:24 | 132:9,12 | 5:22 6:17 | 27:21 127:16 |
| **conversation** | 133:17 135:13 | 76:20 87:11 | 149:24 150:4 |
| 70:16 71:23 | 135:25 136:18 | 93:2 127:10 | 158:15 166:4,6 |
| 91:10 106:17 | 138:12 139:12 | 130:4,10 | **covered**  20:7 |
| 111:20 184:22 | 140:25 141:7 | 151:24 152:22 | 167:6 |
| **conversion** | 141:11,20 | 158:14 167:1 | **craft**  171:24 |
| 112:4 157:2 | 142:8,12,15,21 | 185:19 187:16 | **create**  39:24 |
| **coordinators** | 143:3 145:18 | 187:17 | 43:12 |
| 94:18 | 149:8,9,11,12 | **counselor** | **created**  142:17 |
| **copied**  94:22 | 151:12 153:1,2 | 45:12 53:21 | 142:23 143:2,8 |
| 119:1 | 154:12,14 | 54:7 58:2 | 145:17,23 |
| **copy**  90:14 | 159:22 162:18 | 72:23 76:11 | 146:6 163:3 |
| 114:5 | 164:1 166:16 | 78:23 85:6 | 175:1,6,16,21 |
| **corp**  163:22 | 167:23 170:17 | 126:17 129:19 | **creates**  35:17 |
| **corporate** | 174:20 177:1 | 138:21 172:8 | 40:16 |
| 163:17 | 178:13,16 | **count**  81:17,21 | **crew**  62:24 |
| **correct**  13:7 | 179:21 183:3 | 81:25 82:10 | 111:20,25 |
| 15:15,18 23:1 | 185:11,15,16 | 86:14 92:12 | 113:5 114:11 |
| 23:2,22 30:13 | **corrections** | 93:22 95:17 | 114:25 115:23 |
| 30:14 34:19 | 188:12 190:17 | 96:4,12 100:17 | 116:1 117:23 |
| 36:23 40:4 | **correctly**  8:4 | 162:1 | 117:24 119:4 |
| 41:18 46:7 | 68:25 69:1,14 | **counted**  57:7,8 | 121:2 135:16 |
| 47:16 49:7,17 | 72:9 105:8,12 | **county**  189:10 | 147:9,21 |
| 50:13 54:23 | 107:3 116:13 | 190:15 | 176:13 |
| 55:2 68:12,23 | 117:8 119:21 | **couple**  64:14 | **croone**  172:20 |
| 70:20 71:16 | 120:11 126:18 | 69:8 119:14 | **cross**  128:15 |
| 82:12 86:15,16 | 170:16 181:13 | **course**  47:10 | **crr**  1:23 187:23 |
| 91:13,14 92:5 | 181:14 182:20 | 113:8 134:9,12 | **csr**  1:23 187:23 |
| 94:6 95:19 | | | |

| | | | |
|---|---|---|---|
| ct  145:19 | 95:2 109:20 | 135:4,5 136:23 | 64:17,23,23 |
| current  8:18 | dale  180:6,7,20 | 137:7,10,18,25 | 90:12 109:13 |
| 28:14,24 29:22 | 183:15 185:10 | 138:9,11 139:1 | 109:23 139:10 |
| 29:25 60:24 | dallas  102:16 | date  76:7 108:3 | 144:4 149:19 |
| 63:19 177:13 | 102:23 | 108:23 117:22 | 154:11,13,13 |
| currently  9:6 | dan  114:6 | 120:10 121:15 | 154:16 159:2,7 |
| 78:20 156:18 | daniel  2:4 | 135:18,21 | 165:23,25 |
| cusp  107:11 | 89:23 90:8 | 138:8 141:6,10 | 171:7 187:21 |
| custodian | danielle  2:11 | 142:1,13,22 | 189:16 190:22 |
| 89:16 101:12 | data  39:5 | 143:1,4,9,11,17 | 191:22 |
| 128:1 150:12 | 123:13,16,20 | 143:19,19 | days  33:18 34:9 |
| 166:12 173:1 | 125:4,16,17,21 | 144:9 146:15 | 35:7 36:10 |
| 178:12 | 125:23 126:3,7 | 147:8,23 | 37:3,8,9,10 |
| custodians | 128:20,21 | 149:14 170:11 | 38:11 40:21 |
| 111:13 | 129:4,6,9,11 | 178:14 180:22 | 42:21,22 43:2 |
| customer  69:3 | 131:12,18,23 | 183:4 188:8 | 49:14,14 50:3 |
| 69:4 90:20 | 132:6 133:24 | 189:3,9,19 | 50:24,24 51:24 |
| 174:15 | 134:16,22,22 | 190:3,13,25 | 55:18,18 64:24 |
| cut  83:5 | 134:24 135:3,4 | 191:20,25 | 91:3 108:12,13 |
| cutover  116:10 | 135:8,9,10,13 | dated  90:1 | 108:15,17 |
| 116:15,18 | 142:10 143:18 | 113:2 | 109:3,5,7,9,13 |
| 117:17 118:6 | 143:23 144:1 | dates  33:21 | 109:18 110:8 |
| 135:20 | 145:25 147:17 | 133:16 142:19 | 188:18 |
| cutting  117:25 | 168:16,18 | 143:11 181:15 | deal  63:18 |
| cv  1:6 5:10 | 169:13,22 | 181:22 | dealt  70:17 |
| cycle  116:9,11 | 170:4,14,18 | day  7:19,22 | dear  188:10 |
| 117:16 118:1 | 171:2 182:6 | 53:9,11,12 | dearborn  2:4 |
| **d** | database | 55:11,16,19,19 | deed  189:14 |
| d  114:6 168:5 | 128:12,13,17 | 55:20,21,24 | 190:20 |
| daily  33:19 | 128:24 129:6 | 56:1,6,9,10,10 | deemed  188:19 |
| 42:1 49:16 | 129:13 130:22 | 56:16,16,23 | defendant  5:21 |
| 51:13 57:7 | 130:25 131:15 | 57:5,16,19,19 | 152:22 |
| 69:11 72:8 | 132:2 134:19 | 57:24 58:5,6,6 | defendants  1:8 |
| | 134:23,25 | 58:16,18,20 | 2:15 |

**define** 55:15

**defined** 48:20
  50:11 51:24
  54:14 77:17

**definition**
  54:10,13 56:18
  145:7,9

**degree** 9:24,25
  10:8,24

**deliver** 165:20

**delores** 102:18
  102:21,22
  106:2

**delta** 1:7 4:3,3
  4:7,8,9,10,11
  4:12,13,14,15
  4:16,17,18,19
  5:7 9:6 11:2,4
  12:14,16,19
  14:6 16:4 22:6
  29:4 30:3 31:4
  31:11 32:5,16
  32:20,21 33:10
  35:18 39:11
  43:18 44:2,18
  44:22 46:5,21
  47:12,15,20,22
  47:23 48:3
  49:2 53:13,14
  53:23 54:10
  55:3 59:12,19
  60:4,25 65:1
  65:24 81:17,21
  82:2,19 84:4

86:1,17,22
91:13 101:1
107:5 121:20
122:3,15,17,18
124:13 128:1
130:22 134:8
134:15 151:3,3
151:14,16
157:21 165:8
172:22,24
175:1,25 188:6
189:3 190:3

**delta's** 8:5 32:8
  95:9

**deltanet** 32:16
  32:24 33:3
  71:19,25 77:21

**demand** 71:10

**department**
  13:10 14:15,16
  15:3,7,14 16:8
  16:22 17:22
  18:19,23,24
  19:3 21:22,25
  22:14,19,24,25
  23:4,9,22
  24:25 25:2,10
  25:23 28:5
  30:4,25 39:18
  40:11,24 41:4
  41:7,12,21
  43:16 62:18,25
  63:1 64:9
  65:12 66:12,20

67:1,5,6,9,20
69:16 75:2
78:17 112:1
121:2 179:11
179:13 188:22

**department's**
  61:7 66:8

**departmentally**
  64:7

**departments**
  30:16,20 61:10
  61:11,13,14,21
  62:4,6,9,10
  65:15,22 66:1
  67:14,24 69:22
  72:20 73:3
  75:10 112:13
  115:24 123:10
  131:6 175:25
  176:21,23
  177:1,6

**depended** 42:3

**depending**
  39:25 54:21
  74:14 112:16
  161:9 164:18

**depends** 35:4
  35:21 36:23
  38:5,10,16
  39:18 42:18
  43:2,11,16
  93:15 109:2
  121:24 122:4
  124:10

**depicted**
  168:25

**deposition** 1:10
  5:5 6:12 7:12
  46:25 47:3
  68:4 89:7
  101:5 111:6
  127:17 129:22
  150:6 151:25
  152:2,24 166:8
  167:8,10
  172:13,16
  173:10,12
  178:3 187:10
  187:14 188:8
  188:11 189:1,3
  190:1,3

**describe** 46:21

**description** 4:2
  133:20

**design** 155:17

**designate** 137:6

**designated**
  138:9

**designation**
  136:22 170:25

**designations**
  137:24

**desk** 102:17,23

**detail** 73:14,24

**detailed** 93:18

**details** 75:21
  120:2 125:15
  179:8 184:25

**[determine - document]** Page 12

**determine**
39:22 67:10,21
71:12 138:1
170:11 171:7
**determined**
41:20
**develop** 10:5
**development**
15:14
**dferri** 2:7
**dfw** 102:15,16
102:18
**dicello** 2:3 5:19
**dicellolevitt.c...**
2:6,7
**difference**
19:22 33:15
51:22 84:20
108:4
**different** 20:2
20:23 24:20
26:7 30:1
39:22,25 43:17
43:17 46:3
51:16 54:21,24
54:25 62:10,10
64:13,14,17
65:25,25 69:10
70:12 74:10,11
91:3 95:24
108:16,22
109:9 115:18
131:6,10,10
133:16,16

135:12 136:10
176:20
**differential** 4:5
47:17 77:24
78:5,16
**differentials**
144:2
**differently**
39:19 61:20
84:12 130:8
135:10
**differing** 33:22
**difficult** 6:23
54:7 87:11
133:25 134:6
**difficulties** 83:7
**direct** 20:11
123:4
**directing** 48:12
130:11
**directionally**
92:5 95:19
**directly** 8:15
21:1,7 88:10
166:15 185:10
187:18
**director** 28:25
**disability** 25:21
25:22
**disconnected**
83:15
**discontinues**
142:10 145:1

**discrepancy**
182:24
**discuss** 79:15
80:24 81:11
183:20
**discussed** 6:16
105:7 113:12
**discussing**
157:12
**discussion**
71:17
**discussions**
112:12
**distractions**
8:12
**distributed**
18:1
**district** 1:1,1
5:8,8 12:2
**division** 1:2 5:9
21:22 35:21,22
35:23 36:4
39:18 40:1
62:8,9,15,25
63:2,3,8 64:10
66:4 67:1,10
67:12,20
121:24 122:4
124:10
**divisional** 72:6
72:11 73:8
**divisionally**
64:7

**divisions** 22:1
22:18 39:19
62:7,10,11,21
65:9,22 170:23
170:23
**dlnet** 72:7
**docked** 91:3
184:2 185:5
**document** 33:3
47:8,13,14,18
48:11 68:2,8
68:11,17 70:17
77:24 78:4,8
78:13,16 89:16
97:6 101:13,18
102:1 104:15
111:5,13,16
127:24 132:14
140:17 143:18
149:24 150:12
153:15,17
154:3 156:24
157:5,11 158:6
158:10,25
163:2,13 165:8
165:12 166:1
166:13 167:2
167:15 171:21
172:4 173:15
173:20 174:12
174:24 175:15
175:20 178:1
178:12 179:24

**documentation**
165:21 172:2
**documents**
32:23 71:18,25
72:7 151:20
158:11,20
175:1,6,16
**doing** 81:14
**domestic** 15:12
**double** 169:4
170:5,8 182:8
182:23
**doubt** 106:19
**dowd** 94:15,18
94:23
**download**
130:2,3,6
152:6
**downloading**
129:24 130:15
**draft** 172:2
**drive** 8:23
**dshapiro** 2:14
**dt** 168:11
170:14,24
181:10
**due** 74:23,24
74:25 95:10
100:4,9 105:10
106:3 107:14
107:19 181:25
182:1,7,13
**duly** 6:3 187:9

**duncan** 2:21
5:11
**duration** 33:19
33:22 109:18
109:19,20
110:8

**e**

**e** 6:5 155:5
157:1 159:18
**earlier** 95:20
137:15 177:12
180:13
**early** 24:11,17
25:8 28:23
29:16,18 91:4
91:6 99:20
151:25 166:13
166:15 173:1
173:10
**early's** 167:8
172:13
**earn** 42:2 59:13
59:19 83:21
**education** 9:22
**eight** 33:18,21
51:11 57:5,6
**either** 33:18
35:23 67:21
117:11
**elaborate** 29:14
31:8 156:1
**electronic** 18:8

**eligible** 41:5,8
41:14 59:13,19
82:11,16 92:11
93:8
**else's** 84:18
85:2
**email** 4:7,8,9
4:10,19 68:18
68:19 73:6
101:19 102:4
103:21 110:3
112:8,10
120:21 166:25
172:8,11 179:6
185:9 188:17
**employed** 9:6
**employee** 33:10
35:1,11,12,15
36:12,13,18
37:7,14,19
38:1,6,13,22
39:9 42:15
52:3,14,20
53:5 55:25
56:5,8 57:22
58:9,16 74:22
83:21 88:6
91:25 92:6,9
92:15,24 93:5
93:15,18,23
94:4 96:13
103:23 105:15
106:11,20
110:11,12

117:22 121:14
124:5,7 125:18
125:21 132:2,3
132:18 133:23
133:23 134:15
135:10,14
136:11,12,14
138:1,7 143:19
143:25 144:8
144:11 146:6
146:14,21
147:3 149:13
151:14,16
161:12 169:19
170:5,6,9,13
181:10,11,24
182:7,10,11,12
184:15 187:16
187:17
**employee's**
46:12 53:13
54:21 57:10,18
58:6,10 91:18
93:11 105:19
108:15,24
132:23 134:17
143:12 168:24
169:1 170:2
171:5,14,16
181:20
**employees**
16:24 17:2
32:4 36:4
37:24 39:11,12

**[employees - exhibit]**                                                Page 14

| | | | |
|---|---|---|---|
| 39:14 40:12 | engage 65:1 | 113:16 138:7 | 127:11,14 |
| 43:5,18,21,22 | engagement | 161:11 178:25 | 129:16 130:17 |
| 43:23 44:1,2,3 | 69:3,4 | et 1:14 5:7 | 149:25 151:23 |
| 44:8,17,23 | engine 171:3,3 | evaluation | 153:3 166:21 |
| 45:2,6 48:25 | entail 13:11 | 170:10 | 167:4,13 172:6 |
| 49:9,12 50:20 | entailed 25:6 | evans 102:5 | 173:4,9 178:1 |
| 51:9,17 53:14 | entails 13:14 | 105:18 | exception |
| 53:24 54:12,24 | entered 139:7 | everybody | 100:20,22,25 |
| 55:5 59:12,19 | 168:11 190:9 | 118:22,25 | 105:14 |
| 60:4,7,11,19 | enterprise | ewfm 16:18 | exceptions |
| 61:4,7,21,22 | 13:16 | 18:4 | 100:16 107:2,5 |
| 62:21 65:1,8 | entire 43:6,10 | exact 7:18 | exchange |
| 65:13 67:15 | 59:23 60:15 | 17:13 40:22 | 138:18 |
| 69:13 70:11,22 | 189:5 190:5 | 70:15 108:17 | exclusive 49:16 |
| 71:1,8,10 74:3 | entirely 79:4 | 108:18 135:18 | 51:12 |
| 74:13,21 81:17 | entitled 80:6,15 | 145:7 147:23 | excuse 105:6 |
| 81:21 82:12,16 | 142:17 159:16 | 149:21 153:17 | 122:3 |
| 86:22 88:11 | entries 132:23 | exactly 44:12 | executed 160:6 |
| 96:5 97:12 | entry 142:23 | 76:1 105:10 | 190:10 |
| 109:23 110:4 | 143:8 | 107:19 150:19 | execution |
| 121:21 122:2,2 | equal 48:24 | 151:10 | 189:14 190:19 |
| 122:3,11 | equivalent 80:3 | examination | exhibit 4:2,3,7 |
| 123:25 127:4 | 91:6 93:7 | 3:1 187:8 | 4:8,9,10,11,12 |
| 130:24 131:2,7 | 161:6 | examined 6:4 | 4:13,14,15,16 |
| 131:12,18 | errata 188:13 | example 31:19 | 4:17,18,19,22 |
| 132:25 138:2 | 188:18 190:7 | 37:7 40:5,10 | 4:22 46:23,25 |
| 160:2 161:1,25 | 190:10,18 | 40:14 42:20 | 47:1,3 68:2,4 |
| 169:14,23 | 191:1 | 56:7 58:8 | 77:25 89:5,7 |
| 184:13 | escalate 99:19 | 62:24 64:15,16 | 101:3,5 111:6 |
| empty 162:14 | escalated 98:9 | 93:5 110:3 | 111:9 127:7,15 |
| enclosed | 98:18 | 133:25 142:25 | 127:17 129:19 |
| 188:11 | esq 188:5 | 182:19 | 129:21,22 |
| ended 110:10 | essentially | excel 4:12,14 | 130:16 132:14 |
| | 16:15 110:6 | 4:16,18 127:8 | 140:17 150:3,6 |

**[exhibit - flight]** Page 15

151:25 152:1,2
152:24,25
154:7 158:13
158:15,16
162:3 166:6,8
167:5,7,9,10
172:13,14,16
173:10,11,12
175:14 178:3,6
178:8
**exhibits** 4:1
152:25
**exist** 132:24,25
**expected**
109:21
**experience**
65:11 69:13
74:2 86:23,25
**experienced**
70:12
**expiration**
189:19 190:25
191:25
**explain** 51:18
62:4 71:2
72:12 104:17
105:2 108:14
114:18 170:19
**explained**
70:10
**extent** 81:3
85:11
**extra** 161:11
170:7 181:9

**f**

**f** 141:15,22
146:11,11,12
146:25 149:10
155:8 159:21
160:24
**facilitate**
115:22 157:22
163:3 165:12
171:21
**facilitated**
165:8
**fact** 51:23
73:23
**factors** 87:4
**fairburn** 8:24
**fairly** 167:16
**faith** 184:1
**familiar** 60:20
63:10 75:13
150:17 153:16
164:7,22
166:23 167:15
173:6 179:5
**familiarity**
63:11 75:14
**fang** 114:6
118:15
**far** 8:8 9:2
59:10 70:15
100:23 156:23
**farthest** 147:24

**featured** 120:6
**february** 91:3
141:13
**feed** 123:20
125:4 126:8
**feeds** 123:13,15
125:16
**feel** 183:19
**feeling** 81:15
**feelings** 105:3
**fell** 161:17
**ferri** 2:4
**field** 77:11
**figure** 73:7
173:16
**figured** 78:24
**file** 127:8 128:5
129:16 130:17
144:16 148:6
150:14,17
166:20,21
173:3 178:18
**filed** 5:7
**filled** 141:23
**fills** 129:2
**filter** 141:3
**find** 52:9 66:19
66:24 95:1
132:1 149:16
188:11
**finding** 66:7
**fine** 68:16
78:23 80:13
123:13

**finished** 10:24
**fire** 110:13,15
111:1
**first** 6:3,19
10:23 11:7
12:13,16 37:8
47:12,13 51:1
51:11 53:8,11
53:12 55:10,16
55:19,19,21,24
56:1,6,9,10,14
56:16,23 57:16
57:19,23 58:5
58:6,16,17
69:8 72:4
88:13 89:11
101:11 103:15
103:21 105:6
111:15 127:8
140:23 141:8
141:18 142:25
146:10 148:15
149:24 153:8
161:2,2 165:17
166:4 179:1,17
**fit** 121:18
**fits** 62:20
**five** 28:21 92:9
**fixed** 33:18
35:8 36:10
40:20 110:11
**flexible** 7:4
**flight** 43:22,25
63:8 179:13

**floor** 2:5
**focus** 10:19
**focused** 10:17
**folks** 77:11
**follow** 48:3
  87:16 127:15
  171:9
**following** 49:4
  91:7 106:1,7
  109:4 175:24
**follows** 6:4
  47:24
**font** 174:5
**forecasting**
  18:11,12
**foregoing**
  187:10,12
  189:13 190:18
**forgotten** 88:7
**form** 10:9,13
  10:21,25 11:13
  11:20 12:10,23
  13:12,21 14:3
  14:10,17 15:4
  15:10,16 16:5
  16:13,25 17:4
  17:11,17,23
  18:13,20 19:8
  19:24 20:18
  21:4,23 22:2,9
  22:15,20 23:5
  23:10,16 24:1
  24:9,22 25:4
  25:11,17,24

26:5,12,17
27:6,12,17,25
29:6,12,23
30:5,18 31:6
31:13 32:6,11
32:18,25 33:6
33:11 34:7,13
34:22 35:2,19
35:25 36:7,21
37:15,21 38:3
38:8,14,24
39:16,20 40:2
40:6 41:1,9,22
42:11,16,23
43:7,19 44:4
44:10,19 45:3
46:10,16 47:25
49:21 50:16
51:3 52:10,15
52:25 53:16,25
56:2,11,20
57:2,13 58:1
58:12,25 59:7
59:14,25 60:12
60:21 61:8,16
62:12 63:5,15
63:25 65:3,18
66:2,9,15,21
67:17 69:18,24
71:4,20 72:1
72:14 73:18
74:4 75:5,16
76:10,18 77:6
77:7 78:1,10

78:18 80:8
81:1,23 82:4
82:13,21 83:3
83:18 84:1,6
84:13,22 86:3
86:9,19 87:6
88:16,24 90:22
91:19 92:1,20
93:1 94:1,7
95:11,13 96:1
96:19 97:9,16
97:24 98:15,21
99:5,13,21
100:5,10 102:2
102:9 103:5
104:18 105:21
106:13,21
107:7 108:9,25
109:14,24
112:14 113:9
113:19 114:21
118:2 119:24
120:16 121:22
122:12,24
123:17 124:1,8
124:17 125:6
125:10,19,25
126:9,16
128:10,25
129:7 131:1,8
132:4,10 133:2
134:2,10,20
136:7,24 137:4
137:11 138:13

138:20 139:3
139:13,17
143:13,20
144:13 145:10
146:16 147:5
147:11 148:11
151:18 154:2
155:15 156:4
156:11 157:7
157:24 158:12
159:3 160:9
162:2 163:5
164:16,23
165:9 168:17
169:9,15
171:12 175:3,9
176:14 177:9
182:4 184:18
185:19
**format** 173:4
**fort** 102:16
**forward** 119:18
  188:15
**forwarded**
  179:18,20
**four** 13:5 37:8
  37:10 42:21
  50:24 71:13,15
  91:3 110:10
  176:2,7
**fourth** 141:12
**frankly** 107:11
**franz** 90:14,16
  90:17

**[free - goodyear]**                                                    Page 17

**free**  81:4
  189:14 190:20
**french**  9:17
  11:9,18,23
**frequencies**
  115:21
**frequency**
  114:11 121:6
**frequent**  99:2
**front**  104:23
  127:20
**fulfilled**  120:4
**full**  7:22 35:10
  36:13,20 37:25
  38:1,6,13,18,23
  39:9 48:25
  49:8,11 179:14
**fully**  22:22
  91:16
**further**  9:22
  71:2 108:14
  186:9
**future**  119:15
  120:7
**fyed**  184:23

**g**

**g**  133:13 142:4
  142:10 149:8
  155:10
**gather**  125:17
  125:23 126:3
**gathered**
  130:25 131:13

**general**  10:17
  20:15 23:14,21
  24:18 25:9,15
  28:15,18,20
  29:4,10 61:1,2
  74:21 93:14
  100:25 117:2
  177:24
**generally**  46:9
  50:22 64:4
  93:13 132:17
**generates**
  178:24
**genius**  153:10
  162:14
**geographic**
  15:9 16:23
**georgia**  1:1
  2:13 5:9 8:24
  9:15 11:17
  12:6 13:2 17:7
  17:8,10,15,22
  27:5
**getting**  158:24
**give**  20:24
  40:10 43:4
  47:6 48:6,15
  51:21 56:7
  70:8 93:17
  99:17 101:24
  125:15 135:21
  138:6 185:6
**given**  26:10
  55:12 57:12

  66:8 138:1,8
  178:22 187:13
**go**  6:15 7:8
  9:11,12,14
  12:24 19:15
  29:9 32:4 49:4
  49:11 50:7
  59:10 67:20
  68:8 73:23
  79:8,14 83:4
  85:20 86:13
  88:4 96:22
  106:25 110:14
  112:18 114:23
  114:24 115:10
  116:5,12 119:6
  121:9 132:14
  133:7,18
  144:25 146:10
  146:11,23
  147:15,24
  148:8 149:2,4
  149:7,17 152:9
  153:19,22,23
  154:20 156:18
  156:20 159:15
  164:5,9 166:1
  168:3 170:10
  171:2 173:8,16
  179:1,16,22
  181:5 182:14
**goal**  96:6
**goes**  81:4 126:7
  129:9

**going**  5:2 6:15
  7:3 29:9 45:10
  45:18 46:23
  51:21 56:4
  68:1 79:5,11
  79:15 81:2,9
  83:8 89:18
  104:17,25
  106:24 110:18
  111:4 112:25
  113:22 118:8
  119:18 127:7
  129:18 130:10
  139:8,9 140:2
  140:3,9,16
  141:15 142:3
  148:5 149:23
  151:22 152:12
  157:4 159:13
  160:21 161:10
  165:11,18
  166:1,4 173:16
  173:21 176:19
  177:11 185:9
  186:2,13
**gold**  153:13
**good**  5:1 6:7,8
  45:17 79:19,24
  184:1
**goodyear**  1:3
  5:7 8:3,6,8
  128:6 132:15
  135:9 188:6
  189:3 190:3

**[grade - hills]** Page 18

| | | | |
|---|---|---|---|
| **grade**  20:3 | **green**  174:8 | **h** | **held**  28:17 |
| **graduate**  9:20 | **ground**  6:16 | | 108:19,20 |
| **granting**  107:2 | 43:18,21,24 | **half**  11:11 | **hello**  79:23 |
| 107:5 | 44:1,3,8,17 | 12:12 51:10 | **help**  82:6 95:21 |
| **granular**  73:14 | 45:2,6 59:18 | 59:21 60:10 | 96:8 115:22 |
| 73:24 | 60:7,10,19 | 79:9 | 161:7 165:13 |
| **grasp**  183:21 | 61:4,7,21,22 | **halfway**  94:14 | **helped**  32:1 |
| **gray**  1:12 3:3 | 62:21 81:16,20 | 105:4 183:14 | **helping**  158:23 |
| 5:5 6:2,7 45:15 | 82:11 122:2,2 | **hampton**  114:6 | **hereto**  187:18 |
| 46:2 47:8 54:3 | 122:11 131:7 | **hand**  59:11,11 | **hereunto** |
| 55:7 65:6 | 133:23 | 187:21 | 187:20 |
| 69:25 73:20 | **group**  40:13,15 | **handled**  66:6 | **hey**  161:6 |
| 76:12 79:23 | 43:11,22 62:18 | 74:25 | **hi**  181:6 |
| 81:4 85:11,15 | 62:19 78:14 | **happened** | **hidden**  174:22 |
| 87:24 88:17 | 118:17 149:3 | 171:7 185:17 | **higgins**  114:3 |
| 91:21 92:2 | 175:6 | 185:22 | **high**  11:9 |
| 102:13 104:20 | **groups**  31:17 | **happens** | **hills**  2:3 3:4 |
| 108:10 109:15 | 43:12,15,17 | 131:25 | 5:18,18 6:6,9 |
| 110:25 119:25 | 44:2 45:7 | **hard**  54:19 | 10:10,22 11:21 |
| 120:18 127:21 | 60:19 61:3,13 | 60:18 61:20 | 12:24 17:1 |
| 130:11 134:4 | 61:15,15,19 | 74:6 107:16 | 34:15 36:2 |
| 139:5 140:1 | 62:4,6,17 | 118:21 | 45:8,13 46:1 |
| 145:12 153:6 | 131:10 159:13 | **head**  135:22 | 48:10,14,18 |
| 157:25 163:12 | 176:5,7 | 169:20 176:8 | 51:6 53:22 |
| 169:16 175:11 | **guess**  19:7 | **header**  48:19 | 54:2,9 58:3,4 |
| 177:15 186:8 | 61:21 62:20 | 50:10,15,18 | 61:17 66:17,18 |
| 188:8 189:4,9 | 77:2 110:13 | 51:6 | 68:1,6 72:24 |
| 190:4,13 | 150:18 159:12 | **headers**  133:8 | 76:21 78:2,21 |
| 191:20 | 161:18 175:13 | 174:14 | 79:2,8,22 |
| **gray's**  87:15,19 | **guessing**  44:14 | **hear**  85:22 | 83:14 84:2,24 |
| 163:6 | **guides**  158:19 | 126:17 185:14 | 85:4,7 87:8,15 |
| **great**  153:15 | **guys**  152:5 | **heard**  46:20 | 87:23 89:4,10 |
| 174:11 | | 77:3,11 183:19 | 91:22,23 92:21 |
| | | | 92:22 93:3 |

**[hills - important]**                                        Page 19

| | | | i |
|---|---|---|---|

95:12 96:21
97:17 101:2,8
102:11 110:16
110:24 111:8
114:22 126:19
127:13,19
129:15,20,24
130:7,13,18
131:4 137:5
138:23 139:14
139:23 140:5
140:15 150:3,8
151:22 152:4,9
152:18 153:2,5
154:4,5 158:15
163:7,11 166:5
166:25 167:5
167:12 172:3,9
172:12,19
173:8,18,22,24
175:5 176:17
177:11,25
178:5 184:19
185:24 186:8
**hired**   38:16,17
38:18
**hiring**   38:21
**hit**   165:1,20
**hm**   64:20
101:14 133:21
163:23 181:1
182:17 183:17
**hmm**   64:20
101:14 133:21

163:23 181:1
182:17 183:17
**hold**   108:21
**home**   8:20,22
8:23 153:9
165:2
**honestly**   29:2
**hope**   55:14
**horizon**   75:13
75:15,18,20,23
75:25 76:3
114:14,16
151:11 176:25
177:2
**hosted**   33:5
**hour**   7:4,4 45:9
79:9
**hourly**   51:10
**hours**   4:4 7:18
22:11 33:18,19
33:21 34:20,25
35:8,11,13
36:15,19 37:20
38:1,7 42:2
47:16,24 48:24
51:11,12 57:5
57:6 77:23
78:4,7,15,15
83:23 91:5,12
92:7,9,10,13,16
92:23 93:6,7
93:19,19,23
94:4,9 95:2,22
96:7,10,10,14

97:4,4 105:9
105:10,10,24
105:24 106:2,8
106:11,20
107:19,19
109:20 132:23
136:4,14 138:8
144:2 146:15
146:21 148:4
149:11 161:1,4
161:5,8 168:9
168:12 169:8
169:11,18,23
170:7,18,21
171:1,2 181:9
181:11 182:12
182:22,22,23
**housed**   125:2
156:10
**hpe**   145:15
**hr**   10:4,7,17,18
39:2,3,4 66:25
67:2,3,6,11
75:19 76:4
90:17,17
179:10 182:24
**human**   10:11
16:3,9 22:6
30:4,8,11,16,21
103:1
**hundred**   98:24
98:25
**hypothetical**
138:24

**idea**   24:3 32:22
33:8 118:6
125:14 160:12
**identification**
47:4 68:5 89:8
101:6 103:23
111:7 127:18
129:23 145:1
150:7 152:3
166:9 167:11
172:17 173:13
178:4,23
**identifier**
149:10
**identify**   5:15
48:9
**illinois**   2:5
187:5
**impact**   88:21
88:23 116:9
117:17 173:4
175:2,7,17
177:19
**impacted**   88:8
88:14 108:1
**impacts**   57:4
174:5
**implications**
183:21
**important**
183:19

**[imported - job]** Page 20

**imported** 129:5
129:12 131:20
**inch** 165:4
**include** 43:22
132:8
**included**
132:22 188:13
**includes** 110:7
182:3
**including**
122:10
**incomplete**
137:19
**inconsistency**
85:25 182:24
**incorporated**
190:12
**incorrect** 95:18
**incorrectly**
84:5 86:18
**increase** 92:23
**increased** 97:1
**increases** 95:10
**increasing**
95:16
**increments**
184:6
**indent** 120:21
**index** 4:1
**indicating**
188:13
**indication** 84:3
84:11,19 85:25

**indirectly**
187:19
**individual** 67:9
97:1 171:6
**individually**
1:3
**individuals**
23:3 91:2
118:23
**inexact** 145:8
**information**
10:1,5,16
22:25 43:4
93:18 123:12
127:3 130:24
131:13 132:23
133:22 134:18
185:6
**initially** 146:7
**inside** 136:23
**insight** 123:5,9
127:6
**instance** 62:7
**instances** 97:14
132:1 162:9
177:7,22 183:8
184:11
**intended** 70:10
76:14
**intention** 77:13
161:20
**interact** 98:12
124:15

**interacted**
97:19
**interested**
187:18
**interface**
123:21
**internal** 32:20
**interpret** 86:21
**interpretation**
84:16,18 85:2
85:12
**interpretations**
84:20 85:22
**interpreted**
86:8,12,12,17
**interpreting**
84:4,12 86:1
**intranet** 32:8,9
32:17 33:4
**introduce**
111:4 127:7,8
129:16 151:22
**introduced**
68:2 89:4
101:3 127:15
129:20
**introducing**
111:9 150:3
152:23 166:5
172:14 178:6
**inverse** 139:12
**involved** 76:2
165:23 176:25

**ir** 34:18
**irregular** 33:16
33:19,20 34:17
36:3,6,9 37:1
37:24 40:25
41:4 42:10
44:18,23 45:1
48:20,23 49:12
51:17,23,25
52:4
**irregularly**
35:23 36:12,18
38:12 39:14
40:12 42:14
43:5 52:13,19
53:5,14,24
54:11,24 55:4
**issue** 74:9,15
97:23 107:14
174:21
**issues** 99:20
**italics** 104:1,9
**item** 172:1
**items** 18:11

**j**

**january** 141:10
143:2,5
**jo** 1:23 187:4
187:23
**joann** 5:13
**job** 10:23 11:7
11:22 13:11
20:2 25:6

**joe**  116:9

**john**  24:11,16
25:8 28:23
29:18,25 99:20
166:13,15
173:1

**johnson**  103:16
103:19 104:2,6
105:15

**join**  159:6,6

**joining**  159:9

**july**  112:23
113:2,25
118:12 119:11
180:17

**june**  103:4,11
181:8,8,9,9,16
182:3

**k**

**k**  142:17 143:1

**keep**  6:23 45:10
53:13,14,23
54:10 55:3
61:20 111:24
134:8 140:2,3
173:21

**kevin**  2:21 5:11

**kick**  96:14

**kind**  31:8 34:16
82:24 124:22
154:1

**kinds**  64:14
158:19

**knott**  2:18

**know**  7:6 8:6,8
17:13,20 18:5
23:14,24 28:25
30:17 33:4
38:13,17 43:5
44:12,16,17,22
47:1 49:25
52:20 55:13
57:11 59:12,16
59:18 60:5,7
60:17 61:18
62:1,2,18
65:16,22 67:10
68:14,24 69:9
70:13 72:3
74:7 76:1,14
80:10 81:14
85:23 89:5
90:4,7,9,10,11
90:13 91:2,15
93:11 101:3,23
102:18 103:3,9
103:16,18,20
106:23 107:10
111:10 115:12
116:5 117:3,7
122:1,6,18,21
124:14 125:16
127:5 128:3,9
129:4,5 130:21
131:25 133:5,6
133:22 134:6
134:14 135:1

135:16 141:16
144:12,16
145:6,7,8,20
146:5 149:13
149:15,21
150:18,22
151:10 158:18
158:22 159:11
159:23 160:7
160:14,20
161:10,15,19
166:7 167:17
171:4,20
172:20 175:20
175:22 176:8,9
179:8,13,14
180:4 185:14
185:22

**knowing**  65:14
92:7

**l**

**l**  104:5 133:10

**l'orelle**  180:2
181:7 182:15
183:15 184:15

**label**  48:9

**labeled**  152:20
171:25

**lacks**  66:16
72:23 73:3
96:19 175:4

**lake**  69:2

**largely**  31:1

**larger**  26:15
61:15

**launched**  177:4

**leader**  15:22,24
19:23 69:2

**leaders**  118:20
160:3 180:7
183:20

**leadership**
17:21 153:9,12
153:23 154:6,8
159:1,8,13
165:14,15
167:19 171:22

**learn**  88:10

**learned**  122:20

**learning**  69:10

**leaving**  91:4

**led**  160:7,15

**left**  91:6 156:23
176:3

**legal**  5:12,12
186:15 188:1
191:1

**legend**  133:18
135:12,23
137:9 146:9
148:8,14,15,25

**legitimate**
172:1

**letter**  188:19

**letters**  48:19
50:11 153:20

**[level - maintained]** Page 22

**level** 63:12
67:21
**levitt** 2:3 5:19
**lg** 4:3,3,7,8,9,10
4:11,12,13,14
4:15,16,17,18
4:19 47:12,15
**license** 1:24
**likely** 172:2
179:13 181:23
**line** 3:2 81:3
90:14 103:21
114:5 188:13
190:7 191:3
**lines** 1:7 5:7 9:7
12:20 101:1
128:1
**link** 77:20,21
78:3
**lisa** 103:16,19
104:2,5,23
105:15
**list** 20:24 70:8
71:9 116:21
118:22 164:21
164:22 181:15
**listed** 89:15
101:12 111:13
123:19 127:23
148:6 150:12
161:8 168:6
190:7,17
**listing** 190:7

**little** 29:15 63:9
74:10 78:25
79:12 85:20
106:25 111:1
130:7 156:6
162:6
**live** 156:18
**lived** 102:14
**llp** 2:3,10
**lm** 145:19
**loaded** 4:22
**local** 33:5
**locally** 66:6
69:12
**located** 19:19
**location** 14:9
15:9
**locations** 15:8
15:12,15 16:23
20:5 27:21,24
28:5 29:4
**lodge** 81:5
**logic** 69:10
70:10,11 73:10
73:16,22 76:9
76:15,16,17,22
76:25 77:3,10
95:3,9
**logical** 120:22
145:4
**long** 7:16 9:9
11:10 12:9
13:3 14:20
19:7 21:18

23:24 24:3
35:7 37:11,20
45:12 89:18
90:12 103:18
114:6
**longer** 7:5
162:1 173:15
173:19
**look** 47:9 77:23
78:3 88:20
107:23 112:19
128:5 149:18
149:25 153:15
153:25 163:2
163:20 164:22
167:15 171:4
173:3 179:5
181:7
**looked** 10:4,7
135:19 159:7
167:17 175:14
**looking** 47:14
62:14 63:7
73:5 90:25
97:6 106:24
127:9 132:13
132:17 135:7
135:19,21
137:9,24
141:22 150:19
153:6 174:9
180:24 182:2,6
**looks** 104:24
106:18 110:9

141:25 142:19
148:14 162:24
167:16 183:1
**losoya** 1:23
5:14 187:4,23
**lot** 30:20 61:19
63:18 73:6
95:20 96:5
127:6 177:23
184:24
**lower** 50:14
91:17,24
154:13
**lukas** 1:3 5:6
128:6 188:6
189:3 190:3
**lump** 184:6
**lunch** 7:5 79:9
79:23

**m**

**m** 6:5 145:16
145:24 146:2
**ma'am** 176:10
**madam** 188:10
**made** 21:16
31:22 71:24
78:7 85:12
100:16 105:15
121:17 189:7
**madeline** 2:3
5:18 6:9
**maintained**
128:17 131:14

**[maintains - mentioned]** Page 23

**maintains**
  32:21 130:21
**majority**  17:9
  30:3 135:8
**make**  6:17 7:9
  31:20 73:11
  80:16 92:15,15
  108:4 112:2
  120:21 127:10
  129:16 133:25
  153:6 160:3
  161:25 171:9
  174:2,8
**makes**  43:24
  69:6 71:14
**manageable**
  184:5
**management**
  18:8 25:21,22
  119:19 154:25
  155:22 164:3
**manager**  14:24
  14:25 15:8,18
  19:13,23 20:4
  20:6,15,17,20
  21:2,13,18
  23:8,12,13,14
  23:21 24:7,16
  24:18 25:9,15
  26:4,11 27:20
  28:12,15,18,18
  28:20 29:5,10
  29:10,17,21
  61:1,2 76:6

  100:25
**managers**
  15:13
**manner**  96:6
**manpower**
  16:20
**manual**  144:23
  145:1 176:5
**manually**  135:9
  135:17 144:1
  144:11,18
  175:25
**march**  1:13 5:2
  68:22 142:1,14
  146:15,21
  147:16 187:21
  188:4
**mark**  173:8
**marked**  4:22
  46:24 47:1,3
  68:4 89:7
  101:5 111:6
  127:17 129:22
  150:6 151:24
  152:1,3,25
  166:9 167:9,11
  172:13,17
  173:9,13 178:4
**master**  186:14
**master's**  9:24
  9:25 10:8,24
**masters**  10:12
  10:20,24 11:3

**material**
  165:13
**materials**  151:1
**mathematically**
  92:7,15 95:21
  95:25 97:2
**matrix**  150:15
  154:22 162:17
  164:2 167:19
**matrix05**  173:4
**matter**  5:6
**matters**  187:10
**max**  35:9
**mean**  10:2
  12:18 20:23
  33:9,24 34:6,9
  36:25 37:4,6
  37:17 44:15
  46:4 50:1
  53:10 56:15
  62:5 64:8,21
  70:25 74:19
  76:23 77:10
  85:17 87:13,17
  92:19 98:2
  100:19 106:4
  106:23 109:12
  116:15 117:15
  117:20 118:19
  120:15,20
  121:12 124:25
  136:3,19
  145:22 168:8
  169:2,11

  175:13
**meaning**  169:3
**means**  52:14
  64:9 71:3 76:8
  76:16 80:11
  128:3,9 138:4
  141:16 145:6
  145:20,23
  159:23
**meant**  59:6
  83:25 112:2
  118:20
**media**  186:14
**meeks**  180:2
  182:15 183:15
  184:15
**meet**  7:16 71:9
  82:17
**meeting**  111:19
  111:22,23
  112:12,17,20
  113:5,12,13,13
  113:15,16
  118:24 119:1,1
**meetings**  7:23
  8:7 111:25
  112:5 113:18
**member**  102:6
**memorialize**
  111:25 112:12
  113:17
**memory**  73:7
**mentioned**  18:2
  62:3 65:9 70:6

73:12 109:6
124:4 137:17
152:23 181:16
**mentions** 110:4
114:9
**message** 77:4
89:22 90:25
91:15 94:14,23
94:25 104:2,11
104:15 105:5
105:18 107:1
112:23 113:1,4
113:25 114:8
116:8,16
118:11,14
119:9 179:2,3
179:19,20
180:1,15 181:2
181:16 182:15
182:18 183:1
183:15
**messages**
115:11
**met** 7:17 85:18
**metadata** 47:13
68:8 89:12
101:11 111:12
127:9,14
150:11 158:9
178:11
**mhills** 2:6
**microsoft**
167:13

**middle** 104:6
165:5
**midwest**
188:17 191:1
**miles** 9:3
**min** 114:6
118:15
**mine** 179:7
**minimally**
67:12
**minute** 139:24
140:1,5
**minutes** 45:13
79:5
**miranda**
180:15,23
**mischaracteri...**
42:24 54:5
58:13 73:19
163:6
**misinterpreta...**
88:10
**misinterpreted**
87:1
**misrepresented**
86:24
**missed** 105:11
107:20
**mistake** 169:20
**misunderstand**
82:20 88:7
**misunderstan...**
84:9 88:21,22
177:18

**misunderstan...**
82:3 83:24
88:14
**misunderstood**
97:8 184:11
**mitch** 2:11 5:20
7:15 188:5
**mix** 169:20
**moment** 47:6,9
48:14 83:16
101:21,24
111:5 133:12
152:10 174:21
**month** 115:5
**monthly** 112:4
114:9,13 115:1
115:5,14,20
116:18
**months** 71:13
71:15 110:10
**morning** 5:1
6:7,8
**move** 113:22
114:9 163:19
172:3,5 180:13
**moved** 70:7
76:4 147:14
**moving** 114:13
**mps** 16:18,19
16:20 18:2,25
19:4 69:10
73:13,15,17,24
74:1,12,23
75:2,10 76:17

77:4 78:9
103:12,13
123:2 124:24
125:2,4,17,21
125:23 126:3,7
128:20 131:13
131:17,20,23
132:3 133:24
155:24 156:3,9
157:2 161:24
162:8 168:15
168:23 169:1
169:21,22
170:3,4,6,13
171:10 176:13
176:22,24
177:1
**mrobinson**
2:14
**multiple** 16:23
17:3 107:25
109:13 174:23
**mydeltaday**
123:3 129:11
129:12
**mytime** 100:3
115:16,19,24
116:1 117:24
121:2 122:7
123:2 124:20
124:20,22
133:1 135:17
147:10,14,21
156:9,14,14,18

**[mytime - object]**                                                    Page 25

157:6,16
160:25 161:24
162:8 163:4
178:18,22

**n**

**n**  6:5,5
**name**  5:11 6:9
61:13 62:14
89:15 90:11
103:19 122:6
128:5 150:14
150:17 166:20
172:22,24,25
173:3 178:18
179:7 188:6
189:3,4,15
190:3,4,21
**named**  91:2
**names**  20:25
90:12 114:4
**naomi**  23:20
**near**  8:25 12:7
143:9
**nearest**  113:24
**nearing**  173:22
**necessarily**
65:15 74:7
107:15 153:17
156:13 170:9
184:24
**necessary**
121:8

**need**  7:5 68:3
71:9 78:25
79:10,11 92:16
101:21 120:9
130:5 161:6
**needed**  66:24
71:18 72:7,12
73:9 121:9
**needs**  11:24
12:1 93:23
**net**  74:17,19
**netted**  106:17
**neutral**  74:18
74:19
**never**  7:22 33:2
46:20 77:3
100:24 172:25
177:4
**new**  105:8,25
107:24 109:8
111:4 116:11
120:14 121:11
121:17 151:4
157:22
**norcross**  12:6
**normal**  94:10
135:13
**normally**  178:2
**north**  2:4
**northern**  1:1
5:8
**notarized**
188:14

**notary**  188:25
189:10,18
190:15,23
191:23
**note**  118:25
188:12
**noted**  70:16
73:8,8
**notes**  111:23,24
112:6,8,12,17
112:19 113:4,7
113:11,17
**notice**  119:2
**notices**  111:19
111:22
**noticing**  5:17
**nourishment**
79:1
**number**  7:18
48:6,16 59:17
83:22 89:6,12
89:19 95:22
99:1,3 101:9
103:18,24
111:10 128:6
140:17,21,24
141:2 147:25
148:4 150:4
167:9 178:7,24
188:7,13
**numbered**
160:21 179:2
179:23 183:12

**numbers**  142:6
146:3,5 149:3
178:23 190:7

**o**

**o**  6:5
**oath**  5:24 80:1
**object**  7:20
10:9,13,21,25
11:13,20 12:10
12:23 13:12,21
14:3,10,17
15:4,10,16
16:5,13,25
17:11,17,23
18:13,20 19:8
19:24 20:18
21:4,23 22:2,9
22:15,20 23:5
23:10,16 24:1
24:9,22 25:4
25:11,17,24
26:5,12,17
27:6,12,17,25
29:6,12,23
30:5,18 31:6
31:13 32:6,11
32:18,25 33:6
33:11 34:7,13
34:22 35:2,19
35:25 36:7,21
37:15,21 38:3
38:8,14,24
39:16,20 40:2

**[object - okay]**

Page 26

| | | | |
|---|---|---|---|
| 40:6 41:1,9,22 | 100:5,10 102:2 | 165:9 168:17 | 9:11 11:4,7,10 |
| 42:11,16,23 | 102:9 103:5 | 169:9,15 | 12:7 13:25 |
| 43:7,19 44:4 | 104:18 105:21 | 171:12 175:3,9 | 15:13 16:2 |
| 44:10,19 45:3 | 106:13,21 | 176:14 177:9 | 18:18 19:6 |
| 46:10,16 47:25 | 108:9,25 | 182:4 184:18 | 22:5 29:3 30:2 |
| 49:21 50:16 | 109:14,24 | 185:19 | 30:14 31:25 |
| 51:3 52:10,15 | 112:14 113:9 | **objection** 17:4 | 34:6,20 35:17 |
| 52:25 53:16,25 | 113:19 114:21 | 26:21 28:8 | 40:18 45:9 |
| 56:2,11,20 | 118:2 119:24 | 53:6,20 55:6 | 46:23 48:17,22 |
| 57:2,13 58:1 | 120:16 121:22 | 66:22 72:22 | 50:9 61:2 |
| 58:12,25 59:7 | 122:12,24 | 73:2 81:5 | 62:11 78:22 |
| 59:14,25 60:12 | 123:17 124:1,8 | 85:10 87:10,21 | 79:10 81:14,15 |
| 60:21 61:8,16 | 124:17 125:6 | 107:7 126:4 | 85:5 89:4,21 |
| 62:12 63:5,15 | 125:10,19,25 | 137:20 148:22 | 94:25 101:17 |
| 63:25 65:3,18 | 126:9,16 | 160:16 169:24 | 101:25 111:24 |
| 66:2,9,15,21 | 128:10,25 | **objections** | 113:7,23 |
| 67:17 69:18,24 | 129:7 131:1,8 | 61:23 | 115:13 116:20 |
| 71:4,20 72:1 | 132:4,10 133:2 | **occasion** 23:7 | 117:14 118:9 |
| 72:14 73:18 | 134:2,10,20 | **october** 147:4,8 | 119:3,6,7 |
| 74:4 75:5,5,16 | 136:7,24 137:4 | 178:14 182:15 | 127:12 130:16 |
| 76:10,18 77:6 | 137:11 138:13 | 183:9,16 184:9 | 133:9 139:23 |
| 78:1,10,18 | 138:20 139:3 | 185:13,18 | 140:4,6 142:3 |
| 80:8 81:1,23 | 139:13,17 | **offered** 100:24 | 146:24 150:2,3 |
| 82:4,13,21 | 143:13,20 | **offhand** 90:7 | 153:15,24 |
| 83:3,18 84:1,6 | 144:13 145:10 | **offices** 17:3 | 159:17,20 |
| 84:13,22 86:3 | 146:16 147:5 | **official** 31:11 | 162:15 163:21 |
| 86:9,19 87:6 | 147:11 148:11 | 189:15 190:21 | 164:11 165:3 |
| 88:16,24 90:22 | 151:18 154:2 | **offs** 132:8 | 166:2,5 168:4 |
| 91:19 92:1,20 | 155:15 156:4 | 136:23 162:10 | 172:18 173:22 |
| 93:1 94:1,7 | 156:11 157:7 | **oh** 117:11 | 174:11 177:5 |
| 95:11,13 96:1 | 157:24 158:12 | 149:2 | 177:25 179:1 |
| 96:19 97:9,16 | 159:3 160:9 | **ohio** 188:2 | 179:22,25 |
| 97:24 98:15,21 | 162:2 163:5 | **okay** 6:15 7:11 | 181:5 185:24 |
| 99:5,13,21 | 164:16,23 | 7:24 8:15 9:4 | |

**old** 9:4,5
121:18
**once** 91:11
121:6 122:19
156:17
**ones** 44:6 98:18
122:6 123:19
124:3 163:15
**online** 186:12
**open** 130:15,19
150:9,10
152:19 166:7
166:11 167:13
173:25
**opened** 130:20
153:3 167:3
**opening** 178:10
**operated** 72:21
**operates** 58:9
95:25
**operations**
102:17
**opportunity**
19:17 161:1,4
161:5,8
**opposed** 77:12
**ops** 63:8 102:15
102:16,19,23
103:4,10
174:19 179:13
**opted** 56:24
58:18
**order** 71:11
92:16,24

**organized**
61:14 62:17
162:21 163:24
**original** 92:12
94:5
**ot** 69:11 72:8
95:5 105:10,24
106:2 107:19
168:11 170:14
170:23 181:10
181:12
**outcome**
187:19
**outside** 7:6 9:3
17:7,8 28:5
30:15 77:4
136:14 144:3
170:19
**outstanding**
119:15
**overarching**
88:20,22 89:2
**oversight** 116:3
**overtime** 4:5
8:4 41:5,8,15
41:19 42:2,6,7
42:9 46:8,8,15
46:21 47:17
48:20 49:5,13
49:16 50:11,15
50:20 51:2,7,9
51:11,13 57:1
58:24 59:13,19
71:25 72:12,20

74:13,16,20,23
77:17,24 78:4
78:15 81:18,20
81:22 82:1,9
82:10,11,16
83:17,20,21
84:4,9,12,21
86:1,8,15 87:1
88:11,14,23
91:12,18,24
92:8,11,17,25
93:9,20,24
94:5,12 95:12
95:22,24 96:7
96:14 97:2,8
97:19,21 98:12
98:19 99:11
100:3,8,17
105:16,19
106:6,11 107:6
108:4 134:17
136:6,12,13
148:10,21
149:4,5,6,14
162:1,9 168:15
168:24 169:4
170:5,8,15
171:1,10
176:12 177:7
177:19 181:25
182:1,8,23
183:7 184:10
184:16

**owed** 119:20,23
120:6 184:5
**own** 40:14 67:6

**p**

**p.m.** 79:16,18
79:20 83:9,12
110:18,20,22
113:25 118:12
140:9,11,13
152:12,14,16
183:16 186:2,4
186:6,13,17
**page** 3:2 4:2
6:18 47:12,14
48:6,15 49:4
50:7 68:7,9,9
77:14 89:11,13
89:20 94:13
96:23 101:11
101:16 111:12
111:15 112:3
112:22 113:1
113:22,24
115:11 116:5
117:13 154:7
158:9 164:6
178:11 179:2
179:17,22,23
180:13,21
181:3 183:11
188:13,15
190:7 191:3

**pages**  89:18
**paid**  8:4 51:10
  74:21,22
  100:15 105:8
  105:10,23
  106:3,11,20
  107:19 114:12
  115:5,6 119:18
  120:9 121:1
  148:5 149:13
  149:19 182:20
  182:22 183:7
**pain**  155:10
  159:24 162:22
  168:1
**para**  11:24
  12:1
**paragraph**
  72:4 91:8
**paragraphs**
  106:1 119:14
**parenthesis**
  148:1
**part**  22:23 31:2
  38:20,23 39:9
  62:1 65:21
  71:6 75:22,23
  75:25 80:21
  93:24 106:16
  107:23 109:21
  114:14 155:22
  184:21 190:9
**participants**
  2:1

**participate**
  159:10
**participated**
  96:15 115:25
**particular**  10:7
  65:21 67:1
  108:20 130:11
  157:14 158:7
  161:18
**parties**  187:18
**partner**  66:25
  67:2,11
**partners**  90:18
  179:10
**party**  5:17
**pattern**  33:20
**pay**  59:24 60:4
  60:8 64:23
  69:13 73:16,22
  74:2,13 76:9
  76:15,16,17,22
  77:2,3,10,12
  106:2,6 108:4
  114:11,19,19
  115:1,15,20
  116:10,19
  117:15,18,20
  117:21,25
  121:6 134:17
  136:13 144:4
  161:10 163:18
  164:6 170:9,15
  181:10 184:16

**payback**  64:18
  64:19 137:17
  138:8 139:21
  184:5
**paycheck**  85:18
  88:20 91:5
  97:13 104:24
  149:17 184:3
**paying**  117:22
**payroll**  22:8,12
  22:13,19,25
  23:4,8,12,22
  30:24,25 184:4
**payrolls**  75:9
  75:11,11
**pays**  170:11
  171:8
**pdf**  48:6,15
  50:7 68:10
  89:13,20
  127:14 179:23
**peachtree**  2:12
**pending**  7:7
**people**  14:1
  17:9 20:24
  21:1 26:8,9,16
  26:20,24,25
  31:17 50:23
  61:19 74:16,17
  84:4,11 85:13
  86:1 87:2
  95:21 117:1
  151:5 177:3

**people's**  85:21
  85:23
**percent**  137:22
  155:17 170:17
**percentages**
  17:13
**period**  26:14
  37:14,18,20
  42:9 46:9,14
  46:20 49:15,20
  51:16 52:1
  58:23 59:6
  71:13 99:7
  104:25 114:19
  114:19 115:2,8
  116:10,19
  117:15,18,20
  117:21 121:10
  122:8,14,17
  144:4 159:2
  177:13
**periods**  43:17
  71:15 135:15
**permission**
  91:4 129:25
  130:2
**permitted**
  164:13
**person**  6:21
  10:18 64:3,5
  120:4,5 141:4
**personal**
  165:16

**[personally - presented]**　　　　　　　　　　　　　　　　Page 29

| | | | |
|---|---|---|---|
| **personally** 8:8 33:2 41:3 98:6 189:11 190:15 | **plaintiffs** 1:5 2:8 5:6 | 47:21,23 50:4 64:6 72:20 | **possible** 147:15 147:20,22 156:2 162:7 |
| **personnel** 140:21,24 141:2 | **plan** 184:4 **planning** 13:9 13:24,25 15:1 | **policy** 4:6 8:5 31:19,23 32:8 47:17,20 48:3 | **possibly** 88:8 **post** 71:8 160:25 |
| **pertains** 134:11 **peter** 89:22 90:4 91:1 | 15:19,20 16:20 18:11 19:14,16 20:5,6,15,17,21 | 49:2 50:5 51:20 54:14,15 63:23 64:3 | **posted** 144:4 170:3 **potentially** |
| **phil** 114:3 116:8 | 21:3 30:11 **plans** 176:4 | 78:3,8 91:14 95:1 96:16 | 42:2 58:19 **practice** 112:11 |
| **phillips** 89:23 90:8 | **platform** 130:8 **please** 5:15,23 | 99:19 105:16 105:16 107:6 | **preceding** 49:15 87:8,12 |
| **phone** 91:10 105:7 188:3 | 47:6 72:17 81:19 87:19 | 155:3 159:19 167:22 168:5 | **predecessor** 121:19 |
| **phrase** 58:23 77:3 | 110:17 137:14 140:8 152:11 | 176:12 177:7 177:21 182:24 | **preemptive** 81:6 |
| **pick** 161:1,11 161:25 | 181:6 184:12 185:14 186:1 | 183:7 184:10 184:14 | **prefer** 139:25 **premium** |
| **picked** 93:21 | 188:11,11 **plus** 96:10 97:4 | **population** 59:23 60:15,16 | 134:17 **prepare** 7:11 |
| **picture** 46:5 **piece** 73:10,13 | **point** 17:14 21:7 50:25 | **portion** 151:10 184:22 185:1 | 116:23 158:10 165:18 |
| 171:8 **pieces** 165:19 | 51:1,4 58:18 59:2 78:25 | **position** 12:9 14:20 15:21 | **prepared** 116:24 117:3 |
| 185:3 **pilot** 115:23 | 83:20 106:18 119:14 120:3 | 16:3 19:7,11 19:20 20:9,12 | **preparing** 165:17 |
| 116:1,2,4 157:6,9 159:14 | 120:22,24 121:9 | 20:17 21:12 23:25 25:10 | **present** 2:17 146:5 |
| **piloted** 177:4 **pilots** 43:23,25 | **points** 120:8,24 155:11 159:24 | 27:1,11 28:11 29:11 60:24 | **presentation** 172:4 |
| **place** 95:4 187:15 | 162:22 168:1 **policies** 31:4,9 | 63:19,21 100:25 160:14 | **presented** 104:23 |
| **plaintiff** 5:19 6:10 | 31:11,15,16,18 31:25 32:5,10 | **positions** 28:17 | |

**presently** 8:21 122:9

**pretty** 17:25

**preventing** 8:9

**previous** 63:21 87:16,18 121:10 151:25 152:24 187:7

**previously** 46:24 108:19 167:7 172:12 173:9

**primarily** 30:23

**prior** 46:25 70:12 181:12

**privileged** 81:5

**privy** 158:3,4

**pro** 11:24 12:1

**probably** 61:12 74:17 78:24 130:14

**problem** 140:7

**procedure** 189:5 190:5

**proceed** 45:24 79:21 83:13 110:23 140:14 152:17 186:7

**proceedings** 45:20 79:17 110:19 140:10 152:13 186:3 187:13

**process** 38:21 145:24 155:3 155:22 159:19 167:22 168:5 184:1

**processed** 100:14

**product** 124:23 155:23

**production** 145:15 188:15 188:17,22

**productivity** 24:19 25:3,9

**program** 10:12 10:20 157:10

**programming** 95:3,8

**project** 15:22 15:24 19:23 75:13,15,18,18 75:20,23,25 76:2 113:16 114:14,16 151:1,2,11 158:23 160:19 172:2 176:25 177:2

**projects** 116:21

**promoted** 14:22

**promotion** 14:23

**provide** 49:14

**provided** 124:21,24 125:1 135:8 160:2

**provides** 22:11 22:25

**public** 189:10 189:18 190:15 190:23 191:23

**published** 59:24 60:4,8

**pull** 46:23 68:1 163:21

**pulled** 135:15

**purpose** 112:16

**purposes** 48:8 173:17 175:21

**put** 95:4,9 123:12,12 157:21 158:20 170:22,24

**q**

**qualify** 136:12

**quantify** 98:2 98:23

**question** 14:12 19:2 28:3 32:14 33:13 37:23 40:9 48:2 52:12 53:3,21 54:8 54:18 57:21

58:2 60:18 66:14 72:16 75:8 76:19 77:8 81:10 83:5,16 84:10 84:25 85:4,6,8 85:21,24 86:6 87:16 93:2 94:3 98:13,16 99:19 102:12 103:7 107:16 114:24 118:4 120:14 123:23 124:19 125:13 126:13,14,17 128:19 130:23 133:6 135:2 137:13 138:15 143:16 159:5 163:8 176:20 177:12 185:20

**questioning** 81:3

**questions** 7:7 63:23,24 64:4 67:13 80:12,15 82:23,24 86:7 97:12,15,18,20 98:12 100:13 160:2 186:9

**quick** 185:25

**quickly** 162:12

**quite** 107:11

| | | | |
|---|---|---|---|
| **quoted** 91:14 | **reading** 92:4 | **recollection** | **reference** 46:18 |
| **r** | 188:19 | 80:7,16 | 96:24 118:23 |
| **raise** 91:17,24 | **ready** 68:14,15 | **reconciled** | 119:3 188:7 |
| **random** 65:17 | 101:23,25 | 120:10 | 189:2 190:2 |
| 65:20 | 158:24 165:20 | **reconciliation** | **referenced** |
| **range** 147:23 | **really** 54:17 | 119:19 | 156:15 189:11 |
| **rare** 99:1,2 | 63:12 71:23 | **record** 5:2 6:24 | 190:15 |
| 100:19 | 81:13 84:15 | 45:18,22 48:8 | **referencing** |
| **rarely** 98:19 | 116:9 117:17 | 65:24 79:15,15 | 103:20 |
| **rate** 51:10 | 143:23 161:17 | 79:20 83:9,10 | **referring** 51:4 |
| 184:16 | 171:8 184:23 | 83:11 85:9 | 158:13 |
| **rather** 184:6 | **reask** 83:4 | 87:20 110:15 | **reflected** |
| **reach** 66:13,19 | **reason** 106:19 | 110:18,21 | 171:11 |
| 66:25 67:13 | 135:7 188:14 | 123:25 124:5 | **refresh** 68:3 |
| 92:17 | 190:8 191:3 | 140:9,12 146:7 | **regard** 73:3 |
| **reached** 72:8 | **rebekah** 179:3 | 152:9,12,15 | 77:6 102:10 |
| 72:13 | 179:9 185:14 | 158:13 173:17 | 107:6 131:2 |
| **reaching** 66:11 | **receipt** 188:18 | 186:2,5,13,17 | 154:3 |
| **read** 49:11,17 | **receive** 84:3,19 | 187:12 190:9 | **regarding** |
| 50:25 68:12 | 85:24 88:9 | **recorded** 5:5 | 65:25 184:10 |
| 69:7,14 70:17 | 92:24 93:24 | **recording** | **regardless** |
| 72:9 73:12 | 98:4,6 177:23 | 124:15 | 96:13 |
| 85:9 87:18,20 | 178:21 | **records** 128:7 | **regards** 169:25 |
| 91:7 95:18 | **received** 74:16 | 128:12,14 | **regu** 146:20 |
| 101:21 104:14 | 91:5 167:3 | 171:11 | **regular** 33:15 |
| 105:12 107:3 | 177:20 | **recurring** | 33:17,23 34:2 |
| 114:4 115:11 | **recently** 69:9 | 99:18,20 100:2 | 34:12,17,18,21 |
| 116:13 117:16 | 69:17 126:22 | 113:14,15 | 35:6,13,23 |
| 119:21 120:11 | **recognize** 47:8 | **red** 174:4,8 | 38:2 41:16 |
| 179:8 181:6,13 | 47:18 68:11,17 | **reduction** | 44:24 45:7 |
| 181:14 182:18 | 68:18 101:18 | 74:13 | 50:11,20 51:10 |
| 189:5,6,12 | 101:19 111:16 | **reed** 23:20 | 51:22,23 93:20 |
| 190:5,6,17 | 174:11 | **refer** 52:3 | 96:9 97:4 |
| | | 102:15 | 112:11 113:8 |

134:9,11 144:3
146:21 182:12
182:22
**regularly** 23:4
33:9 35:1,10
36:3 40:20
**reimbursed**
184:16 185:2,3
185:4
**reimbursement**
184:2
**related** 22:8
71:25 87:1
99:10
**relates** 176:12
**relation** 77:4
85:18
**relative** 187:15
187:16
**remeka** 150:20
**remember**
15:25 21:15
32:2 70:3
71:22 74:8
76:7 90:11
105:14,17
117:8 120:2,3
154:18 170:24
184:20,23
185:17
**remembered**
159:9
**remembering**
70:15

**remind** 158:21
**remote** 1:10
**remotely** 2:1
**renee** 117:6
**repayment**
184:4
**repeat** 34:1
36:17 56:4
60:24 81:19
83:16 85:7
99:24 148:13
**repeated** 87:19
**rephrase** 27:22
29:14 55:23
66:17
**replace** 96:9
**report** 20:8
24:8 26:8,9
28:22 132:18
132:21,22,24
132:25 133:25
134:14 149:15
166:15 180:11
180:20
**reported** 1:23
20:16 21:1,6,7
24:16 26:3,10
29:18,25
187:11
**reporter** 5:13
5:23 6:20 83:6
87:18 187:2,5
189:7

**reporting** 27:1
**reports** 134:8
185:10
**represent**
143:18 148:3
148:10,21
149:4 151:24
158:25
**representative**
67:3,7
**represented**
168:15,24
**representing**
5:12 155:14
**represents**
181:19
**request** 190:9
190:11
**requested** 85:9
87:20
**require** 117:25
117:25 134:7
**required** 49:13
50:2 188:25
**requirement**
137:17
**res** 15:22,24
174:17
**research** 13:9
**reservation**
12:17 13:4,15
13:17 70:22
**reservations**
12:19 13:10

14:15,16 15:3
15:7,14 16:10
16:11,21,22
17:3,10 18:19
18:23,24 19:3
41:13,14,20
62:8 69:3 70:4
71:1,14 78:14
78:16 122:19
126:21,23,25
**resource** 10:11
13:24,25 15:1
15:14,18,20
19:13,15 20:4
20:6,15,17,20
21:2 30:11
**resources** 16:4
16:9 22:6 30:4
30:9,12,16,21
103:1
**responded**
179:21 185:13
**responding**
179:18
**responsibilities**
20:3
**responsibility**
62:1
**rest** 162:13
**restate** 19:1
40:8 48:2
53:21 54:6
60:2 72:16
76:19 81:9

**[restate - robinson]**                                          Page 33

| | | | |
|---|---|---|---|
| 85:5 91:22 | 96:5 101:2 | 32:11,18,25 | 81:1,23 82:4 |
| 92:21 100:1 | 107:24 129:15 | 33:6,11 34:7 | 82:13,21 83:3 |
| 126:17 137:13 | 131:7 137:25 | 34:13,22 35:2 | 83:18 84:1,6 |
| 154:4 168:20 | 138:19 142:16 | 35:19,25 36:7 | 84:13,22 85:1 |
| **result** 70:18,19 | 147:25 163:19 | 36:21 37:15,21 | 85:5,10 86:3,9 |
| 78:8 105:20 | 167:22 | 38:3,8,14,24 | 86:19 87:6,10 |
| 108:15 109:7 | **ringot** 68:19,24 | 39:16,20 40:2 | 87:21 88:16,24 |
| 144:15 | 71:17 72:4 | 40:6 41:1,9,22 | 90:22 91:19 |
| **resulted** 74:2 | 76:8,24 77:5 | 42:11,16,23 | 92:1,20 93:1 |
| **retained** | **ringot's** 69:16 | 43:7,19 44:4 | 94:1,7 95:11 |
| 186:15 | 78:14 | 44:10,19 45:3 | 95:13 96:1,19 |
| **returned** | **robin** 20:13 | 45:11,14,17 | 97:9,16,24 |
| 188:18 | **robinson** 2:11 | 46:10,16 47:25 | 98:15,21 99:5 |
| **review** 188:12 | 5:20,20 7:15 | 48:8,12 49:21 | 99:13,21 100:5 |
| 189:1 190:1 | 7:20 10:9,13 | 50:16 51:3 | 100:10 102:2,9 |
| **revisions** 31:15 | 10:21,25 11:13 | 52:10,15,25 | 103:5 104:18 |
| **rhonda** 102:5,6 | 11:20 12:10,23 | 53:6,16,20,25 | 105:21 106:13 |
| 104:12 105:1 | 13:12,21 14:3 | 54:4 55:6 56:2 | 106:21 107:7 |
| 105:18,23 | 14:10,17 15:4 | 56:11,20 57:2 | 108:9,25 |
| **rhonda's** 105:5 | 15:10,16 16:5 | 57:13 58:1,12 | 109:14,24 |
| **rick** 89:24 | 16:13,25 17:4 | 58:25 59:7,14 | 110:14 112:14 |
| 90:10 | 17:11,17,23 | 59:25 60:12,21 | 113:9,19 |
| **right** 8:13 | 18:13,20 19:8 | 61:8,16,23 | 114:21 118:2 |
| 27:11 29:18 | 19:24 20:18 | 62:12 63:5,15 | 119:24 120:16 |
| 30:9 34:18 | 21:4,23 22:2,9 | 63:25 65:3,18 | 121:22 122:12 |
| 36:13,20 40:19 | 22:15,20 23:5 | 66:2,9,15,21 | 122:24 123:17 |
| 41:17 45:8,10 | 23:10,16 24:1 | 67:17 69:18,24 | 124:1,8,17 |
| 46:6 47:15 | 24:9,22 25:4 | 71:4,20 72:1 | 125:6,10,19,25 |
| 48:16,22 51:22 | 25:11,17,24 | 72:14,22 73:2 | 126:4,9,16 |
| 54:22 55:1 | 26:5,12,17,21 | 73:18 74:4 | 128:10,25 |
| 56:22 57:4 | 27:6,12,17,25 | 75:5,16 76:10 | 129:7,18 130:4 |
| 62:7 76:24 | 28:8 29:6,12 | 76:18 77:6 | 130:10 131:1,8 |
| 77:13 79:9 | 29:23 30:5,18 | 78:1,10,18,23 | 132:4,10 133:2 |
| 84:17 90:7 | 31:6,13 32:6 | 79:4,11 80:8 | 134:2,10,20 |

136:7,24 137:4
137:11,20
138:13,20
139:3,13,17,25
140:7 143:13
143:20 144:13
145:10 146:16
147:5,11
148:11,22
151:18 152:21
152:22 153:4
154:2 155:15
156:4,11 157:7
157:24 158:12
159:3 160:9,16
162:2 163:5,9
164:16,23
165:9 167:2
168:17 169:9
169:15,24
171:12 172:7
172:10 173:14
173:21 175:3,9
176:14 177:9
177:14 182:4
184:18 185:19
188:5
**role**   12:16 13:8
16:12 19:6
28:14 98:5
99:18
**roles**   17:21
**room**   8:12

**root**   107:14
**roster**   162:19
171:15,16,19
**rotate**   37:4,6
37:11
**rotation**   36:24
36:25 37:3
38:5
**roughly**   13:5
31:22 110:10
151:21
**round**   119:13
**row**   135:24
136:17 140:23
140:23 141:9,9
141:12,18,19
141:21,23
142:9,11,25
143:1,5 144:25
146:1,2,11,12
146:19,23
147:15,16,18
148:7 149:7,8
149:14 156:21
156:24,24
160:21,21,24
161:15,21,21
168:3,6,11
174:4
**rows**   130:12
141:1,9 142:7
148:16,17
149:2

**rpr**   1:23 187:23
**rule**   77:1 82:3
82:20,23 84:4
84:9,12 86:2,8
86:18,24 91:14
95:24 97:8
100:16
**rules**   6:16
31:20 65:23,25
66:8,20 67:21
74:25 75:3
77:2,12 164:10
171:3,3,5
189:5 190:5
**run**   140:18
162:12 163:12
170:10

**s**

**s**   145:3 188:15
190:8,8 191:3
**safe**   111:2
**sake**   158:13
**salt**   69:2
**sample**   135:13
**sap**   39:7,8
69:10,17,23
70:10,12 73:14
73:15,17,23
74:2,12,23
75:3,3,10,19
76:17 77:4
78:9 124:21,22
124:24 125:2,4

126:8 127:24
128:3,16,17,20
128:21 129:5
129:12 131:20
145:15 149:17
149:22 155:25
156:3,10 157:2
168:15,23,23
169:13,18,21
170:10 171:4
171:10 176:13
177:1,3
**saturday**   34:10
34:10 40:23
**saved**   172:1
**saw**   77:25
104:24 105:2
158:9
**saying**   6:21
68:25 69:1
144:19 157:4
161:6 185:4
**says**   47:12
48:20,22 49:5
49:8 50:11
52:6 69:9 70:9
73:13 77:17
91:2 94:25
105:6 106:2,8
106:25 107:18
110:9 116:8,21
117:16 119:15
119:17 120:8
130:1 133:13

133:19 135:24
140:21,24
144:22 145:19
146:9,9,12,20
147:1 152:8
154:8,10,20,21
154:24 155:3
155:10 156:24
157:1 159:18
159:21 160:22
160:25 164:12
165:5 168:7,11
171:1 174:4
178:18 181:6
183:18,24
**scales**  59:24
60:4,8
**scenario**  57:16
181:25 182:19
**schedule**  13:18
33:16,16,17,20
33:23,24 34:2
34:12,21,25
35:7,13,16
36:6,9 37:1,5
37:11,12,14,24
38:2 39:15,25
40:16,22,25
41:4,17,25
42:4,10,19
43:6 44:18,23
44:24 45:1,7
48:20 49:12
50:12 51:23,24

52:6,8,21,24
54:21 55:10,12
55:13,17 57:18
71:2 92:6 93:8
93:10,12,14,15
93:20,25 96:9
108:21 109:7
110:12 115:15
118:18 121:6,7
121:14,18,19
132:2 136:15
139:9,10
143:12,18,22
144:7 153:25
161:9 169:1,3
169:4,5,5
170:12,20
171:17,18
181:20
**scheduled**
33:10 35:1,10
35:23 36:4,12
36:18 38:6,12
39:14 40:12,20
42:15 43:5
48:24 49:14,14
50:2,20 52:13
52:19 53:5,11
53:14,24 54:11
54:24 55:5
56:15,16,17
57:5 58:17
83:22 97:4
109:12,17

121:16 181:11
181:22
**schedules**
35:17 39:23
40:11 43:12
48:23 71:7,9
71:14 110:12
139:15 168:24
**scheduling**
18:11 116:1,2
121:21 122:22
123:9 124:7,15
131:6
**school**  11:9
12:2
**schramm**  89:23
90:4 91:1
**screen**  130:2
182:7
**scroll**  48:5 68:9
89:19 94:13
101:15 133:19
141:21 142:9
179:16 183:11
**se**  160:19
**seal**  189:15
190:21
**second**  87:10
89:13 105:5
131:17 135:24
148:25 149:3
169:7
**section**  32:8
50:22 51:14,17

148:20
**sections**  32:9
**see**  30:2 38:22
39:8,13 46:3
46:24 47:2,12
47:16 48:7,19
48:22 49:8
50:10,13,14,18
52:14 59:22
60:3,4,6,14,16
60:17 68:3,7
77:14,19 78:13
89:5,9,15,25
90:1,12 94:14
94:22 95:6
97:12,18 99:18
100:2,8 101:4
101:12 103:18
104:5,8,12
105:4 106:1,8
106:10 111:12
112:18,23
113:1,24
116:20 118:11
118:14 119:8
119:13 127:23
128:5 130:8
133:7,10,15
135:23 136:16
137:10,19
140:20,23
141:8,9,18,22
142:4,6,10,17
143:1,5 144:25

145:3,14,16
146:1,2,9,12,25
147:16,25
148:18 149:7
150:11,14,20
153:7,8 154:7
154:10,21
155:3 157:1
159:18 160:24
161:21 162:13
162:16,21
163:21 164:12
165:4 166:12
166:20 167:18
167:24 168:10
169:6 173:1
174:3,7,14,23
178:12,14,19
179:2 180:1,14
181:2,15
182:14 183:1,4
183:14,18,23
184:7
**seeing** 88:13
104:3 144:21
152:5 170:24
174:2
**seem** 165:7
**seen** 46:14,19
82:20 86:23,25
87:2,17 97:20
98:14,20
100:23 132:18
132:20 136:1

153:18 158:5
163:16 164:21
172:22,24,25
175:1
**semi** 112:4
114:9,13 115:1
115:5,14,20
116:18
**send** 144:3
**sending** 107:1
**seniority** 71:11
**sense** 7:9 43:24
69:6 80:16
92:15 120:22
121:17 173:15
**sent** 68:22
128:20 167:1
172:7,11
**sentence** 51:1
69:7 70:9
73:12 87:8,12
91:17 105:5,6
106:7 107:18
117:16
**sentences** 69:8
**separate** 22:13
24:25 25:23
28:4 29:4
67:14 114:16
124:11 165:21
171:16
**serve** 161:2
**server** 33:5

**service** 90:20
174:15
**session** 154:16
159:7
**set** 39:15 40:11
109:9 165:17
184:4 187:20
**sets** 20:23
**several** 7:17
11:6 20:23
21:17 26:7
61:10,13 62:3
62:8 70:2
102:7 104:25
117:1 118:20
123:3 147:17
151:3 153:8
160:12 163:20
176:23
**seyfarth** 2:10
**seyfarth.com**
2:14,14
**shapiro** 2:11
**share** 4:22
129:19 167:6
**shaw** 2:10
**sheet** 127:9,16
128:15 129:3,9
139:19 149:25
150:4 158:16
166:4,6 171:15
172:4,15
188:13 190:7
190:10,18

191:1
**shift** 4:5 13:14
47:17 56:8,10
63:13,13 64:24
70:18,19,21,23
70:24 71:6,7
71:12 77:24
78:4,15 106:3
107:11,14,24
108:3,16,17,19
108:20,23
109:6,8,11,11
109:11,17,23
110:4,7,9
114:25 125:18
127:4 137:16
137:16 138:25
138:25 139:9
151:5 157:18
162:1
**shifted** 133:12
**shifts** 131:18
138:18,18
139:1
**short** 78:22
144:22
**shortage** 161:7
**shorthand**
187:4
**shortly** 173:19
**show** 48:16
139:20 146:14
146:20 147:3
149:24 170:4

**[showing - spreadsheet]**                                      Page 37

| | | | |
|---|---|---|---|
| **showing**  144:18 | **sitting**  8:13,15 | 19:1 24:13 | 26:14 38:22 |
| **shown**  57:18 | 8:21 | 28:2 29:16 | 40:10,14 42:7 |
| 134:18 139:1 | **situated**  1:4 | 32:13 33:8 | 46:12 50:23 |
| 188:16 | **situation**  92:5 | 34:1,16,24 | 53:18 60:23 |
| **shows**  138:12 | 100:23 107:17 | 36:17 52:18 | 64:11 74:22 |
| 139:9,10 | 107:21 108:1 | 53:2 54:18 | 83:22 91:14 |
| 171:15 182:24 | 135:15 136:9 | 56:4 62:23 | 93:12 99:17 |
| **side**  30:4 | 185:18 | 68:15 74:7 | 131:3 132:21 |
| 139:22 | **situations** | 86:5 88:2,3 | 135:14,14 |
| **signature** | 136:10 185:8 | 99:2,24 103:7 | 138:22 163:10 |
| 187:23 188:14 | **sixth**  2:5 | 103:8 112:25 | 179:11 |
| **signed**  104:5,12 | **skip**  32:15 | 114:23 117:11 | **specifically** |
| 189:13 190:18 | 118:7 | 118:10 124:25 | 15:2,25 54:1 |
| **significant** | **skipped**  73:13 | 137:22 138:15 | 61:6 125:24 |
| 155:10 159:24 | **slip**  172:4,15 | 143:10 148:13 | 134:11 156:8 |
| 162:22 168:1 | **slipsheet**  4:11 | 149:2 168:21 | 167:17 |
| **signing**  188:19 | 4:13,15,17 | 168:23 172:23 | **specificity** |
| **similar**  34:16 | **small**  7:23 | 174:21 | 66:16 72:23 |
| 97:14,18 | **smaller**  22:1,18 | **sound**  173:6 | 73:3 96:20 |
| 132:20 153:18 | **smart**  73:13 | **sounds**  34:16 | 175:4 |
| 158:11 160:15 | **snippet**  183:2 | 45:17 | **specifics**  43:3 |
| 162:17 167:16 | **software** | **speak**  59:9 65:8 | **specified** |
| 172:3 175:13 | 157:23 158:6 | 80:18 84:15,17 | 187:15 |
| 175:16 | 175:2,7,17 | 85:2,23 | **speculate**  85:12 |
| **similarly**  1:4 | **solely**  144:6 | **speaking**  97:2 | 124:12 |
| 162:21 163:25 | **solo**  31:17 | **special**  11:24 | **speculation** |
| **simplified**  96:8 | **solutions**  5:13 | 12:1 | 76:11 91:20 |
| **sincerely** | 186:15 188:1 | **specialist**  12:17 | 104:19 160:10 |
| 188:21 | 191:1 | 13:4,17 41:14 | **spoke**  7:13 63:9 |
| **single**  35:22 | **somebody** | **specialists** | **spreadsheet** |
| 64:5 109:13 | 135:11 | 13:15 102:23 | 127:11 130:5 |
| **singular**  151:7 | **soon**  183:25 | 102:24 | 144:19 150:1 |
| **sir**  188:10 | **sorry**  12:15,24 | **specific**  14:13 | 151:23 166:3 |
| | 13:18 15:20 | 20:10 24:14 | 172:6,10 183:2 |

**[spreadsheets - swap]**                                    Page 38

| | | | |
|---|---|---|---|
| **spreadsheets** | **statement** | **subscribed** | 153:6,21 |
| 157:22 | 91:13 189:13 | 189:10 190:14 | 156:22 158:2 |
| **st**  106:3 170:22 | 189:14 190:19 | 191:21 | 158:19 159:5 |
| **stand**  18:7 | 190:19 | **substance** | 159:17 160:3 |
| 110:17 140:8 | **states**  1:1 20:5 | 80:24 81:11,13 | 167:7 171:9 |
| 152:11 186:1 | 20:7 95:1 | **suggest**  79:5 | 174:2,8 176:18 |
| **standard**  52:3 | **stating**  8:3 | **suggesting** | 179:6,7,14 |
| 52:5 | **stay**  135:23 | 79:13 | **swap**  56:19,24 |
| **standpoint** | 140:16 144:24 | **suite**  2:12 | 58:9,16,19 |
| 100:24 | 156:20 179:17 | 188:2 | 63:14 64:6,18 |
| **stands**  18:5 | 186:11 | **sum**  184:6 | 64:22,25 65:9 |
| **start**  12:13 | **stenographic...** | **sunday**  34:10 | 65:13 66:20 |
| 13:3 39:23 | 1:23 187:11 | 34:10 40:23 | 67:16 88:8 |
| 52:23 58:21 | **step**  158:18 | **superior**  99:20 | 91:4 93:7,24 |
| 75:20 76:1 | 175:24 | 188:1 | 93:25 94:5,9 |
| 88:13 89:11 | **stone**  20:13 | **sure**  6:17 14:12 | 94:11 95:16 |
| 105:25 109:18 | **stood**  32:3 | 23:12 29:1 | 96:3,15 105:9 |
| 109:21 110:7 | **store**  32:10 | 33:13 34:2 | 105:11,15,16 |
| 117:21 124:20 | 112:8 127:3 | 37:17,23 40:15 | 105:20 106:12 |
| 126:25 178:11 | **stored**  128:21 | 48:3 54:17 | 107:12,15,20 |
| **started**  40:21 | 129:13 | 57:15 61:25 | 107:21 120:6 |
| 76:1 110:8 | **straight**  106:6 | 72:3,18 73:11 | 121:7,12,18 |
| 121:10,11 | 170:22 | 75:8 76:14 | 125:22,24 |
| 151:9,10 | **street**  2:4,12 | 77:13,16 90:13 | 126:3,7 131:18 |
| **starting**  5:16 | **string**  4:7,8,9 | 91:9 94:3 | 132:8,23 |
| 140:20 | 4:10,19 | 99:12 100:1 | 136:19,23 |
| **starts**  55:13 | **struggling** | 103:9 106:16 | 137:3,8,10,15 |
| 123:7 | 86:11 | 112:2 118:4 | 137:17,19 |
| **state**  34:24 | **studied**  10:16 | 122:7 124:19 | 138:2,5,6,12,16 |
| 54:19 187:5 | **study**  9:16 10:3 | 127:5,11 | 138:25 139:8 |
| 189:10 190:15 | 10:11 | 129:16 131:5 | 139:10,11,15 |
| **stated**  91:11 | **subject**  57:12 | 135:6 137:22 | 139:20,21 |
| 95:19 97:11 | 58:10 | 138:3 143:17 | 161:13 162:9 |
| 182:11 | | 144:6 151:15 | 164:9,20 |

182:13 185:6
**swapped** 57:6
95:2 96:10,11
96:11 97:5
105:24 127:4
132:7 147:3
181:7,8 182:10
182:11,21,21
**swapping**
64:24 67:22
**swaps** 56:8
63:10,11,18,24
64:4,6,10,11,13
65:2,25 66:5,8
81:17,21,25
82:9 86:14
88:14,21,23
91:6,11,17,24
92:6,8,11,23
93:21,21 94:4
95:10 97:1,19
97:20 98:12,19
99:11 100:4,9
100:17 107:6
119:15,20,23
120:3,8,25
121:1 125:18
125:21 131:14
132:1 134:17
151:6 159:16
160:22 161:16
161:22 164:12
176:12 177:8
177:19,22

183:8,21
184:11
**switch** 21:16
171:9
**switched** 75:10
147:10
**switches** 146:3
**switching**
162:8
**swof** 136:17,22
138:11 147:1
**sworn** 5:25 6:4
187:9 189:10
189:13 190:14
190:18 191:21
**symbols** 148:9
**synonymous**
59:2 76:25
115:15
**synonymously**
71:8
**system** 16:17
16:20,21 18:2
18:3,8,18 39:2
39:3,4 75:4,19
103:4,10
106:24 122:5
122:17 123:12
123:15 125:5
125:22 126:8
126:21 132:6
135:12 145:4
147:10 151:5
156:16,17

161:12 178:24
**systems** 10:1,4
10:4,7,11,16,18
16:15,16 18:22
75:1 76:17
95:5,9,15
121:20,25
122:1,10,14,23
123:5,9,24
124:5,6,11,12
124:14 131:6
157:23

**t**

**t** 6:5 149:21
**tab** 132:15
133:18 146:8
146:10 148:8
148:14 153:12
153:19,23
154:6 155:13
156:20 159:8
159:15 162:19
162:24 163:17
164:9 165:2,14
**table** 116:21,23
116:24 117:3
136:16 150:11
**tabs** 132:14
153:9 162:13
163:3,9,13,20
174:22,23
**take** 7:3,5
68:12 78:21

79:9 87:3
93:12 112:12
112:17 118:8
170:11 173:19
181:6 185:24
**taken** 5:5 6:13
45:20 79:17
110:19 112:6
113:7 140:10
152:13 183:19
186:3 187:14
**takes** 171:4
**talk** 6:25 114:8
**talked** 37:1
58:15 72:5
137:15
**talking** 6:24
34:17 46:2
50:1 52:2
70:13 120:13
122:8,9
**talks** 50:5
107:24
**tamberly** 89:23
90:6
**task** 116:21
**teacher** 11:9,19
11:23 12:3
**team** 22:12,23
25:14,16,21,22
26:15 27:15,23
31:3 40:17,19
94:19 102:7
111:21 114:12

116:24,25
117:1 123:7,8
123:15 180:8
183:25
**tech** 174:19
**technical** 83:6
123:22 125:12
126:14 128:19
130:23
**technology**
15:22,24 16:11
18:10
**tell** 31:2 40:17
40:19 61:25
70:3 87:5
106:15 144:8
161:19 185:2
**tells** 144:5
149:18
**ten** 9:3 26:15
33:19,21 45:13
139:24 140:1,5
**tend** 97:12
**tends** 88:6
**term** 46:14,22
51:14 76:9
**terms** 46:3,15
56:25 69:11
76:17
**testified** 6:4
**testify** 80:1
187:9
**testifying** 8:10
80:4

**testimony**
42:24 54:5
58:13 73:19
80:22,25 81:12
163:6,8 186:14
187:13 189:6,7
190:6,9,12
**text** 104:1,8
144:22
**thank** 5:22
79:16,24
104:12 110:25
171:20 186:8
186:10,11,15
**thanks** 104:5
**thing** 6:19 77:1
120:14,20
136:6 149:23
153:7 157:20
165:17 166:4
174:9 185:9
**things** 10:17
25:6 104:25
107:25 113:11
132:20 158:24
160:1 163:18
**think** 20:22
25:6 28:2
32:13 34:3
40:5,8,9 42:21
44:15 46:19
52:12,17 54:4
57:21 72:19
74:1,9 78:21

84:24 86:11
97:11 99:9
111:2 120:22
126:18 143:15
155:20 159:18
159:25 160:18
161:17 173:18
177:17 179:12
181:24 185:24
**thinking** 77:1
96:6
**third** 68:9
**thirty** 188:18
**thought** 56:5
87:2 104:4
160:1
**thoughts** 51:21
72:25 73:5
85:23 105:3
155:18 165:16
**thread** 181:7
**three** 14:21
21:6,20 37:9
42:22 50:24
70:23,25
**threshold** 57:7
57:9 81:18,22
82:1,10,18
83:1,2,17,20
84:21 85:19
86:2,15 87:2
88:11,15,23
91:12,18,25
92:12 94:5,10

95:10,16 96:4
96:12 97:2,8
97:19 100:18
105:19
**thresholds**
69:11 72:8,13
95:3
**ticket** 100:13
178:18,24
**tickets** 97:21
98:5,7,8,13
100:3 178:21
**tiffany** 172:20
**time** 6:21 9:11
14:2 16:21
17:14,21 19:18
20:21 21:8,13
21:18,21 22:5
22:24 24:7,15
24:16,17,19,20
25:2,3,7,9,10
25:13 26:4,8
26:10,11,14
27:15,20,23
28:4,12,15
29:5,17 30:8
30:15 31:5,11
35:10 36:13,20
37:25 38:1,6
38:13,17,18,23
38:23 39:9,9
40:14 41:16
42:9 43:17
47:24 48:25

**[time - transcript]**

| | | | |
|---|---|---|---|
| 49:8,11,13 | 161:11 165:22 | **todd**   180:15,23 | **tracked**   133:1 |
| 50:2 58:9,15 | 168:25 169:4 | **together**   10:4 | 135:10,17 |
| 58:20 61:1,2 | 169:14 170:2,5 | 157:21 158:20 | 144:1,12,18 |
| 68:12 69:20 | 170:8,10,14,18 | **told**   106:8 | 170:13 176:1 |
| 70:7 73:1,7 | 170:19,22 | **took**   12:19 | **tracking**   62:24 |
| 76:6,7 78:17 | 171:14 175:7 | 58:20 110:25 | 111:20 112:1 |
| 78:20 79:10,12 | 175:17 176:1 | 113:17 | 113:5 114:12 |
| 81:6,16,19 | 177:13 180:9 | **tool**   127:6 | 114:25 115:23 |
| 82:2,19,25 | 180:14 181:21 | **tools**   131:10 | 115:23 116:1,4 |
| 88:3,21 94:19 | 182:8,22,23 | **top**   49:5 92:6 | 117:23,24 |
| 95:4,9 96:17 | 183:20 185:4,5 | 107:18 113:24 | 119:4 121:2 |
| 96:18 97:7,22 | 186:9 187:14 | 133:7 135:22 | 135:16 136:13 |
| 98:4,6,8,13 | **timekeeper** | 135:24 142:3 | 147:9,21 176:5 |
| 99:7 101:1 | 170:6,8,19,22 | 142:16 145:3 | 176:13 |
| 102:6 103:3,4 | **times**   7:17 | 146:9 147:24 | **trained**   159:12 |
| 103:9,10 105:1 | 39:25 51:10 | 148:9,20 153:8 | **training**   150:15 |
| 105:3 106:6 | 70:23,25 95:20 | 154:7,20,21 | 150:25 154:8 |
| 109:18,22 | 96:5 149:6 | 155:2 174:4 | 154:16,18,21 |
| 110:7 118:22 | **title**   14:2,23 | 176:8 179:2 | 156:2,8 157:22 |
| 120:5,6 122:8 | 20:3,14 24:12 | 182:15 | 158:11,24,25 |
| 122:14,15,16 | 24:17 28:24 | **total**   95:21 | 159:1,7,9,10 |
| 123:8,25 124:5 | 29:4,22 30:1 | **tough**   118:17 | 160:6,7,15 |
| 124:15 125:4 | 102:25 158:21 | **toward**   81:21 | 162:17 163:3 |
| 126:8,22 | 158:22 160:14 | 96:12 162:1 | 164:2 165:8,12 |
| 128:15,20 | 160:18 167:18 | **towards**   57:7,8 | 165:13,15,17 |
| 129:3,4,9,11 | **titled**   141:16 | 77:14 81:17,25 | 165:22 167:19 |
| 130:24 131:12 | 142:4 143:19 | 82:10 86:14 | 171:21 175:21 |
| 132:23 133:24 | 145:4 147:25 | 92:12 96:4 | **trainings** |
| 135:15 138:7 | 153:23 154:6 | 100:17 | 160:13 |
| 138:19 139:7 | 161:15,22 | **track**   39:4 | **transcribed** |
| 139:19,19 | 162:19 164:6 | 53:13,15,23 | 189:7 |
| 143:9 144:3 | **today**   5:13 6:11 | 54:10 55:3 | **transcript** |
| 147:21 151:4,6 | 7:12 8:10 | 61:20 | 187:11 188:11 |
| 151:15,17,20 | 152:1 186:9,14 | | 188:12 189:5 |

**[transcript - upload]**                                    Page 42

189:12 190:5
190:11,17
**transition**  74:1
74:12,23,24
78:8 115:7,14
116:17,21
120:10 155:24
156:3,9 161:24
168:14,22
176:4,13
**transitioned**
69:17 75:2
121:2 135:17
147:21
**transitioning**
73:17 115:16
115:19,23,25
117:24 121:5
155:23 156:16
177:1,2
**transitions**
158:6
**transmission**
120:23
**true**  45:2 82:11
82:17 95:8
139:12 164:15
187:12
**truth**  187:9
**truthfully**  8:10
80:1,13
**try**  6:25
**trying**  46:4
51:15 54:6

61:18 62:16,19
87:11 105:1
118:5 173:16
**turk**  150:20
151:12 158:10
166:18
**turned**  22:11
**twice**  20:21
115:5
**two**  14:21
19:10 28:18
31:24 40:21
59:10 71:7
74:25 91:11
92:6,8,11
115:6 120:8
127:2 132:14
138:2 139:20
141:8 148:15
152:25 154:11
154:16 156:13
159:2,7 165:23
165:25 177:21
180:21 181:22
**twt**  1:6 5:10
**type**  6:20 18:11
132:18 133:13
133:19 141:17
142:4 148:5,6
149:5 165:12
**types**  64:11,13
66:5 163:18
164:6

**typically**  33:18
35:9,12 36:9
43:21,24 45:6
52:2 92:7
93:18 100:14
113:17 170:22

**u**

**u.s.**  5:8
**ulsaker**  179:3,9
179:18 185:14
**unable**  80:13
**unavailable**
152:7
**unclear**  102:12
156:6
**uncommon**
44:25
**under**  48:23
51:1,6 75:3
80:1 144:22
168:5,10
**undergrad**
11:5
**underpaid**
100:4,9
**understand**
6:20 7:24 28:2
32:13 33:13
37:23 40:9
46:4 50:19
51:15 52:12,17
53:2 57:21
61:18 62:17,20

75:8 76:8,22
79:25 80:3,6
80:10 82:6
86:5 92:18
94:3 95:21
96:8 100:13
104:1 106:4
118:4,5 119:17
120:13 124:19
128:18 133:5
134:16 135:1
136:3,19
142:22 143:15
155:13 159:5
162:25 168:14
168:22 181:19
184:13,14
**understanding**
82:25 155:21
157:13 170:16
176:2 177:17
**understands**
54:7
**understood**
73:11
**unit**  148:1
**united**  1:1 20:5
20:7
**universe**  61:22
**university**  9:15
**updates**  71:18
71:24 72:7
**upload**  129:18
145:24

[uploaded - webas]                                          Page 43

| | | | |
|---|---|---|---|
| **uploaded**  32:23 | 155:18 176:21 | **vagueness**  77:8 | **voluntarily** |
| 33:2 | 176:23 | **valid**  121:9,13 | 96:15 |
| **uploading** | **usually**  33:17 | **variation**  131:5 | **vs**  1:6 |
| 127:13 | 46:18 55:17 | **varies**  42:18 | **w** |
| **usage**  138:21 | 62:6,7 65:11 | **vast**  135:8 | |
| **use**  18:25 19:4 | 71:13 85:17 | **verbiage**  95:20 | **wage**  133:13,19 |
| 39:4 46:22 | 88:19 | 96:3 | 142:4 148:5 |
| 52:2 77:12 | **utilize**  96:3 | **veritext**  5:12 | 149:5 |
| 103:13 121:25 | **v** | 186:15 188:1,7 | **waiting**  116:10 |
| 122:5 131:10 | | 191:1 | 117:18 |
| 134:11 151:5 | **v**  188:6 189:3 | **veritext.com.** | **waived**  188:19 |
| **used**  4:23 18:18 | 190:3 | 188:17 | **want**  24:18 |
| 18:22 46:20,22 | **vac**  162:24 | **versa**  121:16 | 84:17 85:22 |
| 51:16 52:1 | **vacation**  13:15 | **version**  145:15 | 87:14 139:23 |
| 54:3 71:8 74:8 | 31:19,20,23 | 157:6,9,16 | 152:19 160:3 |
| 75:19 92:14 | 32:3 151:6 | 171:14 174:3 | 164:5 165:20 |
| 95:20 103:4,10 | 157:18 162:25 | **versus**  5:7 | 179:22 |
| 103:12 122:1 | 163:1 | **vice**  121:16 | **wanted**  73:11 |
| 122:11,17,23 | **vague**  35:25 | **video**  5:2,4 | 132:22 133:22 |
| 123:9,24 124:6 | 37:21 40:6 | **videographer** | 140:18 160:1 |
| 124:13,14 | 42:23 52:15,25 | 2:21 5:1,12,22 | **way**  42:4 43:3 |
| 126:23 131:6 | 53:25 56:2 | 45:18,22 79:14 | 46:18 54:2 |
| 132:3 135:7 | 59:25 62:12 | 79:19 83:8,11 | 66:7 92:4 |
| 137:25 145:24 | 66:15 72:14,22 | 110:17,21 | 98:23 99:16 |
| 165:13 170:23 | 73:2 74:4 | 140:8,12 | 106:18 116:12 |
| 171:21 | 76:18 82:4 | 152:11,15 | 117:11 137:9 |
| **uses**  51:14 | 86:19 87:6,22 | 186:1,5,11 | 137:10,18 |
| 121:20 122:21 | 92:1 99:22 | **videotaped** | 138:1,5 139:20 |
| **using**  54:2 | 102:9 114:21 | 1:10 | 139:21 170:9 |
| 58:20 69:10,17 | 121:22 133:2 | **view**  178:2 | **we've**  85:17 |
| 77:12 93:5 | 137:11 138:20 | **virtual**  5:4 | 127:9 |
| 123:13 125:22 | 143:20 154:2 | **volume**  18:15 | **webas**  127:24 |
| 126:22,25 | 163:5,9 168:17 | 18:16 | 128:3 |
| 133:1,24 | 169:15 175:3,9 | | |

**website**   32:20
32:21
**week**   33:25,25
34:4,4,11,20
35:1,11 36:11
36:11,16,19
37:3,5,5,6,6,8,9
37:9,19 41:24
42:1,5,6,8,13
42:14 43:2
46:13,22 49:24
50:4,6 51:12
51:15,25 52:4
52:5,6,8,14,20
53:4,8,15,23
54:1,11,13,20
55:4,11,14,21
55:22 56:1,18
56:23,25 57:4
57:10,11,12,15
57:17,20,24
58:5,6,10,22
59:3,6 83:22
91:12 108:6,24
109:10 171:6,7
181:20 182:2
182:20
**weekly**   42:3
46:8 49:5,12
50:15,19 51:2
51:6,9,11 57:8
69:11 95:2,10
96:4 112:4
114:9,13,18

115:1,6,15,20
116:17,18
**weeks**   37:11
42:21 54:25
115:6
**went**   73:7
105:7 112:10
171:4
**whereof**   187:20
**white**   174:5
**wholesale**
107:17
**wholly**   31:16
**widespread**
177:18
**wildly**   74:11
**window**   130:19
149:18,20
171:1
**wish**   80:21
**witness**   3:2
5:25 6:3 7:21
10:15 11:1,14
12:11 13:1,13
13:23 14:4,11
14:18 15:5,11
15:17 16:6,14
17:5,12,18,24
18:14,21 19:9
20:1,19 21:5
21:24 22:3,10
22:16,21 23:6
23:11,17 24:2
24:10,23 25:5

25:12,18 26:1
26:6,13,18,22
27:7,13,18
28:1,9 29:7,13
29:24 30:6,19
31:7,14 32:7
32:12,19 33:1
33:7,12 34:8
34:23 35:3,20
36:8,22 37:16
37:22 38:4,9
38:15 39:1,17
39:21 40:3,7
41:2,10,23
42:12,17 43:1
43:9,20 44:5
44:11,20 45:5
45:16 46:11,17
47:5 48:1,17
49:22 50:17
51:8 52:11,16
53:1,7,17 55:9
56:3,13,21
57:3,14 58:14
59:1,8,15 60:1
60:13,22 61:9
61:24 62:13
63:6,16 64:1
65:7,19 66:3
66:10,23 67:18
69:19 70:1
71:5,21 72:2
72:15 73:4,21
74:5 75:7,17

76:13 77:9
78:11,19 80:9
81:8,24 82:5
82:15,22 83:4
83:19 84:7,14
85:16 86:4,10
86:20 87:9
88:1,18 89:1,9
90:23 92:3
93:4 94:2,8
95:14 96:2
97:10 98:1,17
98:22 99:6,15
99:23 100:6,11
101:7 102:3
103:6 104:21
105:22 106:14
106:22 107:9
108:11 109:1
109:16 110:1
112:15 113:10
113:20 118:3
120:1,19
121:23 122:13
123:1,18 124:2
124:9,18 125:7
125:11,20
126:1,5,10
127:12 128:11
129:1,8 130:1
131:3,9 132:5
132:11 133:4
134:5,13,21
136:8 137:1,12

| | | | |
|---|---|---|---|
| 137:21 138:14 | 27:21,24 30:22 | 108:24 109:9 | 49:12 53:9,12 |
| 139:6,18 140:3 | 35:11 36:15,19 | 109:21 110:11 | 55:10,16,17,18 |
| 143:14,21 | 37:2,8,9,10,14 | 115:7 119:18 | 55:19,21,24 |
| 144:14 145:13 | 37:17,20,25 | 121:16 125:9 | 56:1,6,9,10,16 |
| 146:17 147:6 | 41:24 42:1,5,6 | 126:12 130:9 | 58:7 82:19 |
| 147:12 148:12 | 42:7,13,14 | 137:8,16,16 | 108:13,15 |
| 148:23 151:19 | 43:24 45:14 | 138:17,18,24 | 112:3 149:22 |
| 155:16 156:5 | 46:3,9,13,14,20 | 138:25 139:8,9 | 151:4,20 |
| 156:12 157:8 | 46:22 47:17 | 164:13,18,19 | 181:12 |
| 158:1,17 159:4 | 49:15,19,23 | 170:2 171:6,18 | **works** 35:12,13 |
| 160:11,17 | 50:4,5 51:12 | 175:6 181:8 | 37:19 45:16 |
| 162:5 164:17 | 51:15,16 52:1 | 182:11,13 | 46:21 110:11 |
| 164:24 165:10 | 52:4,5,6,8,14 | **worked** 9:9 | 118:22 119:17 |
| 166:10 168:19 | 52:20 53:4,8 | 40:24 41:3,7 | 169:19 170:7 |
| 169:10,17 | 53:11,15,23 | 41:25 42:1 | 184:1 |
| 170:1 171:13 | 54:1,11,13,20 | 49:13,15 50:2 | **worth** 102:16 |
| 172:18 175:12 | 54:25 55:4,11 | 50:3 51:12 | **write** 51:20 |
| 176:15 177:16 | 55:22 56:9,17 | 62:3 92:6 | 165:13 |
| 182:5 185:21 | 56:18,25 57:4 | 113:16 120:4 | **writes** 72:5 |
| 186:10 187:8,8 | 57:5,8,10,11,17 | 132:24 136:4 | **writing** 95:1 |
| 187:20 188:8 | 57:19,23,24,25 | 136:14 144:8 | **written** 31:4,10 |
| 188:11 189:1,4 | 58:5,6,10,16,18 | 146:15,21 | 31:16 159:25 |
| 189:11 190:1,4 | 58:21,23 59:3 | 149:11 150:25 | 161:19,20 |
| 190:15 | 59:6,6 61:3,6 | 158:23 168:9 | **wrong** 107:1 |
| **witness'** 188:14 | 61:10,13 62:18 | 168:12 169:8 | **x** |
| **wong** 118:15 | 63:12,13 64:16 | 169:12,14,14 | **x** 6:5 |
| **word** 76:25 | 64:16,24 77:24 | 169:23 170:5 | **y** |
| 86:11 135:7 | 78:4,8,15 | 170:21,25 | **y'all** 140:6 |
| 138:21 | 83:22 91:11,14 | 171:19 181:9 | **yeah** 23:7 |
| **words** 55:22 | 92:10,16,24 | 181:11 | 24:15 29:16 |
| 57:22 71:7 | 93:6,7,19,23 | **workforce** 18:8 | 31:10 49:23 |
| 74:8 | 94:10 95:22 | **working** 11:2,4 | 56:15,16 62:16 |
| **work** 4:4 10:4 | 96:7,9,11,12,14 | 12:13 17:9 | 65:8 67:19 |
| 17:2 23:3 | 97:3,5 108:5 | 30:23 48:24 | |

| | |
|---|---|
| 69:21 70:6 | **zsys** 145:19 |
| 79:8 82:8 | |
| 111:23 116:3 | |
| 137:15 148:14 | |
| 149:3 168:22 | |
| 173:22 | |
| **year** 9:20 11:11 | |
| 12:12 15:23,25 | |
| 21:15,17 24:4 | |
| 24:6 38:1,7 | |
| 39:15 43:6,10 | |
| 43:13 48:25 | |
| 70:23 71:1 | |
| 116:11 117:18 | |
| 135:20 177:21 | |
| **yearly** 39:24 | |
| 40:16 | |
| **years** 9:5,10 | |
| 11:6 13:5 | |
| 14:21 19:10 | |
| 21:17,20 26:23 | |
| 28:21 31:24 | |
| 40:21 46:5 | |
| 102:7 127:2 | |
| 151:3 160:12 | |
| **yellow** 153:13 | |
| 174:8 | |
| **yep** 110:16 | |
| **yesterday** | |
| 91:11 | |
| **z** | |
| **zoom** 1:11 | |
| 34:17 | |

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.