Page 1

1         IN THE UNITED STATES DISTRICT COURT

        FOR THE NORTHERN DISTRICT OF GEORGIA

2               ATLANTA DIVISION

3

4 LUKAS GOODYEAR, Individually    )

  and on behalf of all others    )

5 similarly situated,          )

                         )

6         Plaintiffs,       )

                         )

7    vs.               ) No. 1:23-cv-05712-TWT

                         )

8 DELTA AIR LINES, INC.,     )

                         )

9         Defendant.        )

10

11

12         Videotaped deposition of GREGORY S. TAHVONEN,

13 taken remotely before NADINE J. WATTS, CSR, RPR, and

14 Notary Public, pursuant to the Federal Rules of Civil

15 Procedure for the United States District Courts

16 pertaining to the taking of depositions, commencing at

17 9:06 a.m. Central Daylight Time on the 14th day of

18 April, A.D., 2025.

19

20

21

22

23

24

Page 2

```
 1          There were present at the taking of this
 2   deposition the following counsel:
 3          (Appeared via videoconference)
            DiCELLO LEVITT, LLP by
 4          MS. MADELINE HILLS
            MR. DANIEL R. FERRI
 5          10 North Dearborn Street
            Sixth Floor
 6          Chicago, Illinois  60602
            (855) 312-9991
 7          mhills@dicellalevitt.com
            dferri@dicellolevitt.com
 8
              on behalf of the Plaintiffs;
 9
            (Appeared via videoconference)
10          SEYFARTH SHAW, LLP by
            MR. MITCHELL ROBINSON
11          MS. DANIELLE SHAPIRO
            1075 Peachtree Street NE
12          Suite 2500
            Atlanta, Georgia  30309
13          (404) 885-1500
            mrobinson@seyfarth.com
14          dshapiro@seyfarth.com
15            on behalf of the Defendant.
16
17   ALSO PRESENT VIA VIDEOCONFERENCE:
18          Ms. Blaze R. Knott, Delta Air Lines, Inc.
19          Mr. Justin Henricksen, Veritext videographer
20
21
22
23
24
```

Page 3

1           VIDEOTAPED DEPOSITION OF GREGORY S. TAHVONEN
2                     TAKEN APRIL 14, 2025
3
4    EXAMINATION BY                                    PAGE
5    Ms. Madeline Hills                                  6
6                          EXHIBITS
7                                                      PAGE
8    DEPOSITION EXHIBIT 1                                32
         DELTA_LG_00000169 - 00000178
9        Crew Resources, Pilot Scheduling
         & Crew Tracking Department Policies
10
     DEPOSITION EXHIBIT 2                                62
11       DELTA_LG_00018055 - 0018091
         ACS/CGO/Clean DPM
12
     DEPOSITION EXHIBIT 3                                69
13       DELTA_LG_00006381 - 00006382
         E-mail chain, top one from Karen
14       Jenkins to Timothy Gregory dated
         11-14-19
15
     DEPOSITION EXHIBIT 4                                73
16       DELTA_LG_00006383 - 00006408
         Feasibility & Requirements Document
17       Minnesota Wage Theft Law Notification
         Requirements
18
     DEPOSITION EXHIBIT 5                                88
19       DELTA_LG_00007175 - 00007176
         E-mail chain, top one from Kelly Brown
20       to John Early dated 2-8-19
21   DEPOSITION EXHIBIT 6                                92
         DELTA_LG_00007177 - 00007218
22       Hours of Work, Overtime and Shift
         Differential (Ground, Non-Contract
23       Employees)
24

Page 4

1                    EXHIBITS (Continued)

2                                                    PAGE

3   DEPOSITION EXHIBIT 7                              98
        DELTA_LG_00009322 - 00009323
4       E-mail chain, top one from John
        Early to Greg Tahvonen and Cheryl
5       Gray dated 2-23-22

6   DEPOSITION EXHIBIT 8                              103
        DELTA_LG_00012531 - 00012534
7       E-mail chain, top one from Kelly
        Boseman to Charles Dowd and Barbara
8       Franz dated 4-18-17

9   DEPOSITION EXHIBIT 9                              109
        DELTA_LG_00006993
10      Excel spreadsheet

11  DEPOSITION EXHIBIT 10                             114
        DELTA_LG_00006993
12      Excel spreadsheet

13

14

15

16

17

18

19

20

21

22

23

24

1        THE VIDEOGRAPHER:  Good morning.  We are going on

2    the record at 9:06 a.m. on April 14th, 2025.

3            Please note the deposition is being conducted

4    virtually.  The quality of the recording depends on the

5    quality of the camera and the Internet connection of

6    participants.  What is seen from the witness and heard

7    on screen is what will be recorded.

8            Audio and video recording will continue to take

9    place unless all parties agree to go off the record.

10           This is media unit 1 of the video-recorded

11   deposition of Gregory Tahvonen taken by counsel for the

12   plaintiff in the matter of Lukas Goodyear versus Delta

13   Air Lines, Inc., filed in the United States District

14   Court, for the Northern District of Georgia, Atlanta

15   Division, Case No. 1:23-cv-05712-TWT.

16           My name is Justin Henricksen, representing

17   Veritext.  I'm the videographer.  The court reporter is

18   Nadine Watts from the firm Veritext.

19           I'm not related to any party in this action,

20   nor am I financially interested in the outcome.

21           If there are any objections to the proceedings,

22   please state them at the time of your appearance.

23           Counsel and all present, including remotely,

24   will now state their appearance and affiliation for the

1    record, beginning with the noticing attorney.

2        MS. HILLS:  Madeline Hills from DiCello Levitt on

3    behalf of the plaintiff.

4        MR. ROBINSON:  Mitch Robinson, counsel for

5    defendant.

6                    GREGORY S. TAHVONEN,

7    called as a witness herein, having been first duly

8    sworn, was examined upon oral interrogatories and

9    testified as follows:

10                    EXAMINATION

11                  by Ms. Hills:

12       MS. HILLS:  Q    Good morning, Mr. Tahvonen.

13       A    Good morning.

14       Q    Did I say your name correctly?

15       A    Yes.

16       Q    Okay.  Could you please state your full name for

17   the record.

18       A    Sure.  It's Gregory S. Tahvonen.  Last name is

19   T-A-H-V-O-N-E-N, common spelling, at least within my

20   household.

21       Q    And what's your current address?

22       A    ███████████████████████, Mequon, Wisconsin

23   ███████

24       Q    Is that where you are today?

Page 7

1    A    Yes.

2    Q    How old are you?

3    A    59.

4    Q    And have you had your deposition taken before?

5    A    Yes.

6    Q    Okay.  How many times?

7    A    More than 10, less than 30.

8    Q    Okay.  So I'll just run really quickly through

9    housekeeping.  You've probably heard it several times

10   before.

11        The court reporter can't capture any non-verbal

12   sounds or gestures.  So just speak clearly so that she

13   can get a clean record.  Does that make sense?

14   A    Yes.

15   Q    Okay.  And then she can also only get one voice

16   at a time.  So I'm going to try not to speak when you're

17   speaking.  If you can do the same for me.

18   A    Absolutely.

19   Q    And we'll take breaks every once in a while.  If

20   you need one, just let me know.  But I do ask that if

21   there's a question pending, that you answer it before we

22   break.  Is that fair?

23   A    Yes.

24   Q    Is there anything that might prevent you from

1  testifying truthfully today?

2      A    No.

3      Q    How did you prepare for this deposition, if at

4  all?

5      A    I briefly read the subpoena, as well as the case

6  online.

7      Q    Do you understand -- I'm sorry, go ahead.

8      A    No, that's primarily the preparation.

9      Q    Do you understand what the case is about?

10     A    At a high level, yes.

11     Q    Could you describe that for me?

12     A    My understanding is the plaintiff is alleging a

13 break of contract based on the fact that he asserts that

14 time not worked due to a swap should count towards

15 qualification of the calculation of overtime as

16 qualifying threshold hours.

17     Q    Thank you.  And so I'll start with some of your

18 background briefly.  Could you tell me where you went to

19 school?

20     A    I went to school at Michigan State University.

21     Q    And what did you study there?

22     A    I studied psychology, undergrad, and labor and

23 industrial relations, graduate.

24     Q    When did you graduate from undergrad?

Page 9

1      A    1987.

2      Q    And your Master's?

3      A    1989.

4      Q    What was your first job out of school?

5      A    I went to work for General Motors.

6      Q    How long were you there?

7      A    12 years.

8      Q    What was your position there?

9      A    Various roles in HR of different

10   responsibilities.  So everything from compensation to

11   field HR, HR business partner.  And then I ended my role

12   there as the head of marketing HR for vehicle sales,

13   service, and marketing division.

14     Q    Where was that geographically?

15     A    Mostly in Detroit.

16     Q    Okay.  What did you do next?

17     A    I went from GM and joined Delta Technology at

18   that time.  We were a wholly-owned subsidiary of Delta

19   Air Lines supplying IT services to the company.  I began

20   that role in 2001.

21     Q    Was that in Detroit?

22     A    That was in Atlanta.

23     Q    Okay.  What were your responsibilities in that

24   position?

Page 10

1      MR. ROBINSON:  Object to form.

2      THE WITNESS:  I started in the area of compensation,

3  and I ended up as the chief human resources officer for

4  the subsidiary.

5      MS. HILLS:  Q  And -- Let's see.  I don't -- Did you

6  say how long you were in that position?  I might have

7  missed it.

8      MR. ROBINSON:  Object to form.  You can -- you may

9  answer.

10     THE WITNESS:  I was in that role until 2007.  And in

11  2007 I transitioned to Delta Air Lines, what we called

12  main line -- the main line airline.

13     MS. HILLS:  Q  And what was your title at that

14  point?

15     A  At that point I was Director of Compensation and

16  IT Services for the HR division.

17     Q  So is Compensation like its own group within HR?

18  What does that mean?

19     MR. ROBINSON:  Object to form.  You may answer.

20     THE WITNESS:  It's a subspecialty within HR.  It's

21  often referred to as the center of excellence or of

22  expertise.

23     MS. HILLS:  Q  And what was the other category?

24     A  I was the HR field person for the IT division.

Page 11

1    So normally it's referred to as an HR business partner
2    or sometimes as an HR generalist.
3        Q    And what were your responsibilities in that
4    role?
5        A    In that role --
6        MR. ROBINSON:  Objection.  You may answer.  Just
7    give me a second just to --
8        THE WITNESS:  Sure.  I apologize.
9            In that role, it was everything you could
10   imagine from an HR perspective.  From hiring to
11   developing training plans, to career management,
12   fulfilling open roles, compensation for that group, as
13   well as any disciplinary action required, performance
14   management for the team, and leading managers on
15   building organizational effectiveness.
16       MS. HILLS:  Q    You mentioned training I believe.
17   Could you describe that more for me?
18       A    The aspect of training I would have been
19   involved in was dealing with specific leadership
20   training.  The technical skills of an IT person was out
21   of my scope.  I couldn't profess to even know what the
22   acronyms all mean.
23           But the leadership training piece really was
24   around training on Delta philosophy and policy around

Page 12

1   leadership, as well as becoming a good people leader,

2   career management, delivering performance appraisals,

3   those types of things.

4       Q    Were you involved in creating policies in that

5   position?

6       MR. ROBINSON:  Object to form.  You may answer.  You

7   can answer.

8       THE WITNESS:  I was more interpreting corporate

9   policy, not developing it.  We were a division of Delta

10  Air Lines, so we maintained the same policies as the

11  rest of the company.  Those are developed at a center of

12  excellence by subject matter, and then I was on the

13  administrative end of those.

14      MS. HILLS:  Q   So the corporate level policies were

15  consistent?

16      MR. ROBINSON:  Object to form, vague.  You may

17  answer.

18      THE WITNESS:  Generally, they were.

19      MS. HILLS:  Q   When was that not the case?

20      A    Generally it was driven by some market

21  difference.  So, for example, back at the time when I

22  was supporting IT, IT was a different market than an

23  airline person necessarily.

24          So in some cases we were able to offer like a

1    sign-on bonus, where that may not have been common in

2    other areas of the business.  But they were very minute

3    and specific situations where we may have had a

4    different policy affecting IT people.

5        Q   So how long were you in -- I've forgotten the

6    name now.  What was the title we were just discussing?

7        A   That was Director of Compensation and IT

8    business, or IT business partner.

9        Q   How long were you in that position?

10       A   That exact position, only a couple of years.

11   Then the job morphed to added responsibility for

12   retirement, as well as compensation.  So I then became

13   the head of -- I think I was promoted maybe to managing

14   director at that time.  I don't exactly recall.  Then I

15   would have been taking over retirement benefits,

16   compensation, and still maintain the HR business partner

17   role for IT.

18       Q   What is the HR business partner role?

19       A   Often it's referred to as an HR generalist.

20   It's providing HR support to a client group, from

21   leadership all the way to the individual employee.

22       Q   Could you describe that more for me?

23       A   It's providing HR counsel.  So helping leaders

24   as they fill openings, helping employees to achieve

Page 14

```
 1   their career aspirations, understanding the
 2   organization, making sure that there's, you know,
 3   clear -- clarity around job descriptions; that we're
 4   recruiting for the right talent, building the right
 5   capabilities for the long-term success of the
 6   organization, and, very importantly, working with
 7   leaders to make sure that they are equipped with
 8   leadership skills to manage or lead a group of people.
 9        Q   And when you added the compensation piece to
10   your title, what did that entail?
11        MR. ROBINSON:  Object to form.
12        MS. HILLS:  Q   Or the -- I'm sorry.  When you added
13   the retirement piece to your title, what new
14   responsibilities did that entail?
15        MR. ROBINSON:  Object to form.  It's vague.  You may
16   answer to the best of your ability.
17        THE WITNESS:  The retirement piece, as many
18   companies, is multifaceted within Delta.  So it was
19   overseeing both the defined benefit plan for employees,
20   what is commonly referred to as the pension plan, and
21   then, most importantly, the current vehicle for
22   retirement savings, so a 401(k) plan.
23             And so it was developing and overseeing those
24   programs, educating employees on them, and making sure
```

Page 15

1   that they were delivering value to our employees,

2   employees understood how they worked and what their role

3   in that was and what they could do to increase their

4   retirement savings.

5       MS. HILLS:   Q   And when you were in compensation

6   and retirement, was that in Atlanta?

7       A   Yes, it was.

8       Q   Okay.  And did you change your title after that?

9       MR. ROBINSON:  Object to form.  You may answer.

10      THE WITNESS:  Over the course of time I gathered

11  additional responsibilities at Delta.  And so I was

12  promoted to Vice President of Total Rewards, and I also

13  maintained the HR business partner role for IT at that

14  time.

15          So it was really a promotion more or less in

16  place.  I had largely the same responsibilities.  It was

17  a new title, Total Rewards.  And that was in 2014 I

18  believe.

19      MS. HILLS:   Q   What is Total Rewards?

20      A   Total Rewards is the modern term for

21  compensation and benefits.  So there I added in

22  responsibility for the healthcare plans at Delta, the

23  retirement plans at Delta, and the compensation plans.

24  And so collectively those are known as Total Rewards.

Page 16

1    It also includes employee wellness and employee

2    recognition.

3        Q    Was HR IT -- Or were you -- Let me rephrase.

4    Did you act as the business partner for IT or were

5    you -- I guess could you explain to me more what HR IT,

6    what that means?

7        MR. ROBINSON:  I'm going to object to form,

8    compound.  Also vague.  You may answer to the best of

9    your ability.

10       THE WITNESS:  Yes, I was always the HR business

11   partner for IT from 2007 until 2017.  Well, actually of

12   2001.  When we were a separate subsidiary, that was also

13   in my role.  So I was the HR business partner for IT up

14   until 2017 I believe.

15       MS. HILLS:  Q    That's helpful.  And I guess I'm

16   trying to understand when you were acting as the

17   business partner, like was that on behalf of IT as a

18   group or was that, you know, for IT projects?  I'm just

19   trying to understand more of what that means.

20       MR. ROBINSON:  Same objection.  You may answer to

21   the best of your ability.

22       THE WITNESS:  It was on behalf of IT people.  So

23   basically it was partnering with the leadership of IT to

24   make sure that the needs of the IT population were met

Page 17

1    from an HR perspective.

2        MS. HILLS:  Q   Okay.  And how many people reported

3    to you in that position?

4        A    To the best of my recollection, 30 to 35.

5        Q    And were they also located in Atlanta?

6        A    The majority were.  Yes, at that time my team

7    was in Atlanta.

8        Q    And who did you report to?

9        A    I reported to the Senior VP of Total Rewards.

10       Q    Who would that be?

11       A    His name was Rob Kite.

12       Q    Okay.  Did you have any other position changes

13   while at Delta?

14       MR. ROBINSON:  Object to form.

15       THE WITNESS:  Yes, following that role I moved to

16   lead the HR Service Delivery function.  So I was Vice

17   President of HR Service Delivery.  I believe it was in

18   2017 that I moved to that role.  And there I was

19   responsible for HR service delivery globally.

20       MS. HILLS:  Q   And what does that mean?

21       A    It basically is administering HR related -- So

22   rather than working -- An example would be in the

23   benefits world I was developing benefit programs, and in

24   the HR Service Delivery function I was responsible for

Page 18

1    overseeing the administration of those programs.  So

2    it's an operational job within HR.

3        Q    Was that for all -- all Delta employees or a

4    certain group?

5        MR. ROBINSON:  Object to form.

6        THE WITNESS:  All Delta.  I'm sorry.

7        MR. ROBINSON:  Go ahead.

8        THE WITNESS:  All Delta employees.

9        MS. HILLS:  Q    And you were still in Atlanta for

10   that position as well?

11       A    Yes.

12       Q    How many people reported to you as the VP of HR

13   Service Delivery?

14       A    Total organization was around 160 people.

15       Q    Were they in Atlanta as well?

16       A    More of a global footprint.  Largely in Atlanta,

17   but we did have HR operations in other areas of the

18   world.  I can't recall exactly where the bases of people

19   were.  But it was not a hundred percent in Atlanta at

20   that time.

21       Q    And so you still served as -- Did you still

22   serve as a business partner at that time?

23       MR. ROBINSON:  Object to form.  You may answer to

24   the best of your ability.

1      THE WITNESS:  No, I did not.  I stopped the HR

2   business partner role in 2017 partly because, as in HR

3   operations, I was developing and helping to develop IT

4   solutions for HR.  So it would have been conflictual for

5   me to be their HR person as well.  I became a client of

6   HR -- of IT, excuse me.

7      MS. HILLS:  Q   I understand.  So what solutions

8   were you developing around that time?

9      A   Largely we were post-implementation of the ERP

10  system, SAP.  So we were still working through SAP and

11  its ties to downstream systems like payroll and

12  benefits.

13     Q   Were you involved in the decision to use IP --

14  or to use SAP?  I'm sorry.

15     MR. ROBINSON:  Object to form, vague, compound.  You

16  may answer.

17     THE WITNESS:  I was not.  That decision was made

18  prior to my time in that role.

19     MS. HILLS:  Q   And what is SAP?

20     A   SAP is an ERP solution, which basically means an

21  enterprise employee system that holds employee data, as

22  well as position-related data.  It's commonly referred

23  to as an ERP.

24     Q   Does that include time and attendance systems?

Page 20

1      MR. ROBINSON:  Object to form.  You may answer.

2      THE WITNESS:  Not directly.  SAP relies on -- The

3   easiest way to think about it is SAP is the center core

4   of data, and that center core receives input and

5   delivers output to ancillary systems in support of HR,

6   and the time and attendance system would be one of those

7   ancillary systems.

8      MS. HILLS:  Q   What other ancillary systems would

9   feed into SAP?

10     MR. ROBINSON:  Object to form.  You may answer.

11     THE WITNESS:  Output of SAP would be into the

12  payroll system.  It would be into benefit enrollment

13  systems.  It was to outcome vendors, meaning if you

14  enrolled in United Healthcare, we needed to let United

15  Healthcare know that you did that, and we would do that

16  through SAP.

17          And so the back and forth of files in order to

18  support the employee experience at Delta worked a

19  critical role in SAP.  It was the source of -- It was

20  the system of record for lack of a better term.

21     MS. HILLS:  Q   How did SAP -- Let me rephrase.  I'm

22  not very technical, so this will be a tricky one for me.

23  How does the system, SAP, know how to apply Delta's

24  policies?

Page 21

1       MR. ROBINSON:  Object to form.

2       THE WITNESS:  I am only a notch above you relative

3   to technology.  But basically it's called configuration.

4            So a system is configured with the rules and

5   dataflow agreed to or mapped out by the company and the

6   configuration of that system executes the rules against

7   that.  It's called a schema.  So the schema is built in

8   SAP, which includes the rules engine, and from that

9   point it's automated.

10      MS. HILLS:  Q   When you were at Delta, was there a

11  particular person or group that was responsible for that

12  process?

13      MR. ROBINSON:  Object to form, vague.  What's the

14  process you're referring to, Counsel?

15      MS. HILLS:  I'm referring to his inputting the rules

16  into SAP, the schema that you've referenced.

17      MR. ROBINSON:  You may answer.

18      THE WITNESS:  It was a -- I would say it was a

19  collective effort between IT -- So as you could imagine,

20  there would be technical coders that understood the

21  coding system within SAP, as well as end users from the

22  business, as well as people that were on my team that

23  were translating what we called business requirements to

24  a programming need, and then IT would execute and test

1   against that.

2       MS. HILLS:  Q   Are you familiar with MyTime?

3       A   Yes, to some degree.

4       Q   What is it?

5       A   It's a timekeeping system for a segment of

6   Delta's population.

7       Q   And then are you familiar with Delta's Hours of

8   Work, Overtime and Shift Differential policy?

9       MR. ROBINSON:  Object to form.  You can answer it.

10      THE WITNESS:  Yes, again, at a high level, keeping

11  in mind that I haven't worked there in two years, so.

12      MS. HILLS:  Q   All right.  So when did you leave

13  employment with Delta?

14      A   January of 2023.

15      Q   Why did you leave?

16      A   I was recruited by an executive search firm.

17      Q   And what is your current position?

18      A   I'm Vice President of Total Rewards for SC

19  Johnson & Company.

20      Q   Did you have any roles between Delta and your

21  current position?

22      A   No.

23      Q   Do you have any plans on returning to employment

24  with Delta?

Page 23

1      A    No.

2      Q    And I believe you mentioned that -- when you

3   were explaining your previous position at Delta

4   something about not being on the more technical side, to

5   paraphrase.  But who at Delta was considered the more

6   technical side of HR operations?

7      MR. ROBINSON:  Object to form, mischaracterizes

8   testimony, vague.  You may answer to the best of your

9   ability.

10      THE WITNESS:  There were resources on my team who

11   were IT trained, as well as an IT interface person that

12   they would have had.  But the names escape me at this

13   point because there would have been a myriad depending

14   on solution.

15           But I -- by my background, while I've always

16   been around the IT space, I'm not a coder.  I'm not a --

17   I can ask for what I want to ask for, but I can't code

18   it.  So there were people on my team that were SAP

19   experts in coding and there were experts on the IT side.

20      MS. HILLS:  Q   Were those people in Atlanta as

21   well?

22      A    Largely, yes.

23      Q    And are you familiar with the term ground

24   non-contract employee at Delta?

Page 24

1      MR. ROBINSON:  Object to form.

2      THE WITNESS:  Yes.

3      MS. HILLS:  Q   Could you describe that for me?

4      A   It refers to employees who are not part of the

5   crew, meaning in the airplane.  So they're on the

6   ground.  And non-contract refers to the fact that they

7   are not represented under collective bargaining.

8      Q   In your work at Delta did you deal with

9   overtime?

10     MR. ROBINSON:  Object to form, vague.  You may

11  answer to the best of your ability.

12     THE WITNESS:  I would need clarification on that

13  question.  To say I dealt with overtime, I think that

14  would be a fair statement, but my level of direct

15  involvement was minimal.

16     MS. HILLS:  Q   Were you familiar with Delta's

17  policies related to overtime?

18     MR. ROBINSON:  Object to form.  You may answer.

19     THE WITNESS:  Again, at a very high level.

20     MS. HILLS:  Q   Approximately how many ground

21  non-contract employees at Delta were eligible for

22  overtime?

23     A   Well, we're kind of robbing the memory bank.

24  But it would have been in the neighborhood -- Well, can

1    I ask for a point of clarification or make a clarifying

2    point?

3         Q    Sure, yeah.

4         A    So ground employee is a very broad definition,

5    and I think it's helpful to understand scale ground

6    employees from merit ground employees because they're

7    two totally different populations.

8              And scale ground employees number in the tens

9    of thousands.  The merit ground employees is a far lower

10   number.  Probably between 8 and 9,000 to the best of my

11   recollection.

12        Q    And those numbers you just gave, are you talking

13   in terms of in the U.S. or globally?

14        MR. ROBINSON:  Object to form.  You can answer.

15        THE WITNESS:  Primarily in the U.S.

16        MS. HILLS:  Q   So could you describe the -- I'll

17   restate.  What's the distinction between scale and merit

18   employees?

19        MR. ROBINSON:  Object to form.  You may answer.

20        THE WITNESS:  Scale employees grow career-wise and

21   pay-wise through time spent in position.  They go up a

22   pay scale is the easiest way to summarize it.  So they

23   have a scale.  Everyone with that number of years of

24   experience is at the same step on the scale.  That step

Page 26

1    on the scale has a compensation associated with it.

2            Merit employees are in a salary range, and

3    their position in that range is both driven by market

4    conditions, as well as individual performance, and

5    they're not at the same exact number based on years of

6    experience.  While years of experience could be a

7    factor, it's not the sole determining factor of pay.

8        MS. HILLS:   Q   Would -- or could it be the case

9    that there are two employees say in the same department

10   with the exact same title that are both scale and merit?

11       A    No.

12       Q    So it would be consistent for job title whether

13   an employee was scale or merit?

14       A    Correct.

15       Q    Was it also consistent within a department?

16       MR. ROBINSON:  Object to form.  You may answer to

17   the best of your ability.

18       THE WITNESS:  I can't recollect if there would be

19   any differences within a department.  But within job

20   title, the job title would drive whether they were scale

21   or merit.

22       MS. HILLS:   Q   Does the scale or merit

23   classification have any connection to whether someone is

24   full time or part-time?

1      MR. ROBINSON:  Object to form.

2      THE WITNESS:  No.  Sorry.  No.

3      MS. HILLS:  Q   Okay.  That's helpful.

4          And so while you were in HR, did you draft or

5   author any policies related to overtime?

6      MR. ROBINSON:  Object to form, asked and answered.

7   You may answer it to the best of your ability.

8      THE WITNESS:  Not personally, no.

9      MS. HILLS:  Q   Who did?

10      MR. ROBINSON:  Object to form, vague.  You may

11   answer.

12      THE WITNESS:  Members of my team.

13      MS. HILLS:  Q   Do you remember who they were?

14      A   I would be remiss in trying to cite an

15   individual as it could vary by work group.  So I

16   wouldn't be comfortable saying it was a person or even a

17   group of two or three.  Many people were involved at

18   different points.

19      Q   So how -- Let me think.  So the HR policy

20   related to overtime compensation, who had final sign-off

21   authority on that when you were at Delta?

22      MR. ROBINSON:  Object to form, vague.  You may

23   answer to the best of your ability.

24      THE WITNESS:  The final sign-off would have

Page 28

1    ultimately been our CHRO.

2        MS. HILLS:   Q    Who would that be?

3        A    That varied at different points in time.

4        Q    What is a CHRO?

5        A    CHRO was chief human resource officer.

6        Q    Okay.  Did departments at Delta have like

7    department-specific policies for overtime?

8        MR. ROBINSON:  Object to form, vague.  Also

9    compound.  You may answer to the best of your ability.

10        THE WITNESS:  At some point in time there may have

11    been local practices.  But as we moved to a common

12    system, we worked to align policies and procedures

13    with -- with the ability of SAP and other ancillary

14    systems and commonized them over time.

15        MS. HILLS:   Q    When you referenced the move to a

16    new system, is that SAP you're referring to?

17        MR. ROBINSON:  Object to form.

18        THE WITNESS:  Yeah, SAP, it takes on generations,

19    right?  SAP is just not quickly installed.  So if you

20    think of SAP's implementation, it really began I think

21    around 2015.  Before it got all of the feeds from

22    downstream systems and feeds to downstreams -- or

23    outbound systems was more like 2021.

24            So in those years of making was when the work

Page 29

1   would have been done to program SAP accordingly and to

2   commonize to the degree possible policies and procedures

3   between business units.

4        MS. HILLS:   Q   So with the rollout of the SAP

5   system, the goal was to standardize groups in line with

6   the corporate HR policy; is that correct?

7        MR. ROBINSON:  Object to form, vague, compound,

8   calls for speculation.  The witness has already

9   testified as to his knowledge.  But you may answer to

10  the best of your ability.

11       THE WITNESS:  I would say not only standardize, but

12  also make sure that policies were implemented according

13  to spec.  So it allowed for existing policies to be

14  implemented and administered more aligned to their

15  original intent.

16       MS. HILLS:   Q   What do you mean by that?

17       MR. ROBINSON:  Object to form.  You may answer.

18       THE WITNESS:  By getting rid of manual processes and

19  automating them, the automation allowed for the rules to

20  be programmed the way they were intended to be rather

21  than left to manual intervention that could result in an

22  error or a misinterpretation.

23       MS. HILLS:   Q   Were there errors and

24  misinterpretation occurring before the automated system

Page 30

 1   was put in place?

 2       MR. ROBINSON:  Object to form.  Counsel, perhaps you

 3   could reframe the question.  It just calls for

 4   speculation.

 5       MS. HILLS:  I don't think it does.

 6              Was that question confusing to you,

 7   Mr. Tahvonen?

 8       THE WITNESS:  Well, I was going to answer only if I

 9   can speculate.  So I guess so.  I can't speculate as to

10   what was going on.  It wasn't our reason for

11   commonization.  But I don't know what it meant from a

12   before and after perspective because we were

13   administering two established policies.  So I have no

14   way of knowing what may have been occurring previously

15   to be firsthand knowledgeable of.

16       MS. HILLS:  Q   And you mentioned the original

17   intent behind policies.  So I know we discussed who was

18   involved in authoring an HR policy related to overtime.

19   But my question is, who was the source of what -- who

20   had the say for what the original intent of the HR

21   overtime policy was?

22       MR. ROBINSON:  Objection, vague.  You may answer to

23   the best of your ability.

24       THE WITNESS:  I really don't know how to directly

Page 31

1   answer the question.  I mean, obviously we have

2   guidelines that comply with legal requirements.  And so

3   in setting up those legal requirements we want to make

4   sure that our policies reflect that in every part of our

5   business, including HR.

6           And so much of it is dictated by law relative

7   to wage and hour pay, et cetera.  That derives a policy.

8   It helps formulate a policy that is then reviewed

9   through multiple chains within HR and shared with

10  business leaders so that they could administer it

11  accordingly and ultimately communicate it.

12     MS. HILLS:  Q   Did you have any indication that the

13  HR overtime policy was being applied differently across

14  Delta?

15     MR. ROBINSON:  Object to form, vague, speculative.

16  I'm -- Counsel, I'm having problems even understanding

17  what your question is asking for.

18     MS. HILLS:  Q   Did you have any indication that

19  there were occurrences of groups applying the HR

20  overtime policy differently among each other?

21     MR. ROBINSON:  Same -- same objection.  You can

22  answer to the best of your ability.  Also add calls for

23  speculation as part of the objection.

24     THE WITNESS:  Not to my knowledge.

1      MS. HILLS:  Q   Did HR approve like

2   department-specific policy documents?

3      MR. ROBINSON:  Object to form, asked and answered,

4   vague.  You may answer to the best of your ability.

5      THE WITNESS:  Direct approval would be a strong

6   word.  A review for intent of compliance we were often

7   engaged, but I can't guarantee that we saw a hundred

8   percent of them in any way, shape, or form.

9      MS. HILLS:  Q   Okay.  I'm introducing an exhibit.

10   Let me know when you're able to see it.  This is Exhibit

11   1.

12           (Document marked as Deposition

13            Exhibit 1 for identification.)

14      Q   Is that showing up for you?

15      A   I don't see it.

16      Q   I can -- I can screen share it.  Do you have the

17   Exhibit Share pulled up, or not?

18      A   I apologize.  We don't use Zoom, so I don't know

19   what you're referring to.

20      MR. ROBINSON:  Counsel, can we go off the record?  I

21   just want to make sure that he has access to the exhibit

22   before you -- So can we briefly go off the record just

23   to make sure he has Exhibit Share pulled up?

24      MS. HILLS:  Sure.

Page 33

1        THE VIDEOGRAPHER:  Okay.  We're going off the record

2    at 9:54 a.m.  This is the end of media unit 1.

3            (Recess was taken.)

4        THE VIDEOGRAPHER:  Okay.  We are back on the record.

5    The time is 10:02 a.m.  This is the beginning of media

6    unit 2.

7        MS. HILLS:  Q   All right.  So I'm pulling up screen

8    share so that you can see Exhibit 1 on my screen.  Can

9    you see that?

10        A   Yes.

11        Q   Awesome.  All right.  I'll start on the first

12    page.  It's Bates 169.  And you'll see that it says Crew

13    Resources, Pilot Scheduling & Crew Tracking Departmental

14    Policies.  Do you see that?

15        A   Yes.

16        Q   Do you recognize this document?

17        A   No.

18        Q   Could you tell me what crew resources means?

19        A   In this context I believe it is referring to the

20    organization that is responsible for the scheduling of

21    pilots and flight attendants.

22        Q   Let me scroll down.

23        MR. ROBINSON:  Counsel, do you mind zooming in just

24    a little bit in the document given --

1     MS. HILLS:  Yeah, I'm just looking for my spot, and

2     I will do so.

3     MR. ROBINSON:  Okay.  Thank you.

4     THE WITNESS:  Yeah, also, is there a date on this

5     document?

6     MS. HILLS:  Q  I can represent to you the file name

7     is Crew Resource Department Policy 2024.  And I'm --

8     Yeah, and it was created September 5th, 2024.

9     A   Okay.  Just to be upfront, I was no longer an

10    employee of Delta Air Lines on that date.  So I have a

11    hard time kind of commenting on a document for which I

12    was working at SC Johnson at the time.

13    Q   Sure, that I understand.  Did you ever see any

14    kind of departmental policy document for crew resources?

15    MR. ROBINSON:  Object to form.

16    THE WITNESS:  I did not.  Sorry.

17    MS. HILLS:  Q   Okay.  I will scroll down now.  It's

18    going to be Bates 171.  And I'll zoom in here.

19          And you see that it says on this page Pilot

20    Scheduling & Crew Tracking Organization?

21    A   Yes.

22    Q   And then do you see underneath that there's a

23    pdf link?

24    A   Yes.

Case 1:23-cv-05712-TWT    Document 94    Filed 08/01/25    Page 35 of 174

Page 35

1    Q    And that says Flight Ops Org Chart.pdf?

2    A    Yes.

3    Q    When you were at Delta, was there any kind of

4    organizational chart that you had access to?

5    MR. ROBINSON:  Object to form, vague.  Are you --

6    What are you asking him, Counsel?

7    MS. HILLS:  Q  I really don't think that's vague.

8         Was there an organizational chart that existed

9    at Delta?

10    MR. ROBINSON:  Throughout all of Delta, Counsel?

11    That's what you're asking him, did an organizational

12    chart exist?

13    MS. HILLS:  Yes, an org chart.

14    MR. ROBINSON:  Same objection.  It's entirely vague.

15    You know, I understand the rules of discovery are broad,

16    but there's got to be more specificity than that,

17    Counsel.

18    MS. HILLS:  You can answer the question,

19    Mr. Tahvonen.

20    MR. ROBINSON:  To the best of your ability.

21    THE WITNESS:  I would echo that.  I mean, a company

22    the size of Delta, there are many different org charts

23    within divisions, et cetera.  Generally, I did not have

24    access to those on a broad perspective.

Veritext Legal Solutions

www.veritext.com                                    888-391-3376

1      MS. HILLS:  Q   And your position covered employees

2   globally, correct?

3      A   Correct.

4      Q   How did you keep track of the different groups

5   and divisions within Delta?

6      MR. ROBINSON:  Object to form.  You may answer to

7   the best of your ability.

8      THE WITNESS:  Again, within the SAP system we knew

9   their position, their title, information about the

10   individual that was at the right level for what I

11   needed.  And then in various systems you could see who

12   somebody reported to, but you wouldn't necessarily see

13   an entire org chart, nor would you need to see one.

14      MS. HILLS:  Q   Was there an org chart for the

15   employees that would have been in the SAP system?

16      MR. ROBINSON:  Object to form.  You may answer to

17   the best of your ability.

18      THE WITNESS:  No.  SAP was everyone.  So SAP did not

19   have an org charting capacity that we used.

20      MS. HILLS:  Q   I see.  What about, was there an org

21   chart for ground non-contract employees that were in the

22   U.S.?

23      A   Not to my knowledge.

24      Q   Okay.  And what is flight ops?

Page 37

1      MR. ROBINSON:  Object to form, vague.  You may

2  answer to the best of your ability.

3      THE WITNESS:  Flight ops is an abbreviation for the

4  term flight operations, and it largely deals with the

5  cabin and cockpit crew personnel of a flight, flight

6  operations.  But it also includes some ground positions,

7  our inflight ops, such as scheduling, and it also

8  includes -- Dispatchers are a part of flight operations,

9  but they are represented at Delta.

10     MS. HILLS:  Q   About how many employees were in

11  flight ops?

12     MR. ROBINSON:  Object to form, calls for

13  speculation.  You may answer to the best of your

14  ability.

15     THE WITNESS:  I would approximate it to be in the

16  low 30,000s, including flight attendants and pilots.

17          And just to be clear, the flight attendants

18  are also part of the inflight services group.  So flight

19  ops here is boiling it down to just pilots.  And then

20  ground, associated with the actual operating of a

21  flight, that number would be more like 13,000 to 14,000.

22     MS. HILLS:  Q   I'm sorry, you said 13 to 14,000

23  represents --

24     A    Yeah.

1      Q    -- what distinction?

2      A    The exclusion of flight attendants because they

3    actually technically belong to inflight services.

4      Q    Okay.  Would the flight ops group also include

5    pilots?

6      A    Yes.

7      Q    About how many employees would you say were in

8    flight ops during your time at Delta that were ground

9    employees?

10     A    Somewhere between 1500 and 2200-ish.

11     Q    Okay.  Was that fairly consistent overtime?

12     MR. ROBINSON:  Object to form.

13     THE WITNESS:  I don't know where it's at today for

14    instance.  But during my tenure there it was relatively

15    stable.

16     MS. HILLS:  Q  All right.  I'm going to zoom out

17    just a little bit, but you tell me if that is not clear

18    enough and I can make it larger again.  Can you see

19    that?

20     A    I can.

21     Q    Okay.  So I'm on the page Bates numbered 172 and

22    I'm looking at the section 1.1, Coordinator and

23    Scheduler Responsibilities.  Do you see that?

24     A    I do.

1    Q    And then it looks like I can't highlight it, but

2    it says, crew tracking and pilot scheduling employees

3    must adhere to all Federal regulations, company policies

4    and procedures which govern their role within the

5    department.  Did I read that right?

6    A    Yes, as it appears here.

7    Q    Was it -- was it typical for department-specific

8    documents like this one to state that they followed

9    corporate policies?

10    MR. ROBINSON:  Object to form, vague, compound,

11    calls for speculation, particularly since the witness

12    testified that he was not employed with the company at

13    the time of this document.  You may answer to the best

14    of your ability.

15    THE WITNESS:  I would say it's not uncommon in the

16    area of compliance to remind employees that they fall

17    under both the Federal provisions and regulations as

18    indicated here, as well as company policy and codes of

19    ethics, et cetera.  I think it's common for that to

20    occur.

21    MS. HILLS:  Q    If a departmental or

22    division-specific policy document was inconsistent with

23    corporate HR policies, which one would govern?

24    MR. ROBINSON:  Object to form, calls for

Page 40

1   speculation, vague.  You may answer.

2       THE WITNESS:  Again, with the caution that this is

3   speculative, but I think it's clear at the beginning of

4   this sentence that Federal regulations, company policies

5   and procedures govern their role within the department.

6       MS. HILLS:  Q   I understand.  I'm asking just

7   generally during your time working at Delta.  So let me

8   ask a new question.

9           During your time at Delta was there ever an

10  instance where a department or division-specific policy

11  document was inconsistent with one of the corporate HR

12  policies?

13      MR. ROBINSON:  Object to form, vague and compound.

14  You may answer to the best of your ability.

15      THE WITNESS:  While I'm sure there may have been

16  instances that arose where there was a conflict between

17  the interpretation, I'm not aware of that being kind of

18  in place in any way, shape, or form.

19      MS. HILLS:  Q   So generally they -- each different

20  department-specific policies are supposed to comply with

21  the corporate HR policies; is that fair?

22      A   That's fair.

23      Q   All right.  So I've scrolled down.  Actually,

24  let's see.  And I'm on the page that's the next Bates

Page 41

1   No. 173.  There's a section that says 1.3, Schedule, in

2   the middle.  Do you see that?

3       A   Yes.

4       Q   And then it says, crew resource leaders will

5   construct a schedule to ensure appropriate coverage to

6   provide a reliable and consistent service to our crews.

7   Are you seeing that?

8       A   Yes.

9       Q   What does that mean to you?

10      MR. ROBINSON:  Object to form.  You may answer.

11      THE WITNESS:  I think quite literally is that they

12  are responsible for building a schedule that -- to make

13  sure that the crews of our flights are serviced reliably

14  and consistently.

15      MS. HILLS:  Q   Basically just make sure enough

16  people are working?

17      MR. ROBINSON:  Objection.  The testimony speaks for

18  itself.  Asked and answered.  Is there a question?

19      MS. HILLS:  Right.  I was responding to what you

20  said, Mr. Tahvonen, my understanding of your testimony.

21      MR. ROBINSON:  Okay.  Is that a question then?

22      MS. HILLS:  Q   I think we can move on at this point.

23  I think it was just clarifying.

24          Okay.  So I'm now on page 176.  And do you see

Page 42

1   at the top it says 1.8, Weekly Extra Time?

2       A    Yes.

3       Q    What is extra time at Delta in terms of your

4   time at Delta?

5       MR. ROBINSON:  I want to object as I've done so

6   before.  The witness has testified that at the time of

7   this document he was no longer employed by Delta.  So,

8   therefore, this question calls for speculation.  You may

9   answer to the best of your ability.

10      THE WITNESS:  I'm not familiar with the term extra

11  time.  Quite honestly, I don't recall it being used

12  widely within the company.  Again, it could have been a

13  departmental practice.  But I can't say firsthand, other

14  than the literal reading that we could all do of this

15  policy.

16      MS. HILLS:  Q   When you were at Delta, was it

17  common for employees to be offered extra shifts outside

18  of their normal schedule?

19      MR. ROBINSON:  Object to form, vague.

20      THE WITNESS:  I would say it would not be uncommon

21  to protect the operation.  So if the operational needs

22  drove additional staffing requirements, then I'm sure

23  that as a leader, they would do what they could to fill

24  those needs.

1      MS. HILLS:  Q   What do you mean by operational

2    requirements?

3      A    In the airline, as you can imagine, the key is a

4    smooth operation.  But, as we know, weather can impact

5    operations, other things can cause irregular --

6    irregularity to the operations that may make the need

7    for resources need to be adjusted to account for the

8    operation and what's occurring.

9      Q   Would Delta pay employees overtime for picking

10    up those shifts?

11      MR. ROBINSON:  Object to form, vague.  Are you --

12    Lacks specificity.  You can answer to the best of your

13    ability.

14      THE WITNESS:  If it was operationally driven and

15    there was a need for resources, then people were

16    compensated for those extra hours worked on an

17    operationally needed driven basis.

18      MS. HILLS:  Q   So in your experience delta would

19    pay employees overtime for -- in exchange for working

20    for shifts outside of their normal schedule?

21      MR. ROBINSON:  Object to form, mischaracterizes

22    testimony.  You may answer to the best of your ability.

23      THE WITNESS:  I think it's important to keep in mind

24    their regular schedule.  So if those hours that you were

Page 44

1    asked to work extra based on operational need, not

2    through volunteering, nor swapping, were hours worked

3    based on operation need, so if they helped to generate

4    overtime, it wasn't a guarantee that those hours would

5    be overtime elig -- They would be in the threshold for

6    overtime calculations, but it doesn't necessarily mean

7    that people were paid overtime for those hours worked.

8    It depends on whether or not they completed the rest of

9    their scheduled hours in that week.

10        MS. HILLS:  Q   When those shifts -- When those

11   operational overtime shifts were offered, were they --

12   were they called overtime shifts?

13        MR. ROBINSON:  Object to form, vague, calls for

14   speculation.  You may answer to the best of your

15   ability, but --

16        THE WITNESS:  I have no -- I have no idea what they

17   may have colloquially been called.

18        MS. HILLS:  Q   But you're not familiar with the

19   term extra time?

20        MR. ROBINSON:  Objection, asked and answered.

21        THE WITNESS:  No.

22        MS. HILLS:  Q   Do you know what the process was for

23   offering these operational additional shifts to

24   employees?

Veritext Legal Solutions
www.veritext.com                                    888-391-3376

Page 45

1     MR. ROBINSON:  Object to form, lacks specificity.

2   Counselor, are you talking about a specific time period

3   or throughout the history of Delta?

4     MS. HILLS:  Q  We were just discussing how shifts

5   are offered to employees to cover need.  I'm asking

6   generally during your time at Delta what was the process

7   for assigning those shifts to employees?

8     MR. ROBINSON:  Same objection, calls for

9   speculation.  But to the best of your ability, you can

10  answer.

11    THE WITNESS:  I have no idea.  It wasn't in my scope

12  of responsibility to do this.  So, again, I would be

13  reading the same document you are that talks about how

14  they're awarded.  But I don't have any firsthand

15  knowledge or ownership of that process.

16    MS. HILLS:  Q  Do you know how many employees were

17  offered extra -- I don't know what to call them.  I'll

18  restate.  Do you know how many employees at Delta were

19  offered extra shifts they could pick up for company

20  need?

21    A   I do not.

22    Q   Was it fairly common?

23    A   Again, I was never directly in the operation.

24  So I don't know.  I do know that we had a strong history

Page 46

```
 1    of balancing the needs of employees for flexibility and

 2    maintaining a solid operation.

 3           And most Delta people are aligned to the

 4    operation comes first in most people's mind.  So I would

 5    imagine if there was a need, there was an answer, but I

 6    don't know that for sure, how prevalent that was.

 7       Q   Those types of shifts would affect payroll,

 8    right?

 9       MR. ROBINSON:  Object to form.

10       THE WITNESS:  It would just be received in payroll.

11    It was a recipient of the data.

12       MS. HILLS:  Q   The payroll system was?

13       A   Yeah.  At the end of the day the payroll system

14    would pay according to what was submitted.

15       Q   And what was the payroll system that was used at

16    Delta when you were there?

17       MR. ROBINSON:  Object to form.  Same objection,

18    vague, calls for speculation.  The witness testified

19    that he worked for Delta I believe over 20 years.  And

20    so, Counsel, I'm -- Are you asking him to recall --

21       MS. HILLS:  Q  I'll restate.  Since 2017 what

22    payroll systems did Delta use when you were there?

23       A   SAP.

24       Q   So SAP is a payroll system in addition to the
```

1   other capabilities that we had talked about earlier?

2       MR. ROBINSON:  Object to form, vague in the sense

3   that other capabilities you talked to earlier.  You may

4   answer though.

5       THE WITNESS:  It receives data that helps to

6   administer payroll, and then payroll is ran through a

7   third party, and that third party has varied over my

8   course of time there.  But SAP does -- There is a

9   payroll instance within SAP and a rules engine.

10      MS. HILLS:  Q   What do you mean by a rules engine?

11      A   Back to my earlier comment.  You have to

12  configure SAP, right?  SAP is a tool.  It wouldn't know

13  what to do with data unless we directed it through the

14  configuration.  So the rules you're seeing here would be

15  embedded within SAP to administer them in an automatic

16  way based on the entry of time by the local timekeeper.

17      Q   So is it that rules engine in SAP that would

18  make the determination whether an extra shift would be

19  paid an overtime rate?

20      A   I don't know exactly.  It's between the local

21  time administrator and how they key entry it for SAP.

22  SAP would have the rules engines there, but I think a

23  lot of it depends on the key entry of the local time

24  administrator.

Page 48

1      Q    What's a local time administrator?

2      A    It's literally somebody within the department

3   who's responsible for verifying the time worked by

4   individuals within that position.

5      Q    Would that be their entire role or like a

6   responsibility of another role?

7      MR. ROBINSON:  Object to form, vague.  You may

8   answer.

9      THE WITNESS:  Depending on the size of the business

10  unit, there could be dedicated time admins.  I don't

11  know specifically if crew resources had a specific time

12  entry person or not.  But it really depended on the size

13  and complexity of the work group.

14     MS. HILLS:  Q    The rules engine in SAP, would that

15  apply overtime rules consistently for employees on

16  regular schedules and irregular schedules?

17     MR. ROBINSON:  Object to form, compound, calls for

18  speculation.  You may answer.

19     THE WITNESS:  Yes.

20     MS. HILLS:  Q    How is that different?

21     MR. ROBINSON:  Object to form.

22     MS. HILLS:  Q    Oh, I'm sorry.  It was applied

23  consistently?

24     MR. ROBINSON:  Object to form, vague.  What is "it",

Page 49

1   Counsel?

2       MS. HILLS:  Q  The rules engine within SAP, did that

3   apply overtime rules the same way for both irregularly

4   scheduled employees as well as regularly scheduled

5   employees?

6       A   Yes.  So a schedule was included within SAP.  So

7   we would know if somebody was on a regular or a varied

8   work schedule.

9       Q   But the -- so the -- But the operation is the

10  same within SAP?

11      A   Yes.  To put it simply --

12      MR. ROBINSON:  I'll just say object to form, vague.

13  You may answer.

14      THE WITNESS:  It's all about scheduled hours.  And

15  the scheduled hours are included in SAP, what somebody's

16  regularly scheduled hours are and what over and above,

17  or whatever term you want to use, non-regularly

18  scheduled but worked hours.

19      MS. HILLS:  Q  Those are -- Those categories are

20  differentiated in SAP; is that right?

21      A   Yes.  Yes.

22      Q   Do you know how they're represented, how those

23  categories actually appear?

24      A   I do not.

1      Q    And then on this page I'm still on, under the

2   Coordinator/Scheduler Extra Time, it says, shifts are

3   awarded in rounds with the coordinator/scheduler being

4   awarded one shift per round.  Full shifts are awarded

5   first and requests for partial shifts are addressed

6   after.  And below that there's this section that says

7   Extra Time Awards, extra time is awarded in rounds and

8   seniority order.  Are you seeing all this?

9      A    I am.

10     Q    So my more general question is, when you were at

11  Delta, was it common for these extra shifts to be

12  awarded with a bid system?

13     MR. ROBINSON:  Object to form, asked and answered in

14  part, in that he -- I think the witness testified he was

15  not familiar with the term extra time.  But you can

16  answer to the best of your ability.

17     THE WITNESS:  And, again, just from this reading,

18  yes, it's in the bid and award system, which would have

19  been the manual process for crew resources, the crew

20  resource department.  It was not unusual for shifts to

21  be awarded in a very similar fashion to what's dictated

22  here under extra time awards.

23     MS. HILLS:  Q    And is that true for -- I know you

24  said you were not familiar with the phrase extra time,

Page 51

1  but the bid system would be typical for company-offered

2  shifts outside of a regular schedule?

3      A    Yes.

4      Q    Were you aware of any other system to offer

5  company-offered shifts outside the regular schedule?

6      MR. ROBINSON:  Object to form.  You may answer to

7  the best of your ability.

8      THE WITNESS:  No.

9      MS. HILLS:  Q    Okay.  I'm going to go -- All right.

10  Actually, at the bottom of this page, so still on 176,

11  do you see right here it says Rescind Extra Time?  And

12  it says here, extra time/extra time awards are company

13  obligations.  Extra time/extra time rescinds outside of

14  72 hours prior to shift start will not incur a penalty.

15          And then on the following page, the next

16  bullet point says, extra time/extra time rescinds inside

17  72 hours prior to the shift start, creating an

18  operational hardship, and will be treated as an

19  unscheduled absence, which could result in performance

20  development.  Did you see all that?

21      A    I did.

22      Q    Do you have any idea what it means for an extra

23  time award to be, quote, a company obligation?

24      MR. ROBINSON:  Object to form.  Counselor, for this

Page 52

1    document the witness has testified that he was not

2    employed by Delta for.  He's also testified he's not

3    familiar with the term extra time.  And you are asking

4    him a series of questions about a policy and a

5    phraseology which he has already testified that he's not

6    familiar with.  And so you're essentially asking for him

7    to speculate on this document.

8       MS. HILLS:  Q  Yeah, I can -- I mean, I can ask it

9    in a more poynant fashion.

10           So I don't want you to interpret this document

11   in front of you.  What I'm asking is, these

12   company-offered shifts outside of the regular schedule,

13   when you worked at Delta, were those shifts considered

14   company obligations?

15      MR. ROBINSON:  Object to form.  You may answer to

16   the best of your ability.

17      THE WITNESS:  Theoretically, what's happening is

18   you're saying I agree to work this additional shift.

19   Let's just call it that instead of extra time.  That is

20   as much of a commitment as we have for your regular

21   attendance because you've agreed to it.

22           So while it's called a company obligation,

23   it's really an obligation you have to the company.  I've

24   agreed to work this shift and, therefore, the operation

Page 53

1    is depending on me.  So, therefore, if I rescind that

2    agreement too close in time to the scheduled start of

3    that commitment, I could be posing a hardship on the

4    operation, which is not allowed.

5           So that's what it's referring to, is that if

6    you have taken an extra shift, you've agreed to work an

7    extra shift.  It becomes a commitment that you have made

8    to the operation and you need to deliver on it.

9        MS. HILLS:  Q   Was that the general philosophy for

10   all departments?

11       MR. ROBINSON:  Object to form, vague with regard to

12   scope, and the witness worked for Delta for 20 years.

13   And also vague with regard to what you're referring to.

14   You're using the term Delta.  Are you referring,

15   Counselor, to every employee within Delta?

16       MS. HILLS:  Counsel, I would ask that we try to

17   avoid the speaking objections.  They're getting quite

18   long.  And I'll rephrase my question.

19       MR. ROBINSON:  Just for the record, I'm aware,

20   Counsel.  It's not my practice normally to have speaking

21   objections.  It's just that the way that the --

22       MS. HILLS:  We can go off the record if you want

23   to --

24       MR. ROBINSON:  Yeah.  Yes, I would love to just go

Page 54

1    off the record for efficiency sake for a second.

2         THE VIDEOGRAPHER:  Okay.  We're going off the record

3    at 10:39 a.m.

4              (Discussion had off the record.)

5         THE VIDEOGRAPHER:  Okay.  We are back on the record.

6    The time is 10:43 a.m.

7         MS. HILLS:  Q   So, Mr. Tahvonen, just to return to

8    what we were talking about, is it fair to say that

9    during your time at Delta, from 2017 until the end of

10   your employment at Delta, that company-offered shifts

11   outside of the regular schedule were considered a

12   company obligation for the employee who picks up those

13   shifts?

14        A   Yeah.  I think the only nuance I would say is

15   that it's an obligation the employee has to the company.

16   It's an obligation they've made to Delta to work the

17   shift that they've picked up.

18        Q   Sure.  Okay.  And I'm on the Bates numbered page

19   175, or numbered page 7 now.

20        A   I'm sorry, I can no longer see the document.  I

21   think when we went off record, it may have stopped

22   sharing.

23        Q   Oh, I apologize.

24        A   Thank you.

Page 55

1      Q    There you go.  Sure.  So I'm now on Bates

2  numbered page 175.  And then do you see that there's

3  this section here titled Time Off Requests and Swaps?

4      A    Yes.

5      Q    And now, again, I know that this document

6  post-dates your time at Delta.  However, I'm interested

7  in your knowledge of some of the language that's used in

8  here.

9           Are you familiar with swaps?

10     A    Yes.

11     Q    What are swaps at Delta?

12     A    Swaps are an agreement between two employees to

13 alter shifts, take one shift between them, swap, so that

14 I'm working for someone else and someone else is working

15 for me on any given day.

16     Q    And from 2017 until the end of your employment

17 at Delta how many -- or what percentage of the workforce

18 was allowed to engage in swaps?

19     MR. ROBINSON:  Object to form, calls for

20 speculation.  You may answer to the best of your

21 ability.

22     THE WITNESS:  Yeah, I don't know the specifics.  We

23 had a corporate policy that allowed for swaps and then

24 the divisions implemented them.  So if they had any

1   additional rules that prohibited individuals from

2   swapping, I wouldn't have been privy to those firsthand.

3   So I can't give you a firm number.

4        MS. HILLS:  Q   Sure.  Yeah, no problem.  Was

5   swapping pretty popular with employees?

6        A   My understanding is that it allowed for

7   additional flexibility and that it was a nice feature.

8   Again, I don't know the prevalence of who actually used

9   them.  But I think the existing of -- the existence of

10  swapping was a satisfier for employees to know that they

11  had that additional flexible lever.

12       Q   I'm sorry, did you say for the employers to know

13  or the employee?

14       A   The employee.  I think the employees liked

15  having that option.

16       Q   How often would you say was typical for

17  employees to engage in swaps from -- during your time at

18  Delta?

19       MR. ROBINSON:  Object to form.  You may answer to

20  the best of your ability.

21       THE WITNESS:  I don't know.  On any individual

22  basis, I mean, I think that there were some people who

23  probably utilized the policy quite often and there were

24  probably people that didn't use it at all.  And I didn't

Page 57

1    have direct access to anything that would give me a

2    prevalence indicator.

3        MS. HILLS:   Q   What's the basis for your belief

4    that there are some difference in prevalence of

5    swapping?

6        A   Literally just individual differences.  I think

7    some people view shift bidding as this is what I bid

8    for, I don't need the flexibility, I don't want to swap

9    with somebody.  It's just truly individual differences

10   between employees that generate the inclination to swap

11   or not swap.

12       Q   Understood.

13       MR. ROBINSON:  And, Counsel, just as an aside, as

14   you're sharing your screen, I'm just doing this in

15   abundance of caution and good faith, some of your

16   e-mails are popping up on the screen.

17       MS. HILLS:  Oh, okay.

18       MR. ROBINSON:  I just wanted to make you aware of

19   that.

20       MS. HILLS:  I think -- Yeah, I think we'll finish

21   with this document and then maybe if we can get Exhibit

22   Share figured out for Mr. Tahvonen, then that might be

23   the better option, but.

24              Okay.  And so just looking at this document

Page 58

1    again, still on the same page, 175 Bates No., do you see

2    at the bottom here that it says, agreeing to work a swap

3    is a company obligation; as such, an unscheduled absence

4    could result in performance development?  Do you see

5    that?

6         A    Yes.

7         Q    Is it your understanding from your time at Delta

8    that a swap is a company obligation?

9         MR. ROBINSON:  Object to form.  You may answer.

10        THE WITNESS:  Yes, similarly to agreeing to pick up

11    the extra hour or -- I forgot what it was called

12    earlier.  Here, once you've agreed to work for someone,

13    you're expected to work and, therefore, the reliability

14    becomes yours.

15             So once you've swapped with somebody, you're

16    committed to working the hours that you swapped into as

17    though it was your regular -- as though it was your

18    scheduled time.

19        MS. HILLS:  Q    That's generally considered an

20    agreement between the employee engaged in the swap on

21    the one hand and the company on the other; is that fair?

22        MR. ROBINSON:  Object to form, mischaracterizes

23    testimony.  You may answer to the best of your ability.

24        THE WITNESS:  I think I would put it as you are

1    making a commitment to work and you're expected to work

2    the time you've committed to.

3         If I might add one other thing.  It is

4    important to note that the swap on and swap off works

5    both directions, meaning once you have successfully

6    swapped off and someone has agreed to pick up your

7    hours, you aren't accountable for the hours if that

8    person ends up not showing.  They're no longer part of

9    your work.  You've swapped off.

10        So while the policy is written towards the

11   individual who may not own the responsibility of working

12   for hours that they swapped into, the other side of it

13   is once you've swapped off, you're not accountable for

14   the hours.

15        MS. HILLS:  Q  And is that --

16        A   It's truly off.

17        Q   I'm sorry.  Is that consistent or was that

18   consistent across the groups at Delta from your -- from

19   2017 until the end of your employment?

20        A   Yes.

21        Q   Was the same concept true for -- So for the

22   employee who swaps off, was the idea that that day

23   becomes essentially a scheduled off day?

24        MR. ROBINSON:  Object to form.

Page 60

1        THE WITNESS:  It becomes a zero working day.  It's
2    no longer a working day for that individual because
3    they've swapped off.
4        MS. HILLS:  Q   What's a zero working day?
5        A   Meaning they're not -- they don't have any time
6    on that day.  They won't be reporting hours.  They're
7    not being paid.  It's a swap-off.  They're not working.
8        Q   Is that different from when an employee would
9    take a -- take unpaid time off for the same shift?
10        MR. ROBINSON:  Object to form.
11        THE WITNESS:  It would be -- it would be scheduled
12    time off versus unscheduled time off.  So it wouldn't be
13    subject to the last sentence there around development,
14    performance development.
15            An unscheduled absence could be subject to
16    performance development.  If you swap off, you're no
17    longer subject to performance development for the hours
18    that you swapped off because they're no longer in your
19    reliability measure.  You've swapped them away.
20        MS. HILLS:  Q   What does performance development
21    mean in that context?
22        MR. ROBINSON:  Object to form.  What context,
23    Counselor?
24        MS. HILLS:  Q   What you were just describing,

Page 61

1   whether a day could be subject to performance

2   development or not.  I'm just wondering what performance

3   development means.

4       A   Yeah, in the document you were showing, it ended

5   with could be subject to performance development because

6   they're not meeting a company obligation.  That's --

7   It's basically a potential review and discipline.

8       Q   Okay.  That's helpful.

9           And then just to confirm, you're not able to

10  see the screen right now, right?  It looks like --

11      A   I can't.

12      MS. HILLS:  Okay.  So I can continue screen sharing,

13  or if you want to take a quick break to try to figure

14  out the Exhibit Share.

15      MR. ROBINSON:  We can continue with screen share,

16  unless you have an objection to it.

17      MS. HILLS:  I think it should be fine.

18          Let me just adjust my settings so I stop

19  getting pop-ups.  Could we take --

20      MR. ROBINSON:  Want to take a --

21      MS. HILLS:  -- a quick break?

22      MR. ROBINSON:  This might be a good moment to take I

23  think a quick break for like five minutes anyway.

24      MS. HILLS:  Sure, that sounds good.

Page 62

1          THE VIDEOGRAPHER:  Okay.  We're going off the record

2     at 10:56 a.m.  This is the end of media unit 2.

3               (Recess was taken.)

4          THE VIDEOGRAPHER:  Okay.  We are back on the record.

5     The time is 11:09 a.m.  This is the beginning of media

6     unit 3.

7          MS. HILLS:  Q   Okay.  I'm introducing Exhibit 2,

8     Bates No. 18055.  Hopefully that comes up.

9               (Document marked as Deposition

10              Exhibit 2 for identification.)

11         Q   Okay.  I think I just loaded the screen share,

12    just the window this time.  Let me know if you can see

13    that.

14         A   Yes.

15         Q   And then -- So we're on this first page.  Do you

16    see that it says ACS/CGO/Clean DPM?  Do you see that?

17         A   I do, yep.

18         Q   Does that mean anything to you?

19         A   Those appear to be business units, Airport

20    Customer Service, Cargo, and the Clean.  I'm not sure

21    what DPM stands for I have to admit.

22         Q   No problem.  And you see it's dated -- it says

23    revised February 2022?

24         A   Correct.

Page 63

1      Q    And you were still at Delta at that point,

2   right?

3      A    I was still employed at Delta, yep.

4      Q    Do you recognize this document?

5      A    I don't.  It was likely produced locally by the

6   departments.

7      Q    From 2017 until the end of your time at Delta,

8   about how many domestic employees were in Airport

9   Customer Service?

10     MR. ROBINSON:  Object to form.

11     THE WITNESS:  I don't recollect an exact number, but

12  it would have been in the 20 some thousands.  Like 20 --

13  20 -- Between 20 and 30,000 I believe.

14     MS. HILLS:  Q   Is that relatively consistent year

15  to year?

16     MR. ROBINSON:  Object to form.

17     MS. HILLS:  Q   From 2017.

18     A    Since 2017 it's been a relatively stable number.

19  Declined during COVID and then back to where it was

20  after COVID.

21     Q    Sure.  How about Cargo?  Do you recall about how

22  many employees were in Cargo from 2017 -- Or, excuse me,

23  I'll restart.  Do you remember about how many domestic

24  employees were in Cargo from 2017 until the end of your

Page 64

1   employment at Delta?

2       A    In most of our reports they were aggregated with

3   Airport Customer Service.  So they were kind of built

4   into those numbers I just said.  But I -- So I would

5   hate to speculate.

6       Q    And then you said you didn't know what Clean was

7   in reference to, right?

8       A    I didn't know what the acronym after Clean

9   meant.  That DPM, I don't know what that means.  Clean

10  is a business unit, but.

11      Q    What -- Is Clean within a division?

12      A    It's within Airport Customer Service.

13      Q    Okay.  Is Cargo also within Airport Customer

14  Service?

15      A    That's more of a complicated response than you

16  want to hear because their reporting relationship has

17  changed over time.  At one time they were part of

18  TechOps, another part they were ACS I believe.  At the

19  time I left Delta they were part of the ACS

20  organization, but they have a separate senior leader.

21      Q    Okay.  When were they -- when were they part of

22  TechOps?  When was Cargo part of TechOps?

23      A    I don't recall exactly.  I think it was back in

24  like 2010-ish.

Page 65

1      Q    Okay.  And then I am now on page 18057.  You

2   said --

3      A    I now know what -- I now know what DPM must

4   stand for.  Divisional Practices Manual

5      Q    And do you see that on the page here?

6      A    Yeah, the general information, the first

7   sentence.

8      Q    That refreshed your memory?

9      A    No, no.  I'm just saying that that must be what

10  DPM stood for on the cover.

11     Q    Okay.  All right.  And then I'm going to go down

12  to -- I'll tell you the page, 18 -- 18071, if I can find

13  it.

14          And just as I'm scrolling through, does this

15  appear to be a divisional policy document for ACS,

16  Cargo, Clean?

17     A    It does.

18     Q    Okay.  So I'm going to have you -- I'm focusing

19  on this -- Do you see the header?  It's in bold.  It

20  says 104.12, Overtime.

21     A    Yes.

22     Q    And then do you see that under it says,

23  ACS/CGO/Clean follows the corporate policy for overtime,

24  click here for details, and then a link with the words

Page 66

1    Hours of Work, PTO, OT, and Shift Differential?

2        A    Yes.

3        Q    Is it consistent with your understanding from

4    when you were at Delta in 2017 until the end of your

5    employment that these groups followed the hours of work

6    policy for overtime?

7        MR. ROBINSON:  Object to form.  You may answer.

8        THE WITNESS:  Yes.

9        MS. HILLS:  Q    And then I'm also going to represent

10   to you -- I can show you the metadata for this document.

11   In the subject line, it does not appear here, there's --

12   The subject for this pdf, that it says creating an

13   impactful day one onboarding experience.  And I'm

14   wondering during your time in HR Service Delivery were

15   you involved at all in onboarding new employees?

16       A    I was not --

17       MR. ROBINSON:  Object to form.

18       THE WITNESS:  -- personally, no.

19       MS. HILLS:  Q  When employees joined Delta, were

20   they provided with the HR policies that would apply to

21   them?

22       MR. ROBINSON:  Object to form, vague.  You may

23   answer to the best of your ability.

24       THE WITNESS:  I wasn't personally responsible, but

Page 67

1    I'm sure in our process we had familiarity with policy

2    provided during the onboarding process, with access to

3    online policies, et cetera.  But I don't know that

4    firsthand.

5        MS. HILLS:  Q   Was that not -- Was that not like

6    within the scope of the HR Service Delivery

7    responsibilities?

8        A    No, it was not.

9        MR. ROBINSON:  So just for the record purposes, I

10   object to form on the last question with regard to

11   vagueness and calls for speculation.

12       MS. HILLS:  Q  Do you know whether employees had

13   access to the HR overtime policy throughout their

14   employment if they wanted to find it?

15       MR. ROBINSON:  Object to form, vague, specifically

16   with regard to time and scope.  You may answer.

17       MS. HILLS:  Q   I'll be asking about from 2017 until

18   the end of your time at Delta unless I specify

19   otherwise.

20       A    Yes, the vast majority of policies were

21   published online either on divisional websites or the

22   corporate website.

23       Q    Did you ever post any policies onto the

24   corporate website?

Page 68

1    A   Yes, my team would have been instrumental in

2    getting those posted on the corporate site.  But the

3    divisional sites were run through local content

4    managers.

5    Q   Would the HR overtime policy have been on the

6    corporate site or the divisional site?

7    A   To the best of my recollection, it was on the

8    corporate site, but divisional sites linked to it

9    similar to how this document did.

10   Q   And you have no knowledge whether employees are

11   given that policy when they join Delta?

12   A   I can't speculate that it happens a hundred

13   percent of the time.  But during the orientation, either

14   at the company level or a divisional level, they are

15   made aware that our policies are online for them to

16   reference.

17   Q   What's the -- When you say orientation, is

18   that -- was there an orientation for all new employees

19   at Delta?

20        Let me rephrase.  Is there some kind of formal

21   orientation programming that you're referencing?

22   A   There's a combination of orientation efforts,

23   some at the divisional level, which would be delivered

24   by either first-level supervision or a group of people

Page 69

1    that onboard people, and then for the merit position, so

2    separate from that, we have something called B-Day,

3    which is basically a welcome to Delta on your first day,

4    and there's a broad overview of where to get

5    information.

6         So it wouldn't be covered at a granular

7    detailed level, but people would be made aware of where

8    policies, et cetera, could be found on the intranet

9    site.

10    Q    During that orientation?

11    A    Yes, either at the company level or through a

12    divisionally delivered vehicle.  And every division had

13    the responsibility for developing their own content for

14    their orientation.

15    Q    Okay.  I'm going to stop sharing for just a

16    moment to get another document pulled up and then you

17    will see the screen again.

18         Okay.  I've introduced Exhibit 3, which is

19    Bates No. 6381.  And I will get that pulled up.

20         (Document marked as Deposition

21         Exhibit 3 for identification.)

22    Q    Okay.  I'll zoom in for you.  And then I'll just

23    scroll down to this first page, 6381.  I'll zoom out so

24    you can see hopefully all of it in the window, but we'll

Page 70

```
 1    see if that's too small for you.  And I'll give you a
 2    minute to look this over.
 3         A    Okay.
 4         Q    And so is this an e-mail chain from November
 5    2019?
 6         A    (No response.)
 7         Q    Did you hear me?
 8         A    Oh, I'm sorry.  It looks like an e-mail chain.
 9    Is that what you're asking?  Sorry.
10         Q    Yeah.  No, you're fine.
11         A    Yes.
12         Q    And I'm just -- I'm looking at the bottom here.
13    You see this is a message from Karen Jenkins on
14    November 11th, 2019?
15         A    Yes.
16         Q    Do you know who that is?
17         A    Karen Jenkins was a project manager on my team,
18    two or three levels down.
19         Q    And her signature says HR-PMO.  Is that Project
20    Management Office?
21         A    It is.
22         Q    And the subject of this message is regarding
23    Wage Theft BRD Sign-Off.  Do you know what that would be
24    in reference to?
```

Page 71

1      MR. ROBINSON:  Object to form, calls for
2   speculation.
3      THE WITNESS:  Yeah, I don't know exactly what the
4   wage theft is referring to.  But the BRD sign-off, BRD
5   stands for business requirements document, which
6   basically is the specifications to which we develop a
7   solution, the business requirements.  That's what BRD
8   stands for.
9      MS. HILLS:  Q   Okay.  Yeah, and we talked about
10  that term a little bit earlier.  Would it be fair to say
11  that a business requirement document is kind of like
12  programming logic for the HR systems?
13     MR. ROBINSON:  Object to form, vague.
14     THE WITNESS:  It isn't the programming as much as
15  the intent or the outcome you're looking for.  So
16  business requirements specify what the deliverables are
17  and what business requirement we're trying to fulfill.
18  And then a different team translates that into actual
19  technical requirements and coding requirements.  This is
20  generally the higher non-technical level.
21     MS. HILLS:  Q   This being the --
22     A   Yeah, the BRD.  Generally it's at a very
23  technical level.  It's high level requirement.
24     Q   Gotcha.  And then you see this message from a

Page 72

1    Karen Carter in the middle?

2        A    Karen was CC'd on it, yes.

3        Q    Do you know who that is?

4        A    Karen Carter was a manager on the HR Service

5    Delivery team.

6        Q    Does she report to you?

7        A    No, she did not.  I don't recall exactly who she

8    reported back -- to back in 2019.

9        Q    And do you see that her message says, based on

10   our conversation today, please take this e-mail as the

11   sign-off on the BRD?  Do you see that?

12       A    I actually don't see that.  Is that below -- Oh,

13   I'm sorry, I had to scroll down a little bit.  "Take

14   this e-mail as the sign-off."  Okay.  Yes, I see that.

15       Q    2017 until the end of your employment at Delta

16   was it common for business requirement documents to be

17   approved via e-mail?

18       A    Yes.

19       Q    Okay.  And then you see this final message is

20   from Karen Jenkins to Timothy Gregory.  Who is Timothy

21   Gregory?

22       A    Tim Gregory is a technical leader on the HR

23   Service Delivery team.

24       Q    And it looks like Karen Jenkins was requesting

Page 73

1    his approval on a business requirement document?

2        A    Yes.

3        Q    Is Mr. Gregory based in Atlanta?

4        A    He -- I can only comment to the time before I

5    left Delta.  Yes, he was -- he was resident in Atlanta.

6        Q    Okay.  And then I'll stop sharing just for a

7    moment.  I'm going to pull up the document that is

8    attached to this e-mail.

9            (Document marked as Deposition

10            Exhibit 4 for identification.)

11        Q    Are you able to see that document?

12        A    Yes.

13        Q    Okay.  Do you see that it is -- the first page,

14    it says Feasibility & Requirements Document, Minnesota

15    Wage Theft Law Notification Requirements?

16        A    Yes.

17        Q    And that's dated September 16th, 2019?

18        A    Yes.

19        Q    So still on this first page.  Karen Jenkins'

20    name appears on the page under the title.  Did she

21    author this document?

22        MR. ROBINSON:  Object to form.  You may answer.

23        THE WITNESS:  She would have been the final author,

24    yes.  It was probably a collaborative effort.

1          MS. HILLS:  Q   Do you recognize this document?

2          A   I do not.

3          Q   Okay.  I'm on the Bates numbered page 6398.

4     Just taking a look at this page, do you see that the top

5     says 7.0, Deliverables, with some text underneath that?

6          A   Uh-huh.

7          Q   And it says, solutions for delivery of a new

8     notification statement for new employees, as well as

9     notifying changes to existing wage data.  Notification

10    must be electronically signed and stored with audit

11    capabilities and employee policy updates.  Do you see

12    that?

13         A   Yes.

14         Q   Do you -- Did this refresh your memory as to

15    this document?

16         MR. ROBINSON:  Object to form.  You may answer.

17         THE WITNESS:  I don't recall the document per se.  I

18    do recall at a very high level the project.

19         MS. HILLS:  Q   What was the project?

20         A   As described in the deliverables, it was

21    basically a wage notification statement for employees in

22    Minnesota.  It was just a new reporting requirement.

23         Q   Were you involved in the project?

24         A   Not directly.

Page 75

1      Q    Do you see this next section here says Sign-Off

2    and there's a table under it with some names?

3      A    Uh-huh.

4      Q    That's your name listed here, right?

5      A    Yeah, right before the "if applicable".

6      Q    So does that mean you had the authority to

7    approve this project?

8      A    It didn't get to a size that needed my approval.

9    That's why it said if applicable.  So depending on the

10   cost of a project, I would have to sign off.  If it was

11   below a certain cost threshold, my team, namely Tim

12   Gregory and John, would be -- have authority for final

13   sign-off.

14     Q    Gotcha.  And it looks like here this is shown as

15   signed by John Early, who's listed as the business

16   owner-mandatory.  Do you see that?

17     A    Yes.

18     Q    How many projects from 2017 until the end of

19   your time at Delta required your signature in the

20   business requirements document?

21     MR. ROBINSON:  Object to form.  You may answer to

22   the best of your ability.

23     THE WITNESS:  I can't recall.  I can't recall.  Less

24   than a handful that reached that level of capital

Page 76

 1   investment.
 2       MS. HILLS:  Q   Okay.  I've now gone to page 6385,
 3   and I'm just looking at the top where it says 1.0,
 4   Executive Summary and then under that 1.1, Project
 5   Description.  Do you see that section?
 6       A   Yes, I do.
 7       Q   And I'll just -- I'll just give you a moment to
 8   read this I guess couple of paragraphs in this section
 9   and then I'll ask you a couple of questions.
10       A   Okay.
11       Q   And so the project described in this document,
12   was it related -- I guess what prompted this project?
13       A   A law that was enacted in Minnesota.
14       Q   And were there other similar state laws that
15   were addressed with this project?
16       A   That they referred to in here, New York and
17   California had enacted or were about to enact similar
18   legislation, as was New Jersey I think was on the
19   bubble.  Yeah, they were enacted to the end of 2019.  So
20   it was ordered in order to comply with state law.
21       Q   And what was the change that was being done?
22       MR. ROBINSON:  Object to form.  You may answer.
23       MS. HILLS:  Q   What was the end result of this
24   project?

Page 77

1      MR. ROBINSON:  Object to form, calls for

2   speculation.  You may answer to the best of your

3   ability.

4      THE WITNESS:  We abided by the law.  So where the --

5   it was enacted, the changes impacted the groups

6   indicated there.  I don't know what else to say about

7   it.  We conformed with the law.

8      MS. HILLS:  Q   And I'm just going to scroll through

9   the next couple of pages just generally so that you

10  see -- You see that the next section is State of

11  Minnesota, and then it starts off by saying, the notice

12  must contain required information about employee's

13  employment status, benefits, wages, hours, and terms of

14  employment.  Do you see that?

15     A   Yes.

16     Q   Okay.  And then we have a table underneath that

17  and there's a space for employer signature, and it says

18  electronic signature - VP HR.  Do you see that?

19     A   Yes.

20     Q   So would that have been you at this point in

21  time?

22     MR. ROBINSON:  Object to form, calls for

23  speculation.

24     THE WITNESS:  Yeah, I can't speculate because in

Page 78

1    2019 Rob Kite, who I reported to, was still with the

2    company.  So it may have been him.

3        MS. HILLS:  Q   And -- So, sorry, was his title VP

4    of HR in 2019?

5        A    Yeah.

6        Q    And then this next page, do you see there's a

7    similar header for the State of California, and there's

8    some sections with who is covered by the law, what does

9    the law require?  Do you see that?

10       A    Yes.

11       Q    So is this generally explaining the requirements

12   of this State wage law?

13       MR. ROBINSON:  Object to form, calls for

14   speculation.

15       THE WITNESS:  Yeah, that's what it appears to be

16   doing.  California enacted much earlier though.  They

17   were in like 2011, 2012.

18       MS. HILLS:  Q   And while we're on the California

19   section, do you see that in this -- I think it's the

20   first sentence.  Yes, the first sentence mentions -- it

21   says, California's Wage Theft Prevention Act of 2011

22   went into effect January 1, 2012 and requires that all

23   employers provide each non-exempt employee with a

24   written notice containing specified information

Page 79

1  regarding their pay and other benefits.  Do you see

2  that?

3       A    Yes.

4       Q    Do you know what non-exempt means in this

5  context?

6       MR. ROBINSON:  Object to form.

7       THE WITNESS:  Yeah, non-exempt means that they are

8  not treated as exempt employees to the Fair Labor

9  Standards Act that drives a lot of employment-related

10 calculations, including overtime eligibility.

11 Non-exempt indicates that they are indeed qualified for

12 consideration of those provisions of the Fair Labor

13 Standards Act.

14      MS. HILLS:  Q    Okay.  And I'll just -- Going down,

15 you'll see -- or wait, we're still on California --

16 another table here again.  In the space for employer

17 signature it says electronic signature - VP of HR.  Do

18 you see that?

19      A    Yes.

20      Q    And then the next page down there's a section

21 for New York.  And then there's a table for New York

22 where employer signature is listed as -- Well, it says,

23 quote, the form will be signed by Greg Trev.  Do you

24 know who that is?

Page 80

1      A    No, but, as we've proven today, my last name

2   could be misspelled easily, so.

3      Q    So is it possible that's referencing you?

4      A    It's possible.  It also says will be signed.  It

5   hasn't been signed.  So this might have been an original

6   document that got redirected.  I don't know.

7      Q    Gotcha.  Okay.  And then on 6394, that's the

8   Bates numbered page, just looking at the top here, you

9   see that it says, develop compensation statement for

10  wage changes, this statement to be automated when a

11  change is made to compensation, see sample below.  Do

12  you see that?

13     A    Yes.

14     Q    And then down here a little further is the

15  Section 1.2, Business Drivers, that says, in compliance

16  with Minnesota, California, and New York State laws

17  protecting employees against wage theft, Delta must be

18  in compliant, looks like that's a typo, with these

19  requirements.  Do you see that?

20     A    Yes.

21     Q    And then we have the next section is Project

22  Objectives, which says, to create a solution to notify,

23  quote, new hires, transfers, and existing employers, end

24  quote, as well as when changes are made to their wages.

Page 81

1    And then there's some -- there's a bullet point list of

2    some objectives.  Do you see that?

3        A    Yes.

4        Q    This second bullet point on the following page,

5    one of these listed objectives is must be in accordance

6    with company policy and referenced.  Do you see that?

7        A    Yes.

8        Q    So was it your understanding this project had to

9    be compliant with Delta's company policies?

10       MR. ROBINSON:  Object to form, vague, particularly

11   with regard to this project.  You may answer to the best

12   of your ability.

13       THE WITNESS:  I think it's boilerplate language that

14   you would always say we're not going to do a project

15   that's not in accordance with company policy.

16       MS. HILLS:  Q    And you see a little further down

17   this bullet -- last bullet point in this list of

18   objectives, it says, business owner recommends that this

19   solution should be across the Delta population,

20   including subsidiaries.

21       A    Yes.

22       Q    So was a new notification system created at

23   Delta in response to a change in the Minnesota law --

24   I'll ask you that first.  Was a new notification system

Page 82

1   created in response to this referenced Minnesota law?

2       MR. ROBINSON:  Object to form, vague, calls for

3   speculation.

4       THE WITNESS:  Yeah, I don't know the delivery date

5   on the project.  I know we were hoping to deploy it in

6   2019.  I can't recall now if we hit that date or did not

7   hit that exact date, but I assure you we were compliant

8   with any State mandate for employees in those states.

9       MS. HILLS:  Q   Do you know whether those changes

10  were applied to the employees in other states?

11      A   They would not have been.  The scope was

12  Minnesota, New York, and California.

13      Q   So this bullet point, business owner recommends

14  that this solution should be across the Delta

15  population, that didn't come to fruition?

16      MR. ROBINSON:  Object to form, mischaracterizes

17  testimony.  You may answer.

18      THE WITNESS:  I believe what it's referring here is

19  not across the entire Delta population, but including

20  Delta populations in those states that worked for a

21  subsidiary.  So I think it's a wording issue.

22      MS. HILLS:  Q   I see.  And on this page still,

23  6395, there's a section for Assumptions, and it says

24  here, policy on wages need to be available when

Page 83

1    notification is provided.  Do you see that?

2        A    I see that, yes.

3        Q    So the employees affected -- the Minnesota,

4    New York, and California employees impacted by this

5    project, were they still subject to Delta's HR overtime

6    policy?

7        MR. ROBINSON:  Object to form, vague, lacks

8    specificity to the term Delta's overtime policy.  You

9    may answer.

10       THE WITNESS:  As with any corporate policy, they

11   were held to Delta's corporate policy unless a state had

12   a policy that would override Delta's policy in order to

13   operate legally within the state.

14       MS. HILLS:  Q    Okay.  Another one of these

15   assumptions says, streamlined process availability for

16   new employees as they are onboarded - tapping into the

17   new TA platform, et cetera.  Do you see that?

18       A    Yes.

19       Q    Do you know what this means?

20       A    What it was referring to is in the Telenet

21   position platform, when somebody's newly hired, there's

22   a bolt-on system that TA uses that I honestly can't

23   recall the name of, but that system would have been a

24   logical entry for this document so the new employee

Page 84

1    could receive it as part of the onboarding process.

2        Q    From 2017 until the end of your employment at

3    Delta, did Delta notify employees when changes were made

4    to their compensation?

5        MR. ROBINSON:  Object to form.  Again, vague, lacks

6    specificity with regard to scope.

7        MS. HILLS:  Q    You can answer.

8        A    There wasn't a uniform process for notification

9    of salary change.  Oftentimes it would be communicated

10   directly through a leader, the leader that was part of

11   sometimes the decision making.

12           Others would be notified by a published scale,

13   and they would realize that they're the next step on the

14   scale, and the scales were published, so they would know

15   what that meant to them.  And in some cases,

16   unfortunately people found out when they got a change in

17   their pay on their paycheck.  But in most cases the

18   salary increases would be pre-communicated directly --

19   through direct conversation with their leader.

20       Q    But not always, right?

21       A    I'd have no way of ensuring that it happened a

22   hundred percent of the time.  But there wasn't a

23   system-generated message.  We erred on the side of

24   having it be a personal conversation.

1      Q    Okay.  And so we just touched on the meaning of

2    non-exempt employee status.  I'm wondering -- Let me

3    rephrase.  Is an employee's status as exempt or

4    non-exempt under the Fair Labor Standards Act, does that

5    affect how -- let me see -- is that important for

6    Delta's time and attendance systems?

7      MR. ROBINSON:  I'm going to object, vague, compound.

8    Also to the extent you're asking the witness his

9    capacity to make any type of legal conclusion.  You may

10   answer to the best of your ability.

11     MS. HILLS:  Q   I'll rephrase.  In your -- From 2017

12   to the end of your employment at Delta, was it important

13   for your position in HR to understand the exempt or

14   non-exempt status of employees?

15     MR. ROBINSON:  You may answer.

16     THE WITNESS:  We track that status.  It's by

17   position that gets tied to an individual.  And it was

18   important that we understood the differences between

19   exempt and non-exempt.

20          From a timekeeping perspective, all employees

21   of Delta were encouraged to track their time.  In some

22   cases it would have a direct bearing on payroll.  In

23   other cases, being the exempt population, it was

24   informational, but did not necessarily affect payroll.

1      MS. HILLS:  Q   What do you mean by that?

2      A    Well, they were exempt.  So they weren't

3   really -- from an hours worked perspective, weren't

4   tracked to that level, and, therefore, it was important

5   to track their usage of paid time off, et cetera, but

6   generally they were expected that they had fully worked

7   their shifts, where non-exempt employees have more of an

8   hourly mentality or an hours worked mentality.  So it's

9   important from a payroll perspective to understand the

10   hours they actually worked.

11      Q   So does the exempt versus non-exempt status have

12   on a bearing on an employee's ability to earn overtime?

13      A   Yes.

14      MR. ROBINSON:  I'm going to object to form quickly

15   to the extent you're asking for a legal conclusion.  But

16   you may answer.

17      THE WITNESS:  Generally speaking, non-exempt

18   employees are eligible for overtime compensation under

19   certain rules and policies, and exempt employees

20   generally are not eligible for overtime compensation.

21      MS. HILLS:  Q   Can exempt employees still be

22   eligible for overtime compensation under a Delta policy

23   rather than under the FLSA in your understanding?

24      MR. ROBINSON:  Object to form.  As previously

Page 87

1    mentioned, the witness is no longer employed by Delta.

2    And so asking him to speak to policies, the way the

3    question is framed, calls for speculation.

4        MS. HILLS:  Q   My question is during the time

5    period referenced earlier, 2017 to the end of your

6    employment.

7        MR. ROBINSON:  You may answer.

8        THE WITNESS:  Generally speaking, overtime

9    compensation wouldn't be directly calculated for an

10   exempt employee.  If an operational situation arose that

11   required an all hands on deck, there may be other

12   remuneration considered, but it wouldn't be legally

13   mandated under the Fair Labor Standards Act.  It would

14   be done at the description of Delta in very unique

15   circumstances.  And, quite honestly, I can only recall a

16   couple of cases, and that was not delivered through

17   overtime compensation.

18       MS. HILLS:  Q   So the -- Are you familiar with the

19   Hours of Work, Overtime and Shift Differential policy

20   document at Delta?

21       MR. ROBINSON:  Object to form, vague.  You may

22   answer to the best of your ability, but, again, lacks

23   specificity.

24       THE WITNESS:  Yeah, I'm aware that we have one.

1  It's been some time since I've referenced it or needed

2  to reference it for any purpose.  But I know that we

3  have documentation regarding shift differential and

4  overtime eligibility.  Or I should say they have.  After

5  22 years it's hard not to say we.

6      MS. HILLS:  Q   And could you explain further for me

7  what you mean -- what you meant when you said exempt

8  employees generally aren't eligible for overtime?

9      MR. ROBINSON:  Object to form, mischaracterizes

10  testimony.  You may answer to the best of your ability.

11      THE WITNESS:  Yeah, generally the easiest way to say

12  it is they're salaried employees and it doesn't equate

13  to hours worked.  So as a salaried employee, we don't

14  track hours on an hourly basis where we have an

15  expectation that they're receiving pay for every hour

16  worked as an exempt employee.

17      MS. HILLS:  Q   Okay.  I've introduced Exhibit 5.

18  Let me just get this pulled up for you.

19          (Document marked as Deposition

20          Exhibit 5 for identification.)

21      Q   Okay.  Can you see that?

22      A   I can.

23      Q   I'm going to zoom out a little bit for you.  Do

24  you see that this is an e-mail chain from February 2019?

Page 89

1      A    Yes.

2      Q    I'll start at this first message.  Do you see

3    that it's from a Robert Pritchett at the U.S. Department

4    of Labor, Bureau of Labor Statistics?

5      A    Yes.

6      MR. ROBINSON:  Counsel, just for the sake of the

7    record, are you introducing this into the record as an

8    exhibit?

9      MS. HILLS:  Q  Yes, I did, Exhibit 5.

10            Okay.  And do you see here that Mr. Pritchett

11   is asking Bridgette O'Neal whether overtime was paid at

12   one-and-a-half regular hourly rate after 40 hours per

13   week for non-exempt employees?  Do you see that?

14     A    I see that, yes.

15     Q    And then do you see that Bridgette O'Neal

16   forwards this message to Kelly Brown and Cheryl Gray?

17     A    Yes.

18     Q    And it looks like she's asking for help with

19   answering that question from Mr. Pritchett?

20     A    Correct.

21     Q    And then -- Well, let me ask you first.  Who's

22   Kelly Brown?

23     A    Kelly Brown was a manager on the HR Service

24   Delivery team.

Page 90

1      Q   At this time was she qualified to answer

2   questions from the Bureau of Labor Statistics?

3      MR. ROBINSON:  Object to form, vague, calls for

4   speculation.  This e-mail doesn't include the witness.

5   You may answer to the best of your ability.

6      THE WITNESS:  She was -- she was an eligible

7   manager, but I don't -- Without knowing the context of

8   exactly the questions and the reason for the

9   questioning, I don't know that -- whether or not she was

10  in the best position to respond.

11     MS. HILLS:  Q   And do you see that she says, all

12  this information is outlined in our HR policies?  And

13  then further down it says, since we are federally

14  governed by the Railway Labor Act versus FLSA, our pay

15  rules are slightly different.  Do you see that?

16     A   Yes.

17     Q   Does that accurately represent the status of

18  employees at Delta in February 2019?

19     MR. ROBINSON:  Object to form, calls for

20  speculation.  Again, I'm going to also object to the

21  extent it calls for a legal conclusion.  You may answer.

22     THE WITNESS:  Yes, my understanding is that our

23  employees fall under the Railway Labor Act for many

24  purposes.  The exempt, non-exempt definition carries

Page 91

1   over from the FLSA.  The use of the term exempt and

2   non-exempt is most commonly referred to under FLSA

3   language because it's a broader use of the term.  But

4   the Railway Labor Act applies to Delta because of the

5   transportation link.

6       MS. HILLS:  Q   Was it your understanding at this

7   time that Delta ground employees were governed by the

8   Railway Labor Act rather than FLSA?

9       MR. ROBINSON:  Same objection.  You may answer.

10      THE WITNESS:  Yes.

11      MS. HILLS:  Q   How many non-contract ground

12  employees at Delta from 2017 to the end of your

13  employment were exempt versus not exempt from FLSA?

14      A   I don't recall.  I don't recall the split.

15      Q   Do you recall generally whether there were more

16  exempt or non-exempt employees?

17      A   Yeah, that's again difficult with the

18  populations, but I would say generally even, maybe a

19  slightly more non-exempt.

20      Q   And just to be clear since we're using this

21  language, does exempt versus non-exempt, is that

22  language in reference to the Railway Labor Act at Delta

23  or do you understand it to be in reference to FLSA?

24      MR. ROBINSON:  Object to form.  Again, I'm going to

Page 92

1    object to this line of questioning to the extent it's

2    asking for legal conclusions.

3        MS. HILLS:  Q  I want to know what exempt versus

4    non-exempt, when you're using that language, do you

5    understand that to be in reference to the Railway Labor

6    Act or FLSA?

7        A    As a compensation professional, we generally

8    think of FLSA categorization of exempt.  I don't know

9    that that particular definition is distinctive between

10   the Railway Labor Act and the Fair Labor Standards Act.

11   If I'm using it interchangeably incorrectly, I

12   apologize, but, as referenced earlier, I'm not a legal

13   expert.  We colloquially called it exempt and

14   non-exempt, and that generally abides by the definition

15   under FLSA.

16       Q    Understood.  So part of this e-mail says that

17   all the information -- all of this information is

18   outlined in our HR policies.  So let me -- Okay.  So

19   I've introduced Exhibit 6, which is Bates No. 7177.

20           (Document marked as Deposition

21           Exhibit 6 for identification.)

22       Q    Okay.  Are you able to see that?

23       A    Yes.

24       Q    And I will represent this is the document that

Page 93

1    was attached to the e-mail that we just looked at

2    previously.  Let me scroll down.  And this was the

3    attachment to that e-mail with the file name Pay Rules.

4            Do you recognize this document?

5        A    At a high level, yes.

6        Q    What is it?

7        A    I believe it's referring to the policy itself.

8        Q    So does this policy contain Delta's pay rules?

9        MR. ROBINSON:  Object to form.  Counsel, if you

10   could scroll through at least the document.  And then

11   vague with regard to pay rules.

12       THE WITNESS:  It looks like the high level essence

13   of them are there, yep.

14       MS. HILLS:  Q   Would this policy document apply to

15   an employee whether or not they were FLSA exempt?

16       MR. ROBINSON:  Object to form.

17       THE WITNESS:  I believe within the document the

18   differentiations are provided where necessary.

19       MS. HILLS:  Q  Did you -- You said -- What was that?

20       A    I believe within the document the

21   differentiations of exempt and non-exempt are spelled

22   out appropriately.

23       Q    Did you see that?

24       A    No, but I would imagine it's in there.

Page 94

1      Q    Well, actually, what is that?  What's the

2    Bates --

3      A    Yeah, it could be -- You're scrolling fast.  I

4    can't see for sure, but if you look in the overtime

5    policy.

6      Q    All right.  And that's at Bates 7181?

7      A    Yeah.

8      Q    Can you see that?

9      A    Yeah.

10     Q    So is your understanding -- I'm sorry, go ahead.

11     A    So this differentiates all positions on

12    published pay scales are eligible for overtime pay

13    because all scale positions are non-exempt.  We're not

14    using -- We didn't use the term non-exempt.  And this is

15    employee-facing.  They're not going to understand what

16    this means.  And please contact field HR with questions

17    regarding merit positions eligible for overtime.  And

18    that translates to merit positions that are non-exempt,

19    non-exempt merit positions.

20         But we didn't want to use -- we didn't want to

21    use vernacular that the layperson wouldn't understand.

22    Most people don't care if they're exempt or non-exempt.

23    They care whether or not they're eligible for overtime.

24     Q    And so you said all scaled employees would have

Page 95

1   been non-exempt?  Did I hear that right?

2       A    Well, that's where the Railway Labor Act comes

3   in.  And, again, I'm not in the proper position to serve

4   as the legal educator.  But the reason why Railway Labor

5   Act makes sense at Delta is in the transportation

6   industry scale employees, such as a flight attendant,

7   overtime is a different concept for flight attendants.

8   It's just -- It's governed by the Railway Labor Act.

9   So, yes, they're technically non-exempt, but they follow

10  rules governed by the RLA.

11      Q    In your time at Delta, how could employees --

12  how did employees know whether they were exempt or

13  non-exempt?

14      A    Through the -- For many it was clear, right?

15  For a scale employee, ground scale employee, it was

16  clear they were overtime eligible.  For merit, they

17  received notification of salaried overtime eligibility

18  through their leader as shifts were created.  And they

19  were a very small population.

20           So for the majority of people it was very

21  clear based on being a scale employee, but we did have

22  some salaried -- a very small group of salaried overtime

23  eligible.  And that was based on their closeness to the

24  operations.  And they received notification that they

Page 96

 1    were overtime eligible because of their link to the

 2    operation.

 3        Q    And what group is that?

 4        A    It was various groups that were more closely

 5    aligned to the operations of the airline.  So

 6    schedulers, for example, was one such group.

 7        Q    How many people were in that group?

 8        A    I don't recall.  It was a pretty small

 9    population.  It was vetted with leadership to identify

10    who was most closely aligned to the operations.

11    Operations essential basically.

12        Q    So what portion of ground non-contract employees

13    were merit employees during your time at Delta?

14        MR. ROBINSON:  Objection, calls for speculation.

15    You may answer.

16        THE WITNESS:  We always kind of looked at the number

17    10,000 as the number of merit people at Delta.

18        MS. HILLS:  Q   And was that group overtime

19    eligible?

20        A    A small segment of that group was overtime

21    eligible if they were connected to the operation.  So,

22    for example, I would not be, right?  I was in HR.

23    Planes could take off every day without me being there.

24    But crew scheduling, for example, was overtime eligible

Page 97

1    because they were essential to the operation.

2        Q   And when you say overtime eligible, would it be

3    possible for an employee to be eligible for overtime

4    under this document but not FLSA?

5        MR. ROBINSON:  Object to form.

6        MS. HILLS:  Q   Yeah, let me -- That was a bad

7    question.  Let me rephrase.

8            In your understanding, could the exempt

9    employees be eligible to earn overtime under this policy

10   as opposed to under the FLSA?

11       A   No, we aligned it.  So on the merit side we had

12   non-exempt merit employees that were not -- that were

13   overtime eligible because they were -- they were not

14   exempt from FLSA exemption.  And then we had exempt

15   employees on the merit side, and those employees were

16   not overtime eligible.  So it followed precisely the

17   differentiation of exempt and non-exempt for ground

18   employees to the FLSA, Railway Labor Act affected crews.

19       MS. HILLS:  Okay.  And I think we'll just take --

20   Oh, you're not able to see that document anymore.

21           Okay.  Let's just take like a five-minute

22   break, if that works for everyone.

23       MR. ROBINSON:  Fine.

24       THE WITNESS:  Sure.

Page 98

```
 1      THE VIDEOGRAPHER:  Okay.  We're going off the record
 2   at the 12:25 p.m.  This is the end of media unit 3.
 3           (Recess was taken.)
 4      THE VIDEOGRAPHER:  Okay.  We are back on the record.
 5   The time is 12:34 p.m.  This is the beginning of media
 6   unit 4.
 7      MS. HILLS:  Q   Okay.  And I am introducing Exhibit
 8   7, which is Bates No. 9322.  And then I will share my
 9   screen.
10           (Document marked as Deposition
11           Exhibit 7 for identification.)
12      Q   Okay.  Are you able to see that?
13      A   I can.
14      Q   Great.  Okay.  And so I'll scroll down to the
15   first page of this, which is 9322.  Do you see that this
16   is a message from John Early to you on February 23rd,
17   2022?
18      A   Yes.
19      Q   And just briefly before I go forward, you'll see
20   that there are -- there's a redaction in the forwarded
21   message.  I don't want to know the content of that
22   message, but we're going to talk about the rest of this
23   document.
24           And the subject is Swap Policy Changes For
```

Page 99

1    New York Employees.  Do you see that?

2        A    Yes.

3        Q    Do you recall what that would be in reference

4    to?

5        A    At a very high level, but I don't remember any

6    of the details.

7        Q    So if we scroll down, 9322 is -- at the bottom

8    is the top of the first message in this chain and you'll

9    see the next page, 9323, is an attachment.  Can you see

10   that?

11       A    Yes.

12       Q    And it says Swap Policy Changes for New York

13   Employees dated August 26th, 2021?

14       A    Yes.

15       Q    Do you recognize this document?

16       A    I don't recall the document, no.

17       Q    Do you remember swap policy changes being made

18   for New York employees in August of 2021?

19       A    I vaguely recollect, yes.

20       Q    Why were policy changes made?

21       A    To comply with the local law change apparently.

22       Q    And so you see -- I'm on that top paragraph,

23   beginning with the second sentence, where it says,

24   recently we learned that we were not properly paying

1    some of our New York based ACS/CGO employees for the

2    hours they worked over 40 hours per week due to

3    voluntary shift swaps.  We're making a few changes to

4    make this right and ensure full compliance with New York

5    State requirements.  Do you see that?

6         A    Yes.

7         Q    And so these New York employees referenced here,

8    would they be FLSA exempt?

9         MR. ROBINSON:  Object to form again to the extent

10   this calls for a legal conclusion, and also calls for

11   speculation.

12        THE WITNESS:  I believe they would have been

13   non-exempt employees.

14        MS. HILLS:  Q    Non-exempt in reference to the FLSA?

15        A    Yes, and where they worked.

16        Q    What was that?

17        A    Because ACS and Cargo employees in New York are

18   mainly agents.  So they would mainly be scale employees.

19   The scale employees are not exempt.

20        Q    Did you mention the Railway Labor Act?

21        A    Well, under either Act they're non-exempt as

22   codified by FLSA labels.

23        Q    So your assumption is that they -- I'm sorry,

24   could you repeat that?  I'm just trying to wrap my head

Page 101

1    around these --

2        A    Yeah, my assumption was this was aimed -- the

3    policy change was aimed at non-exempt employees in ACS

4    and Cargo, so ground non-exempt employees in New York at

5    certain wage levels.

6              So we were enacting a State mandate relative

7    to -- What it basically did was it moved it from exempt,

8    non-exempt to non-exempt with a wage qualifier.  So that

9    people below a certain wage had to be treated a certain

10   way irrespective of the codification between exempt and

11   non-exempt.

12       Q    And in this description that you just provided,

13   when you're saying the term exempt and non-exempt, are

14   you referencing FLSA only or FLSA as well as the Railway

15   Labor Act?

16       A    Again, I'm not an attorney.  I'm a compensation

17   professional.  And FLSA rules governing non-exempt and

18   exempt status are used to decipher the overtime

19   eligibility at Delta.

20              Railway Labor Act has a different bearing on

21   many things in HR, but relative to this particular

22   compensation element, it follows the normal parameters

23   of FLSA.  So, to me, I'm speaking under both of them

24   from my understanding of the Railway Labor Act's impact

Page 102

1    on overtime eligibility.

2        Q    So when you used the term exempt, is that -- is

3    the understanding that the person is exempt from FLSA

4    because they are instead covered by the Railway Labor

5    Act?

6        A    No.

7        MR. ROBINSON:  Object to form.

8        THE WITNESS:  No.

9        MR. ROBINSON:  Just quickly, object to form, asked

10   and answered.  You may answer.

11       THE WITNESS:  So set the Railway Labor Act aside for

12   a second.  Fair Labor Standard Act, as exempt and

13   non-exempt employees, if you are deemed to be exempt

14   from the Fair Labor Standards Act, it means that you, by

15   definition, do not have to qualify for overtime

16   compensation, among other things, but as it applies to

17   compensation.  And then non-exempt employees from the

18   Fair Labor Standards Act are non-exempt from that

19   overtime prohibition.  So they are eligible for overtime

20   compensation.

21           And, generally, the Railway Labor Act

22   provisions follows similarly from a compensation

23   approach as the Fair Labor Standards Act.  There are

24   other things in the RLA that impact an airline and a

```
                                              Page 103
```

1    railway, but the definition under compensation, I speak

2    colloquially, is exempt, non-exempt under the FLSA.

3        MS. HILLS:  Q   Sure.  No, I appreciate that.

4            All right.  I'm going to stop sharing for a

5    moment and I'll pull one more document up.

6                Okay.  I'm introducing Exhibit 8.

7                (Document marked as Deposition

8                Exhibit 8 for identification.)

9        Q    All right.  That should appear as Bates No.

10   12531.  Can you see that?

11       A    Yes.

12       Q    Okay.

13       A    It's 12534 online though, just FYI.

14       Q    Oh.  Oh, it's a range --

15       A    Oh, okay.

16       Q    -- you're seeing.  But, yes, you're correct, the

17   end page is 12534.

18            Okay.  And so I'll go to the first page here.

19   And do you see this is a message from Kelly Boseman

20   dated April 18th, 2017?  Do you see that?

21       A    I do, uh-huh.

22       Q    Is Kelly Boseman the same Kelly we saw on the

23   previous message?

24       A    Kelly Boseman and Kelly Brown are the same

1   person.  She was remarried.

2       Q   Okay.  And it's a message to Charles Dowd and

3   Barbara Franz.  Are you familiar with them?

4       MR. ROBINSON:  Object to form.  You may answer.

5       THE WITNESS:  Barb Franz is an HR business partner.

6   Charles Dowd was on my team.  I can't remember exactly

7   his capacity while he was with us.

8       MS. HILLS:  Q   Did he report to you, Charles Dowd?

9       A   No.  No.

10      Q   You see in this message at the top Ms. Boseman

11  writes, Barb, first, the employee should be advised that

12  we are not governed by FLSA pay rules.  We are covered

13  under the Railway Labor Act or State pay rules,

14  whichever is more restrictive.  If the state, like

15  Georgia, defers to FLSA, then Railway Labor Act applies.

16  If the state has more restrictive pay rules, like

17  California, then we have to abide by their rules.  Do

18  you see that?

19      A   Yes.

20      Q   Do you understand what this means?

21      MR. ROBINSON:  I'm going to go ahead and just object

22  to form.  Counsel, I'm not trying to have a speaking

23  objection, but this has been one of several e-mails that

24  does not include the witness which are asked for --

Page 105

1    asking for him to speculate as to what other parties are

2    suggesting.

3            So I just want to lodge that for the record

4    purposes.  This is, by my count, one of at least four,

5    and maybe more, e-mail correspondence that the witness

6    is not involved in which he's being asked to speculate

7    on.

8        MS. HILLS:  Understood.  Yeah, I hear you.  We have

9    moved to compel for documents -- for custodial documents

10   from the witness, but I hear your point.

11           But, Mr. Tahvonen, you are familiar with Kelly

12   Boseman, correct?

13       A    Yes.

14       Q    She was on your team?

15       A    Yes.  My extended team, yeah.

16       Q    And Charles Dowd was as well?

17       A    Yes.

18       Q    Okay.  So we won't spend too long on this, just

19   on that section we were just looking at.

20       A    Yeah.

21       Q    Do you believe that this is an accurate

22   representation?

23       MR. ROBINSON:  I'm going to object to -- I'm going

24   to object to form again on the same basis.  You are

Page 106

```
 1   asking him to speculate, A, to the extent it's asking
 2   for a legal conclusion.  I'm going to object on that
 3   basis.  And, secondarily, you're asking him to speak to
 4   an e-mail regarding an employee from 2017 for which --
 5   involving an e-mail that he's not included on.
 6        MS. HILLS:  So I want to know, because of your
 7   position in HR at Delta, as you testified earlier, that
 8   it's important to understand FLSA exemption status
 9   because it affects payroll.  So for that reason, I'm
10   trying to understand how folks in the -- in HR
11   understood FLSA exemption status.  But I'll --
12        MR. ROBINSON:  That's different.
13        MS. HILLS:  Let me restate my question.
14        MR. ROBINSON:  Same objection to the extent you're
15   asking about a particular employee.  If you're asking
16   about his knowledge personally, it's different.
17        MS. HILLS:  Q  Was it your understanding at Delta
18   from 2017 until the end of your employment that
19   employees were not governed by FLSA pay rules, but were
20   under the Railway Labor Act?
21        A  Yes, but let me clarify.  That doesn't mean the
22   codification of exempt and non-exempt is different
23   between the two.  What it refers to is the FLSA pay
24   rules.
```

1          Many states have adopted the FLSA pay rules,

2     right?  They defer to FLSA as a state.  When they do

3     that, for Delta, it really means they're deferring to

4     the Railway Labor Act.  If the state has more restricted

5     convenance or guidance or governance, then of course we

6     have to abide by the State rules.

7          So what Kelly is trying to educate Charles and

8     Barb on is we aren't covered by FLSA globally where we

9     can say no matter what a state says, we're FLSA.  We're

10    governed by the pay rules of the Railway Labor Act.

11    Some states have adopted FLSA as their ALCON.  That

12    really means Railway Labor Act for us.  But, in any

13    case, if the state has more restrictive pay rules, like

14    California, for example, then we abide by their rules.

15         So I think she was merely trying to educate

16    non-payroll people that, you know, while codification

17    under the FLSA for exempt and non-exempt and the Railway

18    Labor Act follow one another, we really are covered by

19    the Railway Labor Act, unless a state has even more

20    guidance that is more restrictive, then we have to abide

21    by the State law is merely what she's saying here.

22        MS. HILLS:  Q   And was that principle applied to

23    all ground non-contract employees?

24        A   Yes.

1     MR. ROBINSON:  Object to form.  You may answer.

2     THE WITNESS:  Yes.

3     MS. HILLS:  Q   Okay.  And just before we exit this

4  document, still looking on the same page, do you see

5  that there's a header for Swaps?

6     A   I don't on my view.  You may have to scroll

7  down.

8     Q   Oh.  Let me zoom in a little bit for you.  Do

9  you see that there's a bold -- in bold in the middle of

10  the message it says Swaps?

11     A   Yes.

12     Q   Did it make a difference whether an employee was

13  FLSA exempt or non-exempt regarding their ability to

14  swap?

15     A   I'm going to need clarification on the question

16  because I don't understand -- I can't think of any

17  workforce that was exempt that had swapping provisions.

18     Q   I guess did the FLSA exempt status have anything

19  to do with employees' ability to swap at Delta?

20     MR. ROBINSON:  Object to form.

21     MS. HILLS:  Q   Are those -- Are those two things

22  related I guess is my question?

23     A   They're not.  It was the nature of the work.

24     Q   Okay.  I'll stop sharing this.

Page 109

1              Okay.  I've introduced Exhibit 9, which is

2    Bates No. 6993.

3              (Document marked as Deposition

4              Exhibit 9 for identification.)

5         Q    All right.  And you should be able to see that

6    now.  Is that up on your screen?

7         A    Yes, it is.

8         Q    Okay.  And I can represent to you that this

9    document was created June 28th of 2018 and has the file

10   name capital RES-Policy.  And it was created by Cheryl

11   Gray.  Do you know who Cheryl Gray is?

12        A    Yes.

13        Q    Is she -- Does she work in HR?

14        A    Yes.

15        Q    And did you work closely with her at your

16   time -- during your time at Delta?

17        A    She was on my team, yes.

18        Q    She reported to you?

19        A    No.

20        Q    Do you understand capital RES to be a shorthand

21   for Reservations?

22        A    I would be -- My educated guess would be yes

23   because Cheryl was instrumental with the Reservations

24   group timekeeping.  So that would make sense.

1      Q    From 2017 until you left Delta, about how many

2   domestic employees were in Reservations?

3      A    I don't recall the exact number.  Probably 6 to

4   7,000.

5      Q    And would these all be ground employees in

6   Reservations?

7      MR. ROBINSON:  Object to form.

8      THE WITNESS:  Yes.

9      MS. HILLS:  Q    And were those employees subject to

10   the Hours of Work, Overtime and Shift Differential

11   policy?

12      MR. ROBINSON:  Object to form, vague.

13      THE WITNESS:  Generally, yes.  They may have had

14   some local provisions, but.

15      MS. HILLS:  Q    And then I pressed on one of the --

16   or if you can see my screen, one of the cells, row 13,

17   column A.  Do you see that it says in this category or

18   in this column, which is titled Category, do you see row

19   13 says Work Time?

20      A    Yes.

21      Q    And then for the next column under

22   Process/Policy row 13 says Company Swaps Bulletin Board?

23      A    Yes.

24      Q    I'll go over.  And this next column that is

Page 111

1    titled RES Current, row 13 says functionality does not

2    exist in MPS.  Do you see that?

3        A    Yes.

4        Q    And then the next column,

5    Notes/Questions/Concerns at the top, for row 13 says

6    supported within SAP.  Do you see that?

7        A    Yes.

8        Q    Did Reservations switch from using MPS to SAP

9    around summer 2018?

10       A    I don't recollect exactly where they ended up.

11   This looks like an early-on requirements document of

12   some kind.

13       Q    Why do you say that?

14       A    Well, I don't know the context of the document.

15   So it's hard for me to opine on what it -- what it's

16   meant to indicate.  But it looks like it's an initial

17   feasibility study.

18       Q    I'm going to go down to row 27.  And here for

19   the Category column it says Swaps.  Then you have the

20   Process/Policy, which says for row 27 should a swap --

21   should a shift swap count towards the overtime

22   threshold.  For RES Current column for row 27 it says,

23   current functionality allows, does allow shift swaps to

24   count towards OT.  Do you see that?

Page 112

1      A    I see that, yep.

2      Q    Did Delta count swaps towards employees'

3   overtime thresholds when you were at Delta?

4      A    I think the context of swap on and swap off is

5   missing here.

6      Q    What do you mean by that?

7      A    Well, as we talked about earlier today with the

8   responsibility for swap-off shifts moving to this person

9   who picked up the shift, we did not count towards

10  overtime threshold hours that you swap away.  They are

11  literally hours off.  They're non-accountable hours.

12  You're not accountable for them.  You can't be --

13  There's no performance tied to them.  They are off.

14          So when -- A lot of this context is missing.

15  When you say should a swap -- should a shift swap count

16  towards the overtime threshold, we've got to decipher

17  the difference between swapping off and picking up.

18     Q    Were swapped-off shifts considered a deficit for

19  employees ability to earn overtime when you were at

20  Delta?

21     A    They aren't a deficit, but they would not count

22  towards the overtime threshold because they were off,

23  they were not worked.  If you -- It was not working

24  regularly scheduled hours.

Page 113

1      Q   So, in other words, for the employee who swaps

2   off, that it's no longer their scheduled workday, right?

3      MR. ROBINSON:  Object to form, mischaracterizes

4   testimony.  You may answer.

5      THE WITNESS:  They're not working.  So, yes, they're

6   giving up that part of their shift, their weekly hours.

7   So they're not accountable for those hours.  They aren't

8   paid for those hours.  They are not working hours.

9   They're literally not at work.

10     MS. HILLS:  Q   And I'm going to take you down in

11  this document to row 31, which is kind of near the

12  bottom.  But do you see it down there?  The category is

13  listed as Overtime, and then the next column for

14  Process/Policy, it says Overtime Abuse - How To We

15  Solve.  Do you see that?

16     A   Yes.

17     Q   Was there a concern around this time, so, again,

18  summer 2018, that Delta was paying employees too much

19  for overtime?

20     MR. ROBINSON:  Object to form.

21     THE WITNESS:  I don't recall anything around that

22  period of time uniquely.  I think there's -- As any good

23  business, you always would want to watch your overtime

24  expense and make sure that it's under control and

Page 114

1    explainable.  But I don't recall anything at that

2    particular time or within RES that was causing

3    unnecessary concern or attention and focus.

4        MS. HILLS:  Q   Were you involved in any kind of

5    effort specifically to reduce the amount of overtime

6    hours worked at Delta?

7        A   No.

8        MR. ROBINSON:  Object to form --

9        THE WITNESS:  Oh, I'm sorry.

10       MR. ROBINSON:  -- vague, lacks specificity, calls

11   for speculation.  You may answer.

12       THE WITNESS:  No, I was never involved in such

13   activity.

14       MS. HILLS:  Q   Okay.  I have introduced Exhibit 10,

15   which is Bates No. 6610.  Let me just pull that up.

16           (Document marked as Deposition

17            Exhibit 10 for identification.)

18       Q   I'm going to open -- Let's see.  I'm going to

19   open this document in Microsoft Excel because the way it

20   appears online it's a little wonky.

21           All right.  Can you see that?

22       A   Yes.

23       Q   And I can represent to you this document was

24   created June 23rd, 2018, and it was last modified on

```
                                              Page 115
 1    August 29th of 2019, and that it was created by Tiffany
 2    Croon.  Do you know who that is?
 3         A   I'm not familiar with that name.
 4         Q   Someone in HR?
 5         A   I don't know.  I've never heard that name
 6    before.
 7         Q   Oh, you said you haven't?  I'm sorry.
 8         A   No.  Sorry.
 9         Q   Do you know who Sannah Kechit (phon.) is?
10         A   Yeah.  Yes, she was on my team.
11         Q   Okay.  She reported to you?
12         A   No.
13         Q   Okay.  And do you recognize this document?
14         A   No.
15         Q   Were you involved in a project to move groups at
16    Delta to the MyTime platform?
17         A   My team was engaged in looking at the efficacy
18    of getting on to a common platform.
19         Q   Okay.  So I'm on row 19.  And then it says
20    here -- There's a column for Current State and Future
21    State.  And in Current State there is a note that says
22    TechOps and GSE do not perform swaps today.  And then
23    listed in Future State there's a note again that says no
24    change for TechOps and GSE as they do not perform swaps.
```

1    Do you see that?

2        A    Yes.

3        Q    Is that accurate, that those groups do not --

4    did not perform swaps --

5        MR. ROBINSON:  Object to -- Go ahead.

6        MS. HILLS:  -- during your time at Delta?

7        THE WITNESS:  To the best of my recollection, yes.

8        MS. HILLS:  Q    Yes, that is correct?

9        A    That is correct.

10       Q    And then do you see that there's columns here

11   for Airport Customer Service, Cargo, GSE, RES, and

12   TechOps?

13       A    Uh-huh.

14       Q    Is it your understanding that ACS, Cargo, and

15   RES are groups that engage in swaps?

16       MR. ROBINSON:  Object to form, vague.  You may

17   answer to the best of your ability.

18       THE WITNESS:  Yes, I believe they have swaps.

19       MS. HILLS:  Q    Was that the case from 2017 until

20   you left Delta?

21       A    To the best of my recollection.

22       Q    Do you know which other divisions allowed

23   employees to swap?

24       MR. ROBINSON:  Object to form, vague, lacks

1    specificity.  Counselor, are you asking across all of

2    Delta?

3        MS. HILLS:  Q  Yeah, by division.  Are there other

4    divisions outside of the ones we just referenced that

5    you're aware allowed their employees to swap?

6        A    They weren't within the scope of this project,

7    though I think it may have occurred more at a local

8    level.

9        Q    What do you mean by that?

10       A    Well, these are the big work groups, right?

11   These are the big operationally dependent work groups

12   that generally had very similar needs from a systems

13   perspective.

14            There may have been smaller work groups, like

15   schedulers, that ran a swap program on their own, and

16   they were considered out of scope initially for this

17   exercise because we were looking at trying to

18   understand, again, initial phases back in 2017 or '18,

19   whenever this was, of where are the barriers to moving

20   towards a common system among the big swap users.

21            So this wasn't meant to be an exhaustive list

22   of there are no other swaps going on at the company, but

23   where are the pinchpoints for the big groups from a

24   technology perspective.

1      Q    Okay.  Speaking of their size, I want to refer

2  to this tab called Change Magnitude Assessment.  Can you

3  see that?

4      A    Yes.

5      Q    In this tab there's a row, row 10, there's a

6  column called Change Breadth and then the next column is

7  Depth Scoring and then a column for Scoring Definitions.

8  Do you see that?

9      A    Yes.

10     Q    Do you see that this row 10 is called People

11 Count, how many people will be directly impacted by the

12 change, and it has a depth scoring of 3.  And do you see

13 that that scoring means 3 equals high (a thousand plus

14 directly impacted employees)?  Do you see that?

15     A    Yes.

16     Q    Is that an accurate reflection of the impact of

17 the change to SAP?

18     MR. ROBINSON:  Object to form.  The witness is here

19 in his fact capacity.  That's one.  Secondly, vague and

20 lacks specificity with regard to the question.  Are you

21 asking him to give his assessment of what's in front of

22 him on the screen?

23     MS. HILLS:  We can -- I'd just -- We can go off the

24 record and discuss.  I'd just really ask that you try to

Page 119

1    reduce the speaking objections.

2        MR. ROBINSON:  Let's go off the record really

3    quickly.

4        THE VIDEOGRAPHER:  Okay.  We're going off the record

5    at 1:20 p.m.  This is the end of media unit 4.

6            (Recess was taken.)

7        THE VIDEOGRAPHER:  Okay.  We are back on the record.

8    The time is 1:21 p.m.  This is the beginning of media

9    unit 5.

10       MS. HILLS:  Q   So, Mr. Tahvonen, around the time

11   this document was created, which, again, June 2018, and

12   last amended in August of 2019, during that time period

13   would you say it's accurate that there were about 26,000

14   employees in Airport Customer Service?

15       MR. ROBINSON:  Object to form.

16       THE WITNESS:  I think it's a combination.  I think

17   it's how you look at this.  The ACS was 26,000, which

18   would have included cargo and ground service equipment

19   at the time.  So that's what the CGO and GSE represent.

20   So even though it's labeled as ACS, it's really ACS,

21   Cargo, and GSE.

22       MS. HILLS:  Q   Understood.

23       A   And that number sounds roughly correct.

24       Q   And how about the number that's listed here for

Page 120

```
 1   capital TOP?  It says 8500.

 2       A    Yeah, that's TechOps.  That looks correct.

 3       Q    That's a -- You would say that's a correct

 4   estimate of the number of employees in TechOps?

 5       A    Yes, for the --

 6       MR. ROBINSON:  Object to form.

 7       THE WITNESS:  For the scale side.

 8       MS. HILLS:  Q   I was thinking that here it's listed

 9   capital RES.  It says 5,000.  Would you say that there

10   were about 5,000 scale employees in Reservations?

11       A    Yes.

12       Q    Has that been pretty consistent over time, at

13   least as of 2017?

14       MR. ROBINSON:  Object to form.

15       THE WITNESS:  Minus the effect of COVID, yes.

16       MS. HILLS:  Q   Understood.  And then I'm just going

17   to go one row down.  This next row for the Change

18   Breadth says, impacts same or different, are people

19   being impacted the same or are they experiencing the

20   change differently.  Do you see that?

21       A    Yes.

22       Q    And then the depth scoring is a 2, which

23   correlates to a scoring definition of medium (slight

24   variances).  Do you see that?
```

Page 121

1      A    Yes.

2      Q    And then finally in the Notes column it says,

3   all getting a new system, but there's some variation in

4   who's adopting the specific functionality and there's

5   variation in policies, which is also the case today.  Do

6   you see that?

7      A    Yes.

8      Q    Would you say the divisions switched to SAP in

9   this time period, for those divisions is it accurate to

10  say that there were only slight variances in how they

11  were impacted by the --

12      MR. ROBINSON:  I'm going to --

13      MS. HILLS:  -- by the new platform?

14      MR. ROBINSON:  Object to form.

15      THE WITNESS:  Okay.  This is going to be -- For the

16  next one they shouldn't.  So this isn't about SAP.  This

17  is about a common timekeeping system between all the

18  divisions.

19          This has never come to be, at least it wasn't

20  delivered while I was at Delta.  And from what I

21  understand, not having worked there for two years, is

22  there's still not a common platform.  So this was an

23  exploratory document of what it would take to commonize

24  a bid and award system and the associated payroll.

1          So this was associated with that project,

2    not -- The move to SAP happened, right, in 2015 and that

3    piece.  This was the efficacy of kind of that next

4    generation, which, somebody would have to correct me if

5    I'm wrong, never came to full fruition because of the

6    amount of capital investment it would require from an IT

7    perspective.

8        MS. HILLS:  Q   All right.

9        A    So this was an exploratory document.

10       Q    Gotcha.  And then -- So last question on this

11   one.  So understanding that the numbers represented in

12   row 10 here still fairly represent the number of scale

13   employees in these divisions; is that correct?

14       MR. ROBINSON:  Object to form, mischaracterizes the

15   testimony.  You may answer.

16       THE WITNESS:  The numbers were directionally correct

17   at the time I left.

18       MS. HILLS:  Okay.  I'll stop sharing.

19            Can we just take a quick break?  I think I'm

20   probably wrapping up here, but just to make sure.

21       MR. ROBINSON:  Okay.  Thank you, Counsel.  How long

22   do you need?

23       THE VIDEOGRAPHER:  Okay.  We're going off the record

24   at 1:28 p.m.

Page 123

1          (Recess was taken.)

2      THE VIDEOGRAPHER:  Okay.  We are back on the record.

3   The time is 1:34 p.m.

4      MS. HILLS:  Okay.  Thank you, Mr. Tahvonen.  I have

5   no further questions.

6      THE WITNESS:  Thank you.

7      MR. ROBINSON:  No questions on behalf of Delta.  We

8   want to obviously read and sign.

9      THE VIDEOGRAPHER:  Okay.  We're going off the record

10  at 1:34 p.m.  This concludes today's testimony given by

11  Greg Tahvonen.  The total number of media units used was

12  five and will be retained by Veritext.

13

14

15

16

17

18

19

20

21

22

23

24

Page 124

1    STATE OF ILLINOIS  )

                        )  SS:

2    COUNTY OF C O O K  )

3            The within and foregoing deposition of the

4    aforementioned witness was taken before NADINE J. WATTS,

5    CSR, RPR and Notary Public, at the place, date and time

6    aforementioned.

7            There were present during the taking of the

8    deposition the previously named counsel.

9            The said witness was first duly sworn and was

10   then examined upon oral interrogatories; the questions

11   and answers were taken down in shorthand by the

12   undersigned, acting as stenographer and Notary Public;

13   and the within and foregoing is a true, accurate and

14   complete record of all of the questions asked of and

15   answers made by the forementioned witness, at the time

16   and place hereinabove referred to.

17           The signature of the witness was not waived,

18   and the deposition was submitted, pursuant to Rules

19   30(e) of the Rules of Civil Procedure for the United

20   States District Courts, to the deponent per copy of the

21   attached letter.

22           The undersigned is not interested in the

23   within case, nor of kin or counsel to any of the

24   parties.

Page 125

1          Witness my official signature and seal as

2     Notary Public in and for Cook County, Illinois on this

3     20th day of April, A.D. 2025.

4

5                         *Nadine J. Watts*

                          NADINE J. WATTS, CSR, RPR

6                         License No. 084-002736

                          Notary Public

7                         One North Franklin Street

                          Suite 3000

8                         Chicago, Illinois 60606

                          Phone:  (312) 442-9087

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
                                                        Page 126
1                        Veritext Legal Solutions
                              1100 Superior Ave
2                                Suite 1820
                          Cleveland, Ohio 44114
3                         Phone: 216-523-1313
4

      April 20, 2025
5

      To: Mitch Robinson, Esq.
6

      Case Name: Goodyear, Lukas v. Delta Airlines, Inc.
7

      Veritext Reference Number: 7311767
8

      Witness:  Gregory S. Tahvonen        Deposition Date:  4/14/2025
9

10    Dear Sir/Madam:
11

      Enclosed please find a deposition transcript.  Please have the witness
12

      review the transcript and note any changes or corrections on the
13

      included errata sheet, indicating the page, line number, change, and
14

      the reason for the change.  Have the witness' signature notarized and
15

      forward the completed page(s) back to us at the Production address
16    shown
17    above, or email to production-midwest@veritext.com.
18

      If the errata is not returned within thirty days of your receipt of
19

      this letter, the reading and signing will be deemed waived.
20

21    Sincerely,
22    Production Department
23

24    NO NOTARY REQUIRED IN CA
```

Page 127

1                DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
2

        ASSIGNMENT REFERENCE NO: 7311767
3       CASE NAME: Goodyear, Lukas v. Delta Airlines, Inc.
        DATE OF DEPOSITION: 4/14/2025
4       WITNESS' NAME: Gregory S. Tahvonen
5        In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7        I have made no changes to the testimony
as transcribed by the court reporter.
8

_____          _____
9  Date                     Gregory S. Tahvonen
10       Sworn to and subscribed before me, a
Notary Public in and for the State and County,
11 the referenced witness did personally appear
and acknowledge that:
12

        They have read the transcript;
13      They signed the foregoing Sworn
             Statement; and
14      Their execution of this Statement is of
             their free act and deed.
15

        I have affixed my name and official seal
16
this _____ day of_____, 20_____.
17

              _____
18            Notary Public
19            _____
              Commission Expiration Date
20
21
22
23
24
25

```
 1                DEPOSITION REVIEW
                CERTIFICATION OF WITNESS
 2
        ASSIGNMENT REFERENCE NO: 7311767
 3      CASE NAME: Goodyear, Lukas v. Delta Airlines, Inc.
        DATE OF DEPOSITION: 4/14/2025
 4      WITNESS' NAME: Gregory S. Tahvonen
 5         In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7         I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
 8  well as the reason(s) for the change(s).
 9         I request that these changes be entered
    as part of the record of my testimony.
10
           I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____        _____
    Date                    Gregory S. Tahvonen
14
           Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17      They have read the transcript;
        They have listed all of their corrections
18          in the appended Errata Sheet;
        They signed the foregoing Sworn
19          Statement; and
        Their execution of this Statement is of
20          their free act and deed.
21      I have affixed my name and official seal
22  this _____ day of_____, 20____.
23          _____
            Notary Public
24
            _____
25          Commission Expiration Date
```

Page 129

1                    ERRATA SHEET
          VERITEXT LEGAL SOLUTIONS MIDWEST
2                ASSIGNMENT NO: 7311767
3     PAGE/LINE(S) /        CHANGE        /REASON
4     _____
5     _____
6     _____
7     _____
8     _____
9     _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19

      _____       _____
20    Date                    Gregory S. Tahvonen
21    SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22    DAY OF _____, 20_____ .
23                   _____
                     Notary Public
24
                     _____
25                   Commission Expiration Date

**[& - 2019]**                                                    Page 1

| & | | | |
|---|---|---|---|
| **&** 3:9,16 22:19 33:13 34:20 73:14 | **1.1** 38:22 76:4 | **14,000** 37:21,22 | **2-23-22** 4:5 |

## &

**&** 3:9,16 22:19
  33:13 34:20
  73:14

## 0

**00000169** 3:8
**00000178** 3:8
**00006381** 3:13
**00006382** 3:13
**00006383** 3:16
**00006408** 3:16
**00006993** 4:9
  4:11
**00007175** 3:19
**00007176** 3:19
**00007177** 3:21
**00007218** 3:21
**00009322** 4:3
**00009323** 4:3
**00012531** 4:6
**00012534** 4:6
**00018055** 3:11
**0018091** 3:11
**05712** 1:7 5:15
**084-002736**
  125:6

## 1

**1** 3:8 5:10
  32:11,13 33:2
  33:8 78:22
**1.0** 76:3

**1.1** 38:22 76:4
**1.2** 80:15
**1.3** 41:1
**1.8** 42:1
**10** 2:5 4:11 7:7
  114:14,17
  118:5,10
  122:12
**10,000** 96:17
**103** 4:6
**104.12** 65:20
**1075** 2:11
**109** 4:9
**10:02** 33:5
**10:39** 54:3
**10:43** 54:6
**10:56** 62:2
**11-14-19** 3:14
**1100** 126:1
**114** 4:11
**11:09** 62:5
**11th** 70:14
**12** 9:7
**12531** 103:10
**12534** 103:13
  103:17
**12:25** 98:2
**12:34** 98:5
**13** 37:22
  110:16,19,22
  111:1,5
**13,000** 37:21
**14** 3:2

**14,000** 37:21,22
**14th** 1:17 5:2
**1500** 38:10
**160** 18:14
**169** 33:12
**16th** 73:17
**171** 34:18
**172** 38:21
**173** 41:1
**175** 54:19 55:2
  58:1
**176** 41:24
  51:10
**18** 65:12
  117:18
**18055** 62:8
**18057** 65:1
**18071** 65:12
**1820** 126:2
**18th** 103:20
**19** 115:19
**1987** 9:1
**1989** 9:3
**1:20** 119:5
**1:21** 119:8
**1:23** 1:7 5:15
**1:28** 122:24
**1:34** 123:3,10

## 2

**2** 3:10 33:6
  62:2,7,10
  120:22

**2-23-22** 4:5
**2-8-19** 3:20
**20** 46:19 53:12
  63:12,12,13,13
  126:4 127:16
  128:22 129:22
**2001** 9:20
  16:12
**2007** 10:10,11
  16:11
**2010** 64:24
**2011** 78:17,21
**2012** 78:17,22
**2014** 15:17
**2015** 28:21
  122:2
**2017** 16:11,14
  17:18 19:2
  46:21 54:9
  55:16 59:19
  63:7,17,18,22
  63:24 66:4
  67:17 72:15
  75:18 84:2
  85:11 87:5
  91:12 103:20
  106:4,18 110:1
  116:19 117:18
  120:13
**2018** 109:9
  111:9 113:18
  114:24 119:11
**2019** 70:5,14
  72:8 73:17

**[2019 - ability]**                                    Page 2

76:19 78:1,4
82:6 88:24
90:18 115:1
119:12
**2021** 28:23
99:13,18
**2022** 62:23
98:17
**2023** 22:14
**2024** 34:7,8
**2025** 1:18 3:2
5:2 125:3
126:4
**20805** 125:5
**20th** 125:3
**216-523-1313**
126:3
**22** 88:5
**2200** 38:10
**23rd** 98:16
114:24
**2500** 2:12
**26,000** 119:13
119:17
**26th** 99:13
**27** 111:18,20,22
**28th** 109:9
**29th** 115:1

**3**

**3** 3:12 62:6
69:18,21 98:2
118:12,13

**30** 7:7 17:4
124:19
**30,000** 63:13
**30,000s** 37:16
**3000** 125:7
**30309** 2:12
**31** 113:11
**312** 125:8
**312-9991** 2:6
**32** 3:8
**35** 17:4

**4**

**4** 3:15 73:10
98:6 119:5
**4-18-17** 4:8
**4/14/2025**
126:8 127:3
128:3
**40** 89:12 100:2
**401** 14:22
**4020** 6:22
**404** 2:13
**44114** 126:2
**442-9087** 125:8

**5**

**5** 3:18 88:17,20
89:9 119:9
**5,000** 120:9,10
**53092** 6:23
**59** 7:3
**5th** 34:8

**6**

**6** 3:5,21 92:19
92:21 110:3
**60602** 2:6
**60606** 125:8
**62** 3:10
**6381** 69:19,23
**6385** 76:2
**6394** 80:7
**6395** 82:23
**6398** 74:3
**6610** 114:15
**69** 3:12
**6993** 109:2

**7**

**7** 4:3 54:19
98:8,11
**7,000** 110:4
**7.0** 74:5
**7177** 92:19
**7181** 94:6
**72** 51:14,17
**73** 3:15
**7311767** 126:7
127:2 128:2
129:2

**8**

**8** 4:6 25:10
103:6,8
**8500** 120:1
**855** 2:6

**88** 3:18
**885-1500** 2:13

**9**

**9** 4:9 109:1,4
**9,000** 25:10
**92** 3:21
**9322** 98:8,15
99:7
**9323** 99:9
**98** 4:3
**9:06** 1:17 5:2
**9:54** 33:2

**a**

**a.d.** 1:18 125:3
**a.m.** 1:17 5:2
33:2,5 54:3,6
62:2,5
**abbreviation**
37:3
**abide** 104:17
107:6,14,20
**abided** 77:4
**abides** 92:14
**ability** 14:16
16:9,21 18:24
23:9 24:11
26:17 27:7,23
28:9,13 29:10
30:23 31:22
32:4 35:20
36:7,17 37:2
37:14 39:14
40:14 42:9

43:13,22 44:15
45:9 50:16
51:7 52:16
55:21 56:20
58:23 66:23
75:22 77:3
81:12 85:10
86:12 87:22
88:10 90:5
108:13,19
112:19 116:17
**able**  12:24
32:10 61:9
73:11 92:22
97:20 98:12
109:5
**above**  21:2
49:16 126:17
**absence**  51:19
58:3 60:15
**absolutely**  7:18
**abundance**
57:15
**abuse**  113:14
**access**  32:21
35:4,24 57:1
67:2,13
**accordance**
81:5,15 127:5
128:5
**account**  43:7
**accountable**
59:7,13 112:11
112:12 113:7

**accurate**
105:21 116:3
118:16 119:13
121:9 124:13
**accurately**
90:17
**achieve**  13:24
**acknowledge**
127:11 128:16
**acronym**  64:8
**acronyms**
11:22
**acs**  3:11 62:16
64:18,19 65:15
65:23 100:1,17
101:3 116:14
119:17,20,20
**act**  16:4 78:21
79:9,13 85:4
87:13 90:14,23
91:4,8,22 92:6
92:10,10 95:2
95:5,8 97:18
100:20,21
101:15,20
102:5,11,12,14
102:18,21,23
104:13,15
106:20 107:4
107:10,12,18
107:19 127:14
128:20
**act's**  101:24

**acting**  16:16
124:12
**action**  5:19
11:13
**activity**  114:13
**actual**  37:20
71:18
**actually**  16:11
38:3 40:23
49:23 51:10
56:8 72:12
86:10 94:1
**add**  31:22 59:3
**added**  13:11
14:9,12 15:21
**addition**  46:24
**additional**
15:11 42:22
44:23 52:18
56:1,7,11
**address**  6:21
126:15
**addressed**  50:5
76:15
**adhere**  39:3
**adjust**  61:18
**adjusted**  43:7
**administer**
31:10 47:6,15
**administered**
29:14
**administering**
17:21 30:13

**administration**
18:1
**administrative**
12:13
**administrator**
47:21,24 48:1
**admins**  48:10
**admit**  62:21
**adopted**  107:1
107:11
**adopting**  121:4
**advised**  104:11
**affect**  46:7 85:5
85:24
**affected**  83:3
97:18
**affecting**  13:4
**affects**  106:9
**affiliation**  5:24
**affixed**  127:15
128:21
**aforemention...**
124:4,6
**agents**  100:18
**aggregated**
64:2
**agree**  5:9 52:18
**agreed**  21:5
52:21,24 53:6
58:12 59:6
**agreeing**  58:2
58:10
**agreement**  53:2
55:12 58:20

**[ahead - april]** Page 4

**ahead** 8:7 18:7
  94:10 104:21
  116:5
**aimed** 101:2,3
**air** 1:8 2:18
  5:13 9:19
  10:11 12:10
  34:10
**airline** 10:12
  12:23 43:3
  96:5 102:24
**airlines** 126:6
  127:3 128:3
**airplane** 24:5
**airport** 62:19
  63:8 64:3,12
  64:13 116:11
  119:14
**alcon** 107:11
**align** 28:12
**aligned** 29:14
  46:3 96:5,10
  97:11
**alleging** 8:12
**allow** 111:23
**allowed** 29:13
  29:19 53:4
  55:18,23 56:6
  116:22 117:5
**allows** 111:23
**alter** 55:13
**amended**
  119:12

**amount** 114:5
  122:6
**ancillary** 20:5,7
  20:8 28:13
**answer** 7:21
  10:9,19 11:6
  12:6,7,17
  14:16 15:9
  16:8,20 18:23
  19:16 20:1,10
  21:17 22:9
  23:8 24:11,18
  25:14,19 26:16
  27:7,11,23
  28:9 29:9,17
  30:8,22 31:1
  31:22 32:4
  35:18 36:6,16
  37:2,13 39:13
  40:1,14 41:10
  42:9 43:12,22
  44:14 45:10
  46:5 47:4 48:8
  48:18 49:13
  50:16 51:6
  52:15 55:20
  56:19 58:9,23
  66:7,23 67:16
  73:22 74:16
  75:21 76:22
  77:2 81:11
  82:17 83:9
  84:7 85:10,15
  86:16 87:7,22

  88:10 90:1,5
  90:21 91:9
  96:15 102:10
  104:4 108:1
  113:4 114:11
  116:17 122:15
**answered** 27:6
  32:3 41:18
  44:20 50:13
  102:10
**answering**
  89:19
**answers** 124:11
  124:15
**anymore** 97:20
**anyway** 61:23
**apologize** 11:8
  32:18 54:23
  92:12
**apparently**
  99:21
**appear** 49:23
  62:19 65:15
  66:11 103:9
  127:11 128:15
**appearance**
  5:22,24
**appeared** 2:3,9
**appears** 39:6
  73:20 78:15
  114:20
**appended**
  128:11,18

**applicable** 75:5
  75:9
**applied** 31:13
  48:22 82:10
  107:22
**applies** 91:4
  102:16 104:15
**apply** 20:23
  48:15 49:3
  66:20 93:14
**applying** 31:19
**appraisals** 12:2
**appreciate**
  103:3
**approach**
  102:23
**appropriate**
  41:5
**appropriately**
  93:22
**approval** 32:5
  73:1 75:8
**approve** 32:1
  75:7
**approved**
  72:17
**approximate**
  37:15
**approximately**
  24:20
**april** 1:18 3:2
  5:2 103:20
  125:3 126:4

| | | | b |
|---|---|---|---|

**area** 10:2 39:16
**areas** 13:2
  18:17
**arose** 40:16
  87:10
**aside** 57:13
  102:11
**asked** 27:6 32:3
  41:18 44:1,20
  50:13 102:9
  104:24 105:6
  124:14
**asking** 31:17
  35:6,11 40:6
  45:5 46:20
  52:3,6,11
  67:17 70:9
  85:8 86:15
  87:2 89:11,18
  92:2 105:1
  106:1,1,3,15,15
  117:1 118:21
**aspect** 11:18
**aspirations**
  14:1
**asserts** 8:13
**assessment**
  118:2,21
**assigning** 45:7
**assignment**
  127:2 128:2
  129:2
**associated** 26:1
  37:20 121:24

122:1
**assumption**
  100:23 101:2
**assumptions**
  82:23 83:15
**assure** 82:7
**atlanta** 1:2
  2:12 5:14 9:22
  15:6 17:5,7
  18:9,15,16,19
  23:20 73:3,5
**attached** 73:8
  93:1 124:21
  128:7
**attachment**
  93:3 99:9
**attendance**
  19:24 20:6
  52:21 85:6
**attendant** 95:6
**attendants**
  33:21 37:16,17
  38:2 95:7
**attention** 114:3
**attorney** 6:1
  101:16
**audio** 5:8
**audit** 74:10
**august** 99:13
  99:18 115:1
  119:12
**author** 27:5
  73:21,23

**authoring**
  30:18
**authority** 27:21
  75:6,12
**authorize**
  128:11
**automated**
  21:9 29:24
  80:10
**automatic**
  47:15
**automating**
  29:19
**automation**
  29:19
**availability**
  83:15
**available** 82:24
**ave** 126:1
**avoid** 53:17
**award** 50:18
  51:23 121:24
**awarded** 45:14
  50:3,4,4,7,12
  50:21
**awards** 50:7,22
  51:12
**aware** 40:17
  51:4 53:19
  57:18 68:15
  69:7 87:24
  117:5
**awesome** 33:11

**b** 69:2
**back** 12:21
  20:17 33:4
  47:11 54:5
  62:4 63:19
  64:23 72:8,8
  98:4 117:18
  119:7 123:2
  126:15
**background**
  8:18 23:15
**bad** 97:6
**balancing** 46:1
**bank** 24:23
**barb** 104:5,11
  107:8
**barbara** 4:7
  104:3
**bargaining**
  24:7
**barriers** 117:19
**based** 8:13 26:5
  44:1,3 47:16
  72:9 73:3
  95:21,23 100:1
**bases** 18:18
**basically** 16:23
  17:21 19:20
  21:3 41:15
  61:7 69:3 71:6
  74:21 96:11
  101:7

**[basis - ca]** Page 6

**basis** 43:17
56:22 57:3
88:14 105:24
106:3
**bates** 33:12
34:18 38:21
40:24 54:18
55:1 58:1 62:8
69:19 74:3
80:8 92:19
94:2,6 98:8
103:9 109:2
114:15
**bearing** 85:22
86:12 101:20
**becoming** 12:1
**began** 9:19
28:20
**beginning** 6:1
33:5 40:3 62:5
98:5 99:23
119:8
**behalf** 1:4 2:8
2:15 6:3 16:17
16:22 123:7
**belief** 57:3
**believe** 11:16
15:18 16:14
17:17 23:2
33:19 46:19
63:13 64:18
82:18 93:7,17
93:20 100:12
105:21 116:18

**belong** 38:3
**benefit** 14:19
17:23 20:12
**benefits** 13:15
15:21 17:23
19:12 77:13
79:1
**best** 14:16 16:8
16:21 17:4
18:24 23:8
24:11 25:10
26:17 27:7,23
28:9 29:10
30:23 31:22
32:4 35:20
36:7,17 37:2
37:13 39:13
40:14 42:9
43:12,22 44:14
45:9 50:16
51:7 52:16
55:20 56:20
58:23 66:23
68:7 75:22
77:2 81:11
85:10 87:22
88:10 90:5,10
116:7,17,21
**better** 20:20
57:23
**bid** 50:12,18
51:1 57:7
121:24

**bidding** 57:7
**big** 117:10,11
117:20,23
**bit** 33:24 38:17
71:10 72:13
88:23 108:8
**blaze** 2:18
**board** 110:22
**boilerplate**
81:13
**boiling** 37:19
**bold** 65:19
108:9,9
**bolt** 83:22
**bonus** 13:1
**boseman** 4:7
103:19,22,24
104:10 105:12
**bottom** 51:10
58:2 70:12
99:7 113:12
**brd** 70:23 71:4
71:4,7,22
72:11
**breadth** 118:6
120:18
**break** 7:22 8:13
61:13,21,23
97:22 122:19
**breaks** 7:19
**bridgette** 89:11
89:15
**briefly** 8:5,18
32:22 98:19

**broad** 25:4
35:15,24 69:4
**broader** 91:3
**brown** 3:19
89:16,22,23
103:24
**bubble** 76:19
**building** 11:15
14:4 41:12
**built** 21:7 64:3
**bullet** 51:16
81:1,4,17,17
82:13
**bulletin** 110:22
**bureau** 89:4
90:2
**business** 9:11
11:1 13:2,8,8
13:16,18 15:13
16:4,10,13,17
18:22 19:2
21:22,23 29:3
31:5,10 48:9
62:19 64:10
71:5,7,11,16,17
72:16 73:1
75:15,20 80:15
81:18 82:13
104:5 113:23

| c |
| --- |

**c** 124:2
**ca** 126:24

**[cabin - chief]**

**cabin** 37:5
**calculated** 87:9
**calculation**
   8:15
**calculations**
   44:6 79:10
**california**
   76:17 78:7,16
   78:18 79:15
   80:16 82:12
   83:4 104:17
   107:14
**california's**
   78:21
**call** 45:17
   52:19
**called** 6:7 10:11
   21:3,7,23
   44:12,17 52:22
   58:11 69:2
   92:13 118:2,6
   118:10
**calls** 29:8 30:3
   31:22 37:12
   39:11,24 42:8
   44:13 45:8
   46:18 48:17
   55:19 67:11
   71:1 77:1,22
   78:13 82:2
   87:3 90:3,19
   90:21 96:14
   100:10,10
   114:10

**camera** 5:5
**canterbury**
   6:22
**capabilities**
   14:5 47:1,3
   74:11
**capacity** 36:19
   85:9 104:7
   118:19
**capital** 75:24
   109:10,20
   120:1,9 122:6
**capture** 7:11
**care** 94:22,23
**career** 11:11
   12:2 14:1
   25:20
**cargo** 62:20
   63:21,22,24
   64:13,22 65:16
   100:17 101:4
   116:11,14
   119:18,21
**carries** 90:24
**carter** 72:1,4
**case** 5:15 8:5,9
   12:19 26:8
   107:13 116:19
   121:5 124:23
   126:6 127:3
   128:3
**cases** 12:24
   84:15,17 85:22
   85:23 87:16

**categories**
   49:19,23
**categorization**
   92:8
**category** 10:23
   110:17,18
   111:19 113:12
**cause** 43:5
**causing** 114:2
**caution** 40:2
   57:15
**cc'd** 72:2
**cells** 110:16
**center** 10:21
   12:11 20:3,4
**central** 1:17
**certain** 18:4
   75:11 86:19
   101:5,9,9
**certificate**
   128:11
**certification**
   127:1 128:1
**cetera** 31:7
   35:23 39:19
   67:3 69:8
   83:17 86:5
**cgo** 3:11 62:16
   65:23 100:1
   119:19
**chain** 3:13,19
   4:4,7 70:4,8
   88:24 99:8

**chains** 31:9
**change** 15:8
   76:21 80:11
   81:23 84:9,16
   99:21 101:3
   115:24 118:2,6
   118:12,17
   120:17,20
   126:13,14
   128:8 129:3
**changed** 64:17
**changes** 17:12
   74:9 77:5
   80:10,24 82:9
   84:3 98:24
   99:12,17,20
   100:3 126:12
   127:7 128:7,9
**charles** 4:7
   104:2,6,8
   105:16 107:7
**chart** 35:4,8,12
   35:13 36:13,14
   36:21
**chart.pdf** 35:1
**charting** 36:19
**charts** 35:22
**cheryl** 4:4
   89:16 109:10
   109:11,23
**chicago** 2:6
   125:8
**chief** 10:3 28:5

**[chro - complete]**

chro  28:1,4,5
circumstances
  87:15
cite  27:14
civil  1:14
  124:19 127:5
  128:5
clarification
  24:12 25:1
  108:15
clarify  106:21
clarifying  25:1
  41:23
clarity  14:3
classification
  26:23
clean  3:11 7:13
  62:16,20 64:6
  64:8,9,11
  65:16,23
clear  14:3
  37:17 38:17
  40:3 91:20
  95:14,16,21
clearly  7:12
cleveland  126:2
click  65:24
client  13:20
  19:5
close  53:2
closely  96:4,10
  109:15
closeness  95:23

cockpit  37:5
code  23:17
coder  23:16
coders  21:20
codes  39:18
codification
  101:10 106:22
  107:16
codified  100:22
coding  21:21
  23:19 71:19
collaborative
  73:24
collective  21:19
  24:7
collectively
  15:24
colloquially
  44:17 92:13
  103:2
column  110:17
  110:18,21,24
  111:4,19,22
  113:13 115:20
  118:6,6,7
  121:2
columns
  116:10
combination
  68:22 119:16
come  82:15
  121:19
comes  46:4
  62:8 95:2

comfortable
  27:16
commencing
  1:16
comment  47:11
  73:4
commenting
  34:11
commission
  127:19 128:25
  129:25
commitment
  52:20 53:3,7
  59:1
committed
  58:16 59:2
common  6:19
  13:1 28:11
  39:19 42:17
  45:22 50:11
  72:16 115:18
  117:20 121:17
  121:22
commonization
  30:11
commonize
  29:2 121:23
commonized
  28:14
commonly
  14:20 19:22
  91:2
communicate
  31:11

communicated
  84:9,18
companies
  14:18
company  9:19
  12:11 21:5
  22:19 35:21
  39:3,12,18
  40:4 42:12
  45:19 51:1,5
  51:12,23 52:12
  52:14,22,23
  54:10,12,15
  58:3,8,21 61:6
  68:14 69:11
  78:2 81:6,9,15
  110:22 117:22
compel  105:9
compensated
  43:16
compensation
  9:10 10:2,15
  10:17 11:12
  13:7,12,16
  14:9 15:5,21
  15:23 26:1
  27:20 80:9,11
  84:4 86:18,20
  86:22 87:9,17
  92:7 101:16,22
  102:16,17,20
  102:22 103:1
complete
  124:14

**[completed - count]**                                                    Page 9

completed  44:8
  126:15
complexity
  48:13
compliance
  32:6 39:16
  80:15 100:4
compliant
  80:18 81:9
  82:7
complicated
  64:15
comply  31:2
  40:20 76:20
  99:21
compound  16:8
  19:15 28:9
  29:7 39:10
  40:13 48:17
  85:7
concept  59:21
  95:7
concern  113:17
  114:3
concerns  111:5
concludes
  123:10
conclusion  85:9
  86:15 90:21
  100:10 106:2
conclusions
  92:2
conditions  26:4

conducted  5:3
configuration
  21:3,6 47:14
configure
  47:12
configured
  21:4
confirm  61:9
conflict  40:16
conflictual  19:4
conformed
  77:7
confusing  30:6
connected
  96:21
connection  5:5
  26:23
consideration
  79:12
considered
  23:5 52:13
  54:11 58:19
  87:12 112:18
  117:16
consistent
  12:15 26:12,15
  38:11 41:6
  59:17,18 63:14
  66:3 120:12
consistently
  41:14 48:15,23
construct  41:5
contact  94:16

contain  77:12
  93:8
containing
  78:24
content  68:3
  69:13 98:21
context  33:19
  60:21,22 79:5
  90:7 111:14
  112:4,14
continue  5:8
  61:12,15
continued  4:1
contract  3:22
  8:13 23:24
  24:6,21 36:21
  91:11 96:12
  107:23
control  113:24
convenance
  107:5
conversation
  72:10 84:19,24
cook  125:2
coordinator
  38:22 50:2,3
copy  124:20
core  20:3,4
corporate  12:8
  12:14 29:6
  39:9,23 40:11
  40:21 55:23
  65:23 67:22,24
  68:2,6,8 83:10

83:11
correct  26:14
  29:6 36:2,3
  62:24 89:20
  103:16 105:12
  116:8,9 119:23
  120:2,3 122:4
  122:13,16
corrections
  126:12 128:17
correctly  6:14
correlates
  120:23
corresponden...
  105:5
cost  75:10,11
counsel  2:2
  5:11,23 6:4
  13:23 21:14
  30:2 31:16
  32:20 33:23
  35:6,10,17
  46:20 49:1
  53:16,20 57:13
  89:6 93:9
  104:22 122:21
  124:8,23
counselor  45:2
  51:24 53:15
  60:23 117:1
count  8:14
  105:4 111:21
  111:24 112:2,9
  112:15,21

118:11
**county**  124:2
  125:2 127:10
  128:15
**couple**  13:10
  76:8,9 77:9
  87:16
**course**  15:10
  47:8 107:5
**court**  1:1 5:14
  5:17 6:22 7:11
  127:7
**courts**  1:15
  124:20
**cover**  45:5
  65:10
**coverage**  41:5
**covered**  36:1
  69:6 78:8
  102:4 104:12
  107:8,18
**covid**  63:19,20
  120:15
**create**  80:22
**created**  34:8
  81:22 82:1
  95:18 109:9,10
  114:24 115:1
  119:11
**creating**  12:4
  51:17 66:12
**crew**  3:9,9 24:5
  33:12,13,18
  34:7,14,20

37:5 39:2 41:4
  48:11 50:19,19
  96:24
**crews**  41:6,13
  97:18
**critical**  20:19
**croon**  115:2
**csr**  1:13 124:5
  125:5
**current**  6:21
  14:21 22:17,21
  111:1,22,23
  115:20,21
**custodial**  105:9
**customer**  62:20
  63:9 64:3,12
  64:13 116:11
  119:14
**cv**  1:7 5:15

**d**

**daniel**  2:4
**danielle**  2:11
**data**  19:21,22
  20:4 46:11
  47:5,13 74:9
**dataflow**  21:5
**date**  34:4,10
  82:4,6,7 124:5
  126:8 127:3,9
  127:19 128:3
  128:13,25
  129:20,25

**dated**  3:14,20
  4:5,8 62:22
  73:17 99:13
  103:20
**dates**  55:6
**day**  1:17 46:13
  55:15 59:22,23
  60:1,2,4,6 61:1
  66:13 69:2,3
  96:23 125:3
  127:16 128:22
  129:22
**daylight**  1:17
**days**  126:18
**deal**  24:8
**dealing**  11:19
**deals**  37:4
**dealt**  24:13
**dear**  126:10
**dearborn**  2:5
**decipher**
  101:18 112:16
**decision**  19:13
  19:17 84:11
**deck**  87:11
**declined**  63:19
**dedicated**
  48:10
**deed**  127:14
  128:20
**deemed**  102:13
  126:19
**defendant**  1:9
  2:15 6:5

**defer**  107:2
**deferring**  107:3
**defers**  104:15
**deficit**  112:18
  112:21
**defined**  14:19
**definition**  25:4
  90:24 92:9,14
  102:15 103:1
  120:23
**definitions**
  118:7
**degree**  22:3
  29:2
**deliver**  53:8
**deliverables**
  71:16 74:5,20
**delivered**  68:23
  69:12 87:16
  121:20
**delivering**  12:2
  15:1
**delivers**  20:5
**delivery**  17:16
  17:17,19,24
  18:13 66:14
  67:6 72:5,23
  74:7 82:4
  89:24
**delta**  1:8 2:18
  3:8,11,13,16,19
  3:21 4:3,6,9,11
  5:12 9:17,18
  10:11 11:24

**[delta - difference]**                                                    Page 11

12:9 14:18
15:11,22,23
17:13 18:3,6,8
20:18 21:10
22:13,20,24
23:3,5,24 24:8
24:21 27:21
28:6 31:14
34:10 35:3,9
35:10,22 36:5
37:9 38:8 40:7
40:9 42:3,4,7
42:16 43:9,18
45:3,6,18 46:3
46:16,19,22
50:11 52:2,13
53:12,14,15
54:9,10,16
55:6,11,17
56:18 58:7
59:18 63:1,3,7
64:1,19 66:4
66:19 67:18
68:11,19 69:3
72:15 73:5
75:19 80:17
81:19,23 82:14
82:19,20 84:3
84:3 85:12,21
86:22 87:1,14
87:20 90:18
91:4,7,12,22
95:5,11 96:13
96:17 101:19

106:7,17 107:3
108:19 109:16
110:1 112:2,3
112:20 113:18
114:6 115:16
116:6,20 117:2
121:20 123:7
126:6 127:3
128:3
**delta's**   20:23
22:6,7 24:16
81:9 83:5,8,11
83:12 85:6
93:8
**department**   3:9
26:9,15,19
28:7 32:2 34:7
39:5,7 40:5,10
40:20 48:2
50:20 89:3
126:22
**departmental**
33:13 34:14
39:21 42:13
**departments**
28:6 53:10
63:6
**depended**
48:12
**dependent**
117:11
**depending**
23:13 48:9
53:1 75:9

**depends**   5:4
44:8 47:23
**deploy**   82:5
**deponent**
124:20
**deposition**   1:12
2:2 3:1,8,10,12
3:15,18,21 4:3
4:6,9,11 5:3,11
7:4 8:3 32:12
62:9 69:20
73:9 88:19
92:20 98:10
103:7 109:3
114:16 124:3,8
124:18 126:8
126:11 127:1,3
128:1,3
**depositions**
1:16
**depth**   118:7,12
120:22
**derives**   31:7
**describe**   8:11
11:17 13:22
24:3 25:16
**described**
74:20 76:11
**describing**
60:24
**description**
76:5 87:14
101:12

**descriptions**
14:3
**detailed**   69:7
**details**   65:24
99:6
**determination**
47:18
**determining**
26:7
**detroit**   9:15,21
**develop**   19:3
71:6 80:9
**developed**
12:11
**developing**
11:11 12:9
14:23 17:23
19:3,8 69:13
**development**
51:20 58:4
60:13,14,16,17
60:20 61:2,3,5
**dferri**   2:7
**dicellalevitt.c...**
2:7
**dicello**   2:3 6:2
**dicellolevitt.c...**
2:7
**dictated**   31:6
50:21
**difference**
12:21 57:4
108:12 112:17

**[differences - duly]**                                                    Page 12

**differences**
26:19 57:6,9
85:18
**different** 9:9
12:22 13:4
25:7 27:18
28:3 35:22
36:4 40:19
48:20 60:8
71:18 90:15
95:7 101:20
106:12,16,22
120:18
**differential**
3:22 22:8 66:1
87:19 88:3
110:10
**differentiated**
49:20
**differentiates**
94:11
**differentiation**
97:17
**differentiations**
93:18,21
**differently**
31:13,20
120:20
**difficult** 91:17
**direct** 24:14
32:5 57:1
84:19 85:22
**directed** 47:13

**directionally**
122:16
**directions** 59:5
**directly** 20:2
30:24 45:23
74:24 84:10,18
87:9 118:11,14
**director** 10:15
13:7,14
**disciplinary**
11:13
**discipline** 61:7
**discovery**
35:15
**discuss** 118:24
**discussed** 30:17
**discussing** 13:6
45:4
**discussion** 54:4
**dispatchers**
37:8
**distinction**
25:17 38:1
**distinctive** 92:9
**district** 1:1,1
1:15 5:13,14
124:20
**division** 1:2
5:15 9:13
10:16,24 12:9
39:22 40:10
64:11 69:12
117:3

**divisional** 65:4
65:15 67:21
68:3,6,8,14,23
**divisionally**
69:12
**divisions** 35:23
36:5 55:24
116:22 117:4
121:8,9,18
122:13
**document** 3:16
32:12 33:16,24
34:5,11,14
39:13,22 40:11
42:7 45:13
52:1,7,10
54:20 55:5
57:21,24 61:4
62:9 63:4
65:15 66:10
68:9 69:16,20
71:5,11 73:1,7
73:9,11,14,21
74:1,15,17
75:20 76:11
80:6 83:24
87:20 88:19
92:20,24 93:4
93:10,14,17,20
97:4,20 98:10
98:23 99:15,16
103:5,7 108:4
109:3,9 111:11
111:14 113:11

114:16,19,23
115:13 119:11
121:23 122:9
**documentation**
88:3
**documents**
32:2 39:8
72:16 105:9,9
**doing** 57:14
78:16
**domestic** 63:8
63:23 110:2
**dowd** 4:7 104:2
104:6,8 105:16
**downstream**
19:11 28:22
**downstreams**
28:22
**dpm** 3:11 62:16
62:21 64:9
65:3,10
**draft** 27:4
**drive** 26:20
**driven** 12:20
26:3 43:14,17
**drivers** 80:15
**drives** 79:9
**drove** 42:22
**dshapiro** 2:14
**due** 8:14 100:2
**duly** 6:7 124:9

| e | | | |
|---|---|---|---|
| **e**  3:13,19 4:4,7 | **effectiveness** | **employee**  13:21 | 66:15,19 67:12 |
| 6:19 57:16 | 11:15 | 16:1,1 19:21 | 68:10,18 74:8 |
| 70:4,8 72:10 | **efficacy**  115:17 | 19:21 20:18 | 74:21 79:8 |
| 72:14,17 73:8 | 122:3 | 23:24 25:4 | 80:17 82:8,10 |
| 88:24 90:4 | **efficiency**  54:1 | 26:13 34:10 | 83:3,4,16 84:3 |
| 92:16 93:1,3 | **effort**  21:19 | 53:15 54:12,15 | 85:14,20 86:7 |
| 104:23 105:5 | 73:24 114:5 | 56:13,14 58:20 | 86:18,19,21 |
| 106:4,5 124:19 | **efforts**  68:22 | 59:22 60:8 | 88:8,12 89:13 |
| **earlier**  47:1,3 | **either**  67:21 | 74:11 78:23 | 90:18,23 91:7 |
| 47:11 58:12 | 68:13,24 69:11 | 83:24 85:2 | 91:12,16 94:24 |
| 71:10 78:16 | 100:21 | 87:10 88:13,16 | 95:6,11,12 |
| 87:5 92:12 | **electronic** | 93:15 94:15 | 96:12,13 97:9 |
| 106:7 112:7 | 77:18 79:17 | 95:15,15,21 | 97:12,15,15,18 |
| **early**  3:20 4:4 | **electronically** | 97:3 104:11 | 99:1,13,18 |
| 75:15 98:16 | 74:10 | 106:4,15 | 100:1,7,13,17 |
| 111:11 | **element**  101:22 | 108:12 113:1 | 100:18,19 |
| **earn**  86:12 97:9 | **elig**  44:5 | **employee's** | 101:3,4 102:13 |
| 112:19 | **eligibility**  79:10 | 77:12 85:3 | 102:17 106:19 |
| **easiest**  20:3 | 88:4 95:17 | 86:12 | 107:23 108:19 |
| 25:22 88:11 | 101:19 102:1 | **employees**  3:23 | 110:2,5,9 |
| **easily**  80:2 | **eligible**  24:21 | 13:24 14:19,24 | 112:2,19 |
| **echo**  35:21 | 86:18,20,22 | 15:1,2 18:3,8 | 113:18 116:23 |
| **educate**  107:7 | 88:8 90:6 | 24:4,21 25:6,6 | 117:5 118:14 |
| 107:15 | 94:12,17,23 | 25:8,9,18,20 | 119:14 120:4 |
| **educated** | 95:16,23 96:1 | 26:2,9 36:1,15 | 120:10 122:13 |
| 109:22 | 96:19,21,24 | 36:21 37:10 | **employer**  77:17 |
| **educating** | 97:2,3,9,13,16 | 38:7,9 39:2,16 | 79:16,22 |
| 14:24 | 102:19 | 42:17 43:9,19 | **employers** |
| **educator**  95:4 | **email**  126:17 | 44:24 45:5,7 | 56:12 78:23 |
| **effect**  78:22 | **embedded** | 45:16,18 46:1 | 80:23 |
| 120:15 | 47:15 | 48:15 49:4,5 | **employment** |
| | **employed** | 55:12 56:5,10 | 22:13,23 54:10 |
| | 39:12 42:7 | 56:14,17 57:10 | 55:16 59:19 |
| | 52:2 63:3 87:1 | 63:8,22,24 | 64:1 66:5 |

67:14 72:15
77:13,14 79:9
84:2 85:12
87:6 91:13
106:18
**enact** 76:17
**enacted** 76:13
76:17,19 77:5
78:16
**enacting** 101:6
**enclosed**
126:11
**encouraged**
85:21
**ended** 9:11
10:3 61:4
111:10
**ends** 59:8
**engage** 55:18
56:17 116:15
**engaged** 32:7
58:20 115:17
**engine** 21:8
47:9,10,17
48:14 49:2
**engines** 47:22
**enrolled** 20:14
**enrollment**
20:12
**ensure** 41:5
100:4
**ensuring** 84:21
**entail** 14:10,14

**entered** 128:9
**enterprise**
19:21
**entire** 36:13
48:5 82:19
127:5 128:5
**entirely** 35:14
**entry** 47:16,21
47:23 48:12
83:24
**equals** 118:13
**equate** 88:12
**equipment**
119:18
**equipped** 14:7
**erp** 19:9,20,23
**errata** 126:13
126:18 128:7
128:10,18
129:1
**erred** 84:23
**error** 29:22
**errors** 29:23
**escape** 23:12
**esq** 126:5
**essence** 93:12
**essential** 96:11
97:1
**essentially** 52:6
59:23
**established**
30:13
**estimate** 120:4

**et** 31:7 35:23
39:19 67:3
69:8 83:17
86:5
**ethics** 39:19
**exact** 13:10
26:5,10 63:11
82:7 110:3
**exactly** 13:14
18:18 47:20
64:23 71:3
72:7 90:8
104:6 111:10
**examination**
3:4 6:10
**examined** 6:8
124:10
**example** 12:21
17:22 96:6,22
96:24 107:14
**excel** 4:10,12
114:19
**excellence**
10:21 12:12
**exchange** 43:19
**exclusion** 38:2
**excuse** 19:6
63:22
**execute** 21:24
**executed**
128:10
**executes** 21:6
**execution**
127:14 128:19

**executive** 22:16
76:4
**exempt** 78:23
79:4,7,8,11
85:2,3,4,13,14
85:19,19,23
86:2,7,11,11,17
86:19,21 87:10
88:7,16 89:13
90:24,24 91:1
91:2,13,13,16
91:16,19,21,21
92:3,4,8,13,14
93:15,21,21
94:13,14,18,19
94:22,22 95:1
95:9,12,13
97:8,12,14,14
97:17,17 100:8
100:13,14,19
100:21 101:3,4
101:7,8,8,10,11
101:13,13,17
101:18 102:2,3
102:12,13,13
102:17,18
103:2,2 106:22
106:22 107:17
107:17 108:13
108:13,17,18
**exemption**
97:14 106:8,11
**exercise** 117:17

**[exhaustive - first]**                                                    Page 15

**exhaustive**
  117:21
**exhibit**  3:8,10
  3:12,15,18,21
  4:3,6,9,11 32:9
  32:10,13,17,21
  32:23 33:8
  57:21 61:14
  62:7,10 69:18
  69:21 73:10
  88:17,20 89:8
  89:9 92:19,21
  98:7,11 103:6
  103:8 109:1,4
  114:14,17
**exhibits**  3:6 4:1
**exist**  35:12
  111:2
**existed**  35:8
**existence**  56:9
**existing**  29:13
  56:9 74:9
  80:23
**exit**  108:3
**expectation**
  88:15
**expected**  58:13
  59:1 86:6
**expense**  113:24
**experience**
  20:18 25:24
  26:6,6 43:18
  66:13

**experiencing**
  120:19
**expert**  92:13
**expertise**  10:22
**experts**  23:19
  23:19
**expiration**
  127:19 128:25
  129:25
**explain**  16:5
  88:6
**explainable**
  114:1
**explaining**  23:3
  78:11
**exploratory**
  121:23 122:9
**extended**
  105:15
**extent**  85:8
  86:15 90:21
  92:1 100:9
  106:1,14
**extra**  42:1,3,10
  42:17 43:16
  44:1,19 45:17
  45:19 47:18
  50:2,7,7,11,15
  50:22,24 51:11
  51:12,12,13,13
  51:16,16,22
  52:3,19 53:6,7
  58:11

**f**

**facing**  94:15
**fact**  8:13 24:6
  118:19
**factor**  26:7,7
**fair**  7:22 24:14
  40:21,22 54:8
  58:21 71:10
  79:8,12 85:4
  87:13 92:10
  102:12,14,18
  102:23
**fairly**  38:11
  45:22 122:12
**faith**  57:15
**fall**  39:16 90:23
**familiar**  22:2,7
  23:23 24:16
  42:10 44:18
  50:15,24 52:3
  52:6 55:9
  87:18 104:3
  105:11 115:3
**familiarity**
  67:1
**far**  25:9
**fashion**  50:21
  52:9
**fast**  94:3
**feasibility**  3:16
  73:14 111:17
**feature**  56:7

**february**  62:23
  88:24 90:18
  98:16
**federal**  1:14
  39:3,17 40:4
**federally**  90:13
**feed**  20:9
**feeds**  28:21,22
**ferri**  2:4
**field**  9:11 10:24
  94:16
**figure**  61:13
**figured**  57:22
**file**  34:6 93:3
  109:9
**filed**  5:13
**files**  20:17
**fill**  13:24 42:23
**final**  27:20,24
  72:19 73:23
  75:12
**finally**  121:2
**financially**  5:20
**find**  65:12
  67:14 126:11
**fine**  61:17
  70:10 97:23
**finish**  57:20
**firm**  5:18 22:16
  56:3
**first**  6:7 9:4
  33:11 46:4
  50:5 62:15
  65:6 68:24

**[first - functionality]** Page 16

69:3,23 73:13
73:19 78:20,20
81:24 89:2,21
98:15 99:8
103:18 104:11
124:9
**firsthand**  30:15
42:13 45:14
56:2 67:4
**five**  61:23
97:21 123:12
**flexibility**  46:1
56:7 57:8
**flexible**  56:11
**flight**  33:21
35:1 36:24
37:3,4,5,5,8,11
37:16,17,18,21
38:2,4,8 95:6,7
**flights**  41:13
**floor**  2:5
**flsa**  86:23
90:14 91:1,2,8
91:13,23 92:6
92:8,15 93:15
97:4,10,14,18
100:8,14,22
101:14,14,17
101:23 102:3
103:2 104:12
104:15 106:8
106:11,19,23
107:1,2,8,9,11
107:17 108:13

108:18
**focus**  114:3
**focusing**  65:18
**folks**  106:10
**follow**  95:9
107:18
**followed**  39:8
66:5 97:16
**following**  2:2
17:15 51:15
81:4
**follows**  6:9
65:23 101:22
102:22
**footprint**  18:16
**foregoing**
124:3,13
127:13 128:18
**forementioned**
124:15
**forgot**  58:11
**forgotten**  13:5
**form**  10:1,8,19
12:6,16 14:11
14:15 15:9
16:7 17:14
18:5,23 19:15
20:1,10 21:1
21:13 22:9
23:7 24:1,10
24:18 25:14,19
26:16 27:1,6
27:10,22 28:8
28:17 29:7,17

30:2 31:15
32:3,8 34:15
35:5 36:6,16
37:1,12 38:12
39:10,24 40:13
40:18 41:10
42:19 43:11,21
44:13 45:1
46:9,17 47:2
48:7,17,21,24
49:12 50:13
51:6,24 52:15
53:11 55:19
56:19 58:9,22
59:24 60:10,22
63:10,16 66:7
66:17,22 67:10
67:15 71:1,13
73:22 74:16
75:21 76:22
77:1,22 78:13
79:6,23 81:10
82:2,16 83:7
84:5 86:14,24
87:21 88:9
90:3,19 91:24
93:9,16 97:5
100:9 102:7,9
104:4,22
105:24 108:1
108:20 110:7
110:12 113:3
113:20 114:8
116:16,24

118:18 119:15
120:6,14
121:14 122:14
**formal**  68:20
**formulate**  31:8
**forth**  20:17
**forward**  98:19
126:15
**forwarded**
98:20
**forwards**  89:16
**found**  69:8
84:16
**four**  105:4
**framed**  87:3
**franklin**  125:7
**franz**  4:8 104:3
104:5
**free**  127:14
128:20
**front**  52:11
118:21
**fruition**  82:15
122:5
**fulfill**  71:17
**fulfilling**  11:12
**full**  6:16 26:24
50:4 100:4
122:5
**fully**  86:6
**function**  17:16
17:24
**functionality**
111:1,23 121:4

**further**  80:14
81:16 88:6
90:13 123:5
**future**  115:20
115:23
**fyi**  103:13

**g**

**gathered**  15:10
**general**  9:5
50:10 53:9
65:6
**generalist**  11:2
13:19
**generally**  12:18
12:20 35:23
40:7,19 45:6
58:19 71:20,22
77:9 78:11
86:6,17,20
87:8 88:8,11
91:15,18 92:7
92:14 102:21
110:13 117:12
**generate**  44:3
57:10
**generated**
84:23
**generation**
122:4
**generations**
28:18
**geographically**
9:14

**georgia**  1:1
2:12 5:14
104:15
**gestures**  7:12
**getting**  29:18
53:17 61:19
68:2 115:18
121:3
**give**  11:7 56:3
57:1 70:1 76:7
118:21
**given**  33:24
55:15 68:11
123:10
**giving**  113:6
**global**  18:16
**globally**  17:19
25:13 36:2
107:8
**gm**  9:17
**go**  5:9 8:7 18:7
25:21 32:20,22
51:9 53:22,24
55:1 65:11
94:10 98:19
103:18 104:21
110:24 111:18
116:5 118:23
119:2 120:17
**goal**  29:5
**going**  5:1 7:16
16:7 30:8,10
33:1 34:18
38:16 51:9

54:2 62:1
65:11,18 66:9
69:15 73:7
77:8 79:14
81:14 85:7
86:14 88:23
90:20 91:24
94:15 98:1,22
103:4 104:21
105:23,23
106:2 108:15
111:18 113:10
114:18,18
117:22 119:4
120:16 121:12
121:15 122:23
123:9
**good**  5:1 6:12
6:13 12:1
57:15 61:22,24
113:22
**goodyear**  1:4
5:12 126:6
127:3 128:3
**gotcha**  71:24
75:14 80:7
122:10
**govern**  39:4,23
40:5
**governance**
107:5
**governed**  90:14
91:7 95:8,10
104:12 106:19

107:10
**governing**
101:17
**graduate**  8:23
8:24
**granular**  69:6
**gray**  4:5 89:16
109:11,11
**great**  98:14
**greg**  4:4 79:23
123:11
**gregory**  1:12
3:1,14 5:11 6:6
6:18 72:20,21
72:22 73:3
75:12 126:8
127:4,9 128:4
128:13 129:20
**ground**  3:22
23:23 24:6,20
25:4,5,6,8,9
36:21 37:6,20
38:8 91:7,11
95:15 96:12
97:17 101:4
107:23 110:5
119:18
**group**  10:17
11:12 13:20
14:8 16:18
18:4 21:11
27:15,17 37:18
38:4 48:13
68:24 95:22

**[group - hit]**                                                  Page 18

96:3,6,7,18,20
109:24
**groups**  29:5
31:19 36:4
59:18 66:5
77:5 96:4
115:15 116:3
116:15 117:10
117:11,14,23
**grow**  25:20
**gse**  115:22,24
116:11 119:19
119:21
**guarantee**  32:7
44:4
**guess**  16:5,15
30:9 76:8,12
108:18,22
109:22
**guidance**  107:5
107:20
**guidelines**  31:2

**h**

**h**  6:19
**half**  89:12
**hand**  58:21
**handful**  75:24
**hands**  87:11
**happened**
84:21 122:2
**happening**
52:17

**happens**  68:12
**hard**  34:11
88:5 111:15
**hardship**  51:18
53:3
**hate**  64:5
**head**  9:12
13:13 100:24
**header**  65:19
78:7 108:5
**healthcare**
15:22 20:14,15
**hear**  64:16 70:7
95:1 105:8,10
**heard**  5:6 7:9
115:5
**held**  83:11
**help**  89:18
**helped**  44:3
**helpful**  16:15
25:5 27:3 61:8
**helping**  13:23
13:24 19:3
**helps**  31:8 47:5
**henricksen**
2:19 5:16
**hereinabove**
124:16
**high**  8:10 22:10
24:19 71:23
74:18 93:5,12
99:5 118:13
**higher**  71:20

**highlight**  39:1
**hills**  2:4 3:5 6:2
6:2,11,12 10:5
10:13,23 11:16
12:14,19 14:12
15:5,19 16:15
17:2,20 18:9
19:7,19 20:8
20:21 21:10,15
22:2,12 23:20
24:3,16,20
25:16 26:8,22
27:3,9,13 28:2
28:15 29:4,16
29:23 30:5,16
31:12,18 32:1
32:9,24 33:7
34:1,6,17 35:7
35:13,18 36:1
36:14,20 37:10
37:22 38:16
39:21 40:6,19
41:15,19,22
42:16 43:1,18
44:10,18,22
45:4,16 46:12
46:21 47:10
48:14,20,22
49:2,19 50:23
51:9 52:8 53:9
53:16,22 54:7
56:4 57:3,17
57:20 58:19
59:15 60:4,20

60:24 61:12,17
61:21,24 62:7
63:14,17 66:9
66:19 67:5,12
67:17 71:9,21
74:1,19 76:2
76:23 77:8
78:3,18 79:14
81:16 82:9,22
83:14 84:7
85:11 86:1,21
87:4,18 88:6
88:17 89:9
90:11 91:6,11
92:3 93:14,19
96:18 97:6,19
98:7 100:14
103:3 104:8
105:8 106:6,13
106:17 107:22
108:3,21 110:9
110:15 113:10
114:4,14 116:6
116:8,19 117:3
118:23 119:10
119:22 120:8
120:16 121:13
122:8,18 123:4
**hired**  83:21
**hires**  80:23
**hiring**  11:10
**history**  45:3,24
**hit**  82:6,7

| | | | |
|---|---|---|---|
| **holds** 19:21 | 17:21,24 18:2 | 88:20 92:21 | **included** 49:6 |
| **honestly** 42:11 | 18:12,17 19:1 | 98:11 103:8 | 49:15 106:5 |
| 83:22 87:15 | 19:2,4,5,6 20:5 | 109:4 114:17 | 119:18 126:13 |
| **hopefully** 62:8 | 23:6 27:4,19 | **identify** 96:9 | **includes** 16:1 |
| 69:24 | 29:6 30:18,20 | **illinois** 2:6 | 21:8 37:6,8 |
| **hoping** 82:5 | 31:5,9,13,19 | 124:1 125:2,8 | **including** 5:23 |
| **hour** 31:7 | 32:1 39:23 | **imagine** 11:10 | 31:5 37:16 |
| 58:11 88:15 | 40:11,21 66:14 | 21:19 43:3 | 79:10 81:20 |
| **hourly** 86:8 | 66:20 67:6,13 | 46:5 93:24 | 82:19 |
| 88:14 89:12 | 68:5 70:19 | **impact** 43:4 | **inconsistent** |
| **hours** 3:22 8:16 | 71:12 72:4,22 | 101:24 102:24 | 39:22 40:11 |
| 22:7 43:16,24 | 77:18 78:4 | 118:16 | **incorporated** |
| 44:2,4,7,9 | 79:17 83:5 | **impacted** 77:5 | 128:12 |
| 49:14,15,16,18 | 85:13 89:23 | 83:4 118:11,14 | **incorrectly** |
| 51:14,17 58:16 | 90:12 92:18 | 120:19 121:11 | 92:11 |
| 59:7,7,12,14 | 94:16 96:22 | **impactful** | **increase** 15:3 |
| 60:6,17 66:1,5 | 101:21 104:5 | 66:13 | **increases** 84:18 |
| 77:13 86:3,8 | 106:7,10 | **impacts** 120:18 | **incur** 51:14 |
| 86:10 87:19 | 109:13 115:4 | **implementati...** | **indicate** 111:16 |
| 88:13,14 89:12 | **huh** 74:6 75:3 | 19:9 28:20 | **indicated** 39:18 |
| 100:2,2 110:10 | 103:21 116:13 | **implemented** | 77:6 |
| 112:10,11,11 | **human** 10:3 | 29:12,14 55:24 | **indicates** 79:11 |
| 112:24 113:6,7 | 28:5 | **important** | **indicating** |
| 113:8,8 114:6 | **hundred** 18:19 | 43:23 59:4 | 126:13 |
| **household** 6:20 | 32:7 68:12 | 85:5,12,18 | **indication** |
| **housekeeping** | 84:22 | 86:4,9 106:8 | 31:12,18 |
| 7:9 | | **importantly** | **indicator** 57:2 |
| **hr** 9:9,11,11,12 | **i** | 14:6,21 | **individual** |
| 10:16,17,20,24 | **idea** 44:16 | **inclination** | 13:21 26:4 |
| 11:1,2,10 | 45:11 51:22 | 57:10 | 27:15 36:10 |
| 13:16,18,19,20 | 59:22 | **include** 19:24 | 56:21 57:6,9 |
| 13:23 15:13 | **identification** | 38:4 90:4 | 59:11 60:2 |
| 16:3,5,10,13 | 32:13 62:10 | 104:24 | 85:17 |
| 17:1,16,17,19 | 69:21 73:10 | | |

**[individually - know]**                                    Page 20

**individually**
  1:4
**individuals**
  48:4 56:1
**industrial**  8:23
**industry**  95:6
**inflight**  37:7,18
  38:3
**information**
  36:9 65:6 69:5
  77:12 78:24
  90:12 92:17,17
**informational**
  85:24
**initial**  111:16
  117:18
**initially**  117:16
**input**  20:4
**inputting**  21:15
**inside**  51:16
**installed**  28:19
**instance**  38:14
  40:10 47:9
**instances**  40:16
**instrumental**
  68:1 109:23
**intended**  29:20
**intent**  29:15
  30:17,20 32:6
  71:15
**interchangea...**
  92:11
**interested**  5:20
  55:6 124:22

**interface**  23:11
**internet**  5:5
**interpret**  52:10
**interpretation**
  40:17
**interpreting**
  12:8
**interrogatories**
  6:8 124:10
**intervention**
  29:21
**intranet**  69:8
**introduced**
  69:18 88:17
  92:19 109:1
  114:14
**introducing**
  32:9 62:7 89:7
  98:7 103:6
**investment**
  76:1 122:6
**involved**  11:19
  12:4 19:13
  27:17 30:18
  66:15 74:23
  105:6 114:4,12
  115:15
**involvement**
  24:15
**involving**  106:5
**ip**  19:13
**irregular**  43:5
  48:16

**irregularity**
  43:6
**irregularly**
  49:3
**irrespective**
  101:10
**ish**  38:10 64:24
**issue**  82:21

**j**

**j**  1:13 124:4
  125:5
**january**  22:14
  78:22
**jenkins**  3:14
  70:13,17 72:20
  72:24 73:19
**jersey**  76:18
**job**  9:4 13:11
  14:3 18:2
  26:12,19,20
**john**  3:20 4:4
  75:12,15 98:16
**johnson**  22:19
  34:12
**join**  68:11
**joined**  9:17
  66:19
**june**  109:9
  114:24 119:11
**justin**  2:19 5:16

**k**

**k**  14:22 124:2
**karen**  3:13
  70:13,17 72:1
  72:2,4,20,24
  73:19
**kechit**  115:9
**keep**  36:4 43:23
**keeping**  22:10
**kelly**  3:19 4:7
  89:16,22,23
  103:19,22,22
  103:24,24
  105:11 107:7
**key**  43:3 47:21
  47:23
**kin**  124:23
**kind**  24:23
  34:11,14 35:3
  40:17 64:3
  68:20 71:11
  96:16 111:12
  113:11 114:4
  122:3
**kite**  17:11 78:1
**knew**  36:8
**knott**  2:18
**know**  7:20
  11:21 14:2
  16:18 20:15,23
  30:11,17,24
  32:10,18 35:15
  38:13 43:4

**[know - list]**                                              Page 21

44:22 45:16,17
45:18,24,24
46:6 47:12,20
48:11 49:7,22
50:23 55:5,22
56:8,10,12,21
62:12 64:6,8,9
65:3,3 67:3,12
70:16,23 71:3
72:3 77:6 79:4
79:24 80:6
82:4,5,9 83:19
84:14 88:2
90:9 92:3,8
95:12 98:21
106:6 107:16
109:11 111:14
115:2,5,9
116:22
**knowing**   30:14
90:7
**knowledge**
29:9 31:24
36:23 45:15
55:7 68:10
106:16
**knowledgeable**
30:15
**known**   15:24

**l**

**labeled**   119:20
**labels**   100:22

**labor**   8:22 79:8
79:12 85:4
87:13 89:4,4
90:2,14,23
91:4,8,22 92:5
92:10,10 95:2
95:4,8 97:18
100:20 101:15
101:20,24
102:4,11,12,14
102:18,21,23
104:13,15
106:20 107:4
107:10,12,18
107:19
**lack**   20:20
**lacks**   43:12
45:1 83:7 84:5
87:22 114:10
116:24 118:20
**language**   55:7
81:13 91:3,21
91:22 92:4
**largely**   15:16
18:16 19:9
23:22 37:4
**larger**   38:18
**law**   3:17 31:6
73:15 76:13,20
77:4,7 78:8,9
78:12 81:23
82:1 99:21
107:21

**laws**   76:14
80:16
**layperson**
94:21
**lead**   14:8 17:16
**leader**   12:1
42:23 64:20
72:22 84:10,10
84:19 95:18
**leaders**   13:23
14:7 31:10
41:4
**leadership**
11:19,23 12:1
13:21 14:8
16:23 96:9
**leading**   11:14
**learned**   99:24
**leave**   22:12,15
**left**   29:21 64:19
73:5 110:1
116:20 122:17
**legal**   31:2,3
85:9 86:15
90:21 92:2,12
95:4 100:10
106:2 126:1
129:1
**legally**   83:13
87:12
**legislation**
76:18
**letter**   124:21
126:19

**level**   8:10 12:14
22:10 24:14,19
36:10 68:14,14
68:23,24 69:7
69:11 71:20,23
71:23 74:18
75:24 86:4
93:5,12 99:5
117:8
**levels**   70:18
101:5
**lever**   56:11
**levitt**   2:3 6:2
**lg**   3:8,11,13,16
3:19,21 4:3,6,9
4:11
**license**   125:6
**liked**   56:14
**likely**   63:5
**line**   10:12,12
29:5 66:11
92:1 126:13
128:7 129:3
**lines**   1:8 2:18
5:13 9:19
10:11 12:10
34:10
**link**   34:23
65:24 91:5
96:1
**linked**   68:8
**list**   81:1,17
117:21

**[listed - master's]**                                                    Page 22

| | | | |
|---|---|---|---|
| **listed**  75:4,15 | 60:18 87:1 | 124:15 127:7 | 84:11 100:3 |
| 79:22 81:5 | 113:2 | **madeline**  2:4 | **manage**  14:8 |
| 113:13 115:23 | **look**  70:2 74:4 | 3:5 6:2 | **management** |
| 119:24 120:8 | 94:4 119:17 | **magnitude** | 11:11,14 12:2 |
| 128:7,17 | **looked**  93:1 | 118:2 | 70:20 |
| **listing**  128:7 | 96:16 | **mail**  3:13,19 | **manager**  70:17 |
| **literal**  42:14 | **looking**  34:1 | 4:4,7 70:4,8 | 72:4 89:23 |
| **literally**  41:11 | 38:22 57:24 | 72:10,14,17 | 90:7 |
| 48:2 57:6 | 70:12 71:15 | 73:8 88:24 | **managers** |
| 112:11 113:9 | 76:3 80:8 | 90:4 92:16 | 11:14 68:4 |
| **little**  33:24 | 105:19 108:4 | 93:1,3 105:5 | **managing** |
| 38:17 71:10 | 115:17 117:17 | 106:4,5 | 13:13 |
| 72:13 80:14 | **looks**  39:1 | **mails**  57:16 | **mandate**  82:8 |
| 81:16 88:23 | 61:10 70:8 | 104:23 | 101:6 |
| 108:8 114:20 | 72:24 75:14 | **main**  10:12,12 | **mandated** |
| **llp**  2:3,10 | 80:18 89:18 | **maintain**  13:16 | 87:13 |
| **loaded**  62:11 | 93:12 111:11 | **maintained** | **mandatory** |
| **local**  28:11 | 111:16 120:2 | 12:10 15:13 | 75:16 |
| 47:16,20,23 | **lot**  47:23 79:9 | **maintaining** | **manual**  29:18 |
| 48:1 68:3 | 112:14 | 46:2 | 29:21 50:19 |
| 99:21 110:14 | **love**  53:24 | **majority**  17:6 | 65:4 |
| 117:7 | **low**  37:16 | 67:20 95:20 | **mapped**  21:5 |
| **locally**  63:5 | **lower**  25:9 | **make**  7:13 14:7 | **marked**  32:12 |
| **located**  17:5 | **lukas**  1:4 5:12 | 16:24 25:1 | 62:9 69:20 |
| **lodge**  105:3 | 126:6 127:3 | 29:12 31:3 | 73:9 88:19 |
| **logic**  71:12 | 128:3 | 32:21,23 38:18 | 92:20 98:10 |
| **logical**  83:24 | | 41:12,15 43:6 | 103:7 109:3 |
| **long**  9:6 10:6 | **m** | 47:18 57:18 | 114:16 |
| 13:5,9 14:5 | **madam**  126:10 | 85:9 100:4 | **market**  12:20 |
| 53:18 105:18 | **made**  19:17 | 108:12 109:24 | 12:22 26:3 |
| 122:21 | 53:7 54:16 | 113:24 122:20 | **marketing**  9:12 |
| **longer**  34:9 | 68:15 69:7 | **makes**  95:5 | 9:13 |
| 42:7 54:20 | 80:11,24 84:3 | **making**  14:2,24 | **master's**  9:2 |
| 59:8 60:2,17 | 99:17,20 | 28:24 59:1 | |

**[matter - name]**                                              Page 23

matter  5:12
  12:12 107:9
mean  10:18
  11:22 17:20
  29:16 31:1
  35:21 41:9
  43:1 44:6
  47:10 52:8
  56:22 60:21
  62:18 75:6
  86:1 88:7
  106:21 112:6
  117:9
meaning  20:13
  24:5 59:5 60:5
  85:1
means  16:6,19
  19:20 33:18
  51:22 61:3
  64:9 79:4,7
  83:19 94:16
  102:14 104:20
  107:3,12
  118:13
meant  30:11
  64:9 84:15
  88:7 111:16
  117:21
measure  60:19
media  5:10
  33:2,5 62:2,5
  98:2,5 119:5,8
  123:11

medium  120:23
meeting  61:6
members  27:12
memory  24:23
  65:8 74:14
mentality  86:8
  86:8
mention  100:20
mentioned
  11:16 23:2
  30:16 87:1
mentions  78:20
mequon  6:22
merely  107:15
  107:21
merit  25:6,9,17
  26:2,10,13,21
  26:22 69:1
  94:17,18,19
  95:16 96:13,17
  97:11,12,15
message  70:13
  70:22 71:24
  72:9,19 84:23
  89:2,16 98:16
  98:21,22 99:8
  103:19,23
  104:2,10
  108:10
met  16:24
metadata  66:10
mhills  2:7
michigan  8:20

microsoft
  114:19
middle  41:2
  72:1 108:9
midwest
  126:17 129:1
mind  22:11
  33:23 43:23
  46:4
minimal  24:15
minnesota  3:17
  73:14 74:22
  76:13 77:11
  80:16 81:23
  82:1,12 83:3
minus  120:15
minute  13:2
  70:2 97:21
minutes  61:23
mischaracteri...
  23:7 43:21
  58:22 82:16
  88:9 113:3
  122:14
misinterpreta...
  29:22,24
missed  10:7
missing  112:5
  112:14
misspelled  80:2
mitch  6:4 126:5
mitchell  2:10
modern  15:20

modified
  114:24
moment  61:22
  69:16 73:7
  76:7 103:5
morning  5:1
  6:12,13
morphed  13:11
motors  9:5
move  28:15
  41:22 115:15
  122:2
moved  17:15
  17:18 28:11
  101:7 105:9
moving  112:8
  117:19
mps  111:2,8
mrobinson
  2:13
multifaceted
  14:18
multiple  31:9
myriad  23:13
mytime  22:2
  115:16

**n**

n  6:19,19
nadine  1:13
  5:18 124:4
  125:5
name  5:16 6:14
  6:16,18 13:6

**[name - object]**                                              Page 24

17:11 34:6
73:20 75:4
80:1 83:23
93:3 109:10
115:3,5 126:6
127:3,4,15
128:3,4,21
**named** 124:8
**names** 23:12
75:2
**nature** 108:23
**ne** 2:11
**near** 113:11
**necessarily**
12:23 36:12
44:6 85:24
**necessary**
93:18
**need** 7:20 21:24
24:12 36:13
43:6,7,15 44:1
44:3 45:5,20
46:5 53:8 57:8
82:24 108:15
122:22
**needed** 20:14
36:11 43:17
75:8 88:1
**needs** 16:24
42:21,24 46:1
117:12
**neighborhood**
24:24

**never** 45:23
114:12 115:5
121:19 122:5
**new** 14:13
15:17 28:16
40:8 66:15
68:18 74:7,8
74:22 76:16,18
79:21,21 80:16
80:23 81:22,24
82:12 83:4,16
83:17,24 99:1
99:12,18 100:1
100:4,7,17
101:4 121:3,13
**newly** 83:21
**nice** 56:7
**non** 3:22 7:11
23:24 24:6,21
36:21 49:17
71:20 78:23
79:4,7,11 85:2
85:4,14,19
86:7,11,17
89:13 90:24
91:2,11,16,19
91:21 92:4,14
93:21 94:13,14
94:18,19,22
95:1,9,13
96:12 97:12,17
100:13,14,21
101:3,4,8,8,11
101:13,17

102:13,17,18
103:2 106:22
107:16,17,23
108:13 112:11
**normal** 42:18
43:20 101:22
**normally** 11:1
53:20
**north** 2:5 125:7
**northern** 1:1
5:14
**notarized**
126:14
**notary** 1:14
124:5,12 125:2
125:6 126:24
127:10,18
128:15,23
129:23
**notch** 21:2
**note** 5:3 59:4
115:21,23
126:12
**notes** 111:5
121:2
**notice** 77:11
78:24
**noticing** 6:1
**notification**
3:17 73:15
74:8,9,21
81:22,24 83:1
84:8 95:17,24

**notified** 84:12
**notify** 80:22
84:3
**notifying** 74:9
**november** 70:4
70:14
**nuance** 54:14
**number** 25:8
25:10,23 26:5
37:21 56:3
63:11,18 96:16
96:17 110:3
119:23,24
120:4 122:12
123:11 126:7
126:13
**numbered**
38:21 54:18,19
55:2 74:3 80:8
**numbers** 25:12
64:4 122:11,16
128:7

**o**

**o** 6:19 124:2,2
**o'neal** 89:11,15
**object** 10:1,8
10:19 12:6,16
14:11,15 15:9
16:7 17:14
18:5,23 19:15
20:1,10 21:1
21:13 22:9
23:7 24:1,10

**[object - online]** Page 25

| | | | |
|---|---|---|---|
| 24:18 25:14,19 | 105:24 106:2 | **occurring** | 62:11 64:13,21 |
| 26:16 27:1,6 | 108:1,20 110:7 | 29:24 30:14 | 65:1,11,18 |
| 27:10,22 28:8 | 110:12 113:3 | 43:8 | 69:15,18,22 |
| 28:17 29:7,17 | 113:20 114:8 | **offer** 12:24 | 70:3 71:9 |
| 30:2 31:15 | 116:5,16,24 | 51:4 | 72:14,19 73:6 |
| 32:3 34:15 | 118:18 119:15 | **offered** 42:17 | 73:13 74:3 |
| 35:5 36:6,16 | 120:6,14 | 44:11 45:5,17 | 76:2,10 77:16 |
| 37:1,12 38:12 | 121:14 122:14 | 45:19 51:1,5 | 79:14 80:7 |
| 39:10,24 40:13 | **objection** 11:6 | 52:12 54:10 | 83:14 85:1 |
| 41:10 42:5,19 | 16:20 30:22 | **offering** 44:23 | 88:17,21 89:10 |
| 43:11,21 44:13 | 31:21,23 35:14 | **office** 70:20 | 92:18,22 97:19 |
| 45:1 46:9,17 | 41:17 44:20 | **officer** 10:3 | 97:21 98:1,4,7 |
| 47:2 48:7,17 | 45:8 46:17 | 28:5 | 98:12,14 103:6 |
| 48:21,24 49:12 | 61:16 91:9 | **official** 125:1 | 103:12,15,18 |
| 50:13 51:6,24 | 96:14 104:23 | 127:15 128:21 | 104:2 105:18 |
| 52:15 53:11 | 106:14 | **oftentimes** 84:9 | 108:3,24 109:1 |
| 55:19 56:19 | **objections** 5:21 | **oh** 48:22 54:23 | 109:8 114:14 |
| 58:9,22 59:24 | 53:17,21 119:1 | 57:17 70:8 | 115:11,13,19 |
| 60:10,22 63:10 | **objectives** | 72:12 97:20 | 118:1 119:4,7 |
| 63:16 66:7,17 | 80:22 81:2,5 | 103:14,14,15 | 121:15 122:18 |
| 66:22 67:10,15 | 81:18 | 108:8 114:9 | 122:21,23 |
| 71:1,13 73:22 | **obligation** | 115:7 | 123:2,4,9 |
| 74:16 75:21 | 51:23 52:22,23 | **ohio** 126:2 | **old** 7:2 |
| 76:22 77:1,22 | 54:12,15,16 | **okay** 6:16 7:6,8 | **onboard** 69:1 |
| 78:13 79:6 | 58:3,8 61:6 | 7:15 9:16,23 | **onboarded** |
| 81:10 82:2,16 | **obligations** | 15:8 17:2,12 | 83:16 |
| 83:7 84:5 85:7 | 51:13 52:14 | 27:3 28:6 32:9 | **onboarding** |
| 86:14,24 87:21 | **obviously** 31:1 | 33:1,4 34:3,9 | 66:13,15 67:2 |
| 88:9 90:3,19 | 123:8 | 34:17 36:24 | 84:1 |
| 90:20 91:24 | **occur** 39:20 | 38:4,11,21 | **once** 7:19 58:12 |
| 92:1 93:9,16 | **occurred** 117:7 | 41:21,24 51:9 | 58:15 59:5,13 |
| 97:5 100:9 | **occurrences** | 54:2,5,18 | **ones** 117:4 |
| 102:7,9 104:4 | 31:19 | 57:17,24 61:8 | **online** 8:6 67:3 |
| 104:21 105:23 | | 61:12 62:1,4,7 | 67:21 68:15 |

**[online - paragraphs]**                                          Page 26

103:13 114:20
**open** 11:12
  114:18,19
**openings** 13:24
**operate** 83:13
**operating**
  37:20
**operation**
  42:21 43:4,8
  44:3 45:23
  46:2,4 49:9
  52:24 53:4,8
  96:2,21 97:1
**operational**
  18:2 42:21
  43:1 44:1,11
  44:23 51:18
  87:10
**operationally**
  43:14,17
  117:11
**operations**
  18:17 19:3
  23:6 37:4,6,8
  43:5,6 95:24
  96:5,10,11
**opine** 111:15
**opposed** 97:10
**ops** 35:1 36:24
  37:3,7,11,19
  38:4,8
**option** 56:15
  57:23

**oral** 6:8 124:10
**order** 20:17
  50:8 76:20
  83:12
**ordered** 76:20
**org** 35:1,13,22
  36:13,14,19,20
**organization**
  14:2,6 18:14
  33:20 34:20
  64:20
**organizational**
  11:15 35:4,8
  35:11
**orientation**
  68:13,17,18,21
  68:22 69:10,14
**original** 29:15
  30:16,20 80:5
**ot** 66:1 111:24
**outbound**
  28:23
**outcome** 5:20
  20:13 71:15
**outlined** 90:12
  92:18
**output** 20:5,11
**outside** 42:17
  43:20 51:2,5
  51:13 52:12
  54:11 117:4
**override** 83:12
**overseeing**
  14:19,23 18:1

**overtime** 3:22
  8:15 22:8 24:9
  24:13,17,22
  27:5,20 28:7
  30:18,21 31:13
  31:20 38:11
  43:9,19 44:4,5
  44:6,7,11,12
  47:19 48:15
  49:3 65:20,23
  66:6 67:13
  68:5 79:10
  83:5,8 86:12
  86:18,20,22
  87:8,17,19
  88:4,8 89:11
  94:4,12,17,23
  95:7,16,17,22
  96:1,18,20,24
  97:2,3,9,13,16
  101:18 102:1
  102:15,19,19
  110:10 111:21
  112:3,10,16,19
  112:22 113:13
  113:14,19,23
  114:5
**overview** 69:4
**own** 10:17
  59:11 69:13
  117:15
**owned** 9:18
**owner** 75:16
  81:18 82:13

**ownership**
  45:15

**p**

**p.m.** 98:2,5
  119:5,8 122:24
  123:3,10
**page** 3:4,7 4:2
  33:12 34:19
  38:21 40:24
  41:24 50:1
  51:10,15 54:18
  54:19 55:2
  58:1 62:15
  65:1,5,12
  69:23 73:13,19
  73:20 74:3,4
  76:2 78:6
  79:20 80:8
  81:4 82:22
  98:15 99:9
  103:17,18
  108:4 126:13
  126:15 128:7
  129:3
**pages** 77:9
**paid** 44:7 47:19
  60:7 86:5
  89:11 113:8
**paragraph**
  99:22
**paragraphs**
  76:8

**parameters**
  101:22
**paraphrase**
  23:5
**part**  24:4 26:24
  31:4,23 37:8
  37:18 50:14
  59:8 64:17,18
  64:19,21,22
  84:1,10 92:16
  113:6 128:9
**partial**  50:5
**participants**
  5:6
**particular**
  21:11 92:9
  101:21 106:15
  114:2
**particularly**
  39:11 81:10
**parties**  5:9
  105:1 124:24
**partly**  19:2
**partner**  9:11
  11:1 13:8,16
  13:18 15:13
  16:4,11,13,17
  18:22 19:2
  104:5
**partnering**
  16:23
**party**  5:19 47:7
  47:7

**pay**  25:21,22
  26:7 31:7 43:9
  43:19 46:14
  79:1 84:17
  88:15 90:14
  93:3,8,11
  94:12,12
  104:12,13,16
  106:19,23
  107:1,10,13
**paycheck**  84:17
**paying**  99:24
  113:18
**payroll**  19:11
  20:12 46:7,10
  46:12,13,15,22
  46:24 47:6,6,9
  85:22,24 86:9
  106:9 107:16
  121:24
**pdf**  34:23 66:12
**peachtree**  2:11
**penalty**  51:14
**pending**  7:21
**pension**  14:20
**people**  12:1
  13:4 14:8
  16:22 17:2
  18:12,14,18
  21:22 23:18,20
  27:17 41:16
  43:15 44:7
  46:3 56:22,24
  57:7 68:24

  69:1,7 84:16
  94:22 95:20
  96:7,17 101:9
  107:16 118:10
  118:11 120:18
**people's**  46:4
**percent**  18:19
  32:8 68:13
  84:22
**percentage**
  55:17
**perform**  115:22
  115:24 116:4
**performance**
  11:13 12:2
  26:4 51:19
  58:4 60:14,16
  60:17,20 61:1
  61:2,5 112:13
**period**  45:2
  87:5 113:22
  119:12 121:9
**person**  10:24
  11:20 12:23
  19:5 21:11
  23:11 27:16
  48:12 59:8
  102:3 104:1
  112:8
**personal**  84:24
**personally**  27:8
  66:18,24
  106:16 127:11
  128:15

**personnel**  37:5
**perspective**
  11:10 17:1
  30:12 35:24
  85:20 86:3,9
  117:13,24
  122:7
**pertaining**  1:16
**phases**  117:18
**philosophy**
  11:24 53:9
**phon**  115:9
**phone**  125:8
  126:3
**phrase**  50:24
**phraseology**
  52:5
**pick**  45:19
  58:10 59:6
**picked**  54:17
  112:9
**picking**  43:9
  112:17
**picks**  54:12
**piece**  11:23
  14:9,13,17
  122:3
**pilot**  3:9 33:13
  34:19 39:2
**pilots**  33:21
  37:16,19 38:5
**pinchpoints**
  117:23

**place** 5:9 15:16
30:1 40:18
124:5,16
**plaintiff** 5:12
6:3 8:12
**plaintiffs** 1:6
2:8
**plan** 14:19,20
14:22
**planes** 96:23
**plans** 11:11
15:22,23,23
22:23
**platform** 83:17
83:21 115:16
115:18 121:13
121:22
**please** 5:3,22
6:16 72:10
94:16 126:11
126:11
**plus** 118:13
**pmo** 70:19
**point** 10:14,15
21:9 23:13
25:1,2 28:10
41:22 51:16
63:1 77:20
81:1,4,17
82:13 105:10
**points** 27:18
28:3
**policies** 3:9
12:4,10,14

20:24 24:17
27:5 28:7,12
29:2,12,13
30:13,17 31:4
33:14 39:3,9
39:23 40:4,12
40:20,21 66:20
67:3,20,23
68:15 69:8
81:9 86:19
87:2 90:12
92:18 121:5
**policy** 11:24
12:9 13:4 22:8
27:19 29:6
30:18,21 31:7
31:8,13,20
32:2 34:7,14
39:18,22 40:10
42:15 52:4
55:23 56:23
59:10 65:15,23
66:6 67:1,13
68:5,11 74:11
81:6,15 82:24
83:6,8,10,11,12
83:12 86:22
87:19 93:7,8
93:14 94:5
97:9 98:24
99:12,17,20
101:3 109:10
110:11,22
111:20 113:14

**pop** 61:19
**popping** 57:16
**popular** 56:5
**population**
16:24 22:6
81:19 82:15,19
85:23 95:19
96:9
**populations**
25:7 82:20
91:18
**portion** 96:12
**posing** 53:3
**position** 9:8,24
10:6 12:5 13:9
13:10 17:3,12
18:10 19:22
22:17,21 23:3
25:21 26:3
36:1,9 48:4
69:1 83:21
85:13,17 90:10
95:3 106:7
**positions** 37:6
94:11,13,17,18
94:19
**possible** 29:2
80:3,4 97:3
**post** 19:9 55:6
67:23
**posted** 68:2
**potential** 61:7
**poynant** 52:9

**practice** 42:13
53:20
**practices** 28:11
65:4
**pre** 84:18
**precisely** 97:16
**preparation**
8:8
**prepare** 8:3
**present** 2:1,17
5:23 124:7
**president** 15:12
17:17 22:18
**pressed** 110:15
**pretty** 56:5
96:8 120:12
**prevalence**
56:8 57:2,4
**prevalent** 46:6
**prevent** 7:24
**prevention**
78:21
**previous** 23:3
103:23
**previously**
30:14 86:24
93:2 124:8
**primarily** 8:8
25:15
**principle**
107:22
**prior** 19:18
51:14,17

**pritchett** 89:3
89:10,19
**privy** 56:2
**probably** 7:9
25:10 56:23,24
73:24 110:3
122:20
**problem** 56:4
62:22
**problems** 31:16
**procedure** 1:15
124:19 127:5
128:5
**procedures**
28:12 29:2
39:4 40:5
**proceedings**
5:21
**process** 21:12
21:14 44:22
45:6,15 50:19
67:1,2 83:15
84:1,8 110:22
111:20 113:14
**processes** 29:18
**produced** 63:5
**production**
126:15,17,22
**profess** 11:21
**professional**
92:7 101:17
**program** 29:1
117:15

**programmed**
29:20
**programming**
21:24 68:21
71:12,14
**programs**
14:24 17:23
18:1
**prohibited** 56:1
**prohibition**
102:19
**project** 70:17
70:19 74:18,19
74:23 75:7,10
76:4,11,12,15
76:24 80:21
81:8,11,14
82:5 83:5
115:15 117:6
122:1
**projects** 16:18
75:18
**promoted**
13:13 15:12
**promotion**
15:15
**prompted**
76:12
**proper** 95:3
**properly** 99:24
**protect** 42:21
**protecting**
80:17

**proven** 80:1
**provide** 41:6
78:23
**provided** 66:20
67:2 83:1
93:18 101:12
**providing**
13:20,23
**provisions**
39:17 79:12
102:22 108:17
110:14
**psychology**
8:22
**pto** 66:1
**public** 1:14
124:5,12 125:2
125:6 127:10
127:18 128:15
128:23 129:23
**published**
67:21 84:12,14
94:12
**pull** 73:7 103:5
114:15
**pulled** 32:17,23
69:16,19 88:18
**pulling** 33:7
**purpose** 88:2
**purposes** 67:9
90:24 105:4
**pursuant** 1:14
124:18

**put** 30:1 49:11
58:24

**q**

**qualification**
8:15
**qualified** 79:11
90:1
**qualifier** 101:8
**qualify** 102:15
**qualifying** 8:16
**quality** 5:4,5
**question** 7:21
24:13 30:3,6
30:19 31:1,17
35:18 40:8
41:18,21 42:8
50:10 53:18
67:10 87:3,4
89:19 97:7
106:13 108:15
108:22 118:20
122:10
**questioning**
90:9 92:1
**questions** 52:4
76:9 90:2,8
94:16 111:5
123:5,7 124:10
124:14
**quick** 61:13,21
61:23 122:19
**quickly** 7:8
28:19 86:14

**[quickly - referring]**                                         Page 30

102:9 119:3
**quite** 41:11
    42:11 53:17
    56:23 87:15
**quote** 51:23
    79:23 80:23,24

**r**

**r** 2:4,18
**railway** 90:14
    90:23 91:4,8
    91:22 92:5,10
    95:2,4,8 97:18
    100:20 101:14
    101:20,24
    102:4,11,21
    103:1 104:13
    104:15 106:20
    107:4,10,12,17
    107:19
**ran** 47:6
    117:15
**range** 26:2,3
    103:14
**rate** 47:19
    89:12
**rather** 17:22
    29:20 86:23
    91:8
**reached** 75:24
**read** 8:5 39:5
    76:8 123:8
    127:5,6,12
    128:5,6,17

**reading** 42:14
    45:13 50:17
    126:19
**realize** 84:13
**really** 7:8 11:23
    15:15 28:20
    30:24 35:7
    48:12 52:23
    86:3 107:3,12
    107:18 118:24
    119:2,20
**reason** 30:10
    90:8 95:4
    106:9 126:14
    128:8 129:3
**recall** 13:14
    18:18 42:11
    46:20 63:21
    64:23 72:7
    74:17,18 75:23
    75:23 82:6
    83:23 87:15
    91:14,14,15
    96:8 99:3,16
    110:3 113:21
    114:1
**receipt** 126:18
**receive** 84:1
**received** 46:10
    95:17,24
**receives** 20:4
    47:5
**receiving** 88:15

**recently** 99:24
**recess** 33:3
    62:3 98:3
    119:6 123:1
**recipient** 46:11
**recognition**
    16:2
**recognize**
    33:16 63:4
    74:1 93:4
    99:15 115:13
**recollect** 26:18
    63:11 99:19
    111:10
**recollection**
    17:4 25:11
    68:7 116:7,21
**recommends**
    81:18 82:13
**record** 5:2,9
    6:1,17 7:13
    20:20 32:20,22
    33:1,4 53:19
    53:22 54:1,2,4
    54:5,21 62:1,4
    67:9 89:7,7
    98:1,4 105:3
    118:24 119:2,4
    119:7 122:23
    123:2,9 124:14
    128:9
**recorded** 5:7
    5:10

**recording** 5:4,8
**recruited** 22:16
**recruiting** 14:4
**redaction**
    98:20
**redirected** 80:6
**reduce** 114:5
    119:1
**refer** 118:1
**reference** 64:7
    68:16 70:24
    88:2 91:22,23
    92:5 99:3
    100:14 126:7
    127:2 128:2
**referenced**
    21:16 28:15
    81:6 82:1 87:5
    88:1 92:12
    100:7 117:4
    127:11 128:15
**referencing**
    68:21 80:3
    101:14
**referred** 10:21
    11:1 13:19
    14:20 19:22
    76:16 91:2
    124:16
**referring** 21:14
    21:15 28:16
    32:19 33:19
    53:5,13,14
    71:4 82:18

**[referring - responding]**                                                Page 31

| | | | |
|---|---|---|---|
| 83:20 93:7 | **relationship** | **reporter** 5:17 | **requirements** |
| **refers** 24:4,6 | 64:16 | 7:11 127:7 | 3:16,17 21:23 |
| 106:23 | **relative** 21:2 | **reporting** 60:6 | 31:2,3 42:22 |
| **reflect** 31:4 | 31:6 101:6,21 | 64:16 74:22 | 43:2 71:5,7,16 |
| **reflection** | **relatively** 38:14 | **reports** 64:2 | 71:19,19 73:14 |
| 118:16 | 63:14,18 | **represent** 34:6 | 73:15 75:20 |
| **reframe** 30:3 | **reliability** | 66:9 90:17 | 78:11 80:19 |
| **refresh** 74:14 | 58:13 60:19 | 92:24 109:8 | 100:5 111:11 |
| **refreshed** 65:8 | **reliable** 41:6 | 114:23 119:19 | **requires** 78:22 |
| **regard** 53:11 | **reliably** 41:13 | 122:12 | **res** 109:10,20 |
| 53:13 67:10,16 | **relies** 20:2 | **representation** | 111:1,22 114:2 |
| 81:11 84:6 | **remarried** | 105:22 | 116:11,15 |
| 93:11 118:20 | 104:1 | **represented** | 120:9 |
| **regarding** | **remember** | 24:7 37:9 | **rescind** 51:11 |
| 70:22 79:1 | 27:13 63:23 | 49:22 122:11 | 53:1 |
| 88:3 94:17 | 99:5,17 104:6 | **representing** | **rescinds** 51:13 |
| 106:4 108:13 | **remind** 39:16 | 5:16 | 51:16 |
| **regular** 43:24 | **remiss** 27:14 | **represents** | **reservations** |
| 48:16 49:7 | **remotely** 1:13 | 37:23 | 109:21,23 |
| 51:2,5 52:12 | 5:23 | **request** 128:9 | 110:2,6 111:8 |
| 52:20 54:11 | **remuneration** | 128:11 | 120:10 |
| 58:17 89:12 | 87:12 | **requesting** | **resident** 73:5 |
| **regularly** 49:4 | **repeat** 100:24 | 72:24 | **resource** 28:5 |
| 49:16,17 | **rephrase** 16:3 | **requests** 50:5 | 34:7 41:4 |
| 112:24 | 20:21 53:18 | 55:3 | 50:20 |
| **regulations** | 68:20 85:3,11 | **require** 78:9 | **resources** 3:9 |
| 39:3,17 40:4 | 97:7 | 122:6 | 10:3 23:10 |
| **related** 5:19 | **report** 17:8 | **required** 11:13 | 33:13,18 34:14 |
| 17:21 19:22 | 72:6 104:8 | 75:19 77:12 | 43:7,15 48:11 |
| 24:17 27:5,20 | **reported** 17:2,9 | 87:11 126:24 | 50:19 |
| 30:18 76:12 | 18:12 36:12 | **requirement** | **respond** 90:10 |
| 79:9 108:22 | 72:8 78:1 | 71:11,17,23 | **responding** |
| **relations** 8:23 | 109:18 115:11 | 72:16 73:1 | 41:19 |
| | | 74:22 | |

**[response - role]**                                                    Page 32

| | | | |
|---|---|---|---|
| **response**  64:15 | 14:17,22 15:4 | **rob**  17:11 78:1 | 58:9,22 59:24 |
| 70:6 81:23 | 15:6,23 | **robbing**  24:23 | 60:10,22 61:15 |
| 82:1 | **return**  54:7 | **robert**  89:3 | 61:20,22 63:10 |
| **responsibilities** | **returned** | **robinson**  2:10 | 63:16 66:7,17 |
| 9:10,23 11:3 | 126:18 | 6:4,4 10:1,8,19 | 66:22 67:9,15 |
| 14:14 15:11,16 | **returning** | 11:6 12:6,16 | 71:1,13 73:22 |
| 38:23 67:7 | 22:23 | 14:11,15 15:9 | 74:16 75:21 |
| **responsibility** | **review**  32:6 | 16:7,20 17:14 | 76:22 77:1,22 |
| 13:11 15:22 | 61:7 126:12 | 18:5,7,23 | 78:13 79:6 |
| 45:12 48:6 | 127:1 128:1 | 19:15 20:1,10 | 81:10 82:2,16 |
| 59:11 69:13 | **reviewed**  31:8 | 21:1,13,17 | 83:7 84:5 85:7 |
| 112:8 | **revised**  62:23 | 22:9 23:7 24:1 | 85:15 86:14,24 |
| **responsible** | **rewards**  15:12 | 24:10,18 25:14 | 87:7,21 88:9 |
| 17:19,24 21:11 | 15:17,19,20,24 | 25:19 26:16 | 89:6 90:3,19 |
| 33:20 41:12 | 17:9 22:18 | 27:1,6,10,22 | 91:9,24 93:9 |
| 48:3 66:24 | **rid**  29:18 | 28:8,17 29:7 | 93:16 96:14 |
| **rest**  12:11 44:8 | **right**  14:4,4 | 29:17 30:2,22 | 97:5,23 100:9 |
| 98:22 | 22:12 28:19 | 31:15,21 32:3 | 102:7,9 104:4 |
| **restart**  63:23 | 33:7,11 36:10 | 32:20 33:23 | 104:21 105:23 |
| **restate**  25:17 | 38:16 39:5 | 34:3,15 35:5 | 106:12,14 |
| 45:18 46:21 | 40:23 41:19 | 35:10,14,20 | 108:1,20 110:7 |
| 106:13 | 46:8 47:12 | 36:6,16 37:1 | 110:12 113:3 |
| **restricted** | 49:20 51:9,11 | 37:12 38:12 | 113:20 114:8 |
| 107:4 | 61:10,10 63:2 | 39:10,24 40:13 | 114:10 116:5 |
| **restrictive** | 64:7 65:11 | 41:10,17,21 | 116:16,24 |
| 104:14,16 | 75:4,5 84:20 | 42:5,19 43:11 | 118:18 119:2 |
| 107:13,20 | 94:6 95:1,14 | 43:21 44:13,20 | 119:15 120:6 |
| **result**  29:21 | 96:22 100:4 | 45:1,8 46:9,17 | 120:14 121:12 |
| 51:19 58:4 | 103:4,9 107:2 | 47:2 48:7,17 | 121:14 122:14 |
| 76:23 | 109:5 113:2 | 48:21,24 49:12 | 122:21 123:7 |
| **retained** | 114:21 117:10 | 50:13 51:6,24 | 126:5 |
| 123:12 | 122:2,8 | 52:15 53:11,19 | **role**  9:11,20 |
| **retirement** | **rla**  95:10 | 53:24 55:19 | 10:10 11:4,5,9 |
| 13:12,15 14:13 | 102:24 | 56:19 57:13,18 | 13:17,18 15:2 |

15:13 16:13 17:15,18 19:2 19:18 20:19 39:4 40:5 48:5 48:6

**roles** 9:9 11:12 22:20

**rollout** 29:4

**roughly** 119:23

**round** 50:4

**rounds** 50:3,7

**row** 110:16,18 110:22 111:1,5 111:18,20,22 113:11 115:19 118:5,5,10 120:17,17 122:12

**rpr** 1:13 124:5 125:5

**rules** 1:14 21:4 21:6,8,15 29:19 35:15 47:9,10,14,17 47:22 48:14,15 49:2,3 56:1 86:19 90:15 93:3,8,11 95:10 101:17 104:12,13,16 104:17 106:19 106:24 107:1,6 107:10,13,14 124:18,19

127:5 128:5

**run** 7:8 68:3

**s**

**s** 1:12 3:1 6:6 6:18 126:8,15 127:4,9 128:4 128:8,8,13 129:3,20

**sake** 54:1 89:6

**salaried** 88:12 88:13 95:17,22 95:22

**salary** 26:2 84:9,18

**sales** 9:12

**sample** 80:11

**sannah** 115:9

**sap** 19:10,10,14 19:19,20 20:2 20:3,9,11,16,19 20:21,23 21:8 21:16,21 23:18 28:13,16,18,19 29:1,4 36:8,15 36:18,18 46:23 46:24 47:8,9 47:12,12,15,17 47:21,22 48:14 49:2,6,10,15,20 111:6,8 118:17 121:8,16 122:2

**sap's** 28:20

**satisfier** 56:10

**savings** 14:22 15:4

**saw** 32:7 103:22

**saying** 27:16 52:18 65:9 77:11 101:13 107:21

**says** 33:12 34:19 35:1 39:2 41:1,4 42:1 50:2,6 51:11,12,16 58:2 62:16,22 65:20,22 66:12 70:19 72:9 73:14 74:5,7 75:1 76:3 77:17 78:21 79:17,22 80:4 80:9,15,22 81:18 82:23 83:15 90:11,13 92:16 99:12,23 107:9 108:10 110:17,19,22 111:1,5,19,20 111:22 113:14 115:19,21,23 120:1,9,18 121:2

**sc** 22:18 34:12

**scale** 25:5,8,17 25:20,22,23,24 26:1,10,13,20 26:22 84:12,14 94:13 95:6,15 95:15,21 100:18,19 120:7,10 122:12

**scaled** 94:24

**scales** 84:14 94:12

**schedule** 41:1,5 41:12 42:18 43:20,24 49:6 49:8 51:2,5 52:12 54:11

**scheduled** 44:9 49:4,4,14,15,16 49:18 53:2 58:18 59:23 60:11 112:24 113:2

**scheduler** 38:23 50:2,3

**schedulers** 96:6 117:15

**schedules** 48:16,16

**scheduling** 3:9 33:13,20 34:20 37:7 39:2 96:24

schema 21:7,7 21:16
school 8:19,20 9:4
scope 11:21 45:11 53:12 67:6,16 82:11 84:6 117:6,16
scoring 118:7,7 118:12,13 120:22,23
screen 5:7 32:16 33:7,8 57:14,16 61:10 61:12,15 62:11 69:17 98:9 109:6 110:16 118:22
scroll 33:22 34:17 69:23 72:13 77:8 93:2,10 98:14 99:7 108:6
scrolled 40:23
scrolling 65:14 94:3
se 74:17
seal 125:1 127:15 128:21
search 22:16
second 11:7 54:1 81:4 99:23 102:12

secondarily 106:3
secondly 118:19
section 38:22 41:1 50:6 55:3 75:1 76:5,8 77:10 78:19 79:20 80:15,21 82:23 105:19
sections 78:8
see 10:5 32:10 32:15 33:8,9 33:12,14 34:13 34:19,22 36:11 36:12,13,20 38:18,23 40:24 41:2,24 51:11 51:20 54:20 55:2 58:1,4 61:10 62:12,16 62:16,22 65:5 65:19,22 69:17 69:24 70:1,13 71:24 72:9,11 72:12,14,19 73:11,13 74:4 74:11 75:1,16 76:5 77:10,10 77:14,18 78:6 78:9,19 79:1 79:15,18 80:9 80:11,12,19 81:2,6,16

82:22 83:1,2 83:17 85:5 88:21,24 89:2 89:10,13,14,15 90:11,15 92:22 93:23 94:4,8 97:20 98:12,15 98:19 99:1,9,9 99:22 100:5 103:10,19,20 104:10,18 108:4,9 109:5 110:16,17,18 111:2,6,24 112:1 113:12 113:15 114:18 114:21 116:1 116:10 118:3,8 118:10,12,14 120:20,24 121:6
seeing 41:7 47:14 50:8 103:16
seen 5:6
segment 22:5 96:20
senior 17:9 64:20
seniority 50:8
sense 7:13 47:2 95:5 109:24
sentence 40:4 60:13 65:7

78:20,20 99:23
separate 16:12 64:20 69:2
september 34:8 73:17
series 52:4
serve 18:22 95:3
served 18:21
service 9:13 17:16,17,19,24 18:13 41:6 62:20 63:9 64:3,12,14 66:14 67:6 72:4,23 89:23 116:11 119:14 119:18
serviced 41:13
services 9:19 10:16 37:18 38:3
set 102:11
setting 31:3
settings 61:18
several 7:9 104:23
seyfarth 2:10
seyfarth.com 2:13,14
shape 32:8 40:18
shapiro 2:11

**[share - specific]**                                                    Page 35

| | | | |
|---|---|---|---|
| **share** 32:16,17 | **shorthand** | **sir** 126:10 | 49:7 57:9 |
| 32:23 33:8 | 109:20 124:11 | **site** 68:2,6,6,8 | 58:15 122:4 |
| 57:22 61:14,15 | **show** 66:10 | 69:9 | **somebody's** |
| 62:11 98:8 | **showing** 32:14 | **sites** 68:3,8 | 49:15 83:21 |
| **shared** 31:9 | 59:8 61:4 | **situated** 1:5 | **sorry** 8:7 14:12 |
| **sharing** 54:22 | **shown** 75:14 | **situation** 87:10 | 18:6 19:14 |
| 57:14 61:12 | 126:16 | **situations** 13:3 | 27:2 34:16 |
| 69:15 73:6 | **side** 23:4,6,19 | **sixth** 2:5 | 37:22 48:22 |
| 103:4 108:24 | 59:12 84:23 | **size** 35:22 48:9 | 54:20 56:12 |
| 122:18 | 97:11,15 120:7 | 48:12 75:8 | 59:17 70:8,9 |
| **shaw** 2:10 | **sign** 13:1 27:20 | 118:1 | 72:13 78:3 |
| **sheet** 126:13 | 27:24 70:23 | **skills** 11:20 | 94:10 100:23 |
| 128:7,10,18 | 71:4 72:11,14 | 14:8 | 114:9 115:7,8 |
| 129:1 | 75:1,10,13 | **slight** 120:23 | **sounds** 7:12 |
| **shift** 3:22 22:8 | 123:8 | 121:10 | 61:24 119:23 |
| 47:18 50:4 | **signature** 70:19 | **slightly** 90:15 | **source** 20:19 |
| 51:14,17 52:18 | 75:19 77:17,18 | 91:19 | 30:19 |
| 52:24 53:6,7 | 79:17,17,22 | **small** 70:1 | **space** 23:16 |
| 54:17 55:13 | 124:17 125:1,5 | 95:19,22 96:8 | 77:17 79:16 |
| 57:7 60:9 66:1 | 126:14 | 96:20 | **speak** 7:12,16 |
| 87:19 88:3 | **signed** 74:10 | **smaller** 117:14 | 87:2 103:1 |
| 100:3 110:10 | 75:15 79:23 | **smooth** 43:4 | 106:3 |
| 111:21,23 | 80:4,5 127:13 | **sole** 26:7 | **speaking** 7:17 |
| 112:9,15 113:6 | 128:18 | **solid** 46:2 | 53:17,20 86:17 |
| **shifts** 42:17 | **signing** 126:19 | **solution** 19:20 | 87:8 101:23 |
| 43:10,20 44:10 | **similar** 50:21 | 23:14 71:7 | 104:22 118:1 |
| 44:11,12,23 | 68:9 76:14,17 | 80:22 81:19 | 119:1 |
| 45:4,7,19 46:7 | 78:7 117:12 | 82:14 | **speaks** 41:17 |
| 50:2,4,5,11,20 | **similarly** 1:5 | **solutions** 19:4 | **spec** 29:13 |
| 51:2,5 52:12 | 58:10 102:22 | 19:7 74:7 | **specific** 11:19 |
| 52:13 54:10,13 | **simply** 49:11 | 126:1 129:1 | 13:3 28:7 32:2 |
| 55:13 86:7 | **sincerely** | **solve** 113:15 | 39:7,22 40:10 |
| 95:18 112:8,18 | 126:21 | **somebody** | 40:20 45:2 |
| | | 36:12 48:2 | 48:11 121:4 |

**[specifically - suggesting]**                                    Page 36

specifically
  48:11 67:15
  114:5
specifications
  71:6
specificity
  35:16 43:12
  45:1 83:8 84:6
  87:23 114:10
  117:1 118:20
specifics  55:22
specified  78:24
specify  67:18
  71:16
speculate  30:9
  30:9 52:7 64:5
  68:12 77:24
  105:1,6 106:1
speculation
  29:8 30:4
  31:23 37:13
  39:11 40:1
  42:8 44:14
  45:9 46:18
  48:18 55:20
  67:11 71:2
  77:2,23 78:14
  82:3 87:3 90:4
  90:20 96:14
  100:11 114:11
speculative
  31:15 40:3
spelled  93:21

spelling  6:19
spend  105:18
spent  25:21
split  91:14
spot  34:1
spreadsheet
  4:10,12
ss  124:1
stable  38:15
  63:18
staffing  42:22
stand  65:4
standard
  102:12
standardize
  29:5,11
standards  79:9
  79:13 85:4
  87:13 92:10
  102:14,18,23
stands  62:21
  71:5,8
start  8:17
  33:11 51:14,17
  53:2 89:2
started  10:2
starts  77:11
state  5:22,24
  6:16 8:20 39:8
  76:14,20 77:10
  78:7,12 80:16
  82:8 83:11,13
  100:5 101:6
  104:13,14,16

107:2,4,6,9,13
107:19,21
115:20,21,21
115:23 124:1
127:10 128:15
statement
  24:14 74:8,21
  80:9,10 127:13
  127:14 128:19
  128:19
states  1:1,15
  5:13 82:8,10
  82:20 107:1,11
  124:20
statistics  89:4
  90:2
status  77:13
  85:2,3,14,16
  86:11 90:17
  101:18 106:8
  106:11 108:18
stenographer
  124:12
step  25:24,24
  84:13
stood  65:10
stop  61:18
  69:15 73:6
  103:4 108:24
  122:18
stopped  19:1
  54:21
stored  74:10

streamlined
  83:15
street  2:5,11
  125:7
strong  32:5
  45:24
studied  8:22
study  8:21
  111:17
subject  12:12
  60:13,15,17
  61:1,5 66:11
  66:12 70:22
  83:5 98:24
  110:9
submitted
  46:14 124:18
subpoena  8:5
subscribed
  127:10 128:14
  129:21
subsidiaries
  81:20
subsidiary  9:18
  10:4 16:12
  82:21
subspecialty
  10:20
success  14:5
successfully
  59:5
suggesting
  105:2

**suite** 2:12
125:7 126:2
**summarize**
25:22
**summary** 76:4
**summer** 111:9
113:18
**superior** 126:1
**supervision**
68:24
**supplying** 9:19
**support** 13:20
20:5,18
**supported**
111:6
**supporting**
12:22
**supposed** 40:20
**sure** 6:18 11:8
14:2,7,24
16:24 25:3
29:12 31:4
32:21,23,24
34:13 40:15
41:13,15 42:22
46:6 54:18
55:1 56:4
61:24 62:20
63:21 67:1
94:4 97:24
103:3 113:24
122:20
**swap** 8:14
55:13 57:8,10

57:11 58:2,8
58:20 59:4,4
60:7,16 98:24
99:12,17
108:14,19
111:20,21
112:4,4,8,10,15
112:15 116:23
117:5,15,20
**swapped** 58:15
58:16 59:6,9
59:12,13 60:3
60:18,19
112:18
**swapping** 44:2
56:2,5,10 57:5
108:17 112:17
**swaps** 55:3,9
55:11,12,18,23
56:17 59:22
100:3 108:5,10
110:22 111:19
111:23 112:2
113:1 115:22
115:24 116:4
116:15,18
117:22
**switch** 111:8
**switched** 121:8
**sworn** 6:8
124:9 127:10
127:13 128:14
128:18 129:21

**system** 19:10
19:21 20:6,12
20:20,23 21:4
21:6,21 22:5
28:12,16 29:5
29:24 36:8,15
46:12,13,15,24
50:12,18 51:1
51:4 81:22,24
83:22,23 84:23
117:20 121:3
121:17,24
**systems** 19:11
19:24 20:5,7,8
20:13 28:14,22
28:23 36:11
46:22 71:12
85:6 117:12

**t**

**t** 6:19
**ta** 83:17,22
**tab** 118:2,5
**table** 75:2
77:16 79:16,21
**tahvonen** 1:12
3:1 4:4 5:11
6:6,12,18 30:7
35:19 41:20
54:7 57:22
105:11 119:10
123:4,11 126:8
127:4,9 128:4
128:13 129:20

**take** 5:8 7:19
55:13 60:9,9
61:13,19,20,22
72:10,13 96:23
97:19,21
113:10 121:23
122:19
**taken** 1:13 3:2
5:11 7:4 33:3
53:6 62:3 98:3
119:6 123:1
124:4,11
**takes** 28:18
**talent** 14:4
**talk** 98:22
**talked** 47:1,3
71:9 112:7
**talking** 25:12
45:2 54:8
**talks** 45:13
**tapping** 83:16
**team** 11:14
17:6 21:22
23:10,18 27:12
68:1 70:17
71:18 72:5,23
75:11 89:24
104:6 105:14
105:15 109:17
115:10,17
**technical** 11:20
20:22 21:20
23:4,6 71:19
71:20,23 72:22

| | | | |
|---|---|---|---|
| **technically** | 58:23 82:17 | 82:21 92:8 | 33:5 34:11,12 |
| 38:3 95:9 | 88:10 113:4 | 97:19 107:15 | 38:8 39:13 |
| **technology** | 122:15 123:10 | 108:16 112:4 | 40:7,9 42:1,3,4 |
| 9:17 21:3 | 127:6,7 128:6 | 113:22 117:7 | 42:6,11 44:19 |
| 117:24 | 128:9,12 | 119:16,16 | 45:2,6 47:8,16 |
| **techops** 64:18 | **text** 74:5 | 122:19 | 47:21,23 48:1 |
| 64:22,22 | **thank** 8:17 34:3 | **thinking** 120:8 | 48:3,10,11 |
| 115:22,24 | 54:24 122:21 | **third** 47:7,7 | 50:2,7,7,15,22 |
| 116:12 120:2,4 | 123:4,6 | **thirty** 126:18 | 50:24 51:11,12 |
| **telenet** 83:20 | **theft** 3:17 | **thousand** | 51:12,13,13,16 |
| **tell** 8:18 33:18 | 70:23 71:4 | 118:13 | 51:16,23 52:3 |
| 38:17 65:12 | 73:15 78:21 | **thousands** 25:9 | 52:19 53:2 |
| **tens** 25:8 | 80:17 | 63:12 | 54:6,9 55:3,6 |
| **tenure** 38:14 | **theoretically** | **three** 27:17 | 56:17 58:7,18 |
| **term** 14:5 | 52:17 | 70:18 | 59:2 60:5,9,12 |
| 15:20 20:20 | **thing** 59:3 | **threshold** 8:16 | 60:12 62:5,12 |
| 23:23 37:4 | **things** 12:3 | 44:5 75:11 | 63:7 64:17,17 |
| 42:10 44:19 | 43:5 101:21 | 111:22 112:10 | 64:19 66:14 |
| 49:17 50:15 | 102:16,24 | 112:16,22 | 67:16,18 68:13 |
| 52:3 53:14 | 108:21 | **thresholds** | 73:4 75:19 |
| 71:10 83:8 | **think** 13:13 | 112:3 | 77:21 84:22 |
| 91:1,3 94:14 | 20:3 24:13 | **tied** 85:17 | 85:6,21 86:5 |
| 101:13 102:2 | 25:5 27:19 | 112:13 | 87:4 88:1 90:1 |
| **terms** 25:13 | 28:20,20 30:5 | **ties** 19:11 | 91:7 95:11 |
| 42:3 77:13 | 35:7 39:19 | **tiffany** 115:1 | 96:13 98:5 |
| **test** 21:24 | 40:3 41:11,22 | **tim** 72:22 75:11 | 109:16,16 |
| **testified** 6:9 | 41:23 43:23 | **time** 1:17 5:22 | 110:19 113:17 |
| 29:9 39:12 | 47:22 50:14 | 7:16 8:14 9:18 | 113:22 114:2 |
| 42:6 46:18 | 54:14,21 56:9 | 12:21 13:14 | 116:6 119:8,10 |
| 50:14 52:1,2,5 | 56:14,22 57:6 | 15:10,14 17:6 | 119:12,19 |
| 106:7 | 57:20,20 58:24 | 18:20,22 19:8 | 120:12 121:9 |
| **testifying** 8:1 | 61:17,23 62:11 | 19:18,24 20:6 | 122:17 123:3 |
| **testimony** 23:8 | 64:23 76:18 | 25:21 26:24,24 | 124:5,15 |
| 41:17,20 43:22 | 78:19 81:13 | 28:3,10,14 | |

**[timekeeper - understanding]**                                    Page 39

| | | | |
|---|---|---|---|
| **timekeeper** | 111:24 112:2,9 | **true** 50:23 | **under** 24:7 |
| 47:16 | 112:16,22 | 59:21 124:13 | 39:17 50:1,22 |
| **timekeeping** | 117:20 | **truly** 57:9 | 65:22 73:20 |
| 22:5 85:20 | **track** 36:4 | 59:16 | 75:2 76:4 85:4 |
| 109:24 121:17 | 85:16,21 86:5 | **truthfully** 8:1 | 86:18,22,23 |
| **times** 7:6,9 | 88:14 | **try** 7:16 53:16 | 87:13 90:23 |
| **timothy** 3:14 | **tracked** 86:4 | 61:13 118:24 | 91:2 92:15 |
| 72:20,20 | **tracking** 3:9 | **trying** 16:16,19 | 97:4,9,10 |
| **title** 10:13 13:6 | 33:13 34:20 | 27:14 71:17 | 100:21 101:23 |
| 14:10,13 15:8 | 39:2 | 100:24 104:22 | 103:1,2 104:13 |
| 15:17 26:10,12 | **trained** 23:11 | 106:10 107:7 | 106:20 107:17 |
| 26:20,20 36:9 | **training** 11:11 | 107:15 117:17 | 110:21 113:24 |
| 73:20 78:3 | 11:16,18,20,23 | **two** 22:11 25:7 | **undergrad** |
| **titled** 55:3 | 11:24 | 26:9 27:17 | 8:22,24 |
| 110:18 111:1 | **transcribed** | 30:13 55:12 | **underneath** |
| **today** 6:24 8:1 | 127:7 | 70:18 106:23 | 34:22 74:5 |
| 38:13 72:10 | **transcript** | 108:21 121:21 | 77:16 |
| 80:1 112:7 | 126:11,12 | **twt** 1:7 5:15 | **undersigned** |
| 115:22 121:5 | 127:5,12 128:5 | **type** 85:9 | 124:12,22 |
| **today's** 123:10 | 128:11,17 | **types** 12:3 46:7 | **understand** 8:7 |
| **tool** 47:12 | **transfers** 80:23 | **typical** 39:7 | 8:9 16:16,19 |
| **top** 3:13,19 4:4 | **transitioned** | 51:1 56:16 | 19:7 25:5 |
| 4:7 42:1 74:4 | 10:11 | **typo** 80:18 | 34:13 35:15 |
| 76:3 80:8 99:8 | **translates** | | 40:6 85:13 |
| 99:22 104:10 | 71:18 94:18 | **u** | 86:9 91:23 |
| 111:5 120:1 | **translating** | | 92:5 94:15,21 |
| **total** 15:12,17 | 21:23 | **u.s.** 25:13,15 | 104:20 106:8 |
| 15:19,20,24 | **transportation** | 36:22 89:3 | 106:10 108:16 |
| 17:9 18:14 | 91:5 95:5 | **uh** 74:6 75:3 | 109:20 117:18 |
| 22:18 123:11 | **treated** 51:18 | 103:21 116:13 | 121:21 |
| **totally** 25:7 | 79:8 101:9 | **ultimately** 28:1 | **understanding** |
| **touched** 85:1 | **trev** 79:23 | 31:11 | 8:12 14:1 |
| **towards** 8:14 | **tricky** 20:22 | **uncommon** | 31:16 41:20 |
| 59:10 111:21 | | 39:15 42:20 | 56:6 58:7 66:3 |

**[understanding - vp]**                                                    Page 40

81:8 86:23
90:22 91:6
94:10 97:8
101:24 102:3
106:17 116:14
122:11
**understood**
15:2 21:20
57:12 85:18
92:16 105:8
106:11 119:22
120:16
**unfortunately**
84:16
**uniform** 84:8
**unique** 87:14
**uniquely**
113:22
**unit** 5:10 33:2,6
48:10 62:2,6
64:10 98:2,6
119:5,9
**united** 1:1,15
5:13 20:14,14
124:19
**units** 29:3
62:19 123:11
**university** 8:20
**unnecessary**
114:3
**unpaid** 60:9
**unscheduled**
51:19 58:3
60:12,15

**unusual** 50:20
**updates** 74:11
**upfront** 34:9
**ups** 61:19
**usage** 86:5
**use** 19:13,14
32:18 46:22
49:17 56:24
91:1,3 94:14
94:20,21
**used** 36:19
42:11 46:15
55:7 56:8
101:18 102:2
123:11
**users** 21:21
117:20
**uses** 83:22
**using** 53:14
91:20 92:4,11
94:14 111:8
**utilized** 56:23

**v**

**v** 6:19 126:6
127:3 128:3
**vague** 12:16
14:15 16:8
19:15 21:13
23:8 24:10
27:10,22 28:8
29:7 30:22
31:15 32:4
35:5,7,14 37:1

39:10 40:1,13
42:19 43:11
44:13 46:18
47:2 48:7,24
49:12 53:11,13
66:22 67:15
71:13 81:10
82:2 83:7 84:5
85:7 87:21
90:3 93:11
110:12 114:10
116:16,24
118:19
**vaguely** 99:19
**vagueness**
67:11
**value** 15:1
**variances**
120:24 121:10
**variation** 121:3
121:5
**varied** 28:3
47:7 49:7
**various** 9:9
36:11 96:4
**vary** 27:15
**vast** 67:20
**vehicle** 9:12
14:21 69:12
**vendors** 20:13
**verbal** 7:11
**verifying** 48:3
**veritext** 2:19
5:17,18 123:12

126:1,7 129:1
**veritext.com.**
126:17
**vernacular**
94:21
**versus** 5:12
60:12 86:11
90:14 91:13,21
92:3
**vetted** 96:9
**vice** 15:12
17:16 22:18
**video** 5:8,10
**videoconfere...**
2:3,9,17
**videographer**
2:19 5:1,17
33:1,4 54:2,5
62:1,4 98:1,4
119:4,7 122:23
123:2,9
**videotaped**
1:12 3:1
**view** 57:7 108:6
**virtually** 5:4
**voice** 7:15
**voluntary**
100:3
**volunteering**
44:2
**vp** 17:9 18:12
77:18 78:3
79:17

| | | | |
|---|---|---|---|
| **vs**  1:7 | 84:21 87:2 | 21:18 22:10 | 97:24 100:12 |
| **w** | 88:11 101:10 | 23:10 24:2,12 | 102:8,11 104:5 |
| **wage**  3:17 31:7 | 114:19 | 24:19 25:15,20 | 104:24 105:5 |
| 70:23 71:4 | **we've**  80:1 | 26:18 27:2,8 | 105:10 108:2 |
| 73:15 74:9,21 | 112:16 | 27:12,24 28:10 | 110:8,13 113:5 |
| 78:12,21 80:10 | **weather**  43:4 | 28:18 29:8,11 | 113:21 114:9 |
| 80:17 101:5,8 | **website**  67:22 | 29:18 30:8,24 | 114:12 116:7 |
| 101:9 | 67:24 | 31:24 32:5 | 116:18 118:18 |
| **wages**  77:13 | **websites**  67:21 | 34:4,16 35:21 | 119:16 120:7 |
| 80:24 82:24 | **week**  44:9 | 36:8,18 37:3 | 120:15 121:15 |
| **wait**  79:15 | 89:13 100:2 | 37:15 38:13 | 122:16 123:6 |
| **waived**  124:17 | **weekly**  42:1 | 39:11,15 40:2 | 124:4,9,15,17 |
| 126:19 | 113:6 | 40:15 41:11 | 125:1 126:8,11 |
| **want**  23:17 | **welcome**  69:3 | 42:6,10,20 | 127:1,4,11 |
| 31:3 32:21 | **wellness**  16:1 | 43:14,23 44:16 | 128:1,4,15 |
| 42:5 49:17 | **went**  8:18,20 | 44:21 45:11 | **witness'**  126:14 |
| 52:10 53:22 | 9:5,17 54:21 | 46:10,18 47:5 | **wondering** |
| 57:8 61:13,20 | 78:22 | 48:9,19 49:14 | 61:2 66:14 |
| 64:16 92:3 | **west**  6:22 | 50:14,17 51:8 | 85:2 |
| 94:20,20 98:21 | **whichever** | 52:1,17 53:12 | **wonky**  114:20 |
| 105:3 106:6 | 104:14 | 55:22 56:21 | **word**  32:6 |
| 113:23 118:1 | **wholly**  9:18 | 58:10,24 60:1 | **wording**  82:21 |
| 123:8 | **widely**  42:12 | 60:11 63:11 | **words**  65:24 |
| **wanted**  57:18 | **window**  62:12 | 66:8,18,24 | 113:1 |
| 67:14 | 69:24 | 71:3,14 73:23 | **work**  3:22 9:5 |
| **watch**  113:23 | **wisconsin**  6:22 | 74:17 75:23 | 22:8 24:8 |
| **watts**  1:13 5:18 | **wise**  25:20,21 | 77:4,24 78:15 | 27:15 28:24 |
| 124:4 125:5 | **witness**  5:6 6:7 | 79:7 81:13 | 44:1 48:13 |
| **way**  13:21 20:3 | 10:2,10,20 | 82:4,18 83:10 | 49:8 52:18,24 |
| 25:22 29:20 | 11:8 12:8,18 | 85:8,16 86:17 | 53:6 54:16 |
| 30:14 32:8 | 14:17 15:10 | 87:1,8,24 | 58:2,12,13 |
| 40:18 47:16 | 16:10,22 17:15 | 88:11 90:4,6 | 59:1,1,9 66:1,5 |
| 49:3 53:21 | 18:6,8 19:1,17 | 90:22 91:10 | 87:19 108:23 |
| | 20:2,11 21:2 | 93:12,17 96:16 | 109:13,15 |

**[work - zooming]**                                    Page 42

| | | |
|---|---|---|
| 110:10,19 | **written** 59:10 | 100:1,4,7,17 |
| 113:9 117:10 | 78:24 | 101:4 |
| 117:11,14 | **wrong** 122:5 | **z** |
| **workday** 113:2 | **y** | **zero** 60:1,4 |
| **worked** 8:14 | **yeah** 25:3 | **zoom** 32:18 |
| 15:2 20:18 | 28:18 34:1,4,8 | 34:18 38:16 |
| 22:11 28:12 | 37:24 46:13 | 69:22,23 88:23 |
| 43:16 44:2,7 | 52:8 53:24 | 108:8 |
| 46:19 48:3 | 54:14 55:22 | **zooming** 33:23 |
| 49:18 52:13 | 56:4 57:20 | |
| 53:12 82:20 | 61:4 65:6 | |
| 86:3,6,8,10 | 70:10 71:3,9 | |
| 88:13,16 100:2 | 71:22 75:5 | |
| 100:15 112:23 | 76:19 77:24 | |
| 114:6 121:21 | 78:5,15 79:7 | |
| **workforce** | 82:4 87:24 | |
| 55:17 108:17 | 88:11 91:17 | |
| **working** 14:6 | 94:3,7,9 97:6 | |
| 17:22 19:10 | 101:2 105:8,15 | |
| 34:12 40:7 | 105:20 115:10 | |
| 41:16 43:19 | 117:3 120:2 | |
| 55:14,14 58:16 | **year** 63:14,15 | |
| 59:11 60:1,2,4 | **years** 9:7 13:10 | |
| 60:7 112:23 | 22:11 25:23 | |
| 113:5,8 | 26:5,6 28:24 | |
| **works** 59:4 | 46:19 53:12 | |
| 97:22 | 88:5 121:21 | |
| **world** 17:23 | **yep** 62:17 63:3 | |
| 18:18 | 93:13 112:1 | |
| **wrap** 100:24 | **york** 76:16 | |
| **wrapping** | 79:21,21 80:16 | |
| 122:20 | 82:12 83:4 | |
| **writes** 104:11 | 99:1,12,18 | |

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.