# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

LUKAS GOODYEAR, individually and on behalf of all others similarly situated,

        Plaintiff,

    v.

DELTA AIR LINES, INC.

        Defendant.

Case No. 1:23-cv-05712-TWT

**MEMORANDUM OF UNDISPUTED FACTS AND LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Page

INTRODUCTION .............................................................................................. 1

FACTUAL BACKGROUND .............................................................................. 3

ARGUMENT ...................................................................................................... 8

I.     PLAINTIFF'S ALLEGED HARMS RESULT FROM A CHANGE IN
       THE TERMS OF AT-WILL EMPLOYMENT, NOT BREACH OF
       CONTRACT. ........................................................................................... 9

       A.     Delta Had Discretion to Change the Terms of At-Will
              Employment ................................................................................... 9

       B.     Goodyear Received Advance Notice of the Change. .......................... 10

       C.     Goodyear Accepted Delta's Change By Continuing His
              Employment With Delta .................................................................. 11

II.    "HOURS OF WORK" IS NOT A CONTRACT ...................................... 12

III.   PLAINTIFF'S INTERPRETATION OF THE CONTRACT FINDS NO
       SUPPORT IN THE TEXT OR THE RECORD. ...................................... 15

       A.     "Count Towards" Must Be Given Its Ordinary Meaning: To
              Assist in Satisfying a Threshold Amount ........................................ 15

              1.     "Count Towards" Means "Enable to Fulfill" ........................... 16

              2.     The "Thresholds" Are Defined Amounts, Not Variable ......... 17

              3.     Yearly Hours Are a Red Herring .............................................. 18

       B.     To Count, Shifts Must "Have Been Worked" by the Employee. ........ 20

              1.     Text of the Provision References the Employee Seeking
                     Overtime. ............................................................................... 20

              2.     Plaintiff's Reading Is Unreasonable and Leads to
                     Absurdity ............................................................................... 21

3.    Hours of Work Defines "Scheduled Time Not Worked"
That Counts Toward Overtime—Swaps Are Not on the
List. ............................................................................................. 22

4.    "By the Employee" Must Be Read Into the Document as
a Usage, Custom, or Obvious Implied Term. ........................... 23

5.    Parol Evidence Confirms Delta's View, Not Plaintiff's. .......... 24

IV.    GOODYEAR'S UNJUST ENRICHMENT CLAIM FAILS. ........................... 24

CONCLUSION ............................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Brown v. Blackmon*,
  272 Ga. 435 (2000) .................................................................................... 24

*Cajun Contractors, Inc. v. Peachtree Prop. Sub, LLC*,
  360 Ga. App. 390 (2021) ............................................................................ 22

*Caley v. Gulfstream Aerospace Corp.*,
  428 F.3d 1359 (11th Cir. 2005) .................................................................. 12

*Campbell v. Ailion*,
  338 Ga. App. 382 (2016) ............................................................................ 25

*Chastain v. Physicians Hair Transplant Ctr., Inc.*,
  2022 WL 19388 (N.D. Ga. Jan. 3, 2022) .................................................... 9

*Chavez v. City of Albuquerque*,
  630 F.3d 1300 (10th Cir. 2011) .................................................................. 16

*Cox v. Erwin*,
  246 Ga. App. 439 (2000) ............................................................................ 10

*Matter of Crowther*,
  318 Ga. 277 (2024) ..................................................................................... 23

*Cunningham v. Fulton Co., Georgia*,
  2019 Wl 1428346 (N.D.Ga. Mar. 29, 2019) ............................................. 15

*Ellison v. DeKalb Cnty.*,
  236 Ga. App. 185 (1999) ............................................................................ 13

*Fulton v. Keith Lawson Co., Inc.*,
  2021 WL 12300084 (N.D. Ga. July 26, 2021) ........................................... 24

*Harvey v. Walmart, Inc.*,
  2024 WL 1460314 (11th Cir. Apr. 4, 2024) ......................................... 12, 13

*Hutto v. Snap-On Tools Corp.*,
  71 Ga. App. 245 (1944) .............................................................................. 21

*IHI E&C Int'l Corp. v. Robinson Mech. Contractors, Inc.*,
  2022 WL 4773388 (N.D. Ga. Sept. 30, 2022) ........................................................... 23

*Johnson v. Metro. Atlanta Rapid Transit Auth.*,
  429 S.E.2d 285 (Ga. App. 1993) ................................................................................... 9

*Labas Ventures, LLC v. Butterfly Agency, LLC*,
  2020 WL 8182216 (N.D. Ga. Nov. 30, 2020) ................................................... 17, 21

*McBride v. Gamestop, Inc.*,
  2011 WL 578821 (N.D. Ga. Feb. 8, 2011) ................................................................. 12

*McKissick v. Roth Commc'ns of Savannah, Inc.*,
  203 Ga. App. 747, 417 S.E.2d 696 (1992) ................................................................. 14

*Moffie v. Oglethorpe Univ., Inc.*,
  186 Ga. App. 328 (1988) .............................................................................................. 14

*Moore v. Sears Roebuck & Co.*,
  2007 WL 1950405 (N.D. Fla. July 2, 2007) ............................................................. 16

*Norton v. Budget Rent A Car Sys., Inc.*,
  307 Ga. App. 501 (2010) .............................................................................................. 24

*Obester v. Lucas Assocs., Inc.*,
  2010 WL 8292401 (N.D. Ga. Aug. 2, 2010) ............................................................. 13

*RLI Ins. Co. v. Banks*,
  2015 WL 400540 (N.D. Ga. Jan. 28, 2015) ............................................................. 13

*Schulman v. MIS Res. Int'l*,
  212 Ga. App. 588, 443 S.E.2d 2 (1994) ..................................................................... 14

*Shannon v. Huntley's Jiffy Stores, Inc.*,
  174 Ga. App. 125 (1985) ....................................................................................... 13, 14

*Shroff v. Kendall*,
  2021 WL 3476121 (M.D. Ga. Aug. 6, 2021) ............................................................. 16

*Simpson v. Infinity Select Ins. Co.*,
  269 Ga. App. 679 (2004) .............................................................................................. 20

*Stover v. Candle Corp. of Am.*,
520 S.E.2d 7 (Ga. App. 1999) ........................................................................ 9, 10, 11

*Talley v. U.S. Dep't of Agric.*,
595 F.3d 754 (7th Cir. 2010), *opinion vacated, but not overruled*, 2010
WL 5887796 (Oct. 1, 2010) ...................................................................... 16

*Taylor v. AMISUB, Inc.*,
186 Ga. App. 834 (1988) ...................................................................... 9

*U.S. Lawns, Inc. v. Cutting Edge Landscaping*,
LLC, 311 Ga. App. 674 (2011) ............................................................ 23

*Williams v. Powell*,
2023 WL 11971249 (N.D. Ga. Sept. 26, 2023) .................................. 20

*Yochum v. Barnett Banks, Inc. Severance Pay Plan*,
234 F.3d 541 (11th Cir. 2000) ............................................................ 17

**Statutes**

Fair Labor Standards Act ("FLSA") ........................................................... 5, 16

O.C.G.A. § 13-2-2 ...................................................................................... 23, 24

**Other Authorities**

OVERTIME, Black's Law Dictionary (12th ed. 2024) .................................. 23

## INTRODUCTION

Plaintiff's breach of contract claim cannot survive summary judgment. Plaintiff worked in a small department within Delta—Crew Tracking—and, prior to 2022, took advantage of the idiosyncratic way that department's supervisors calculated overtime. In short, the department paid employees overtime even when they did not work all their scheduled hours due to having "swapped off" a shift to another employee. By way of illustration, suppose an employee scheduled for 36 hours swapped off a 12-hour shift and worked only 24 of his scheduled hours, and then worked 12 hours on his day off. Prior to 2022, the department recorded the 12 hours worked on the day off (hours 25-36) as *overtime*, even though the employee had not yet worked 36 hours. This practice was inconsistent with Delta's written policy, incongruent with the practice in other departments at Delta, and led to windfall payments of overtime premiums that Plaintiff should not have received.

In 2022, Delta modified the exceptional way that Plaintiff's department recorded overtime, aligning it with policy. That alignment, however, came only after months of advance notice and explanation. And Delta never tried to recoup the overpayments it made because of the department's errors.

Plaintiff admits all of this. He also does not dispute that he was an at-will employee and that Delta could prospectively change the terms of his employment, including the terms of compensation. So while, for reasons discussed below,

1

Plaintiff will be unable to show that he had an employment contract with the terms he asserts, *at worst* Delta acted strictly within the bounds of Georgia law by exercising its discretion to change the terms of employment, with advance notice and without retroactive effect. Viewed through that lens, this change in terms created a new employment agreement that superseded both any prior practices in Crew Tracking and any prior understandings of the meaning of the "Hours of Work" policy document ("HOW").

To be clear, however, despite Plaintiff's contentions in this lawsuit, HOW is not and never was a contract between him and Delta. There are no hallmarks that it was intended to be contractual, and it does not represent a clear offer to be bound. Nor does it fall within the narrow exception for handbooks or manuals setting out an additional compensation plan.

Even if it were contractual, HOW's plain text, supported by canons of construction and record evidence, confirms that Plaintiff was not entitled to overtime after swapping off. The phrase "[s]waps do not count towards" the overtime threshold means, in plain English, that Plaintiff could not meet the threshold using hours he swapped off and let someone else work. And the definition of overtime requiring that an employee's scheduled hours must "have been worked" for him to be over-time eligible, clearly contemplates that the *employee* works his hours. Thus, HOW requires that an employee make up any

hours he swaps away before becoming overtime-eligible—*e.g.*, if the employee was scheduled to work 36 hours in a week, her weekly threshold was 36. If she "swapped off" a 12-hour shift that week, she would not be eligible for overtime pay until *after* she worked another 12 hours to bring up her weekly hours to the 36-hour threshold. To read the document otherwise (as Plaintiff does) is to create absurdities, to deny the ordinary meaning of "overtime," and to allow employees to game the system by receiving overtime without working excess hours.

Finally, Plaintiff's unjust enrichment claim fails, too: among other things, he cannot show that he had a reasonable expectation of receiving overtime pay that he was expressly told, and understood, he would not receive.

This Court should grant summary judgment on both claims.

## FACTUAL BACKGROUND

Plaintiff worked for Defendant Delta Air Lines, Inc. from 1999 to 2023. Defendant's Separate Statement of Undisputed Material Facts In Support of Motion for Summary Judgment ("SUMF") ¶¶ 55, 98. From 2009 to 2023, he worked in Crew Tracking, which manages the routing and assignment of flight crews to meet operational needs. SUMF ¶¶ 56, 58, 98. During the relevant time period, Plaintiff was an "irregularly-scheduled" employee, meaning that his scheduled shifts rotated over time and in general did not add up to 40 hours per week. SUMF ¶¶ 18, 59. (A "regularly-scheduled" employee works a fixed 40 hours. SUMF ¶ 16.)

HOW summarizes various aspects of Delta policy, including hours classifications, definitions of overtime, the use of compensatory time, the effect of different types of time off on overtime eligibility, and other similar policies. SUMF ¶ 14. It states that its purpose is "to ensure uniform administration of the Company's policies." SUMF ¶ 14. HOW does not state that it is a "contract," "agreement," or similar document, does not ask employees to accept it, and contains no space for a signature or other agreement. SUMF ¶¶ 38–39. No witness testified that HOW was presented to new employees or that they were ever made aware of it, except in the general sense that employees were told they could find Delta's policies on the intranet. SUMF ¶¶ 6–7, 13.

Delta makes its policies accessible to employees on an internal intranet so they may be reviewed when needed. SUMF ¶¶ 6–7. Delta intends the policies to be read in conjunction with each other and not in isolation. SUMF ¶ 14. The HR policies available on that intranet, in addition to HOW, include *The Way We Fly* and *Rules of the Road*, both of which make clear that the employment relationship is always at-will and that Delta has the discretion to change its practices and policies at any time. SUMF ¶¶ 8–10. Plaintiff admitted that he understood what those provisions meant, that he was an at-will employee, and that Delta could change its policies and practices. SUMF ¶¶ 11–12, 89.

Delta is an air carrier, and therefore is not subject to the federal Fair Labor Standards Act ("FLSA"), which mandates overtime pay for many employees in the U.S. SUMF ¶ 1. Delta nevertheless chooses, for commercial reasons, to pay some employees overtime even when the law does not require it to do so. SUMF ¶ 1. HOW makes clear that eligibility to be paid overtime is conditioned on numerous factors, such as an employee's location, applicable state law, when they work, whether the employee is regularly- or irregularly-scheduled, divisional or departmental policies, and manager approval. SUMF ¶ 25.

Under certain circumstances Delta allows employees to voluntarily "swap" shifts with one another. SUMF ¶ 19. In other words, an employee may ask another employee to work his or her scheduled shift. SUMF ¶ 28. If the other employee agrees, the employee taking the day off "swaps off," while the employee doing the work "swaps on" or "swaps to work." SUMF ¶ 28. Delta also allows employees to "pick up" additional shifts on their days off to meet operational needs not covered by scheduled shifts. SUMF ¶ 33. Thus, HOW anticipates that employees will sometimes work on their days off, whether to earn extra overtime pay—when eligible—or to make up hours they've swapped off.  SUMF ¶¶ 34–35.

HOW therefore defines weekly overtime for both regularly-scheduled employees (time worked in excess of 40 hours per week, excluding daily overtime) and irregularly-scheduled employees like Plaintiff for whom "weekly overtime is

the time required to be worked on scheduled days off, provided the scheduled days have been worked during the preceding work period (exclusive of daily overtime)." SUMF ¶ 21. These provisions, collectively, outline Delta's policy for paying overtime when an employee swaps off a scheduled shift and then picks up additional shifts later in the week. SUMF ¶ 27. Because the employee must meet the threshold of hours worked (for an irregularly-scheduled employee, their "scheduled days" for the week), and because "[s]waps do not count toward" the employee's "OT threshold," an employee who swaps off a shift must make up the lost hours to reach overtime eligibility. SUMF ¶ 35.

For almost all employees, Delta uses automated systems in calculating payroll – various "timekeeping" systems track the hours worked, and that time information is then funneled into "SAP," a separate system that pays out overtime according to rules set by Delta. SUMF ¶¶ 42–45. In essence, these two systems implement Delta's overtime policy through code. SUMF ¶¶ 46, 49.

While the vast majority of Delta's employees have utilized automated timekeeping system for years, prior to 2022, Crew Tracking still had not. SUMF ¶¶ 40–41, 60–61. Instead, that department manually tracked employee hours and overtime on internal spreadsheets. SUMF ¶ 62. Because the spreadsheets bypassed the automated timekeeping system and simply presented a number of "overtime" hours for each employee, without explanation as to how the number was reached,

SUMF ¶¶ 63–64, Delta HR and Payroll had no visibility into whether Crew Tracking was correctly applying HOW. SUMF ¶¶ 64–65.

In the fall of 2021, Delta's Time and Attendance team conducted an audit of the timekeeping and pay records in Crew Tracking. SUMF ¶¶ 66–68. Among other things, the audit revealed that supervisors in Crew Tracking were not applying HOW as Delta intended. SUMF ¶ 69. They had been counting shifts that an employee had swapped off—and thus had not personally worked—toward meeting the employee's overtime threshold for the week, in contradiction of HOW. SUMF ¶ 70. This was a windfall that Goodyear should not and *would not* have been paid but for the supervisor's misapplication of HOW.  SUMF ¶¶ 70–72.

Accordingly, Delta decided to fast-track Crew Tracking's migration to an automated timekeeping system called MyTime. SUMF ¶ 74. Delta did not simply drop this change on Crew Tracking one day. SUMF ¶ 88. On the contrary, Delta's HR team and Crew Tracking leaders repeatedly provided training, shared written guidance, and answered questions over a period of months beginning in the fall of 2021. SUMF ¶¶ 79–80, 83–84, 88. Thus, by the transition to MyTime in March 2022, Plaintiff was well aware that, going forward, he would not be paid overtime for shifts worked on days off if he swapped off a shift that week, unless he made up the hours. SUMF ¶¶ 82, 85–87.

Plaintiff alleges that in fall 2022, he "swapped" shifts with a colleague, Patrick Slaughter: Mr. Slaughter worked Plaintiff's shift on October 18, 2022—or, to put it another way, Plaintiff "swapped off" his twelve-hour shift. Dkt. 1 at ¶¶ 42, 47; SUMF ¶ 95. Plaintiff also alleges that he picked up a 12-hour shift on one of his scheduled days off, October 21, 2022. Dkt. 1 at ¶ 48; SUMF ¶ 97. Because his additional shift merely equaled the hours he swapped off, Plaintiff did not work more than the total number of hours for which he was scheduled in this work period. SUMF ¶¶ 95, 97.

The gravamen of Plaintiff's complaint is that because Mr. Slaughter worked one of his shifts, "all of his scheduled shifts and scheduled days had been worked" in the relevant period, and therefore he should have been paid overtime for the shift he worked outside his regular schedule. Dkt. 1 at ¶¶ 38-39, 49-50. Put another way, Goodyear believes that Delta should pay him overtime based on scheduled hours that Delta paid someone else to work for him.

## ARGUMENT

Plaintiff's breach of contract claim fails because, first, an at-will employer is entitled to offer new terms at any time, and employees accept such terms by continued employment; second, Plaintiff cannot prove that the HOW is a contract; and third, Plaintiff's interpretation of the alleged contract is erroneous, and under a correct reading Delta never breached. As to unjust enrichment, Plaintiff

conferred no benefit on Delta justifying an expectation of overtime, and any such expectation was unreasonable given Delta's clear warning that he would not be paid overtime in such circumstances going forward.

Delta's motion for summary judgment should be granted.

## I.    PLAINTIFF'S ALLEGED HARMS RESULT FROM A CHANGE IN THE TERMS OF AT-WILL EMPLOYMENT, NOT BREACH OF CONTRACT.

As discussed further below, Plaintiff's breach of contract claim fails on the fundamentals (existence of a contract and actual breach of its terms). But the Court need not even reach those issues. Assuming, *arguendo*, all of Plaintiff's premises, his claim still fails because Georgia law indisputably allows an employer to prospectively change the terms of at-will employment, if done with advance and without retroactive effect—exactly what happened here.

### A.    <u>Delta Had Discretion to Change the Terms of At-Will Employment</u>

In an at-will employment relationship, an employer may unilaterally change the terms of employment without the employee's consent. *See Stover v. Candle Corp. of Am.*, 520 S.E.2d 7, 9 (Ga. App. 1999); *Johnson v. Metro. Atlanta Rapid Transit Auth.*, 429 S.E.2d 285, 287 (Ga. App. 1993); *Taylor v. AMISUB, Inc.*, 186 Ga. App. 834 (1988). Indeed, this Court has examined the issue and noted that, under an at-will employment contract, employers are "within their right to amend" the employee's compensation structure, as long as the "amendment [does] not apply retroactively." *Chastain v. Physicians Hair Transplant Ctr., Inc.*, 2022 WL 19388, at *4

(N.D. Ga. Jan. 3, 2022). This is consistent with an employer's right to terminate an at-will employee at any time and rehire him under different conditions—including different compensation. That is what "at-will" means. It follows that the same employer is likewise entitled to change the terms of employment on a going-forward basis *without* firing the employee, as long as the employer provides notice of the change—essentially offering a new contract.

Goodyear admits that he was an at-will employee. SUMF ¶ 12. Delta thus had the power to change the terms of his employment—including as to overtime compensation—at any time, and for any reason—a point Plaintiff conceded twice in deposition. SUMF ¶ 89.

Delta went on to do just that in March 2022: Delta exercised its power as an at-will employer to make a change in the terms of employment for Crew Tracking personnel by bringing their local practice into line with how overtime hours were calculated in the rest of the company: going forward one of Delta's automated timekeeping systems, MyTime, would record worked hours as overtime *only* once the employee had met their weekly hours threshold. SUMF ¶¶ 75–76, 78.

### B.    Goodyear Received Advance Notice of the Change.

Delta took numerous steps to provide Goodyear clear prospective notice of the change. *Stover*, 520 S.E.2d at 9 (employer could change employee's commission rate without consent because it was not retroactive and employee had notice); *Cox*

*v. Erwin*, 246 Ga. App. 439, 440 (2000) (confirming *Stover* allows for "prospective

changes" in compensation "of which the employee was given notice").

Goodyear admits that Delta notified him of the upcoming MyTime

transition as early as October 2021—five months before the new system went into

effect. SUMF ¶ 88. He also admits he received various resources that explained the

effect of the change, including PowerPoint presentations, FAQ documents, and

invitations to in-person trainings. SUMF ¶¶ 82, 85–87. These materials were very

clear about the overtime policy as to swaps going forward:

> When you swap off a shift and pick up a shift (from the weekly or
> operational extra time) during the same scheduled work week (first
> scheduled day of work until last scheduled off day), **you will not be
> paid OT/DT unless you exceed your original hours as scheduled**
> prior to the swap off.

SUMF ¶ 80 (emphasis added). Were that not enough, Goodyear also attended one

or more informational meetings about the MyTime transition. SUMF ¶ 86. And he

understood that these documents and meetings reflected a change in his

department's pay practices. SUMF ¶¶ 82, 87. Goodyear indisputably had advance

notice of the change to how overtime would be recorded in Crew Tracking in

instances of swapping.

### C. <u>Goodyear Accepted Delta's Change By Continuing His Employment With Delta.</u>

Fatally for his breach claim, Goodyear's decision to continue his

employment with Delta—after receiving multiple forms of advance notice of the

change—constitutes acceptance of the changed overtime pay practice. *See Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1374 (11th Cir. 2005) ("Georgia courts have held that an employee can accept new terms of employment of which the employee is aware by remaining in employment."); *McBride v. Gamestop, Inc.*, 2011 WL 578821, at *3 (N.D. Ga. Feb. 8, 2011) (employer's "numerous actions of distributing and displaying information" about a new policy "would have put a reasonably prudent employee on notice" such that continued employment constituted acceptance). Indeed, Goodyear admits as much. SUMF ¶¶ 93–94 .

Summary judgment is proper on this undisputed ground alone: Delta was entitled to change the terms of Plaintiff's employment prospectively; Delta gave Goodyear abundant notice of the change in practice; he understood the change; and he understood he would accept the change by continuing to work for Delta. That is no breach. It is merely the formation of a new at-will agreement.

## II.    "HOURS OF WORK" IS NOT A CONTRACT

Back to the fundamentals: Plaintiff attempts to ground his claim in HOW, arguing that it amounts to a contract. "The party asserting a breach of contract has the burden of proving the existence of a valid contract." *Harvey v. Walmart, Inc.*, 2024 WL 1460314, at *4 (11th Cir. Apr. 4, 2024). The record is devoid of, and Plaintiff cannot present, any evidence showing that Delta intended to form a contract with him.

First, as a general rule, Georgia courts have held that "the policies and information in personnel or employee manuals neither create a contract" nor "support a claim for breach of contract." *Id.* Plaintiff must therefore prove that HOW is an exception to that general rule. While in limited circumstances, "an employee manual relating to additional compensation plans, of which an employee is aware, may amount to a binding contract," *Ellison v. DeKalb Cnty.*, 236 Ga. App. 185, 186 (1999), that narrow exception cannot include Delta's swap policy. HOW—and deposition testimony—are clear that swaps are permitted solely to allow employees flexibility in scheduling, not to increase an employee's compensation. SUMF ¶¶ 19, 31–32. Rather, the "Swaps" section twice emphasizes that it should *not* result in additional compensation, Dkt. 1-1 at 4 (swapping cannot "put an employee into an overtime eligible situation" and may not be done for "monetary payment"), and it never says that it *should*. There is no "additional compensation plan" here.

Second, while "an additional compensation plan **offered by an employer** and **impliedly accepted by an employee**" can constitute a contract, *Shannon v. Huntley's Jiffy Stores, Inc.*, 174 Ga. App. 125, 126 (1985) (emphases added), basic principles of contract formation still apply. *RLI Ins. Co. v. Banks*, 2015 WL 400540, at *2 (N.D. Ga. Jan. 28, 2015) (without "language clearly creating a contract, there can be no action for breach of contract"); *Obester v. Lucas Assocs., Inc.*, 2010 WL

8292401, at *11 (N.D. Ga. Aug. 2, 2010) (applying manual or handbook, court must look to formation). Thus, the document must constitute an offer to employees. Cases in this space therefore typically refer to documents that are expressly intended to *inform employees* of an additional compensation plan—employee manuals, handbooks, and the like. *E.g.*, *Moffie v. Oglethorpe Univ., Inc.*, 186 Ga. App. 328, 329 (1988) (relying on "Faculty Handbook" setting out tenure rules); *Shannon*, 174 Ga. App. at 126 (relying on "employees' handbook" setting out vacation pay policy); *see also Schulman v. MIS Res. Int'l*, 212 Ga. App. 588, 589, 443 S.E.2d 2, 2 (1994) ("bonus program outlined in the personnel manual"); *McKissick v. Roth Commc'ns of Savannah, Inc.*, 203 Ga. App. 747, 748, 417 S.E.2d 696, 697 (1992) ("commission" program described in "employee manual")

By contrast, HOW does not evidence an intent to inform employees about a bonus program or commission plan; rather it describes how Delta administers its policies under varying circumstances and given a multitude of conditions. This is no offer to be accepted or promise to be fulfilled.  Indeed, the first page of HOW expressly describes its purpose, which is "to ensure uniform administration of the Company's policies"—not to offer a particular compensation plan. Dkt 1-1 at 1. Nor does the evidence show that Delta ever presented Plaintiff with a copy of HOW in circumstances that would suggest an offer. The document is simply posted on an internal website (along with many other policies). SUMF ¶¶ 6–8, 13.

Contract formation requires more, lest the general rule that HR policies *do not* constitute contracts be overwhelmed by the exception. Because no evidence of more exists here, the HOW document cannot be contractually binding.

## III.    PLAINTIFF'S INTERPRETATION OF THE CONTRACT FINDS NO SUPPORT IN THE TEXT OR THE RECORD.

Even assuming, *arguendo*, that HOW is a contract, Goodyear's breach claim fails: on its face and under the rules of contract construction, the HOW establishes that 1) employees who swap shifts must work their scheduled hours (their "threshold") before being eligible for overtime, and 2) "swaps do not count towards [the] OT threshold." Dkt. 1-1 at 4, 12. Goodyear attempts to twist this to mean that when a shift is swapped it is *removed* from the employee's overtime threshold, but that is not what HOW says, nor can it reasonably be interpreted to say so. Where, as here, "the language of a contract is plain and unambiguous, no construction is required and courts must give the terms of the contract an interpretation of ordinary significance." *Cunningham v. Fulton Co., Georgia*, 2019 Wl 1428346 at *4 (N.D.Ga. Mar. 29, 2019). Plaintiff's breach claim fails.

### A.    <u>"Count Towards" Must Be Given Its Ordinary Meaning: To Assist in Satisfying a Threshold Amount</u>

The HOW provision governing shift swaps states: "**<u>[s]waps do not count towards OT threshold</u>** so swapping should never put an employee into an overtime eligible situation. " Dkt. 1-1 at 4 (emphasis added). The key point here is that, to be eligible for overtime, an employee must meet an overtime "threshold" —

a minimum number of hours they must work in a given week. SUMF ¶¶ 20–21. However, "[s]waps do not count towards" meeting that threshold.

### 1.    *"Count Towards" Means "Enable to Fulfill"*

The straightforward meaning of that provision is that an employee cannot count a swapped-off shift toward fulfilling their threshold. This is the way "count toward . . . [a] threshold" is consistently used in both everyday language and legal writing. *See, e.g., Talley v. U.S. Dep't of Agric.*, 595 F.3d 754, 762 (7th Cir. 2010) (examining which attorneys' fees "count toward [amount-in-controversy] thresholds"), *opinion vacated, but not overruled*, 2010 WL 5887796 (Oct. 1, 2010); *Chavez v. City of Albuquerque*, 630 F.3d 1300, 1306 (10th Cir. 2011) (hours not worked "did not count towards the FLSA overtime threshold"); *Shroff v. Kendall*, 2021 WL 3476121, at *3 (M.D. Ga. Aug. 6, 2021) (alien argued certain purchases should "count towards the . . . threshold" for obtaining a visa); *Moore v. Sears Roebuck & Co.*, 2007 WL 1950405, at *4 (N.D. Fla. July 2, 2007) (hours not actually worked "do not count towards" threshold for FMLA leave).

In all these cases, to "count toward" a "threshold" meant that a particular thing counts toward *satisfying* the threshold. So too here: "[s]waps do not count towards OT threshold" means that a swapped-off shift does not assist an employee in *satisfying* the overtime threshold—not that the swapped-off shift is somehow subtracted from the calculation of what the threshold *is*.

16

## 2.    The "Thresholds" Are Defined Amounts, Not Variable

HOW specifically defines overtime thresholds—40 hours per week for regularly-scheduled employees, Dkt. 1-1 at 7, and the employee's "scheduled days . . . during the preceding work period" for irregularly-scheduled employees.[1] *Id.* at 12. Because these definitions are unambiguous, they must be applied as written. *Yochum v. Barnett Banks, Inc. Severance Pay Plan*, 234 F.3d 541, 546 (11th Cir. 2000). Nor may Plaintiff create an ambiguity by proposing an unreasonable alternative interpretation. *Labas Ventures, LLC v. Butterfly Agency, LLC,* 2020 WL 8182216, at *9  (N.D. Ga. Nov. 30, 2020).

Nothing in HOW's text indicates that the Swaps provision is intended to reduce or vary these plainly-defined thresholds. Where the drafters of HOW intended to exclude certain hours from the overtime thresholds, they noted those hours in the definition itself—e.g., Dkt. 1-1 at 7, 11 (excluding meal periods from daily overtime); *id.* at 7, 12 (excluding daily overtime from weekly overtime). They did not exclude swapped-off hours from these definitions of overtime. The charts of examples included in HOW reinforce this: a regularly-scheduled employee must meet a "**40-hour** weekly threshold"—and if they do not, "[a]ll hours worked until **40 hour** threshold met" are paid at straight time. *Id.* at 8. Again, there is no

---

[1] An employee's weekly "work period" starts on the first scheduled working day and runs to the end of the last scheduled day off. SUMF ¶ 23.

exception for swapped time. The same is true of an irregularly-scheduled employee: they must meet their weekly threshold, as defined by HOW, without reductions or exclusions due to swaps. There is no basis in the text or in any evidence in this case to support varying these clearly defined and established thresholds of overtime eligibility.

### 3.    *Yearly Hours Are a Red Herring*

Part of Plaintiff's misinterpretation appears to stem from his belief that "[a] swapped shift neither adds nor takes away from an employee's total scheduled hours for the year—it just moves them around." Dkt. 1 at ¶ 27. In Plaintiff's view, as long as Delta gets the same total number of "scheduled hours" from an employee in a year (even if swapped around some), what's the harm? Indeed, Plaintiff even asserted in deposition that an irregular employee's overtime threshold must be determined on an annual basis. SUMF ¶ 73. But Plaintiff's view contradicts the express terms of the document he claims is a contract: in HOW, overtime is calculated on the basis of weekly hours worked, not yearly. Dkt. 1-1 at 7, 12. Yearly totals are irrelevant.

And Plaintiff is wrong: there is no reason, as a general matter, that swaps would always be matched by other hours later. HOW clearly anticipates that divisions or departments may authorize "one-way swaps," Dkt. 1-1 at 4, in which an employee can swap off a shift without working a matched shift for the other

employee. SUMF ¶¶ 19, 30. Where an employee leaves the company, for instance, is promoted, or moves to another department, time swapped off would never be made up by that employee. SUMF ¶ 29.

Plaintiff's interpretation would also subject Delta to an abuse of the system, in which personnel simply swap shifts to avoid work on their scheduled days, then pick up additional shifts on their off days. SUMF ¶ 72. Consider an example: Alice is scheduled to work 36 hours a week (M-Tu-W), but she routinely swaps away two of her scheduled shifts to Bob and Carol, then picks up two additional shifts on her off days. Under Plaintiff's interpretation of the swaps provision, Alice can now work no more than her usual 36 hours a week, yet end up being paid far more than her normal salary. This would create a perverse incentive structure where employees would be paid more to work their off days than to actually work their regular scheduled days. That cannot possibly be what Delta intended by the language in HOW.

During the week at issue, Plaintiff swapped off one of his scheduled days. Because the swapped-off time did not count toward meeting his overtime threshold, he was not paid overtime for an extra shift worked later that week. This is consistent with the terms of the HOW; thus, Plaintiff's breach claim fails.

19

**B.**  **To Count, Shifts Must "Have Been Worked"** *by the Employee.*

An irregularly-scheduled employee like Goodyear can only become eligible for weekly overtime under HOW by working on his day off, "provided the scheduled days have been worked during the preceding work period." *See* Dkt. 1-1 at 12. Plaintiff asserts that the phrase "have been worked" shows that "what matters is whether an employee's scheduled hours in a given work period were worked, not whether they were the one working them." Dkt. 1 at ¶ 39. Plaintiff's position is atextual, unreasonable, and creates absurdities.

**1.**    *Text of the Provision References the Employee Seeking Overtime.*

Interpretation of contracts begins with the text of the disputed provision itself. *Simpson v. Infinity Select Ins. Co.*, 269 Ga. App. 679, 681 (2004). Plaintiff ignores that the provision limits its scope to the employee from the outset: "**For full-time employees** working an irregular schedule, weekly overtime is the time required to be worked on scheduled days off, provided the scheduled days have been worked during the preceding work period (exclusive of daily overtime)." Dkt. 1-1 at 12 (emphasis added). The "employees" who wish to receive the overtime pay are the topic of the sentence—thus, the phrases "scheduled days," "scheduled days off," and "time required to be worked" all refer to the specific employee seeking overtime. Likewise, "scheduled days have been worked" refers back to those employees. *See, e.g.*, *Williams v. Powell*, 2023 WL 11971249, at *14 (N.D. Ga.

Sept. 26, 2023) (words "do not stand alone but must be read as a whole in conjunction with the clauses that surround those individual words, especially the immediately preceding phrase").

### 2.    *Plaintiff's Reading Is Unreasonable and Leads to Absurdity.*

Under Georgia law courts must give "[t]he words of a contract . . . a reasonable construction, where that is possible, rather than an unreasonable one . . . . [and] that interpretation which evolves the more reasonable and probable contract should be adopted, and a construction leading to an absurd result should be avoided." *Hutto v. Snap-On Tools Corp.*, 71 Ga. App. 245 (1944). And where one party's interpretation is unreasonable under a contract's plain language, the court may not vary the terms of the contract. *Labas Ventures*, 2020 WL 8182216, at *9.

Plaintiff's position leads to absurd results. Taken literally, it would allow him to collect overtime even if he failed to show up to work one day (necessitating coverage by another employee), then later in the week worked an unscheduled shift. His scheduled hours would "have been worked," just not by him—on Plaintiff's theory, he should be overtime-eligible. But that is absurd; no employer would reward an employee under such circumstances.

Similarly, if "have been worked" allows anyone to have worked the employee's scheduled days then it logically follows that the similarly passive phrase "to be worked" ("weekly overtime is the time required to be worked on

scheduled days off . . . ," Dkt. 1-1 at 12) is likewise not limited to the employee seeking overtime. If that were the case, Plaintiff could claim overtime when he worked his scheduled days but someone else worked on his scheduled days off. Such an absurd premise should be rejected.

### 3. Hours of Work Defines "Scheduled Time Not Worked" That Counts Toward Overtime—Swaps Are Not on the List.

The Court, moreover, must read the document as a whole—and doing so undermines Plaintiff's position. A few pages earlier, HOW actually defines "scheduled time not actually worked within a work week [that] will count as time worked for purposes of calculating overtime." Dkt. 1-1 at 7. Such "[s]cheduled time not actually worked would include **paid time off** such as PPT, vacation and holidays." *Id.* 7-8; SUMF ¶ 24. Under principles of *ejusdem generis* and *noscitur a sociis*, this list should be understood to be limited to, at most, various forms of *paid time off* that are "analogous" to the listed examples. *Cajun Contractors, Inc. v. Peachtree Prop. Sub, LLC*, 360 Ga. App. 390, 415 & n.17 (2021).

A swap is not "paid time off"—there is no dispute that an employee who swaps off is not paid for that shift. SUMF ¶ 50. Nor is it analogous to PPT, vacation, or holidays. Each of those is a type of paid leave benefit—and one that is anticipated by the employer. It is essentially a form of compensation. Shift-swapping, on the other hand, is not intended to be additional compensation: rather, it is tool for employees to create more flexible schedules by taking *unpaid* time off.

SUMF ¶ 32. Notably, other forms of voluntary unpaid time off also do not count toward fulfilling one's overtime threshold. SUMF ¶ 53.

### 4. *"By the Employee" Must Be Read Into the Document as a Usage, Custom, or Obvious Implied Term.*

What's more, Georgia contract law recognizes that there are times when something is so obvious it does not need to be said expressly. "Words generally bear their usual and common signification," "words used in a particular trade or business will be construed" accordingly, and "[t]he custom of any business or trade" can be binding if "it is of such universal practice as to justify the conclusion that it became, by implication, a part of the contract." O.C.G.A. § 13-2-2 (2)-(3); *see also, e.g.*, *Matter of Crowther*, 318 Ga. 277, 287 (2024) (common usages among attorneys); *IHI E&C Int'l Corp. v. Robinson Mech. Contractors, Inc.*, 2022 WL 4773388, at *9 (N.D. Ga. Sept. 30, 2022) (common usages in construction). Here, the usual and common meaning of the word "overtime," as universally used in industry, is "[t]he hours worked **by an employee** in excess of a standard day or week." OVERTIME, Black's Law Dictionary (12th ed. 2024) (emphasis added). HOW must be read in light of this ordinary usage.

Courts may also consider a term implied in the contract where "it is reasonable and necessary to effect the full purpose of the contract and is so clearly within the contemplation of the parties that they deemed it unnecessary to state." *U.S. Lawns, Inc. v. Cutting Edge Landscaping*, LLC, 311 Ga. App. 674, 678 (2011);

*Norton v. Budget Rent A Car Sys., Inc.*, 307 Ga. App. 501, 503 (2010). Here "by the employee" must be read into the provision to effectuate its obvious intent—rewarding employees for working beyond their ordinary schedule—and as a term so obvious in the employment sphere as to be implied.

### 5.    *Parol Evidence Confirms Delta's View, Not Plaintiff's.*

Finally, although the Court can dispose of this issue on the text and the canons of construction alone, to the extent the Court considers parol evidence, *see* O.C.G.A. § 13-2-2(1), there is no genuine dispute of material fact about how the term "have been worked" was understood at Delta. No witness besides Plaintiff agreed with his idiosyncratic interpretation. No documentary evidence supports it, either. Plaintiff's self-serving and uncorroborated statement of his belief about the intended meaning does not defeat summary judgment. *Fulton v. Keith Lawson Co., Inc.*, 2021 WL 12300084, at *16 (N.D. Ga. July 26, 2021); *see also Brown v. Blackmon*, 272 Ga. 435, 436 (2000) (undisclosed private intent of one party does not govern objective interpretation of contract).

For an employee to be eligible for overtime their scheduled hours must "have been worked" by the employee: otherwise, they have not worked *over* their scheduled *time*. Plaintiff did not do so in the week at issue; his claim fails.

## IV.    GOODYEAR'S UNJUST ENRICHMENT CLAIM FAILS.

An unjust enrichment claim exists where "the defendant induced or encouraged the plaintiff to provide something of value," "the plaintiff provided a

benefit to the defendant with the expectation that the defendant would be responsible for the cost," and "the defendant . . . affirmatively chose to accept the benefit or failed to reject it." *Campbell v. Ailion*, 338 Ga. App. 382, 387 (2016).

Goodyear's unjust enrichment claim fails in all respects. First, he admits that in instances in which he swapped off, he did not perform any work for Delta. SUMF ¶ 96. Of course, Delta did receive the benefit of Plaintiff's labor on the days he worked on his scheduled days off after a swap. But there is no dispute that he was paid for those hours. SUMF ¶ 97. Plaintiff, however, wants additional pay for an additional benefit—one that he did not confer: the benefit provided to Delta when an employee works more hours than scheduled.

Finally, Goodyear cannot have reasonably expected Delta to pay him overtime for having worked after swapping off his shift. Delta clearly communicated about the change in pay practices in his department, and Goodyear understood those communications. Part I.C., supra. Where there is no reasonable expectation of the desired payment, there is no unjust enrichment claim. *Campbell*, 338 Ga. App. at 387.

## CONCLUSION

Summary judgment should be granted as to both of Goodyear's claims.

DATED: August 1, 2025        Respectfully submitted,

SEYFARTH SHAW LLP

By: */s/ Brett C. Bartlett*
     Brett C. Bartlett
     Georgia Bar No. 040510
     bbartlett@sayfarth.com
     Lennon B. Haas
     Georgia Bar No. 158533
     lhaas@seyfarth.com
     Seth J. Fortin
     Georgia Bar No. 759830
     sfortin@seyfarth.com
     Danielle Shapiro
     Georgia Bar No. 606345
     dshapiro@seyfarth.com
     SEYFARTH SHAW LLP
     1075 Peachtree Street, N.E.
     Suite 2500
     Atlanta, Georgia 30309-3958
     Telephone: (404) 885-1500
     Facsimile: (404) 892-7056

*Attorneys for Defendant*

**CERTIFICATE OF COMPLIANCE**

Pursuant to LR 7.1(D), ND Ga., defense counsel certifies that this filing has been prepared with one of the font and point selections approved by the Court in LR 5.1B.

**CERTIFICATE OF SERVICE**

I hereby certify that on this day, I caused the foregoing document to be electronically filed with the Clerk of the Court via the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

/s/ Brett C. Bartlett
Brett C. Bartlett
*Attorney for Defendant*