## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

LUKAS GOODYEAR, individually and
on behalf of all others similarly
situated,

Plaintiff,

v.

DELTA AIR LINES, INC.

Defendant.

Case No. 1:23-cv-05712-TWT

**DEFENDANT'S SEPARATE
STATEMENT OF UNDISPUTED
MATERIAL FACTS IN SUPPORT
OF MOTION FOR SUMMARY
JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Civil Local

Rules 7.1 and 56.1, Defendant files this Statement of Undisputed Material Facts in

Support of its Motion for Summary Judgment.

### Delta's Business

1.  Delta Air Lines, Inc. ("Delta") is an air carrier that provides transportation

    for passengers and cargo worldwide. Ex. 1, Declaration of Cheryl Gray ¶ 2.

    Therefore, Delta is governed by the Railway Labor Act, and is not subject to

    the Fair Labor Standards Act. *See Delta Air Lines, Inc. v. Air Line Pilots Ass'n,*

    *Int'l*, 238 F.3d 1300, 1304 (11th Cir. 2001). Delta provides overtime for

    commercial reasons, not because it is required by law to do so. Ex. 2, Early

    Dep. Tr. at 46:11–47:5; Ex. 3, Tahvonen Dep. Tr. at 43:9–43:17.

2.      Delta employs individuals who work on its planes, in the air (*i.e.*, flight attendants, pilots, etc.), as well as other employees who work in its facilities and at various airports on the ground. Ex. 4, Gray Dep. Tr. at 43:21–44:7; Ex. 2, Early Dep. Tr. at 143:18–144:1. The latter set of employees are known as "ground employees." *Id.*

3.      Delta's ground employees work in numerous roles, with a wide variety of responsibilities, different types of work schedules, supervisors, managers, etc. in Atlanta, Boston, Chicago, Dallas/Fort Worth, Houston, Los Angeles, Las Vegas, Miami, New York, Phoenix, Portland, Rochester, San Francisco, Seattle, Tulsa, and dozens more cities across the United States. Ex. 1, Gray Decl. ¶3. And the employees work at an array of locations, departments, assignments, and roles—in airports, offices, call centers, mechanic repair shops, cargo centers, air traffic control towers, etc. *Id.*

4.      Within Delta's corporate HR department, there are groups, *i.e.*, Time & Attendance, Payroll, etc., that are responsible for overseeing time and pay for Delta employees. Ex. 4, Gray Dep. at 21:21–22:17.

5.      Time & Attendance is specifically responsible for assisting with employee concerns related to time and pay, scheduling support, and assisting with liability balances (*i.e.*, vacation, paid personal time, etc.) for Delta employees, other than pilots. Ex. 5, Barnwell Dep. at 14:1–15:17.

**Delta's Corporate Policies**

6.    Delta maintains corporate policies applicable to all of its employees, which

are available online on Delta's internal website, called "DeltaNet." Ex. 5,

Barnwell Dep. Tr. at 79:23–79:24.

7.    At the onset of their employment, employees are informed that they may

visit the policy section of DeltaNet to access the Delta policies that apply to

them at any time during their employment. Ex. 4, Gray Dep. Tr. at 32:4–

32:22; Ex. 3, Tahvonen Dep. Tr. at 68:5–68:16.

8.    Available on DeltaNet are relevant policies, such as *The Way We Fly* and the

*Rules of the Road*, which describe the employee-employer relationship and

Delta's expectations of its employees. Ex. 6, Goodyear Dep. Tr. at 150:10–

150:14 (describing *The Way We Fly* as "a guideline set for employees to

follow").

9.    Specifically, *The Way We Fly* states,

>    "We always hope that the experience that each employee has at Delta
>    will be long and mutually rewarding. But we also recognize that
>    circumstances change and that Delta employment is not always right
>    for everyone. With that in mind, the employment relationship
>    between Delta and each employee is based on mutual consent and can
>    be terminated, either by Delta or an employee, at will at any time
>    consistent with applicable law." Ex. 7, GOODYEAR_000433 at
>    GOODYEAR_000446.

10.    Likewise, the *Rules of the Road* states, "Delta maintains the ability to modify

an employee's duties, title, compensation, or other terms and conditions of

employment consistent with applicable law." Ex. 8, DELTA_LG_00017950 at DELTA_LG_00017957.

11.     Goodyear admitted that he reviewed and understood both of these polices, as well as their provisions about at-will employment. Ex. 6, Goodyear Dep. Tr. at 149:22–154:11.

12.     Goodyear further admitted that, throughout his time at Delta, he understood that he was an at-will employee. Ex. 6, Goodyear Dep. Tr. at 151:17–151:20 ("Q. You were an at-will employee with Delta, right? . . . A. Yes, I worked for Delta voluntarily.").

### Delta's Hours of Work Document

13.     Delta's policies regarding overtime and double time pay for both employees and leaders are available on DeltaNet. Ex. 5, Barnwell Dep. Tr. at 42:7–47:10; 42:11–42:21. One such policy is called the Hours of Work, Overtime and Shift Differential (Ground, Noncontract Employees) ("HOW"). *Id*. at 79:14–79:24.

14.     HOW defines Delta's practices relating to work hours, overtime pay, compensatory time, shift differentials, and other matters in order to "ensure uniform administration of the Company's policies." Dkt. 1-1 at 1 and *generally*; Ex. 1, Gray Decl. ¶ 6.

15.     HOW applies to both regularly and irregularly scheduled ground employees. *See* Dkt. 1-1 at 11.

16.     HOW defines a regularly scheduled employee as working an "8 hour shift/40 hours a week (5 days on and 2 off)" and "10 hour shift/40 hours a week (4 days on and 3 off)." Dkt. 1-1, at 11. Regularly scheduled employees have a consistent (generally 40-hour-per-week) schedule each week, including the same off-days. Ex. 4, Gray Dep. Tr. at 33:17–35:13.

17.     "Any shift outside of [the definition for a regular schedule] will be considered an irregular schedule." Dkt. 1-1 at 11.

18.     Irregularly scheduled employees have an "irregular pattern" of off-days each week, depending on their rotation, and may work differing durations during each of their scheduled shifts. Ex. 4, Gray Dep. Tr. at 33:17–33:22; 37:1–37:12; Ex. 5, Barnwell Dep. Tr. at 21:12–21:15 ("An irregular schedule is a number of different combinations of hours and days off and rotations."); Ex. 9, Dockstader Dep. Tr. at 56:22–57:8.

19.     HOW outlines Delta's shift swapping policy, in which the Company permits employees to voluntarily trade shifts with one another for the purpose of enjoying greater scheduling flexibility. Dkt. 1-1 at 4. This section states:

> Swaps are designed to provide front-line employees with increased flexibility to swap shifts. Divisional and local policies should be followed when determining the number of swaps allows per month, if one way swaps are allowed and if full-time and part-time employees are eligible to swap with each other. Swaps do not count towards OT threshold so swapping should never put an employee into an overtime eligibly situation. Under no circumstances may an

employee work another employee's shift/day for personal monetary payment. *Id.*

20. As indicated in the HOW "Swaps" section, to be eligible for overtime, an employee must meet a weekly threshold of hours to be eligible for weekly overtime. Ex. 2, Early Dep. Tr. at 43:5–43:9; 148:7–148:10; Ex. 4, Gray Dep. Tr. at 83:17–83:23; Ex. 10, Higgins Dep. Tr. at 62:1–62:3.

21. An "OT threshold," for an irregularly-scheduled employee like Plaintiff, refers to the "sum of all regularly scheduled hours" for the work week. Ex. 9, Dockstader Dep. Tr. at 28:10–28:17. Specifically, HOW defines "weekly overtime" as, "[f]or full-time employees working an irregular schedule, weekly overtime is the time required to be worked on scheduled days off, provided the scheduled days have been worked during the preceding work period (exclusive of daily overtime)." Dkt. 1-1 at 11-12; *see also* Ex. 9, Dockstader Dep. Tr. at 57:11–57:23 (overtime threshold is 40 hours for regularly-scheduled employees); Dkt. 1-1 at 7 (same).

22. The phrase "scheduled days have been worked during the preceding work period" refers to whether the single, irregularly scheduled employee seeking overtime worked his or her scheduled hours during that work week. Ex. 11, Miranda Dep. Tr. at 114:20–117:6.

23.　　An employee's weekly "work period" or work week starts on their first

working day and runs to the end of their last scheduled day off. Ex. 9,

Dockstader Dep. Tr. at 44:15–44:23.

24.　　HOW provides that "[e]ffective May 1, 2014 scheduled time not actually

worked within a work week will count as time worked for purposes of

calculating overtime." Dkt. 1-1 at 7. "[S]cheduled time not actually worked"

is defined to include "PPT, vacation and holidays." *Id*.

25.　　HOW makes clear, however, that it is not the sole authority on overtime—

rather, numerous other factors matter, such as the employee's location,

applicable state law, when they work, how they are scheduled, divisional or

departmental policies, and manager approval. *See* Dkt. 1-1 at 5–6.

26.　　HOW contains a section entitled "Authorization." It provides:

> "Approval of overtime should be handled as specified by divisional
> or departmental policy. The appropriate supervisor/manager must
> authorize all overtime worked by employees. Employees may not
> work overtime unless it is authorized. . . . ." Dkt. 1-1 at 5.

27.　　These provisions within HOW, collectively, outline Delta's policy for

paying overtime. Ex. 1, Gray Decl. ¶ 5.

28.　　In practice, a shift swap occurs when one employee asks another employee

to work his or her scheduled shift. Ex. 4, Gray Dep. Tr. at 63:12–63:17; Ex.

11, Miranda Dep. Tr. at 18:4–18:6; Ex. 3, Tahvonen Dep. Tr. at 55:12–55:15.

In this case, the employee taking the day off "swaps off" his or her shift, Ex.

3, Tahvonen Dep. Tr. at 59:21–60:7, while the employee performing the work

"swaps on" or "swaps to work." Ex. 9, Dockstader Dep. Tr. at 53:3–53:6.

29.    Swaps are not required to be bilateral or two-way, meaning that employees

do not have to pay each other back for the shifts they trade. *See* Dkt. 1-1 at

4.

30.    "One way swaps," as referenced above, occur when "one employee swaps

off and one employee swaps to work and no payback is done." Ex. 11,

Miranda Dep. Tr. at 73:6–73:10; Ex. 9, Dockstader Dep. at 35:11–35:15.

31.    Shift swapping is a tool that Delta provides certain employees to create

greater flexibility in their schedules. Ex. 10, Higgins Dep. Tr. at 44:22–45:5

("Swaps are . . . for employee flexibility."); *id*. at 58:17–59:5 (stating that

Crew Tracking does not benefit from swaps); Ex. 12, Long Dep. Tr. at 31:10–

31:12 ("Employee has that flexibility to swap with another employee who

are qualified to do the job. We provide that flexibility to employees."); Ex. 3,

Tahvonen Dep. Tr. at 56:6–56:7 ("My understanding is that it allowed for

additional flexibility and that it was a nice feature.").

32.    Shift-swapping is not intended to be additional compensation: rather, it is a

tool for employees to create more flexible schedules by taking *unpaid* time

off. Ex. 1, Gray Decl. ¶ 8; Ex. 9, Dockstader Dep. Tr. at 35:11–35:20

(explaining that employees are not paid when they swap off).

33.    Separately, Delta also permits employees to voluntarily agree to work on their scheduled days off to meet operational needs not covered by scheduled shifts. Ex. 3, Tahvonen Dep. Tr. at 42:16–44:9.

34.    Irregularly scheduled employees who do so may earn overtime or double-time if they were eligible when they worked such shifts, as governed by HOW. *See* Dkt. 1-1 at 11-12.

35.    The provisions of HOW have long been understood by divisions and departments outside Crew Tracking to mean that when an employee "swaps off" a shift within a given week (i.e., asking another employee to work the shift for them), the originally-scheduled employee must make up the swapped-off hours before he or she can be overtime-eligible for that week. Ex. 13, DELTA_LG_00000093 at DELTA_LG_00000106 (shift swapping presentation stating, "[w]eekly OT is based on working 40 hours a week and then doing OT on your RDOs. If you have swapped off, your weekly threshold will be lowered (even if you pick up another swap). OT will have to be worked as regular pay on your RDO until you hit 40 hours. If you have swapped off on a regular day to work and you do OT, it will pay as regular pay until your shift for the day is 'made up.'"); Ex. 14, DELTA_LG_00000385 at DELTA_LG_00000404 (divisional practices manual for ACS/CGO/Clean stating, "[s]wap time worked does not count

toward daily or weekly overtime thresholds and this time does not count toward insufficient rest since it is voluntary time worked, unless state or local law dictates otherwise."); Ex. 1, Gray Decl. ¶ 7.

36. In addition to HOW and other corporate policies, each Delta department or division may also maintain its own policies, as long as they are not in conflict with Delta's overall corporate policies. Ex. 3, Tahvonen Dep. Tr. at 39:7–40:22; Ex. 6, Goodyear Dep. Tr. at 110: 25–112:11; 121:7–121:15.

37. For example, swapping practices are generally departmentally or divisionally based. Ex. 4, Gray Dep. Tr. at 64:3–64:18 (explaining that "there might be a department or division that doesn't allow swaps or they might have specific types of swaps that they allow that others do not"); 65:1–66:12; 67:14–67:22. *See also* Ex. 15, DELTA_LG_00000087 at DELTA_LG_00000092 (setting out swaps policy for Technical Operations division); Ex. 14, DELTA_LG_00000385 at DELTA_LG_00000404 *et seq.* (swaps policy for Airport Customer Service division); Ex. 13, DELTA_LG_00000093 (presentation on swaps policy for Reservations division).

38. HOW does not state that it is a contract or agreement. Ex. 6, Goodyear Dep. Tr. at 66:13–66:23.

39. HOW, likewise, does not ask for acceptance or contain a space for the employee to sign it. Ex. 6, Goodyear Dep. Tr. at 66:24–67:8.

**Delta's Automated Pay Systems**

40.    In 2016, Delta began a concerted effort to migrate all of its employees to automated systems that record time and calculate pay. Ex. 2, Early Dep. Tr. at 122:22–123:1 ("We've been slowly working on the manual groups and transitioning them over to MyTime with the goal of eventually having no more manual employees."); Ex. 5, Barnwell Dep. Tr. at 47:13–47:23; Ex. 9, Dockstader Dep. Tr. at 7:14–7:16 (stating that SAP has been in place since 2017).

41.    Delta's three largest divisions that employ ground employees, Technical Operations, Airport Customer Service, and Reservations, used an automated system, Manpower Planning System ("MPS"), even prior to this initiative. Ex. 2, Early Dep. Tr. at 27:7–30:5.

42.    Currently, 98 percent of employees' hours are tracked through such a system. Ex. 9, Dockstader Dep. Tr. at 12:10–12:14; Ex. 10, Higgins Dep. Tr. at 67:1–67:5 (explaining that by 2022, Crew Tracking was one of the last remaining departments to transition); Ex. 2, Early Dep. Tr. at 122:22–123:1 (clarifying that Delta's goal was to transition all groups to automated systems such that there would be no manually tracked employees).

43.  To facilitate automated pay for hourly employees, Delta utilizes a two-part system that includes a time collection system and the time evaluation schema, called SAP. Ex. 2, Early Dep. Tr. at 13:11–13:16.

44.  The time collection system varies by department within Delta, including systems such as MPS, Calabrio, My Delta Day, and MyTime. Ex. 2, Early Dep. Tr. at 27:7–27:23.

45.  All time collection systems perform the same function—they collect and report the hours worked for each day in a given work week and feed this data directly into the time evaluation schema, SAP, which determines the pay that an employee is due. Ex. 2, Early Dep. Tr. at 125:2–125:4.; Ex. 9, Dockstader Dep. Tr. at 11:12–11:13 (defining the "evaluation schema" as "a series of codes that make business decisions for our time and pay").

46.  SAP is then used to apply Delta policies, based on coding, to provide consistent pay. Ex. 5, Barnwell Dep. Tr. at 49:10–50:10.

47.  Delta has a team of employees dedicated to monitoring for any defects in SAP. Ex. 9, Dockstader Dep. Tr. at 17:24–20:10. If they notice any deviations in overtime pay, for example, they will investigate the schema to verify that the code is functioning appropriately. *Id.*

48.  These employees are also responsible for ensuring that the time schema remains consistent with HOW, discussed above, and other Delta policies.

Ex. 9, Dockstader Dep. Tr. at 20:19–20:22. They have done so by performing consistent testing to ensure that the time schema is an accurate reflection of what is stated in HOW. *Id*. at 23:4–23:24.

49.   The time schema has numerical codes that correspond with different types of work occurrences. Ex. 9, Dockstader Dep. Tr. at 32:24–34:10. For example, 93 is a "swap off," 96 is a "swap on." *Id*.

50.   An employee who swaps off a shift is not paid for that shift. Ex. 9, Dockstader Dep. Tr. at 35:19–35:20 (stating that a one way swap is an unpaid absence); 54:18–55:3.

51.   Instead, the hours they swap off get moved into the category of "makeup hours" for the weekly threshold for overtime. Ex. 9, Dockstader Dep. Tr. at 38:23–39:2.

52.   Consistent with HOW, paid time off counts as time worked for purposes of the overtime threshold if the employee has "paid personal time hours to cover [the] absence." Ex. 9, Dockstader Dep. Tr. at 42:14–43:5.

53.   Personal *unpaid* time off, however, does not count towards the threshold for overtime. Ex. 9, Dockstader Dep. Tr. at 43:14–43:19.

54.   As with other forms of unpaid time off, SAP does not count swap offs as time worked for purposes of meeting the overtime threshold. Ex. 9, Dockstader Dep. Tr. at 39: 19–40:4.

**Goodyear's Employment Within Crew Tracking**

55.  Goodyear began working for Delta in 1999. Ex. 6, Goodyear Dep. Tr. at 62:7–62:9.

56.  In 2009, Goodyear joined the Crew Tracking department. Ex. 6, Goodyear Dep. Tr. at 62:10–62:11.

57.  Crew Tracking is a department within Delta's ground division, with fewer than 100 employees. Ex. 2, Early Dep. Tr. at 122:4–122:9.

58.  Crew Tracking is responsible for assigning, rerouting, and managing flight crews on each Delta flight to meet operational needs. Ex. 16, Declaration of Philip J. Higgins ¶ 3.

59.  While in Crew Tracking, Goodyear worked an irregular schedule. Ex. 6, Goodyear Dep. Tr. at 58:18–58:19.

**Crew Tracking Managers Used a Manual Tracking System for Overtime Payment**

60.  Historically, Crew Tracking used a manual time and pay tracking system. Ex. 5, Barnwell Dep. Tr. at 39:24–40:3; Ex. 10, Higgins Dep. Tr. at 67:3– 67:5 ("Time and Attendance and HR were migrating work groups across Delta to MyTime, and we [Crew Tracking] were one of the last remaining departments to transition.").

61.  Manually tracked employees are the minority at Delta—only two percent of the population. Ex. 9, Dockstader Dep. Tr. at 12:16–12:19. At this time, only

four such departments remain within Delta. Ex. 5, Barnwell Dep. Tr. at 45:19–45:23.

62. When it used manual tracking, Crew Tracking relied upon supervisors to determine the overtime and double time hours worked by the individuals they supervised. Ex. 2, Early Dep. Tr. at 123:21–124:12; Ex. 5, Barnwell Dep. Tr. at 39:4–40:3; Ex. 11, Miranda Dep. Tr. at 39:12–39:18; Ex. 10, Higgins Dep. Tr. at 68:12–68:18.

63. The supervisor would input what they believed to be an employees' overtime hours into a spreadsheet to be sent to Time & Attendance for submission into Delta's payroll system, SAP—bypassing the time schema-- which would then pay out based on the reported number of overtime hours. Ex. 5, Barnwell Dep. Tr. at 38:1–38:5; Ex. 11, Miranda Dep. Tr. 60:19– 60:24 ("So prior to MyTime, we would take the pay period, employee by employee, and figure out any additional hours that employee has worked and then submitted that file to payroll, the time and attendance people."); *see e.g.*, Ex. 17, DELTA_LG_00000525–DELTA_LG_00000526.

64. During the manual tracking time period, Delta relied upon Crew Tracking's supervisors to interpret and correctly apply Delta policy to accurately report overtime hours. Ex. 5, Barnwell Dep. Tr. at 38:24–39:6; Ex. 2, Early Dep. Tr. at 123:21–124:2 ("There is usually a timekeeper in that

area who will capture the time manually through a spreadsheet. They will determine the pay that is due and pass the actual pay hours to SAP for our payroll system bypassing the time schema.").

65.    Delta Time and Attendance did not perform calculations to verify the managers' determinations. Ex. 9, Dockstader Dep. Tr. at 14:18–14:24; Ex. 11, Miranda Dep. Tr. at 62:6–62:15 ("A. So before MyTime, I was responsible for looking at the schedule and determining if someone got time and a half or double time. Q. And would they be paid consistent with your determination there? . . . A. They were paid upon how I submitted the file. And if there were discrepancies after they got paid, you know, those are handled on a one-by-one basis.").

**Audit of Crew Tracking Reveals Discrepancies in Overtime Pay Practice**

66.    In 2021, Delta learned of employee concerns regarding Crew Tracking's determination of proper pay for reduced work schedules as a result of COVID-19. Ex. 5, Barnwell Dep. Tr. at 27:18–28:10; Ex. 11, Miranda Dep. Tr. at 35:1–36:15.

67.    Accordingly, Renee Barnwell from Time & Attendance in conjunction with Crew Tracking supervisor, Todd Miranda, performed an "overtime/double time reconciliation for Crew Tracking." Ex. 5, Barnwell Dep. Tr. at 27:11–27:13. This was a "complete" department-wide audit that sought to validate

whether "people were paid correctly or not." Ex. 5, Barnwell Dep. Tr. at 45:3–45:9.

68. Specifically, Delta looked at each Crew Tracking employee's individual schedule to "calculate or audit" how they were being paid for shifts beyond the overtime threshold. Ex. 5, Barnwell Dep. Tr. at 28:23–30:2; 32:1–32:6.

69. Ultimately, Delta determined that there were instances in which Crew Tracking supervisors had not paid overtime in accordance with Delta's policies and procedures. Ex. 5, Barnwell Dep. Tr. at 33:2–33:15; 41:20–42:6; 45:10–45:12; 58:14– 59:20; 60:7–60:24.

70. The audit revealed to Time and Attendance, and therefore to Delta, that Crew Tracking supervisors were recording overtime hours in instances in which the employee had not yet met their overtime threshold due to swapped off shifts. Ex. 5, Barnwell Dep. Tr. at 29:12–30:22; 32:1–32:12; 32:24–33:15; Ex. 11, Miranda Dep. Tr. at 40:9–40:13; 40:20–41:11 (Crew Tracking supervisor stating that he believed at the time that his calculation of overtime pay for Crew Tracking, in which a swap off "would not have affected their entitlement to overtime pay if they picked up an extra shift"— was correct). This was not consistent with the swap policy in HOW or the practice in other Delta departments. Ex. 5, Barnwell Dep. Tr. at 58:8–60:24.

71. Goodyear admits that, throughout the manually tracked period, he was paid consistent with his expectations in instances of swapping. Ex. 6, Goodyear Dep. Tr. at 48:15–49:9. In other words, Goodyear alleges no harm during this time period. *Id*.

72. Goodyear admits that he used swaps (along with four weeks of accrued vacation time) to take a *three-month* vacation, and then on returning was able to immediately receive overtime for work performed on scheduled days off. Ex. 6, Goodyear Dep. Tr. 51:20–54:1 (Goodyear swapped off an entire week and believed he was entitled to overtime for shifts picked up on off days immediately after); 157:5–158:20.

73. Goodyear believes that an employee's "pay period" consists of an entire year, and that the overtime threshold must be calculated on an annual basis. Ex. 6, Goodyear Dep. Tr. at 186:13–187:22.

**Crew Tracking Transitioned to Automated MyTime System**

74. After the audit, Delta decided to transition Crew Tracking to an automated pay system, MyTime, in the fall of 2021 and no longer rely on manual reporting of hours. Ex. 4, Gray Dep. Tr. at 115:22–116:1.

75. For Crew Tracking employees, this transition, which went into effect in March 2022, resulted in a change in overtime pay. Ex. 11, Miranda Dep. Tr. at 23:21–24:3 ("[Y]ou know, it was a change and we had to get used to the

change."); 94:24– 95:4 ("Q. How swaps were treated in practice changed even if the words in the written policy did not change, is that right? . . . A. That's correct.").)

76. As explained above, after the MyTime implementation, whether a shift should be paid overtime or double time rates would be determined automatically by the time evaluation schema. Ex. 5, Barnwell Dep. Tr. 40:12– 40:18.

77. Thus, there would not be any further risk of human error or misapplication of Delta policy. Ex. 3, Tahvonen Dep. Tr. at 29:18–29:22 ("By getting rid of manual processes and automating them, the automation allowed for the rules to be programmed the way they were intended to be rather than left to manual intervention that could result in an error or a misinterpretation."); Ex. 5, Barnwell Dep. Tr. at 59:10–59:20.

78. In the instance of a swap, MyTime reflects the hours worked by each employee—in other words, the employee who "swapped off" would reflect zero hours worked, while the employee who "swapped on" would reflect the hours of work that individual performed. Ex. 16, Higgins Decl. ¶ 8. "Completed" or "matched" swaps between two employees would be noted by supervisors in the department schedule file. *Id.* These notes vary in detail and completeness depending on the supervisor and circumstances. *Id.*

79.    In preparation for the MyTime implementation, Delta's HR team and Crew

Tracking leaders provided various resources, explaining the impact of the

transition. *See infra* ¶¶ 80, 83–84.

80.    Delta provided PowerPoint presentations, which explained how MyTime

would calculate the impact of swapping on overtime and double time pay,

going forward:

> "If swapping off one or more shifts during a single pay period
> without swapping on an equal number of shifts during the same pay
> period, your paycheck will be less because you will only be paid for
> hours worked during the pay period[.]
>
> When you swap off a shift and pick up a shift (from the weekly or
> operational extra time) during the same scheduled work week (first
> scheduled day of work until last scheduled off day), you will not be
> paid OT/DT unless you exceed your original hours as scheduled
> prior to the swap off[.]" Ex. 18, DELTA_LG_00000005.

81.    Time picked up "from the weekly or operational extra time" here means an

additional shift at Delta's request—not another swap. Ex. 1, Gray Decl. ¶ 9;

Ex. 11, Miranda Dep. Tr. at 49:2–49:12 ("Q. How often do people pick up

extra shifts – Well, let me stop. I've been using the term extra shifts to mean

picking up unscheduled work hours. Is that a defined nomenclature, or

what do you call it at Delta? A. In crew tracking, we refer to it as extra time.

Q. Extra time. A. Further defined as not a swap shift. It's hours that Delta

needs you to work.").

82. Plaintiff admitted that he understood the language within this PowerPoint—"beginning with the new bid period on April 1, 2022"—made clear that there was going to be a change on that date from what was happening before. Ex. 6, Goodyear Dep. Tr. at 162:15–163:18 ("Q. Would you agree with me that normally when a sentence begins "beginning with the new bid period on April 1, 2022," it suggests that there's likely to be a change on that date from what was happening before? A. Yes.").

83. Delta also distributed a Frequently Asked Question (FAQ") document that explained the effect of the MyTime transition. Ex. 6, Goodyear Dep. at 164:19–164:22 ("Q. Was this the frequently-asked questions that were distributed to the Crew Tracking Department in advance of the change that we've been discussing? A. Yes.").

84. Delta also led in-person training, called townhall meetings, in which attendees discussed the aforementioned documents and could ask questions regarding the MyTime transition. Ex. 19, DELTA_LG_00000015; Ex. 20, DELTA_LG_00001083; Ex. 21, DELTA_LG_00001357.

85. Plaintiff admits to having received and reviewed the PowerPoint presentation and FAQ document. Ex. 6, Goodyear Dep. Tr. at 175:6–175:8 ("Q. So you actually did receive the PowerPoint slides and the FAQs, right? A. Yes."); 165:8–165:17 ("Did you read these FAQs when they came to you?

A. Yes. Q. When did they come to you? A. I believe it was November of 2021 when they were distributed to the whole department. Q. So when Delta was making changes to the way that you were paid, it published these FAQs to answer just what they're supposed to be, frequently asked questions, correct? A. Correct."); 156:24–157:4 ("Q. And whether it was in a PowerPoint format or not, it's a document that you reviewed when it was distributed? A. Yes.").

86.     Plaintiff also admits to having received invitations to townhall meetings and believes that he attended at least one townhall meeting regarding the MyTime transition. Ex. 6, Goodyear Dep. Tr. at 173:4–173:16 ("Q. So this was essentially an invitation to attend a townhall meeting discussing the change that would be made. Do you agree? A. Yes. . . . Q. You did actually attend a townhall meeting on this topic? . . . A. This was a while ago.  I believe I may have attended one of the townhall meetings, possibly more than one.  I don't believe I attended all of them."); 173:17–174:3 (agreeing that he and other Crew Tracking employees received an invitation for a follow-up townhall meeting about the MyTime transition).

87.     Plaintiff admitted that the changes described in the PowerPoint, FAQ document, and townhall meetings—including regarding overtime and double time pay in instances of a swap—went into effect. Ex. 6, Goodyear

Dep. Tr. at 161:4–161:25 ("In your mind, are these conditions or are they changes to the way things had been done . . . ? A. Yes. These changes and the subsequent treatment from these changes did go into effect. Q. And these changes were made for Crew Tracking at this time? A. Correct.").

88.    Goodyear admits that Delta notified him of the upcoming MyTime transition as early as October 2021—five months before the new system went into effect. Ex. 6, Goodyear Dep. Tr. at 158:3–158:20.

89.    Plaintiff admitted that Delta was free to change its policies at any time. Ex. 6, Goodyear Dep. Tr. at 67:9–67:11 ("Q. You would agree with me that a business can change its policies, right? A. Yes."); 152:10–152:19 ("[D]o you agree with me that it says '[a]s part of the at will relationship, Delta maintains the ability to modify an employee's duties, title, compensation, or other terms and conditions of employment consistent with applicable law.' Do you see that? A. Yes. Q. And you agree that Delta has the right to make changes to its policies and the terms of its policies and so on? A. Yes.").

**Plaintiff Complained Regarding the Effect of the MyTime Transition**

90.    Plaintiff began complaining regarding the change to the overtime pay practice in instances of swaps in November 2021. Ex. 22, DELTA_LG_00000018; Ex. 6, Goodyear Dep. at 178:2–178:8 ("How many times I complained about the treatment under MyTime? Maybe -- including

this document here, if you consider that a complaint? This was one, and then

I filed a complaint via the Ethics portal as an anonymous submission and

filed a complaint with the HR Service Delivery Team with an HR ticket.

That's all I recall at this time.")

91.    In November 2021, he wrote an email to the "MyTime_Bi-Weekly Pay

Transition_Crew Tracking_Team" citing the Pay Transition FAQ document.

Ex. 23, DELTA_LG_00000019–DELTA_LG_00000020.

92.    In December 2021, Plaintiff prepared an "Ethics Report and Notice

regarding Hours of Work, Overtime and Shift Differential." It stated that, ".

. . [t]hey [Delta] have created a rule that if a swap is completed, any extra

time on an off day will be paid as straight time to bring the weekly threshold

up to the originally scheduled hours prior to paying overtime." Ex. 24,

DELTA_LG_00001383–DELTA_LG_00001384.

93.    Nonetheless, Plaintiff continued to work for Delta. Ex. 6, Goodyear Dep. Tr.

at 175:22–176:6; 177:13–177:16; 179:9–179:14.

94.    In doing so, Plaintiff, by his own admission, accepted the changed overtime

pay practice. Ex. 6, Goodyear Dep. Tr. at 77:3–77:16 ("Q. And you're

essentially saying, I think -- and you can correct me if I'm wrong -- that if a

company puts into place a policy and causes its employee to work under

that policy, that constitutes a sort of offer, right?  Do you understand that?

A. Right. Yes. Q. And by continuing to work under the terms of that policy, that's like the employee's acceptance. Is that what you're saying? A. Yes. Q. And so you're saying that continuing to work under a policy indicates your acceptance to the terms of that policy, right? A. Yes.").

**Plaintiff Swaps Shifts with Patrick Slaughter After MyTime Transition**

95.   On October 18, 2022, Plaintiff swapped shifts with Patrick Slaughter. Dkt. 1 at ¶ 47; Ex. 16, Higgins Decl. ¶ 5. Slaughter worked Plaintiff's twelve-hour shift. Dkt. 1 at ¶ 47; Ex. 16, Higgins Decl. ¶ 5.

96.   Goodyear admits that when he swapped off this shift, he did not perform any work for Delta. Ex. 6, Goodyear Dep. Tr. at 53:1–53:9; 53:18–54:1; Ex. 16, Higgins Decl. ¶ 6.

97.   Plaintiff then picked up a twelve-hour shift later in that workweek on one of his scheduled days off, October 21, 2022. Dkt. 1 at ¶ 48; Ex. 16, Higgins Decl. ¶ 7. Plaintiff was paid straight time for this shift. Dkt. 1 at ¶ 48.

**Goodyear's Separation from Delta**

98.   Goodyear worked in the Crew Tracking department for 15 years, Ex. 6, Goodyear Dep. Tr. at 59:11, until his separation from Delta in November 2023. Ex. 6, Goodyear Dep. Tr. at 6:24–7:1.

99. Delta informed Goodyear that his termination was due to performance, specifically a high number of occurrences (*i.e.*, calling in sick, being late to work) during the prior year. Ex. 6, Goodyear Dep. Tr. at 191:7–191:19.

100. Goodyear challenged his termination, raising complaints to leadership and alleging that his termination was retaliatory. Ex. 25, DELTA_LG_00016723–DELTA_LG_00016724 (complaint to leadership regarding termination).

101. Approximately four to five months after his termination, Goodyear moved from Georgia to Texas to assume another job. Ex. 6, Goodyear Dep. Tr. at 6:18–7:8.

102. Since he moved to Texas (at the latest), Goodyear admits that he does not recall being in contact with any Delta employees regarding this lawsuit. Ex. 6, Goodyear Dep. Tr. at 9:1–10:1; 10:25–11:2; 12:3–12:24.

DATED: August 1, 2025

Respectfully submitted,

SEYFARTH SHAW LLP

By: */s/ Brett C. Bartlett*

    Brett C. Bartlett
    Georgia Bar No. 040510
    bbartlett@sayfarth.com
    Lennon B. Haas
    Georgia Bar No. 158533
    lhaas@seyfarth.com
    Seth J. Fortin
    Georgia Bar No. 759830
    sfortin@seyfarth.com
    Danielle Shapiro
    Georgia Bar No. 606345
    dshapiro@seyfarth.com
    SEYFARTH SHAW LLP
    1075 Peachtree Street, N.E.
    Suite 2500
    Atlanta, Georgia 30309-3958
    Telephone: (404) 885-1500
    Facsimile: (404) 892-7056

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on this day, I caused the foregoing document to be electronically filed with the Clerk of the Court via the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

*/s/ Brett C. Bartlett*
Brett C. Bartlett
*Attorney for Defendant*